## Ho NYSD Chambers

| | |
|---|---|
| From: | Vicky <c21res@aol.com> |
| Sent: | Thursday, March 19, 2026 8:37 AM |
| To: | Ho NYSD Chambers |
| Subject: | Amended Affirmation and Request for the Preliminary / Settlement Conference to be rescheduled with attachments |
| Attachments: | AMENDED AFFIRMATION REQUEST TO RESCHEDULE PRELIMINARY SETTLEMENT CONFERENCE WITH ATTACHMENTS 26-CV-914.pdf |

The Court is in receipt of voluminous correspondence from Plaintiff, which it construes as a motion for settlement conference, a motion to enforce judgment, a motion for default judgment, and a motion for damages. The motions are **DENIED** as moot and/or premature. Plaintiff is reminded that all requests for relief **must** be filed on the docket rather than by email or telephone. Continued failure to comply with this directive, ECF No. 48, will result in sanctions. The Clerk of Court is respectfully directed to terminate ECF No. 51. **SO ORDERED.**

**CAUTION - EXTERNAL:**

March 19, 2026

Dated: March 24, 2026
New York, New York

Dale E. Ho
United States District Judge

To:      Honorable Dale E. Ho

From:    Vicky Ware Bey,  Plaintiff /  Claimant / Crime Victim / Aggrieved and Injured Party

RE:      Vicky Ware Bey v. The City of New York et al. 26-CV-914

Good Morning Honorable Dale E. Ho

Attached is an Amended Affirmation and Request for the Preliminary  / Settlement Conference to be rescheduled for March 24, 2026, with attachments.

Please confirm this Preliminary / Settlement Conference for March 24, 2026 on the docket sheet and with me by phone.

Sincerely,
Vicky Ware Bey, All Rights Reserved
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic [11434]
c21res@aol.com
347-869-8529

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe  1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Complainant
Crime Victim / Aggrieved And Injured Party


VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

---

**AMENDED AFFIRMATION**


**REQUEST FOR PRELIMINARY
/ SETTLEMENT CONFERENCE**


**DOCKET # 26-CV-914**

**Honorable Dale E. Ho**

The Plaintiff / Petitioner / Claimant / Crime Victim / Aggrieved and Injured Party Vicky

Ware Bey, In Proper Persona affirms that she is personally knowledgeable of all of the

facts and circumstances involved in this mater and requests for the court to reschedule

the Preliminary / Settlement Conference that was supposed to be held on March 6, 2026

for March 24, 2026, at 10:45 AM or soon thereafter at 40 Foley Square, #905, New York,

New York 10007 and asks for Justice Ho's Chambers confirm this Preliminary /

Settlement Conference for March 24, 2026 and file his confirmation on the docket sheet

and confirm Conference with the Plaintiff by phone, because her incoming emails have been blocked since March 17, 2026, which is another injury and obstruction.

The Plaintiff who is a Crime Victim and the Aggrieved and Injured Party requested a Preliminary Conference on February 6, 2026 for March 6, 2026, which she appeared for on March 6, 2026 for the Preliminary Conference and the return date for her unopposed Civil Order to Show Cause in which the Plaintiff moved the court to grant her immediate interim monetary and injunctive relief in the amount of $5,000,000.00, Five Million Dollars in direct deposit and $10,000,000.00, Ten Million Dollars to deposited in direct deposit and an Indefinite Interstate Restraining upon the approval of Judgment in her favor, which judgment in favor of the Plaintiff has already been approved in the total Sum of $8,000,000,000.00 Eight Billion Dollars with an Indefinite Interstate Restraining Order in which remaining balance of $7,985,000,000.00 in a Cashiers Check shall be paid after $15,000,000.00 is directly deposited into her account in which the Defendants already have this information.  The Plaintiff and her relatives have already suffered eleven years, two months and three weeks of the Defendants ongoing felonious criminal course of conduct which has not ceased.

February 2, 2026, the Plaintiff proceeded Informa Paupers by filing an Affidavit of Financial Statement and her Summons and Complaint which was assigned a Case number on February 5, 2026, at which time the Defendants were served her Summons and Complaint in which the Defendants were given 21 days to answer in which they did not file an answer, deny or refute any of the Plaintiff's causes of action, claims and grievances contained in her complaint arising out of the Defendants intentional and actionable employment discrimination in direct violation of Civil Rights Act of 1964, title VII codified as Title 42 U.S.C 2000e-17 and its amendments in 1972 and 1991 which

prohibits discrimination based upon sex/gender, national origin, religion,; Age Discrimination and Employment Act "ADEA" codified as Title 29 U.S.C 621 which prohibits age discrimination against employees over 40, and is prohibited by American with Disabilities Act "ADA" codified as Title 42 U.S.C 12101 which prohibits disability discrimination.

The Defendants and their accomplices interstate continue to retaliate against the Plaintiff who is the crime victim and the injured and aggrieved party by intentionally and tortuously interfering with staff members from N.Y.C.E.R.S impeding them from properly administering their duties and intentionally causing them to breach their fiduciary duties concerning the Plaintiff whom they have intentionally diminished and impaired her ordinary pension, and caused the arbitrary and capricious denied her performance of duty disability pension because of the defendants tortuous interference and ongoing retaliation against the Plaintiff which prevented her from receiving her performance of duty disability pension she is entitled pursuant to the Retirement and Social Security Law, Article 14, Section 507-c which was done to further cause her additional economic injuries while they forcibly and sexually exploit her and her relatives interstate on a daily basis without their implied or expressed consent while terrorizing and stalking them interstate over the course of eleven years, two months and three weeks without ceasing resulting in some of the Plaintiff's relatives wrongful deaths which were premeditated, hate crimes and act of genocide.

**Title 29 U.S.C 1140 prohibits the interference with protected rights**.

**Title 29 U.S.C 1140 provides that**: *"It shall be unlawful for any person to discharge, fine, suspend, expel discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit*

*plan or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, 1201 or the Welfare and Pension Plans Disclosure Act."*

## LEGAL BASIS FOR RELIEF SOUGHT

Title 29 U.S.C 1140, and Title 18 U.S.C 245 prohibits the Defendants and their accomplices from interfering with Plaintiff's protected rights and employment benefits.

**The Crime Victims Rights Act codified as Title 18 U.S.C 3771(a)(1),(2),(3),(4),(5),(6),(7),(8)**, (9) provides that A crime victim has the right to be reasonably protected from the accused. (2) The right to reasonable, accurate and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused. (3) The right not be be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that the testimony of the victim would be materially altered if the victim heard other testimony at that proceeding. (4) The right to be heard at a public proceeding in the district court involving release, plea, sentencing, or any parole proceeding. (5) The reasonable right to confer with the attorney for the Government in the case. **(6) The right to full and timely restitution as provided in law. (7) The right to proceedings free from unreasonable delay. (8) The right to be treated with fairness and with respect for the victim's dignity and privacy,** (9)The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement. (10) The right to be informed of the rights under this section and the services described in section 503c of the Victims Rights and Restitution Act of 1990 codified at Title 42 U.S.C 10607(c)and provided contact information.

Title 18 U.S.C 3771, Section B provides the Plaintiff who is the Crime Victim and the Aggrieved and Injured Party in this matter the following rights "In any court proceeding

involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the right described in subsection (a) before making a determination described in subsection (a)(3), the court shall make every effort to permit the fullest attendance possible by the victim and shall consider reasonable alternatives to the exclusion of the victim from the criminal proceeding.  The reasons for any decision denying relief under the chapter shall be clearly stated on the record.

The Plaintiff was approved for Judgment in the sum of $8,000,000,000.00 in her favor and Indefinite Interstate Restraining Order from the Defendants who still continue to terrify and stalk her and her relatives interstate, while illegally and unlawfully intercepting and disseminating all of Plaintiff's and her relatives oral, wire and wireless electronic communications interstate while continuing to criminally trespass upon their personal and private property houses and effects and unlawfully installing hidden eavesdropping and surveillance equipment to stalk, and unlawfully eavesdrop, monitor, record and disseminate unlawful intimate surveillance images of them inside of their houses and effects where they all have a reasonable expectation of privacy with the intentions of injuring them by disseminating unauthorized intimate surveillance images of them to the public over the world wide web without their knowledge, and without their implied or expressed consent.  The Defendants and their accomplices continue to stalk the Plaintiff and her relatives interstate with the intentions of killing them and continuing the ongoing felonious criminal course of conduct in which they intentionally continue to inflict permanent injuries on them by dehumanizing, degrading and sexually exploiting them against their will.  The Defendants and their accomplices interstate continue to oppress them for the unjust purpose of intentionally inflicting emotional distress upon them just because the Plaintiff objected to being sexually harassed at work.

The Defendants and their accomplices interstate continue to use their employment status and resources to act under color of law, statute, ordinance regulation and custom, while acting under color of office and authority to continue to discriminate, retaliate and oppress the Plaintiff by employing illegal, unlawful and unfair employment practices depriving her of employment, material benefits, full retirement benefits, performance of duty disability retirement as well as tortuously interfere and deprive the Plaintiff other financial opportunities that's not related to employment which is exhibited by the Defendants intentional extreme outrageous conduct against the Plaintiff and her relatives. The Defendants are directly and willfully violating the United States Constitution, Article VI, Section 2; Article IV, Section 4; the 1st, 2nd, 4th, 5th, 7th, 8th, 9th, 10th Amendments, which they have an oath to uphold and are willfully violating the Treaty of Peace and Friendship Articles 21, and 22; The Zodiac Constitution; The International Covenant Against Torture and Inhumane or Degrading Treatment or Punishment Part I, Article 1, Article 2 subsection 1, 2, and 3, Article 5, Sections (1)(a)(c), 2, 3; The Declaration of Right On Indigenous Peoples Articles; International Convention on the Elimination of All Forms of Discrimination Against Women; The International Covenant on Civil and Political Rights; The Defendants intentional actions against the Plaintiff are prohibited by Title 42 U.S.C 2000e-2; Title 42 U.S.C 2000e-3; Tile 42 U.S.C 2000ff-6(f); Title 42 U.S.C 12112; Title 42 U.S.C 1981; Title 18 U.S.C 2261A; Title 18 U.S.C 249;Title 18 U.S.C 1801; The Communications Decency Act codified as Title 47 U.S.C 230(5); Title 18 U.S.C 241; Title 18 U.S.C 242; Title 18 U.S.C 1983; Title 18 U.S.C 3771; Title 18 U.S.C 2511; Title 42 U.S.C 12111; Title 42 U.S.C 12203; Title 42 U.S.C 623; Title 18 U.S.C 2331 (A),(B1), (5A0, (5B1), (5B2),(C); 29 C.F.R 1604.11(A) (3); 29 U.S.C 1140; Human Rights Laws 8-107.1; The Communications Decency Act, Section 230

codified as Title 47 U.S.C 230; Title 18 U.S.C 664; NYC Administrative Code 10-180; New York Penal Law 245.15; Alabama Code 15, Article 5, Section 13A-6-90, 13A-6-240; 13A-6-240; 13A-4-1, 13A-4-2, 13A-4-3, 13A-4-4, OCGA 16-11-90; Tennessee Code, Chapter 872

## LEGAL BASIS FOR RELIEF AND REMEDIES SOUGHT

Remedies for violations complained of in the Plaintiff's Complaint are enforceable by Title 42 U.S.C 2000e-5(e)(3), Civil Rights Act of 1991 codified as Title 42 U.S.C 3553 ;American Disabilities Act of 1990 section 501 codified as Title 42 U.S.C 12117.

The powers, remedies, and procedures set forth in sections Title 42 U.S.C 2000e-4, Title 42 USC 2000e-5, Title 42 U.S.C 2000e-6, Title 42 U.S.C 2000e-8, and Title 42 U.S.C 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

The Victims Rights and Restitution Act of 1990 codified as 42 U.S.C 10607 also provides relief for the Plaintiff / Petitioner / Claimant / Crime Victim / Aggrieved and Injured Party who is entitled to relief under Title 18 U.S.C 1595 (a), (b)(1),(b)(2),( c ) (1), ( c )(2); as well as Tile 42 U.S.C 2000ff-6 which provides power and procedures and remedies in sections 705, 706, 707, 709, 710,  and 711 of Title 42 U.S.C 2000e-4 –  Title 42 U.S.C 2000e-6  and Title 42 U.S.C 2000e-8 - Title 42 U.S.C 2000e-10 to the person alleging the violation of title VII of that Act codified as Title 42 U.S.C 2000e shall be the powers procedures and remedies this chapter provides to the person alleging an unlawful employment practice in violation of this chapter.  Amendments to Title VII in 1972 and 1991extended protection to public sector employees and authorizes awards of both

compensatory and punitive damages.   Congress and the Courts have extended the prohibition against sex discrimination to include prohibitions against sexual harassment. Title 29 U.S.C 1132 (a)(1); (B); (2); (3);(4);(5);provides that "a civil action may be brought by a participant nor beneficiary for the relief provided for in subsection (c) of the section, or to recover benefits due to him under this terms of his plan, to enforce his rights under the terms of the plan, or to clarify his right s to future benefits under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or  (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title."

PROVISIONS SET FORTH IN THE NEW YORK STATE CONSTITUTION

provided in "Article V, § 7 of the New York Constitution provides protection as 'a contractual relationship' the benefits of membership in a public pension or retirement system against diminishment and impairment. The provision 'fix[es] the rights of the employees at the time of commencement of membership in [a pension or retirement] system, rather than as previously at retirement." *Ballentine v Koch (89 NY2d 51, 56 [1996]).*  As the Court of Appeals stated in (*Matter of Guzman v New York City Employees' Retirement Sys., 45 NY2d 186, 190-191*, citing Birnbaum v New York State Teachers Retirement Sys., 5 NY2d 1, 9), and thus prohibits unilateral action by either the employer or the Legislature that impairs or diminishes the rights established by the

employee's membership (*Matter of Village of Fairport v Newman, 90 AD2d 293, 295, appeal dismissed 58 NY2d 1112*)."

The Plaintiff already moved the court to enter judgment against the Defendants because of their failure to answer the Plaintiff's Complaint in a timely manner which arises under employment discrimination, employment retaliation and sexual harassment in which the Plaintiff sustained adverse employment action and became a crime victim at the behest of the Defendants and their accomplices interstate who willfully violate United States Constitution, Federal Laws, Criminal Laws and State Laws which the Plaintiff hereby invokes State Laws involved in this matter in which the defendants and their criminal accomplices willfully violate New York Penal Law 250.05; 250.15; 250.40; 250.45; 250.55; 250.60; Alabama Code § 13A-6-90; Georgia Code § 16-5-90; Tennessee Code § 39-17-315; Ohio Rev. Code § 2903.211; Texas Penal Code § 42.072; Georgia Code § 16-5-1; Tennessee Code § 39-13-202; Alabama Code § 13A-11-30; Georgia Code § 16-11-62; Tennessee Code § 39-13-601; Ohio Rev. Code § 2933.52; Texas Penal Code § 16.02 as well as Federal Criminal Laws including but not limited to Title 18 U.S.C 2331; Title 18 U.S.C 2261a; Title 18 U.S.C 1801; Title 18 U.S.C 2511; Title 18 U.S.C 1111; Title 18 U.S.C 1091; Title 18 U.S.C 249; and in direct violation of the Fourth Amendment in the United States Constitution;

The Defendants and their accomplices whom they act in concert with interstate continue to invade the Plaintiff's and her relatives privacy interstate and internationally in which the Defendants and their accomplices criminally trespass, breaking into their houses and effects installing surreptitious surveillance and eavesdropping equipment to stalk and illegally and unlawfully monitor, record and publicly disseminate unlawful surveillance images of them publicly over the world wide web and via closed circuit TV without their

implied or expressed consent and without their knowledge for profit, sexual gratification and entertainment with the intentions of harming, killing and intentionally causing them permanent injuries and irreparable harm while illegally and unlawfully intercepting and publicly disseminating all of their oral, wire, wireless electronic communications publicly while tortuously interfering in their lives while stalking, harassing, sabotaging, and oppressing them.

If the court allows the Defendants and their accomplices whom they act in concert with interstate, continue their ongoing criminal course of conduct against the Plaintiff and her relatives, it will continue have a negative impact on all crime victims, especially employees who work in the public sector who are subjected to abusive and hostile work environments where abuse and hostility have already become a condition of employment, and individuals who are discriminated against by their employer based upon their national origin, sex/gender, age, religion, occupational disability, pregnancy,

genetic disposition, and occupational disability even if an employee is working in a qualified position, and in terms of compensation, and who are retaliated against and who are met with extreme opposition and work place violence because they have an expectation of equality in the work place as the Plaintiff in this matter had the expectation of equality in the workplace and who has suffered eleven years, two months and three weeks of Terrorism, Interstate Stalking resulting in multiple premeditated murders and wrongful deaths of her relatives interstate in which this matter involves conspiracy and has not been investigated as well as other horrific abuses of her other relatives in this organized crime. If the Defendants are not held accountable for their ongoing felonious criminal course of conduct which is being committed openly against the

Plaintiff and her relatives, it condones lawlessness., which would lead others to wonder why should they should continue to obey laws when these criminals who openly commit felonious crimes against others are not apprehended or held accountable for multiple crimes they have committed openly which involves terrorism, interstate stalking, premeditated murders and hate crimes in this corrupt organization. Other employees who are injured by their employers negligent hiring and retention practices resulting in horrific crimes committed against them will continue to work in fear and be silenced by this type of ongoing criminal activity in the work place if the court fails curtail New York City Department Of Corrections extreme outrageous conduct, and ongoing and organized criminal course of conduct against employees whom they choose to discriminate and retaliate against for simply asserting their rights as a human beings and as an employee who is directly affected by unfair employment practices, sexual harassment, and other prohibited conduct in the workplace that violates the United States Constitution, New York State Constitution, Federal Laws, Criminal Laws and State Laws.

The United States Constitution provides that:

**United States Constitution, Article IV, Section 4.**

*The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against invasion; and on Application of the Legislature, or of the Executive  (when the Legislature cannot be convened ) against domestic Violence."*

**United States Constitution, Article VI, Section 2.**

*This Constitution , and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme law of the Land; and the Judges, in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."*

**United States Constitution, First Amendment**

*Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or their right of the people to peaceably to assemble, and to petition the Government for a redress of grievances."*

**United States Constitution, Fourth Amendment**

*<u>The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons of things to be seized.</u>*

**United States Constitution, Ninth Amendment**

*The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage other retained by the people.*

**In Conclusion**

The Plaintiff asks the court to enforce Judgment, and the Indefinite Interstate Restraining Order that has already been granted to the Plaintiff, and to grant her immediate interim monetary relief she requested in her unopposed Civil Order to Show Cause she filed on February 20, 2026, returnable on March 6, 2026 direct deposit, and the immediate monetary relief she requested upon the approval of Judgment in her favor while she waits for this matter to be settled and satisfied via a Cashiers Check.

Date: March 19, 2026                     *Vicky Ware Bey*

_____
Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

## 26-CV-914

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

---

## CERTIFICATE OF SERVICE

---

The Plaintiff affirms under the penalty of perjury that the Attorney of Record for the all of the above Defendants, Kayla Coles Esq. c/o The City of New York Law Department / Corporation Counsel located 100 Church Street, New York, New York 10007 was served the Plaintiff's Request to Reschedule the Preliminary / Settlement Conference for March 24, 2026.

Date: March 19, 2026                    *Vicky Ware Bey*

---

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

Case 1:26-cv-00914-DEH   Document 22   Filed 02/23/26   Page 1 of 9
26-CV-914

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Vicky Ware Bey, In Propria Persona
Jane Doe 1-1000 and John Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime Victim / Complainant
Aggrieved and Injured Party

VS

Eric Adams Mayor for
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery, Executive Director and her Successors
NEW YORK CITY EMPLOYEE RETIREMENT SYSTEM

NEW YORK CITY EMPLOYEE RETIREMENT SYSTEM

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

---

### CERTIFICATE OF SERVICE OF CIVIL ORDER TO SHOW CAUSE WITH NOTICE AND A RESTRAINING ORDER

The Plaintiff affirms under the penalty of perjury on Friday, February 20, 2026, the Attorney of Record for all of the above named Defendants in the Matter of Vicky Ware Bey v. The City of New York et al., 26-CV-914, via K. Coles Esq. c/o The City of New York Law Department / Corporation Counsel located at 100 Church Street, New York, New York 10007 was served the Civil Order to Show Cause with Notice and Restraining Order in which immediate relief is required for this ongoing exploitative situation, filed in the United States District Court for the Southern District of New York at 500 Pearl Street, New York, New York 10007 electronically via ServiceECF@law.nyc.gov and kcoles@law.nyc.gov. March 6, 2026, is the return date for this Civil Order to Show Cause filed on February 19, 2026 and a Pretrial Preliminary Conference is requested on the same date before Honorable Swain.

February 23, 2026            *Vicky Ware Bey*

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relatione
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A,
Jamaica Territory, New York Republic [11434]

Case 1:26-cv-00914-DEH     Document 22     Filed 02/23/26     Page 2 of 9

← Back   ↰   ↱   →                    Keep as New   Move   Delete   Spam   More                    ▲ ▼ ✕

☆ Proof of service receipt                                                                      Aol/Old Mail ☆

**ServiceOP (Lee)**
From: serviceof@law.nyc.gov
To: ▓▓▓                                                                        Fri, Feb 20 at 10:59 AM ☆

This email confirms receipt of email and constitutes proof of service at the Office of the Corporation Counsel for the City of New York. Please retain it for your records. Please note that the Office of the Corporation Counsel has accepted service only for the City of New York and entities for which the Law Department is authorized to accept service, including the Mayor and City Agency Heads named in their official capacities. Service of process on any individually named parties has not been accepted.

Documents must be submitted as attachments; linked documents will not be accepted and will not be considered as proper service on the New York City Law Department. All documents submitted after 5:00PM will be considered served on the next business day.

Please be reminded that the Law Department Service Window remains open to accept service of papers on Tuesdays and Thursdays from 9:00 am until 5:00 pm.

Service of process on individuals should continue to proceed in a manner required by applicable law.

This mailbox is only monitored for service. Please call (212) 356-1160 with any questions or concerns.

↰   ↱   →   ⋯

Reply, Reply All or Forward

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Vicky Ware Bey, In Propria Persona

Jane Doe 1-1000 and John Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime Victim /
Complainant / Aggrieved and Injured Party

VS

Eric Adams Mayor for
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery, Executive Director and her Successors
NEW YORK CITY EMPLOYEE RETIREMENT SYSTEM

NEW YORK CITY EMPLOYEE RETIREMENT SYSTEM

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

**NOTICE OF CIVIL ORDER
TO SHOW CAUSE AND
MOTION FOR PRELIMINARY
INJUNCTIVE RELIEF AND
INTERIM MONETARY
RELIEF**

Docket # 26-CV-914

DALE E, ND

Honorable Laura Taylor Swain

**PLEASE TAKE NOTICE** on March 6, 2026, at 10:00, in the United States District Court for the Southern District at 500 Pearl Street, New York, New York 10007, in Room 17C the Plaintiff will move the court to enter a preliminary injunction and move for the court to grant her interim monetary relief as a partial provisional remedy for gross human rights violations, temporary housing and to stop the Defendants criminal course of conduct which involves unlawful violations of the Plaintiff's and her relatives privacy, safety, and fundamental human rights interstate who will continue to endure psychological and physical distress, exacerbated by the ongoing unlawful surveillance and public dissemination of the Plaintiff's and her relatives images / intimate images and

private information unlawfully taken from inside of their houses and effects where they have a reasonable expectation of privacy, as well as the unlawful interception and public dissemination of their private communications. Let the Defendants show cause before this Court show cause why interim monetary relief and a preliminary injunction should not be granted.

February 19, 2026       *Vicky Ware Bey*

_____

Vicky Ware Bey, In Proper Persona
Vicky Ware, Ex Relatione
All Rights Reserved, Without Prejudice
c/o 168-42 127th Avenue, #7A
Jamaica Territory, New York Republic [11434]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Vicky Ware Bey, In Propria Persona

Jane Doe 1-1000 and John Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime Victim /
Complainant / Aggrieved and Injured Party

VS

Eric Adams Mayor for
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery, Executive Director and her Successors
NEW YORK CITY EMPLOYEE RETIREMENT SYSTEM

NEW YORK CITY EMPLOYEE RETIREMENT SYSTEM

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

**AFFIRMATION IN SUPPORT
OF CIVIL ORDER TO SHOW
CAUSE AND MOTION FOR
PRELIMINARY INJUNCTIVE
RELIEF AND INTERIM
MONETARY RELIEF**

Docket # 26-CV-914

Honorable Laura Taylor Swain

The Plaintiff / Petitioner / Claimant / Crime Victim / Aggrieved and Injured Party, Vicky Ware Bey, In Propria Persona affirms under the penalty of perjury she is personally familiar with all circumstances involved in this matter.

### 1. Introduction

The Plaintiff, Petitioner / Claimant / Crime Victim / Aggrieved and Injured Party, Vicky Ware Bey, In Propria Persona, hereinafter referred to as the Plaintiff hereby moves this Court for an Order to Show Cause, pursuant to Rule 65 of the Federal Rules of Civil Procedure, requiring the Defendants to appear and show cause why they should not be enjoined, pending trial on the merits, from continuing to engage in the unlawful recording, interception, and public dissemination of the Plaintiff's and her family's oral, wire, wireless, electronic communications, private communications, as described herein. Plaintiff also seeks preliminary injunctive relief for the Defendants to cease and desist all unlawful eavesdropping, surveillance, and the public dissemination unlawful surveillance images / intimate images of the Plaintiff and her relatives interstate of the Plaintiffs and her relatives interstate inside of their houses and effects where they have a reasonable

Case 1:26-cv-00914-DEH    Document 22    Filed 02/23/26    Page 6 of 9

expectation of privacy, which has already occurred for eleven years and two months without ceasing, and without their expressed or implied consent. An Order is required to prevent further sexual exploitation, and the ongoing violations of their human rights and their rights secured by the United States Constitution.

## 2. Relief Sought

The Plaintiff respectfully requests that the Court:

a)   Issue an immediate Temporary Restraining Order ("TRO"), and upon hearing, a Preliminary Injunction requiring Defendants to:

   i)    Cease and desist all unlawful monitoring, recording, and public dissemination of Plaintiff's and her relatives' interstate communications inside of their homes and other places where they have a reasonable expectation of privacy.

   ii)   Cease all unlawful eavesdropping and surveillance of Plaintiff and her relatives interstate inside of their houses and effects where they have a reasonable expectation of privacy.

   iii)  Cease all unlawful interception and public dissemination of all interstate oral, wire, and wireless electronic communications of Plaintiff and her family members.

b)   Award Plaintiff a preliminary monetary relief of Five Million Dollars ($5,000,000.00), based on the severity of the human rights violations, including forcibly sexual exploitation, interstate stalking, and wrongful deaths / murders resulting from Defendants ongoing criminal course of conduct. This amount is requested to address the ongoing harm and prevent further injury.

c)   Grant Plaintiff and certain family members temporary housing and interim monetary relief, as she is unable to remain in her current residence due to the ongoing threats, harassment, and criminal conduct perpetrated by the Defendants and their accomplices.

d)   Grant such other and further relief as the Court may deem just and proper.

## 3. Background and Facts

Plaintiff and her family have been subjected to a coordinated and ongoing scheme of stalking, unlawful surveillance, recording, and eavesdropping by the Defendants and their accomplices for the past eleven years and two months. These violations include unlawful monitoring and dissemination of Plaintiff's and her relatives private communications, both interstate oral and electronic, inside their homes and other areas where they have a reasonable expectation of privacy. Despite repeated requests and attempts to stop these violations, Defendants have continued their illegal activities, and criminal course of conduct which has escalated over time, resulting in severe

psychological harm, complete loss of privacy, harassment, and physical danger to Plaintiff and her relatives in direct violation of the Fourth Amendment in the United States Constitution, Title 18 U.S.C 2261A, Title 18 U.S.C 2511, Title 18 U.S.C 1801, as well as other Federal and Criminal Laws.

Furthermore, the Defendants' actions have caused multiple wrongful deaths and premeditated murders within Plaintiff's family, contributing to an overall scheme of ongoing Interstate Stalking / Coordinated Stalking and Human Rights Violations. These actions were carried out under the color of law, violating the Fourth Amendment in the United States Constitution and other federal and state statutes, ordinances, and regulations, specifically laws against unlawful surveillance, wiretapping, and eavesdropping.

The Plaintiff has suffered and will continue to suffer irreparable harm, including emotional distress, complete loss of privacy, and personal safety, unless this Court intervenes with the requested Injunctive Relief. Additionally, Plaintiff requires financial relief to address the current and ongoing harm, to assist in her immediate need for temporary housing, and to secure her and her relatives safety and well-being as she is separated from the Defendants and their accomplices.

### 4. Legal Grounds for Relief

The Plaintiff's claims are based on violations of the following legal principles and statutes:

- The Fourth Amendment to the United States Constitution, which protects individuals from unreasonable searches and seizures, including unauthorized surveillance and eavesdropping.

- The Federal Wiretap Act, 18 U.S.C. §§ 2510-2522, which prohibits the interception and disclosure of wire, oral, and electronic communications without consent.

- The Electronic Communications Privacy Act, 18 U.S.C. §§ 2701-2712, which extends privacy protections to certain types of communications.

- The Civil Rights Act, 42 U.S.C. § 1983, which provides for redress against violations of constitutional rights under the color of law.

In light of the egregious nature of these violations, Plaintiff seeks immediate relief in the form of a Temporary Restraining Order and preliminary injunction to prevent further harm, as well as monetary compensation for the damages suffered over the course of more than a decade which has not ceased.

### 5. Irreparable Harm

The Plaintiff faces irreparable harm if the Defendants' unlawful and criminal course of conduct is allowed to continue. Without immediate intervention, the Plaintiff and her relatives interstate will continue to suffer intentional and unlawful violations of their

privacy, safety, and fundamental human rights. Additionally, the Plaintiff will continue to endure psychological and physical distress, further exacerbated by the ongoing unlawful surveillance and public dissemination of private intimate images and private information this is of no concern to the public.

### 6. Likelihood of Success on the Merits

The Plaintiff has demonstrated a likelihood of success on the merits of her claims. The Defendants have engaged in a systematic pattern of illegal surveillance, eavesdropping, and public dissemination of private communications in violation of the Fourth Amendment and relevant federal laws. Given the severity and duration of the harm caused, the Plaintiff is entitled to relief under the Civil Rights Act and related legal provisions.

### 7. Temporary Housing and Monetary Relief

The Plaintiff urgently requests the Court to grant temporary housing for herself and her relatives due to their unsafe living situations. Additionally, the Plaintiff seeks partial interim monetary relief based on the likelihood of success in this matter. The amount of $5,000,000.00 is requested as an immediate interim and partial remedy to address the damages sustained from Defendants' unlawful actions.

### 8. Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court issue an Order to Show Cause requiring Defendants to appear and show cause why they should not be enjoined from continuing their unlawful conduct and to grant the relief requested, including preliminary injunctive relief, monetary compensation, and temporary housing for Plaintiff and her family. A Preliminary Restraining Order does not impede the Defendants from performing their lawful duties, it prevents their ongoing criminal course of conduct that deprives the Plaintiff and her relatives of their human rights and their rights secured by the United States Constitution as well as other Federal and Criminal Laws that protects the Plaintiff and her relatives from crime and ongoing Human Rights Violations. The Plaintiff request access to efile on the Courts ECF System.

Respectfully submitted,

February 19, 2026

*Vicky Ware Bey*

---

Vicky Ware Bey, In Proper Persona
Vicky Ware, Ex Relatione
All Rights Reserved, Without Prejudice
c/o 168-42 127th Avenue, #7A
Jamaica Territory, New York Republic [11434]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Vicky Ware Bey, In Propria Persona

Jane Doe 1-1000 and John Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime Victim /
Complainant / Aggrieved and Injured Party

VS

Eric Adams Mayor for
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery, Executive Director and her Successors
NEW YORK CITY EMPLOYEE RETIREMENT SYSTEM

NEW YORK CITY EMPLOYEE RETIREMENT SYSTEM

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

**CIVIL ORDER FOR
PRELIMINARY INJUNCTIVE
RELIEF AND INTERIM
MONETARY RELIEF**

Docket # 26-CV-914

Honorable Laura Taylor Swain
Dale E. Ho

Upon consideration of Plaintiff's Motion for Preliminary Injunctive Relief, it is hereby ORDERED that the Defendants appear before this Court on March 6, 2026, at 10:00, in the United States District Court for the Southern District at 500 Pearl Street, New York, New York 10007, in Rom 17C and show cause why the preliminary injunction should not be granted as requested by Plaintiff.

It is ORDERED that the Defendants shall immediately cease and desist stalking and all unlawful surveillance, eavesdropping, interception, and public dissemination of Plaintiff's and her family members' private communications and images as set forth in the Motion, pending further hearing of this matter.

It is further ORDERED that the Plaintiff serve this Civil Order upon the Attorney of Record for the Defendants.

**SO ORDERED.**

_____
**UNITED STATE DISTRICT JUDGE**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

**NOTICE OF SPECIAL APPEARANCE**

DOCKET # 26-CV-914

DATE Ho

Honorable Taylor Swain

RECEIVED SDNY PRO SE OFFICE 2026 MAR -6 AM 11: 27

PLEASE TAKE NOTICE, on March 6, 2026, at approximately 10:00 AM, Vicky Ware Bey, the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured Party made a Special Appearance for the Preliminary Conference she requested on February 6, 2025 for this day March 6, 2026, in which the Defendants have not denied her claims, causes of action and grievance in her Complaint in which they were summoned to answer. The Plaintiff Made this Special Appearance to resolve and settle this matter during this Preliminary Conference or to proceed with pretrial procedures.

Date: March 6, 2026

*Vicky Ware Bey*

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Complainant
Crime Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

PROPOSED CIVIL CASE
MANAGEMENT PLAN AND
AND SCHEDULING ORDER

DOCKET # 26-CV-914

Dale Ho

Honorable Laura Taylor Swain

RECEIVED
SDNY PRO SE OFFICE
2025 MAR -6 AM 11: 27

Pursuant to Federal Rules of Civil Procedure5(2)(e) the Defendants were served the Plaintiff's Summons and Complaint in which a Trial By Jury was Demanded on February 5. 2026. and proof of acceptance of service has been filed on court record. The Defendants time to answer has already expired, and the Plaintiff did not consent to an extension of time for the Defendants to answer her Summons and Complaint. The Plaintiff has already moved for the entry of Judgment. However Judgment has not been entered and the Plaintiff seeks to move forward with this matter until it is resolved, settled, satisfied and the Defendants and their accomplices ongoing criminal course of conduct against the Plaintiff and her relative are permanently enjoined.

The crimes the Plaintiff complains of are being committed against her and her relatives nationally and are ongoing. It's not just one incident or even three incidents its daily, 24 hours a day, 7 days a week for eleven years, and two months which has not ceased.

Pursuant to Federal Rules of Civil Procedure Rules 16 and 26, and the Court's authority to manage civil litigation, Plaintiff respectfully submits the following Proposed Case Management and Scheduling Order.

## NATURE OF THE ACTION

This action arises from the Plaintiff's employment as a Corrections Officer with the City of New York / New York City Department of Corrections in which all of the above Defendants engaged in systemic and intentional and actionable employment discrimination, discrimination, harassment, retaliation, and other related unlawful conduct that resulted in Plaintiff's constructive discharge and severe adverse employment actions, as well as the Defendants ongoing criminal course of conduct which involves federal and state claims made by the Plaintiff arising from matters involving Federal Crimes and State Crimes committed against her and her relatives by the Defendants and their accomplices interstate during this eleven year and two month ordeal which has not ceased, and involves the Defendants and their accomplices interstate / nationally, violating the United States Constitution which further secures the Plaintiff's and her Relatives rights interstate. These issues also arises from the Plaintiff who was subjected to intentional and actionable employment discrimination based upon her sex/gender, race, national origin, age, religion, in terms of compensation, her occupational disability related to the injuries she sustained while interacting with an inmate during the performance of her duties upon responding to alarms for inmate disturbances which is the direct and proximate cause of her occupational disabilities. These issues also arises from the Plaintiff who is within her legal right to object to being sexually harassed at work suffering an adverse employment action and constructive discharge in retaliation for her objecting to being sexually harassed at work. Instead of the Defendants attempting to resolve an employment matter involving sexual harassment the Defendants conspired and made a conscious decision to criminally abuse their power and retaliate against the Plaintiff, who never made a complaint about anyone in the workplace even though she had reasons too, during her entire tenure by stalking and sexually exploiting her in front of other employees at work and to the general public over the world wide web to intentionally deter other employees who are already afraid to speak out from making valid complaints about sexual harassment, sexual misconduct and unfair employment practices in the workplace. This matter also involves workplace / official misconduct; intentional and actionable employment discrimination; employment retaliation, and the Defendants ongoing eleven year and two month felonious criminal course of conduct against the Plaintiff and her relatives interstate /nationally which has not ceased and involves terrorism that transcends national boundaries; interstate stalking resulting in multiple wrongful deaths of some of the Plaintiff's relatives interstate / nationally involving multiple counts of premeditated murders / hate crimes, and acts of genocide during this eleven year and two month ordeal that has become progressively worse over time; Interstate Stalking; Coordinated Stalking / Gang Stalking / Organized Stalking; Unlawful Surveillance and Eavesdropping of the Plaintiff and her relatives interstate / nationally as well as the unconsentual public dissemination of unlawful intimate surveillance images of the Plaintiff and her relatives interstate / nationally within their house and effects where they have a reasonable expectation of privacy without their implied or expressed consent, and without their knowledge; Unlawful Interception and Public Dissemination of all of the Plaintiffs and her relatives oral, wire, wireless electronic communications in which these crimes are being committed interstate / nationally against the Plaintiff and her relatives daily which has not ceased,

as well as other egregious, violent, and unprovoked hateful crimes committed against the Plaintiff and her relatives interstate / nationally by the Defendants and their accomplices interstate / nationally, and daily, 24 hours a day, seven days a week during this eleven year and two months ordeal which has become progressively worse over time and has not ceased, as well as other related felonious crimes and torts against the Plaintiff and her relatives interstate / nationally which involves theft, fraud, embezzlement, misrepresentations and the deprivation of material benefits earned by the Plaintiff and her relatives interstate / nationally which is intended to intentionally inflict emotional distress and anguish upon them by the Defendants and their accomplices interstate / nationally. The Defendants further retaliated against the Plaintiff by arbitrarily and capriciously denying the Plaintiff a Performance of Duty Disability Pension which is ¾ of her average salary, and then intentionally diminished and impaired the Plaintiff's Ordinary pension benefits embezzling her ordinary pension benefits, committing fraud by changing her pension number to deprive her of her full ordinary pension benefits while denying her a performance of duty disability pension, breaching their fiduciary duties. The Defendants and their accomplices interstate / nationally whom they act in concert with has cased the Plaintiff to suffer from adverse health conditions involving her heart and high blood pressure caused by the Defendants and their accomplices ongoing and unprovoked criminal course of conduct against her and her relatives nationally during this eleven year and two month ordeal which has not ceased and involves grooming, and sexual coercion and misconduct. The Relations Back Doctrine applies to this matter pursuant to FRCP 15, in which the Defendants could have stopped their criminal course of conduct but refused to do so. Given the scope of the Defendants misconduct and ongoing criminal course of conduct which involves diversity in this matter which this Court has jurisdiction over, the Court enters the following case management and scheduling structure to ensure efficient resolution under the Federal Rules of Civil Procedure 16 and 26.

**Pursuant to Federal Rule of Civil Procedure 26(f) and Local Rules of the [District Court Name],**

the parties submit the following proposed pretrial case management and scheduling order in relation to the case concerning claims of sexual harassment in the workplace, employment discrimination, retaliation, terrorism, interstate stalking, hate crimes, genocide, unlawful eavesdropping, unlawful interception, and the dissemination of intimate surveillance of the plaintiff and her relatives.

## 1. Case Overview

This case involves egregious claims of systemic and individual violations, including:

- **Sexual Harassment** under Title 29 C.F.R 1601.8

- **Employment Discrimination and Retaliation** under Title VII and the Equal Pay Act. 29 U.S.C. § 206(d); Title VII of the Civil Rights Act of 1964 codified as Title 42 U.S.C. § 2000e-17 et seq; Title 42 U.S.C. § 2000e-2; Title 42 U.S.C. § 2000e-3; ADEA codified as Title 29 C.F.R 623; Title 29 C.F.R 1604.11; Title 29 C.F.R 1604.8

- **Terrorism, Interstate Stalking, State Stalking** some resulting in deaths pursuant to Title 18 U.S.C. § 2331, Title 18 U.S.C. § 2261A, Title 18 U.S.C. § 2511; New York Penal Laws §245.15, §250.05, §250.30, §250.45, §250.60 §120.60, §120.50, §120.45; O.C.G.A 16-5-90, 16-5-91, 16-5-1; Texas Penal Code 42.072; Ohio Code 2903.211; Tennessee Code 39-17-315, 39-13-202; Alabama 13A-6-90

- **Hate Crimes** under the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act codified as Title 18 U.S.C. § 249; O.C.G.A 17-10-17.

- **Acts of Genocide** and violations of **International Human Rights Law** as governed by the International Convention on the Prevention and Punishment of the Crime of Genocide (1948), and Title 18 U.S.C 1091 (Genocide); Declaration on the Rights of Indigenous Peoples (DRIP).

- **Unlawful Surveillance and Eavesdropping and the Public Dissemination of Unlawful Surveillance Images** in violation of the Fourth Amendment in the United States Constitution, Title 18 U.S.C. § 2511, 2515, and relevant Criminal Laws in Alabama, Georgia, Tennessee, Ohio, Texas, and New York.

- **Sexual Coercion, Abuse and Misconduct associated with Terrorism and Interstate Stalking** Title 18 U.S.C 2422; New York Penal Law 130.05, 130.65, 130.52

- **Breach of Fiduciary duties**, intentional impairment and diminishment of ordinary pension benefits, arbitrary and capricious denial of performance of duty disability pension, tortuous interference, embezzlement, misrepresentation, fraud.

- Title 42 U.S.C. § 1981, 1983, 1985, 1986

- Violence Against Women Act

- Electronic Communications Privacy Act of 1986, Title 18 U.S.C 2515

- Stored Communications Act

- Wiretap Act

The Defendants, their agents, and accomplices interstate / nationally unlawfully targeted and perpetrated a series of invasions into the Plaintiff's and her relatives' privacy rights, through illegal and unlawful surveillance and eavesdropping, and the dissemination of unlawful intimate surveillance images of the Plaintiff and her relatives interstate / nationally live and recorded over the World Wide Web / internet without their implied or expressed consent, as well as the Defendants and their accomplices unlawfully intercepting and publicly disseminating all of the Plaintiff's and her relatives oral, wire, wireless electronic communications all of which these crimes occur nationally and across several states, including Alabama, Georgia, Tennessee, Ohio, Texas, and New York etc.

## 2. Jurisdiction and Venue

This Court has jurisdiction over the claims under Title 28 U.S.C.1331; Title 28 U.S.C.1332; Title 28 U.S.C.1343; Title 28 U.S.C.1369; Title 28 U.S.C.1367 and Title 28 U.S.C.1391 which covers Federal and Constitutional Question, Diversity, Civil Rights, matters involving multiple parties and Supplemental Jurisdiction, as well as Subject Matter Jurisdiction pertaining to the United States Constitution, Title 42 U.S.C 2000e-17 et. Seq and 2,3; Title 42 U.S.C 12112; Title 40 U.S.C 122(a); Title 42 U.S.C 1983; Title 18 U.S.C 241; Title 18 U.S.C 242; Title 18 U.S.C 245; Title 18 U.S.C 249; Title 18 U.S.C 2511; Title 34 U.S.C 12291; Title 18 U.S.C 1589 (a1), (a2), (a3), (a4); Title 18 U.S.C 1593A. Title 18 U.S.C 1595; Title 18 U.S.C 2331(A); (B1), (5A), (5B1), (5B2), ( C ); Title 18 U.S.C 1593A; Title 18 U.S.C 2261A; Title 18 U.S.C 2511; Title 18 U.S.C 1091; Title 29 C.F.R 1604.8; Title 29 U.S.C 623; Title 29 U.S.C 206; Title 29 U.S.C 158; Title 29 U.S.C 162; Title 18 U.S.C 3771; Title 42 U.S.C 10607(c); Title 42 U.S.C 1981; Title 42 U.S.C 1981A; Title 42 U.S.C 1983; Title 42 U.S.C 1985; Title 42 U.S.C 1986; Title 18 U.S.C 1512; Title 18 U.S.C 1513, New York Penal Laws §120.60, §120.50, §120.45; O.C.G.A 16-5-90, 16-5-91, 16-5-1; Texas Penal Code 42.072; Ohio Code 2903.211; Tennessee Code 39-17-315, 39-13-202; Alabama 13A-6-90; New York State Penal Laws 245.15, 250.05, 250.30, 250.45, 250.60, and all State Laws and State Criminal Laws are invoked. Venue is proper in this Court because the Defendants have committed tortious acts, and have done business within the geographical jurisdiction of this District Court, and because the unlawful acts and Crimes have impacted the Plaintiff and her relatives within this jurisdiction as well as multiple Jurisdiction in which this court has supplemental jurisdiction over.

The case involves claims involving the violation of the United States Constitution and claims under Federal Laws, Criminal Laws, Statutes, State Laws and International Human Rights Laws, in which the Plaintiff invokes principles of Indigenous and Aboriginal rights and Constitutional protections and applicable International Treaties.

## 3. Rule 26(f) Conference

Pursuant to Rule 26(f) of the Federal Rules of Civil Procedure, the parties held a conference on March 6, 2026, and agreed on the following pretrial deadlines and proposals:

## Preservation of Evidence

Each party must preserve all documents, communications, electronically stored information (ESI), recordings, metadata, and digital materials potentially relevant to the alleged conduct.

This includes: email; text messages; wireless communications; digital surveillance data; internal employment records; audio/video recordings; server logs and cloud-storage data;

social-media content; materials stored in third-party systems

Identification of Foreign or Interstate Discovery Parties must identify any:

cross-border data transfers; international discovery issues; state-to-state subpoena requirements; cross-jurisdiction privacy issues

## (a) Initial Disclosures

The parties agree to exchange their initial disclosures pursuant to Rule 26(a)(1) within 14 days from the date of the Court's entry of this Pretrial Case Management Order.

## (b) Amendments to Pleadings

The parties agree that any amendments to the pleadings or joinder of additional parties shall occur no later than 30 days from the date of this Order, absent agreement by all parties or leave of Court.

## (c) Discovery Plan

- The parties anticipate the need for extensive discovery, including but not limited to documents, interrogatories, depositions, expert discovery, and electronic discovery.

- Initial requests for the production of specified documents, and initial written interrogatories shall be completed within 30 days of this order.

- Discovery will include materials related to communications, surveillance footage, security systems, metadata, and documents implicating violations of federal wiretap laws, interstate stalking, hate crimes, unlawful discrimination, and genocide.

- The parties agree that discovery will be completed no later than 30 days from the date of this Order. Depositions of all fact witnesses will be completed by this date. Electronic Discovery submissions are sufficient via email and ECF filing.

- (d) Expert Discovery

- Expert reports shall be exchanged by March 26, 2026, and expert depositions shall be completed by April 4, 2026.

- The parties shall each provide a list of expert witnesses by April 15, 2026, with the depositions of experts to occur no later than 90 days before trial.

## (e) Pretrial Disclosures and Pretrial Conference

- Pretrial disclosures pursuant to Rule 26(a)(3) shall be made by April 14, 2026.

- A Pretrial Conference will be held on April 21, 2026 to finalize issues such as evidence, witnesses, jury instructions, and voir dire procedures.

(f) **Amended Pleadings**

No additional Parties, amendments of pleadings may be Joined or filed after April 24, 2026, any motion to join after this date will need to meet the good cause requirements of FRCP 16

(g) **Anticipated Motions**

Discovery demands are incorporated in the complaint and have already been served upon the Defendants.

Motion for Judgment in favor of the Plaintiff has already been filed on court record.

4. **Legal Issues and Constitutional Considerations**

This case involves several constitutional and international law issues, particularly related to the Plaintiff's and her relatives rights secured by the United States Constitution, Fourth Amendment (illegal surveillance, wiretapping, eavesdropping, forced sexual exploitation) and the First Amendment rights (freedom from retaliation for exercising rights to report harassment and discrimination).
The parties will brief the following legal issues:

- **Whether** the Defendants violated the Plaintiff's rights secured by Title VII and the Civil Rights Act of 1964 codified as Title 42 U.S.C 2000e-17 et seq.; ADA, Title 42 U.S.C 12112, ADEA, Title 29 C.F.R 623; through sexual harassment and employment discrimination and retaliation.

- **Whether** the Defendants' actions involving employment retaliation violate the Plaintiff's rights secured by the United States Constitution First, Fourth and Ninth Amendments and New York State Constitution, Article 5, Section 7 regarding unfair employment practices and employment retaliation involving the intentional diminished and impairment of the Plaintiff's ordinary pension benefits; unlawful surveillance, eavesdropping and wiretapping of the Plaintiff's and her relatives private communications and the unlawful surveillance and eavesdropping and public dissemination of unlawful intimate surveillance images of the Plaintiff and her relatives interstate / nationally over the World Wide Web within their houses and effects where they have a reasonable expectation of privacy without their implied and expressed consent and without their knowledge.

- **Whether** the Defendants' ongoing criminal course of conduct involve conspiracy and several counts of premeditated murders, hate crimes resulting from interstate stalking which directly violate Title 18 U.S.C 2261A Interstate Stalking, Title 18 U.S.C 249, Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, in which these felonious crimes are acts of genocide and terrorism which transcends

national boundaries which directly violates of Title 18 U.S.C 1091, and Title 18 U.S.C 2331 as well as Criminal State Laws.

- **Whether the Defendants' acts of genocide, terrorism, and interstate stalking** are actionable under relevant Federal and International Laws.
- **Whether Indigenous and Aboriginal rights** are implicated in the Plaintiff's experiences, considering the Defendant's criminal course of conduct, and unlawful actions against her and her family as well as the Plaintiff's ancestral ties Globally.
- **Whether the Defendant's ongoing criminal course of conduct caused the Plaintiff to loose profits on her intellectual property.**
- **Whether the Defendant's ongoing criminal course of conduct caused the Plaintiff to suffer additional adverse health conditions.**
- **Conflict of laws** between state laws governing torts, privacy rights, crimes, particularly under New York, Alabama, Georgia, Tennessee, Ohio, and Texas statutes.
- **International treaty obligations** related to the crimes of genocide and terrorism, and the application of those laws to the Defendant's actions.
- **The Plaintiff preserves her rights to talk about other issues involving this matter.**

5. **Case Management Issues**

- **Aboriginal/Indigenous Rights:** The Plaintiff will provide supporting documentation and legal analysis concerning any violations of Indigenous and Aboriginal rights, particularly with respect to legal claims relating to human rights and criminal abuses of Power.

- **Joint Discovery Plan:** The parties have agreed to the use of a **documentary preservation order** given the likely involvement of substantial electronic and surveillance evidence.

- **Settlement Discussions:** The parties have agreed to explore settlement options through a Written Stipulation and have set the goal of attempting settlement within 30 days.

6. **Proposed Trial Date**

The parties request that a trial by Jury be scheduled for May 5, 2026, assuming no delays in discovery or pretrial motion practice. The trial by Jury is expected to take approximately 20 days, and the parties anticipate the use of expert testimony and significant electronic evidence.

7. Additional Orders

- **Interstate Restraining Order:** The parties request that an Interstate Restraining Order be issued to govern the handling of sensitive and confidential materials, especially given the nature of the claims involving privacy violations and the Plaintiff's and her relatives personal information.

- **Public Safety Concerns:** Due to the nature of the claims, the Plaintiff will request that appropriate security protocols be considered for the safety of witnesses, including but not limited to remote depositions or courtroom protections.

- **Relation-Back Doctrine**
  Plaintiff asserts that claims in this action relate back under Federal Rule of Civil Procedure 15 due to a continuing criminal course of conduct and unlawful conduct extending for more than eleven years and two months and escalating in severity. Plaintiff alleges that the unlawful conduct constitutes a continuing violation affecting employment, personal safety, human rights, civil rights and right secured by the United States Constitutional rights.

It appears that the Defendants and their accomplices nationally do not have the intention to stop their ongoing criminal course of conduct against the Plaintiff and her relatives which transcends national boundaries and has persisted over eleven years and two months 24/7 resulting in multiple wrongful deaths / premeditated murders, hate crimes an ongoing abuses involving but not limited to grooming, sexual coercion, abuse and misconduct and psychological control and exploitation of a vulnerable adult which has not ceased.

8. Conclusion

The parties respectfully submit this proposed pretrial case management and scheduling order for the Court's consideration. The parties agree to cooperate in ensuring a fair and efficient trial by Jury process, while safeguarding the Plaintiff's constitutional rights and public safety. The Parties shall submit a Joint Status Letter by April 25, 2026.

Respectfully submitted,

*Vicky Ware Bey*

_____

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic [11434]
::1res@aol.com
347-869-8529

IT IS SO ORDERED

_____

Honorable Laura Taylor Swain
United States District Judge

3/12/26, 1:32 PM    SDNY CM/ECF NextGen Version 1.9.5

Query    Reports    Utilities    Help    Log Out

ECF,PRO-SE

# U.S. District Court
## Southern District of New York (Foley Square)
### CIVIL DOCKET FOR CASE #: 1:26-cv-00914-DEH

| | |
|---|---|
| Ware Bey v. Adams et al<br>Assigned to: Judge Dale E. Ho<br>Cause: 42:1983 Civil Rights Act | Date Filed: 02/02/2026<br>Jury Demand: None<br>Nature of Suit: 440 Civil Rights: Other<br>Jurisdiction: Federal Question |

**Plaintiff**

**Vicky Ware Bey**  represented by **Vicky Ware Bey**
168-42 127th Avenue
7A
Jamaica, NY 11434
(347) 869-8529
PRO SE

**V.**

**Defendant**

**Mayor Eric Adams**  represented by **Kayla Coles**
New York City Law Department
Labor and Employment
100 Church Street
Ste 2-103
New York, NY 10007
718-664-3090
Email: kcoles@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lynelle Maginley-Liddie**  represented by **Kayla Coles**
*Commissioner for New York City*  (See above for address)
*Department of Corrections*  *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Melanie Whinnery**  represented by **Kayla Coles**
*Executive Director and her Successors, New*  (See above for address)
*York City Employees Retirement System*  *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**New York City Employee Retirement**  represented by **Kayla Coles**
**System**  (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Doe 1-1000**

**Defendant**

**Jane Doe 1-1000**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/02/2026 | 1 | COMPLAINT against Eric Adams, Jane Doe 1-1000, John Doe 1-1000, Lynelle Maginley-Liddie, New York City Employee Retirement System, Melanie Whinnery. Document filed by Vicky Ware Bey. (jca) (Entered: 02/04/2026) |
| 02/02/2026 | 2 | AFFIDAVIT OF FINANCIAL STATEMENT TO PROCEED INFORMA PAUPERS. Document filed by Vicky Ware Bey. (jca) (Entered: 02/04/2026) |
| 02/02/2026 | | Case Designated ECF. (jca) (Entered: 02/04/2026) |
| 02/04/2026 | 3 | STANDING ORDER IN RE CASES FILED BY PRO SE PLAINTIFFS (See 24-MISC-127 Standing Order filed March 18, 2024). To ensure that all cases heard in the Southern District of New York are handled promptly and efficiently, all parties must keep the court apprised of any new contact information. It is a party's obligation to provide an address for service; service of court orders cannot be accomplished if a party does not update the court when a change of address occurs. Accordingly, all self-represented litigants are hereby ORDERED to inform the court of each change in their address or electronic contact information. Parties may consent to electronic service to receive notifications of court filings by email, rather than relying on regular mail delivery. Parties may also ask the court for permission to file documents electronically. Forms, including instructions for consenting to electronic service and requesting permission to file documents electronically, may be found by clicking on the hyperlinks in this order, or by accessing the forms on the courts website, nysd.uscourts.gov/forms. The procedures that follow apply only to cases filed by pro se plaintiffs. If the court receives notice from the United States Postal Service that an order has been returned to the court, or otherwise receives information that the address of record for a self-represented plaintiff is no longer valid, the court may issue an Order to Show Cause why the case should not be dismissed without prejudice for failure to comply with this order. Such order will be sent to the plaintiffs last known address and will also be viewable on the court's electronic docket. A notice directing the parties' attention to this order shall be docketed (and mailed to any self-represented party that has appeared and has not consented to electronic service) upon the opening of each case or miscellaneous matter that is classified as pro se in the court's records. (Signed by Chief Judge Laura Taylor Swain on 3/18/2024) (jca) (Entered: 02/04/2026) |
| 02/04/2026 | | CASE MANAGEMENT NOTE: For each electronic filing made in a case involving a self-represented party who has not consented to electronic service, the filing party must serve the document on such self-represented party in a manner permitted by Fed. R. Civ. P. 5(b)(2) (other than through the ECF system) and file proof of service for each document so served. Please see Rule 9.2 of the courts ECF Rules & Instructions for further information.. (jca) (Entered: 02/04/2026) |
| 02/05/2026 | | MAILING RECEIPT: Document No: 3. Mailed to: Vicky WareBey PO Box 340031 Jamaica, NY 11434. (dsh) (Entered: 02/05/2026) |

| 02/05/2026 | | NOTICE OF CASE REASSIGNMENT - SUA SPONTE to Judge Laura Taylor Swain. Judge Unassigned is no longer assigned to the case..(kgo) (Entered: 02/05/2026) |
|---|---|---|
| 02/05/2026 | 4 | CERTIFICATE OF SERVICE of Summons and Complaint served on Eric Adams, Lynelle Maginley, NEW YORK CITY DEPARTMENT OF CORRECTIONS, Melanie Whinnery, NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM NYCERS, JOHN DOE 1-10,000, JANE DOE 1-10,000 on 1/16/2026. Service was made by Electronic Mail. Document filed by Vicky Ware Bey. (jjc) (Entered: 02/06/2026) |
| 02/05/2026 | | ***DELETED DOCUMENT. Deleted document number 5 AFFIRMATION. The document was incorrectly filed in this case. (jjc) (Entered: 02/06/2026) |
| 02/05/2026 | 5 | LETTER from Vicky Ware Bey dated 2/5/2026 re: AFFIRMATION REQUEST FOR THE DOCKET SHEET TO BE EMAILED WITH DISPLAYING THE FILING OF THE SUMMONS AND COMPLAINT, AND THE CERTIFICATE OF SERVICE OF WITH PROOF OF ACCEPTANCE OF SERVICE FROM THE ATTORNEY OF RECORD FOR THE DEFENDANTS. Document filed by Vicky Ware Bey. (jjc) (Entered: 02/06/2026) |
| 02/05/2026 | | Request for Copies/Transcripts/Docket Sheet Received: Re 5 Letter,. Request for Docket Report, from Vicky Ware Bey received on 2/5/2026. Transmission to Records Management for processing. (jjc) (Entered: 02/06/2026) |
| 02/06/2026 | | Request for Copies/Transcripts/Docket Sheet Processed: Mailed letter to Vicky Ware Bey at PO Box 340031, Jamaic, NY 11434 advising that copy/copies of the docket sheet requested will be furnished upon receipt of the statutory fee of $1.50 in the form of a company check, certified check or money order payable to the Clerk of the Court, SDNY. (sov) (Entered: 02/06/2026) |
| 02/06/2026 | 6 | REQUEST FOR PRELIMINARY CONFERENCE. Document filed by Vicky Ware Bey. (mml) (Entered: 02/06/2026) |
| 02/06/2026 | 7 | CERTIFICATE OF SERVICE of REQUEST FOR A PRELIMINARY CONFERENCE served on Eric Adams Mayor for City of New York et al. on 2/6/2026. Service was made by Email. Document filed by Vicky Ware Bey. (ar) (Entered: 02/09/2026) |
| 02/10/2026 | 8 | ORDER DIRECTING PAYMENT OF FEE OR IFP APPLICATION: Plaintiff is directed to render payment of the filing fee or submit an IFP application to this Court's *Pro Se* Office within thirty (30) days of the date of this Order. The Clerk of Court is directed to assign this matter to my docket. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962). Filing Fee due by 3/12/2026. In Forma Pauperis (IFP) Application due by 3/12/2026. (Signed by Judge Laura Taylor Swain on 2/10/2026) (Attachments: # 1 IFP Application) (tp) (Entered: 02/10/2026) |
| 02/10/2026 | | MAILING RECEIPT: Document No: 8. Mailed to: Vicky WareBey PO Box 340031 Jamaica, NY 11434. (tp) (Entered: 02/10/2026) |
| 02/11/2026 | 9 | WRITTEN INQUEST. Document filed by Vicky Ware Bey. (jjc) (Entered: 02/11/2026) |
| 02/12/2026 | 12 | WRITTEN INQUEST. Document filed by Vicky Ware Bey. (jjc) (Entered: 02/17/2026) |
| 02/13/2026 | 10 | NOTICE OF APPEARANCE by Kayla Coles on behalf of Eric Adams, Lynelle Maginley-Liddie, New York City Employee Retirement System, Melanie Whinnery..(Coles, Kayla) (Entered: 02/13/2026) |
| 02/13/2026 | 13 | AFFIRMATION of Vicky Ware Bey REQUEST FOR THE DOCKET SHEET TO BE EMAILED WITH DISPLAYING THE FILING OF THE SUMMONS AND COMPLAINT, AND THE CERTIFICATE OF SERVICE OF WITH PROOF OF |

| | | |
|---|---|---|
| | | ACCEPTANCE OF SERVICE FROM THE ATTORNEY OF RECORD FOR THE DEFENDANTS AS WELL AS THE PLAINTIFFS WRITTEN INQUEST FILED ON. Document filed by Vicky Ware Bey..(tro) (Entered: 02/18/2026) |
| 02/17/2026 | 11 | LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Laura Taylor Swain from Kayla Coles dated February 17, 2026. Document filed by Eric Adams, Lynelle Maginley-Liddie, New York City Employee Retirement System, Melanie Whinnery..(Coles, Kayla) (Entered: 02/17/2026) |
| 02/17/2026 | 14 | AFFIRMATION IN OPPOSITION TO THE DEFENDANTS REQUEST OR MOTION FOR AN EXTENSION OF TIME TO ANSWER THE SUMMONS AND COMPLAINT re: 11 LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Laura Taylor Swain from Kayla Coles dated February 17, 2026. Document filed by Vicky Ware Bey..(jjc) (Entered: 02/19/2026) |
| 02/18/2026 | 15 | REQUEST FOR PRELIMINARY CONFERENCE. Document filed by Vicky Ware Bey. (tp) (Entered: 02/20/2026) |
| 02/18/2026 | 16 | CERTIFICATE OF SERVICE of Plaintiffs Request for a Preliminary Conference served on Attorney of Record for all named Defendants on 2/6/2026. Service was accepted by Muriel Goode Trufant. Document filed by Vicky Ware Bey. (tp) (Entered: 02/20/2026) |
| 02/19/2026 | | Mailed a copy of 13 Affirmation, to Vicky Ware 168-42 127th Avenue, 7A, Jamaica, New York 11434. (nb) (Entered: 02/19/2026) |
| 02/19/2026 | 17 | PROPOSED NOTICE OF CIVIL ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTIVE RELIEF AND INTERIM MONETARY RELIEF. Document filed by Vicky Ware Bey. (tp) **Proposed Order to Show Cause to be reviewed by Clerk's Office staff.** (Entered: 02/20/2026) |
| 02/19/2026 | 18 | NOTICE OF CIVIL ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTIVE RELIEF AND INTERIM MONETARY RELIEF. Document filed by Vicky Ware Bey.(tp) (Entered: 02/20/2026) |
| 02/19/2026 | 19 | PROPOSED ORDER. Document filed by Vicky Ware Bey. (tp) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 02/20/2026) |
| 02/19/2026 | 20 | AFFIRMATION of Vicky Ware Bey in Support re: 17 Proposed Order to Show Cause Without Emergency Relief. Document filed by Vicky Ware Bey. (tp) (Entered: 02/20/2026) |
| 02/20/2026 | | MAILING RECEIPT: Document No: 8. Mailed to: Vicky WareBey 168-42 127th Avenue 7A Jamaica, NY 11434. (nb) (Entered: 02/20/2026) |
| 02/20/2026 | 21 | AFFIRMATION REQUEST FOR ACCESS TO Plaintiff / Petitioner / Claimant / Crime Victim / THE COURTS ECF SYSTEM Complainant / Aggrieved and Injured Party OR FOR CORRESPONDENCE AND DOCKET SHEETS VS TO BE EMAILED DIRECTLY TO THE PLAINTIFF. Document filed by Vicky Ware Bey. (tg) (Entered: 02/20/2026) |
| 02/23/2026 | 22 | CERTIFICATE OF SERVICE of CIVIL ORDER TO SHOW CAUSE WITH NOTICE AND A RESTRAINING ORDER served on K. Coles Esq. c/o The City of New York Law Department, Corporation Counsel on 2/20/2026. Document filed by Vicky Ware Bey..(jjc) (Entered: 02/25/2026) |
| 02/25/2026 | 23 | PROPOSED NOTICE OF CIVIL ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTIVE RELIEF AND INTERIM MONETARY RELIEF. Document filed by Vicky Ware Bey. (jjc) **Proposed Order to Show Cause to be reviewed by Clerk's Office staff.** (Entered: 02/25/2026) |

| 02/25/2026 | 24 | AFFIRMATION IN OPPOSITION TO THE DEFENDANTS REQUEST OR MOTION FOR AN EXTENSION OF TIME TO ANSWER THE SUMMONS AND COMPLAINT re: 11 LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Laura Taylor Swain from Kayla Coles dated February 17, 2026.. Document filed by Vicky Ware Bey..(jjc) (Entered: 02/25/2026) |
|---|---|---|
| 02/25/2026 | 25 | CERTIFICATE OF SERVICE of CIVIL ORDER TO SHOW CAUSE WITH NOTICE AND A RESTRAINING ORDER served on K. Coles Esq. c/o The City of New York Law Department, Corporation Counsel on 2/20/2026. Service was made by Electronic Mail. Document filed by Vicky Ware Bey..(jjc) (Entered: 02/25/2026) |
| 02/25/2026 | 26 | AFFIRMATION REQUEST FOR ACCESS TO THE COURTS ECF SYSTEM OR FOR CORRESPONDENCE AND DOCKET SHEETS TO BE EMAILED DIRECTLY TO THE PLAINTIFF. Document filed by Vicky Ware Bey. (Attachments: # 1 Exhibit 1).(jca) (Entered: 02/25/2026) |
| 02/25/2026 | 27 | CERTIFICATE OF SERVICE of Plaintiff's Request for a Preliminary Conference served on Attorney of Record on 2/6/2026. Service was made by Electronic service. Document filed by Vicky Ware Bey. (jjc) (Entered: 02/26/2026) |
| 02/26/2026 | | Pro Se Payment of Fee Processed: $405.00 Credit Card processed by the Finance Department on 02/26/2026, Receipt Number 47030. (sr) (Entered: 02/26/2026) |
| 02/26/2026 | | NOTICE OF CASE REASSIGNMENT to Judge Dale E. Ho. Judge Laura Taylor Swain is no longer assigned to the case..(kgo) (Entered: 02/26/2026) |
| 02/26/2026 | | Magistrate Judge Sarah Netburn is designated to handle matters that may be referred in this case. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (kgo) (Entered: 02/26/2026) |
| 02/27/2026 | 28 | MOTION for Judgment. Document filed by Vicky Ware Bey. Return Date set for 3/10/2026 at 10:00 AM.(yv) (Entered: 02/27/2026) |
| 03/02/2026 | 29 | LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Dale E. Ho from Kayla Coles dated March 2, 2026. Document filed by Eric Adams, Lynelle Maginley-Liddie, New York City Employee Retirement System, Melanie Whinnery.. (Coles, Kayla) (Entered: 03/02/2026) |
| 03/02/2026 | 30 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** PROPOSED ORDER - NOTICE OF JUDGMENT ORDER FOR JUDGMENT. Document filed by Vicky Ware Bey. Related Document Number: 28 . (vfr) **Proposed Order to be reviewed by Clerk's Office staff.** Modified on 3/5/2026 (km). (Entered: 03/03/2026) |
| 03/03/2026 | 31 | CORRESPONDENCE TO CHIEF JUSTICE SWAIN AND CONFIRMATION OF PRELIMINARY / SETTLEMENT CONFERENCE FOR MARCH 6, 2026 AT 10:00 AM AND OPPOSITION TO THE DEFENDANTS REQUEST FOR AN EXTENSION OF TIME TO ANSWER THE SUMMONS AND COMPLAINT re: 29 LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Dale E. Ho from Kayla Coles dated March 2, 2026. Document filed by Vicky Ware Bey. (jjc) (Entered: 03/05/2026) |
| 03/03/2026 | 32 | AFFIRMATION IN OPPOSITION TO THE DEFENDANTS REQUEST OR MOTION FOR AN EXTENSION OF TIME TO ANSWER THE SUMMONS AND COMPLAINT re: 29 LETTER MOTION for Extension of Time to File Response/Reply addressed to |

| | | Judge Dale E. Ho from Kayla Coles dated March 2, 2026. Document filed by Vicky Ware Bey. (Attachments: # 1 Exhibit Ex to affirmation) (jjc) (Entered: 03/05/2026) |
|---|---|---|
| 03/03/2026 | 33 | CERTIFICATE OF SERVICE of CIVIL ORDER TO SHOW CAUSE WITH NOTICE AND A RESTRAINING ORDER served on Attorney of Record for all of the above named Defendants on 2/20/2026. Service was made by Electronic Filings. Document filed by Vicky Ware Bey..(jjc) (Entered: 03/05/2026) |
| 03/05/2026 | | ***NOTICE TO FILER REGARDING DEFICIENT PROPOSED JUDGMENT. Notice to Filer regarding Document No. 30 Proposed Order. The filing is deficient for the following reason(s): The wrong Judge is listed on the signature line. Please correct and resubmit to the Pro Se office. (km) (Entered: 03/05/2026) |
| 03/05/2026 | | Mailed a copy of docket sheet regarding 30 Proposed Order to Vicky Ware Bey 168-42 127th Avenue 7A Jamaica, NY 11434.(km) (Entered: 03/05/2026) |
| 03/06/2026 | 34 | NOTICE OF SPECIAL APPEARANCE. Document filed by Vicky Ware Bey. (sac) (Entered: 03/06/2026) |
| 03/06/2026 | 35 | PROPOSED CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER. Document filed by Vicky Ware Bey. (sac) (Entered: 03/06/2026) |
| 03/06/2026 | 36 | FILING ERROR - DEFICIENT DOCKET ENTRY - NOTICE OF JUDGMENT ORDER FOR JUDGMENT. Document filed by Vicky Ware Bey. (km) Proposed Order to be reviewed by Clerk's Office staff. Modified on 3/9/2026 (km). (Entered: 03/09/2026) |
| 03/06/2026 | 37 | NOTICE OF JUDGMENT ORDER FOR JUDGMENT. Document filed by Vicky Ware Bey. (km) Proposed Judgment to be reviewed by Clerk's Office staff. (Entered: 03/09/2026) |
| 03/09/2026 | | ***NOTICE TO FILER REGARDING DEFICIENT PROPOSED JUDGMENT. Notice to Filer regarding Document No. 36 Proposed Judgment. The filing is deficient for the following reason(s): the wrong Judge is listed on the signature line. (km) (Entered: 03/09/2026) |
| 03/09/2026 | | ***NOTICE TO COURT REGARDING PROPOSED JUDGMENT. Document No. 37 Proposed Judgment was reviewed and approved as to form. (km) (Entered: 03/09/2026) |
| 03/09/2026 | 38 | AFFIRMATION VICKY WARE BEY EX-PART COMMUNICATION REGARDING UNOPPOSED CIVIL ORDER TO SHOW. Document filed by Vicky Ware Bey.(yv) (Entered: 03/10/2026) |
| 03/09/2026 | 39 | CERTIFICATE OF SERVICE of Plaintiffs Notice of Special Appearance for the Preliminary / Settlement Conference and Proposed Case Management and Scheduling Order served on Eric Adams, Mayor CITY OF NEW YORK Lynelle Maginley -Liddie Commissioner for NEW YORK CITY DEPARTMENT OF CORRECTIONS NEW YORK CITY DEPARTMENT OF CORRECTIONS Melanie Whinnery Executive Director and her Successors NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM NYCERS NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM NYCERS JOHN DOE 1-10,000, JANE DOE 1-10,000 on 3/6/26. Service was made by EMAIL. Document filed by Vicky Ware Bey. (yv) (Entered: 03/10/2026) |
| 03/10/2026 | 40 | NOTICE OF ENTRY OF JUDGMENT re: 37 Proposed Judgment. PLEASE TAKE NOTICE entry of Judgment in favor of the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured Party Vicky Ware Bey, has been approved by the court, Docket #37. Document filed by Vicky Ware Bey..(tp) (Entered: 03/10/2026) |

| 03/10/2026 | 41 | CERTIFICATE OF SERVICE of Plaintiff's Proposed Writ of Execution with Notice of Motion of Proposed Writ of Execution with a Declaration in Support and a Memorandum of Law served on Kayla Coles Esq. on 3/10/2026. Service was made by Email. Document filed by Vicky Ware Bey. (ar) (Entered: 03/11/2026) |
| 03/11/2026 | | Received returned mail re: 8 Order Directing Payment of Fee or IFP Application. Mail was addressed to Vicky WareBey PO Box 340031 Jamaica, NY 11434 and was returned for the following reason(s): Return to sender not deliverable as addressed unable to forward.(kma) (Entered: 03/11/2026) |
| 03/12/2026 | | Received returned mail re: 3 Standing Order re Cases Filed By Pro Se Plaintiffs. Mail was addressed to Vicky WareBey PO Box 340031 Jamaica, NY 11434 and was returned for the following reason(s): Return to sender not deliverable as addressed unable to forward. (kma) (Entered: 03/12/2026) |
| 03/12/2026 | 42 | LETTER addressed to Ms. Kayla Coles Esq., Attorney of Record for the Defendants from Vicky Ware Bey dated 3/12/2026 re: Formal Demand for Satisfaction of Federal Court Judgment. Document filed by Vicky Ware Bey. (jjc) (Entered: 03/12/2026) |
| 03/12/2026 | 43 | REQUEST TO HAVE ACCESS TO EFILING AND THE COURTS CM / ECF SYSTEM. Document filed by Vicky Ware Bey. (jjc) (Entered: 03/12/2026) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/12/2026 13:02:28 | | |
| PACER Login: | recmgmt370 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:26-cv-00914-DEH |
| Billable Pages: | 6 | Cost: | 0.60 |
| Exempt flag: | Exempt | Exempt reason: | Always |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)
_____

**NOTICE OF ENTRY
OF JUDGMENT**

**DOCKET # 26-CV-914**

**Honorable Dale E. Ho**

PLEASE TAKE NOTICE entry of Judgment in favor of the Plaintiff / Petitioner /

Claimant / Complainant / Crime Victim and the Aggrieved and Injured Party Vicky Ware

Bey, has been approved by the court, Docket #37.

Date: March 10, 2026

*Vicky Ware Bey*

_____
Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

 Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe  1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

NOTICE OF JUDGMENT
ORDER FOR JUDGMENT

DOCKET # 26-CV-914

Honorable Dale E. Ho

TO: Defendants and all interested parties:

After due consideration of the Plaintiff's claims, and the failure of the Defendants to

defend against said claims, and the extensive, ongoing harm suffered by the Plaintiff,

hereby issues this Notice of Judgment and Order for Judgment pursuant to the laws of

the United States, the State of New York, and other relevant jurisdictions, including

applicable International Laws, Federal Laws, Criminal Laws, and State Labor and

Human Rights Laws as well as matters involving the United States Constitution.

## FINDINGS OF FACT AND LAW

Sexual Harassment, Employment Discrimination, and Ongoing Employment Retaliation:

The Plaintiff has demonstrated, with clear and convincing evidence, that she was subject to a pattern of egregious Sexual Harassment at her workplace in which the Defendants had knowledge of and intentionally remained recklessly indifferent. These patterns of sexual harassment included but are not limited to physical, verbal, and emotional abuse, unwelcome sexual advances, and retaliatory conduct for lodging complaints against such harassment. Such actions have led to the constructive discharge of the Plaintiff, who was constructively discharged and barred from employment in which she was forced out of employment due to a hostile and unsafe work environment.  "A claim of hostile work environment sexual harassment is actionable under Title VII of the Civil Rights Act of 1964." *Meritor Savings Bank v. Vinson\*, 477 U.S. 57 (1986).*  The Court further noted that an employer's failure to act upon sexual harassment allegations can result in liability for damages in violation of Title VII of the Civil Rights Act of 1964 codified as Title 42 U.S.C 2000e-17 et seq., and other applicable state and federal statutes.

The Defendants, through deliberate and willful actions, have orchestrated a systematic campaign of ongoing retaliation against the Plaintiff. This retaliation includes, but is not limited to, forced and unconsentual sexual exploitation voyeurism used to deter other employees from participating in protected activities or from filing complaints about unfair employment practices including but not limited to sexual harassment. The Defendants acts of employment retaliation involves felonious criminal acts that are also in direct violation of Fourth Amendment in the United States Constitution as well as Title 18 U.S.C 2261A, Title 18 U.S.C 1801 in which the Defendants and their accomplices

subjected the Plaintiff and her relatives interstate to interstate stalking, and the surreptitious installation of surveillance ad eavesdropping equipment inside the Plaintiff's and her family's private residences, houses and effects as well as the public dissemination of unlawful intimate surveillance images of the Plaintiff and her relative interstate over the world wide web, Closed Circuit TV and other means resulting in direct violations of the Plaintiff's and her relatives right to privacy inside of their houses and effects where they have a reasonable expectation of privacy inside of their houses and effects. *"The anti-retaliation provision of Title VII does not only protect employees from discrimination based on complaints but also prohibits any retaliatory actions that would deter a reasonable person from engaging in protected activity." Burlington Northern & Santa Fe Railway v. White\*, 548 U.S. 53 (2006),*

The Defendants, and their accomplices whom they act in concert with interstate ongoing criminal course of conduct involves conspiracy and ongoing criminal trespassing, home invasions, unlawful interception and dissemination of all of the Plaintiff's and her relatives interstate oral, wire, wireless, electronic communications; Coordinated Stalking / Gang Stalking / Organized Stalking; Hate Crimes; Genocide; Premeditated Murders resulting in all of their Wrongful Deaths.  These actions violate Title 18 U.S.C 241 Conspiracy Against Rights; Title 18 U.S.C. § 242 Deprivation of Rights Under Color of Law; Title 18 U.S.C § 2511, Wiretapping; Title 18 U.S.C 2252 Sexual Exploitation of Minors and other offenses; as well as international human rights laws, the United States Constitution, Federal Laws, and State Laws. United States Constitution, Fourth Amendment provides *"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,*

*and no Warrants shall issue, but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."*

The Plaintiff has presented credible evidence on court record in which the Relations Back Doctrine directly applies to this matter pursuant to Federal Rules of Civil Procedure 15(f) that the Defendants and their agents have engaged in theft, fraud and embezzlement, resulting in the loss of the use of her intellectual property, property damage, and unjust financial enrichment of the Defendants at the expense of the Plaintiff who is being deprived of her rights. *"Theft and embezzlement not only deprive the rightful owner of their property but also undermine the integrity of the economic system, inflicting harm that goes beyond mere financial loss." People v. Mahboubian\*, 74 N.Y.2d 174 (1989)*

The Plaintiff's reputation has been severely damaged and unjustly harmed by slander, libel, and the public dissemination of false and defamatory statements. These actions are in violation of state tort laws, including defamation, and have caused lasting harm to the Plaintiff's personal and professional standing and future endeavors."The publication of a defamatory statement is actionable if it is made with actual malice, i.e., with knowledge of its falsity or with reckless disregard for the truth." Chapadeau v. Utica Observer-Dispatch\*, 38 N.Y.2d 196 (1975)

The Plaintiff, and her relatives are Indigenous natural persons, whose basic human rights are being violated daily by the Defendants and their accomplices interstate in which the Plaintiff and her relatives rights are secured and guaranteed under both domestic and International Human Rights Laws which including but are not limited to the Declaration on the Rights of Indigenous Peoples (DRIP); Universal Declaration of

Human Rights (UDHR); and the International Covenant on Civil and Political Rights (ICCPR).

## ORDER FOR JUDGMENT

In light of the failure of the Defendants to defend against the claims within the Plaintiffs complaint:

**IT IS ORDERED,** Judgment is hereby granted and entered in favor of the Plaintiff as a matter of law because there are no genuine disputes in material facts or issues on all claims, including, but not limited to, Sexual Harassment, Employment Discrimination, Constructive Discharge, Employment Retaliation, Criminal Stalking, Wiretapping, Fraud, Defamation, and all other related claims.

## MONETARY DAMAGES

The Plaintiff is entitled to the following monetary relief for the sum certain claimed in her complaint in the sum of $8,000,000,000.00, Eight Billion Dollars for:

Compensatory Damages for emotional distress, lost wages, pain and suffering, loss of future earnings, and damage to reputation.

Punitive Damages in an amount sufficient to deter the Defendants and others from engaging in similar conduct.

Restitution for the loss of use of intellectual property, property damage, and financial harm resulting from theft, fraud, and embezzlement of employment and pension benefits.

Special Damages for the Defendants and their accomplices ongoing criminal course conduct whereby the crimes committed by the Defendants include interstate stalking resulting in wrongful deaths, hate crimes and premeditated murders.

Injunctive Relief is granted whereby the Defendants are hereby permanently and indefinitely enjoined from conducting any further surveillance, eavesdropping, criminal trespassing or harassment of the Plaintiff and her relatives interstate. The Defendants shall immediately cease and desist from all acts of Interstate Stalking, Coordinated Stalking / Gang Stalking / Organized Stalking; Surveillance; Eavesdropping; Wiretapping; Home Invasions; Sexual Exploitation and Abuse as well as any other unlawful activities, and crimes perpetrated against the Plaintiff and her relatives, and associates and future associates.

## INDEFINITE INTERSTATE RESTRAINING ORDER:

An Indefinite Interstate Restraining Order is hereby issued to the Defendants, enjoining them and their agents and accomplices from engaging in any further acts of Terrorism, Interstate Stalking; Coordinated Stalking / Gang Stalking / Organized Stalking; Conspiracy; Surveillance; Eavesdropping; Criminal Harassment; Harassment; Defamation; Retaliation; All types of thefts as well as any other unlawful activities, and crimes against the Plaintiff and her relatives. This Order shall apply nationwide and across International Borders.

## PLEASE TAKE NOTICE, YOU ARE HEREBY NOTIFIED THAT IT IS A FEDERAL CRIME TO:

- Cross state lines to violate this order or to stalk, harass or commit domestic violence against Plaintiff and her relatives in New York and Interstate;

  Cross International lines to violate this order or to stalk, harass or commit domestic violence against the Plaintiff and her relatives Nationally pursuant to Executive Order 13107 and Treaties entered into by the United States;

- Buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect

(Note: there is a limited exception for military or law enforcement officers but only while they are on duty) ; and

- Buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of physical force or a deadly weapon against a relative, even after this Order has expired.. (18 U.S.C. "922(g)(8), 922(g)(9), 2261, 2261A, 2262).

**THE DEFENDANTS ARE HEREBY NOTIFIED THAT** the license of the person against whom this order is issued to carry, possess, repair, sell or otherwise dispose of a firearm or firearms, if any, pursuant to Penal Law §400.00, is hereby revoked all persons against whom this order is issued shall remain ineligible to receive a firearm license during the period of this order.

The Defendants, their predecessors, successors and their accomplices / conspirators in this matter are **hereby ordered** to immediately CEASE and DESIST and to forever refrain from all illegal, unlawful, and criminal activities they intentionally commit against the Plaintiff and her relatives interstate in this matter immediately.

**THE DEFENDANTS, THEIR, PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS ARE HEREBY NOTIFIED AND ORDERED** to immediately cease and desist and to permanently and indefinitely refrain from all and every illegal, unlawful and criminal activities they and their Accomplices / Conspirators are committing against the Plaintiff and her relatives nationally and internationally which includes all acts of terrorism, genocide but are not limited to Interstate stalking, International Stalking, Criminal Harassment, Burglary, Theft of all types, Criminal

Trespassing, Trespassing of any sort, and are to immediately cease and desist and permanently and indefinitely refrain from all illegal, unlawful and unconsented surveillance, monitoring, recording and dissemination of unconsented intimate images, all acts of sexual exploitation as well as the illegal and unlawful interception and dissemination of the Plaintiff's and her relatives and associates oral, wire, wireless, electronic communications nationally and internationally.

**THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS ARE HEREBY NOTIFIED AND ORDERED** THAT they are forever enjoined and barred from illegally and unlawfully installing surveillance and eavesdropping equipment inside of the Plaintiff and her relatives homes interstate and in places where they have a reasonable expectation of privacy and from illegally and unlawfully surveilling, eavesdropping and recording and disseminating images of the Plaintiff and her relatives nationally and internationally intimate body parts, dressing and disrobing and or engaging in private familial activities which is also referred to as revenge porn and are forever enjoined from intercepting and disseminating all and any of the Plaintiff and her relatives and associates nationally and internationally oral, wire, wireless, electronic communications.

**THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS ARE HEREBY NOTIFIED AND ORDERED** THAT they are forever barred and enjoined from being within 1000 yards of the Plaintiff's and her relatives and associates nationally and internationally.

**THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS ARE HEREBY NOTIFIED AND ORDERED** THAT

they are forever barred and enjoined from Stalking Plaintiff and her relatives and their associates interstate, internationally and, are forever enjoined and barred from criminally harassing, committing any and all forms of violence against the Plaintiff and her relatives nationally and internationally.

**THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS ARE HEREBY NOTIFIED AND ORDERED** THAT they are forever barred and enjoined from burglarizing, interfering with the Plaintiff's and her relatives mail and medical service, obstructing justice, criminally trespassing and trespassing of any sort upon the Plaintiff and her relatives nationally and internationally.

**THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS ARE HEREBY NOTIFIED AND ORDERED** THAT they are forever barred and enjoined from destroying, damaging, stealing the personal and private property belonging to the Plaintiff and her relatives nationally and internationally.

**THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS ARE HEREBY NOTIFIED AND ORDERED** THAT they are forever barred and enjoined from all acts of discrimination and unfair employment practices against the Plaintiff and her relatives and are further enjoined from soliciting others into committing crimes against the Plaintiff and her relatives nationally and internationally indefinitely.

**This Indefinite Restraining Order is effective immediately** and is warranted to prevent a continuing and substantial injury to Plaintiff and her relatives nationally pursuant to Title 18 U.S.C 2521.

This Indefinite Restraining Order is necessary to prevent the Defendants and their accomplices / conspirators from continuing to knowingly from engaging in harmful conduct causing bodily injury to Plaintiff and her relatives nationally and internationally and from damaging their property or threatening to do with the intentions of retaliating against them for giving testimonies in an official proceeding via a record document or any other means. This indefinite injunction / indefinite Restraining Order is in effect to prevent the further commissions of Federal and State Crimes against the Plaintiff and her relatives, and it is to enjoin the existing crimes committed against them by the Defendants and their accomplices / conspirators in this matter.

**This Indefinite Restraining Order is relevant to Title 18 U.S.C 2266 (5)(A) which provides:** *"any injunction, restraining order, or any other order issued by a civil or criminal court for the purpose of preventing violent or threatening acts or harassment against, sexual violence, or contact or communication with or physical proximity to, another person, including any temporary or final order issued by a civil or criminal court whether obtained by filing an independent action or as a pendente lite order in another proceeding so long as any civil or criminal order was issued in response to a complaint , petition, or motion filed by or on behalf of a person seeking protection: and (B) any support, child custody or visitation provisions, orders, remedies or relief issued as part of a protection order, restraining order or injunction pursuant to State, tribal, territorial, or local law authorizing the issuance of protection orders, restraining orders, or injunctions*

*for the protection of victims of domestic violence, sexual assault, dating violence or stalking."*

**Furthermore, the** Plaintiff who bought this action against the Defendants is a crime victim at the behest of the Defendants and their accomplices / conspirators interstate as well as her relatives nationally and internationally.

*"Victim" means the individual harmed as a result of a commission of a crime under this chapter including, in the case of a victim who is under 18 years of age, incompetent, incapacitated, or decreased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, but in no event shall the defendant be named as such representative or guardian."* *Pursuant to Title 18 U.S.C 2264 (4)( c).*

Therefore this Notice and Order issued is necessary enjoin the Deprivation of the Plaintiff's and her relatives rights, to prevent irreparable harm and to stop the continuation of multiple crimes against the Plaintiff and her relatives nationally and internationally.

THIS NOTICE AND ORDER PREVENTS THE DEFENDANTS AND THEIR ACCOMPLICES / CONSPIRATORS FROM CONTINUING THEIR CRIMINAL COURSE OF CONDUCT AGAINST THE PLAINTIFF AND HER RELATIVES NATIONALLY AND INTERNATIONALLY, IT DOES NOT PREVENT THE DEFENDANTS FROM PERFORMING THEIR LAWFUL STATUTORY DUTIES.

NOTICE TO DEFENDANTS: YOUR FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL

<u>CONTEMPT, AND/OR MAY SUBJECT YOU TO SUPREME COURT PROSECUTION AND PENALTIES FOR CONTEMPT OF COURT. IF YOU FAIL TO APPEAR IN COURT WHEN YOU ARE REQUIRED TO DO SO, THIS ORDER MAY BE EXTENDED IN YOUR ABSENCE AND THEN CONTINUES IN EFFECT UNTIL A NEW DATE SET BY THE COURT.</u>

<u>THIS ORDER OF PROTECTION / RESTRAINING ORDER WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS ISSUED. THIS ORDER OF PROTECTION / RESTRAINING ORDER CAN ONLY BE MODIFIED OR TERMINATED BY THE INJURED PARTY AND COURT. THE PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS ORDER.</u>

<u>PLEASE TAKE FURTHER NOTICE  THAT THE PENALTIES FOR VIOLATING THIS NOTICE AND ORDER IS PUNISHABLE BY TITLE 18 U.S.C 2262 AS WELL AS OTHER FEDERAL AND STATE LAWS</u>

TITLE 18 U.S.C 2262

A person who travels in interstate or foreign commerce, or enters or leaves Indian country or is present within the special maritime and territorial jurisdiction of the United States, with the intent to engage in conduct that violates the portion of a protection order that prohibits or provides protection against violence, threats, or harassment against, contact or communication with, or physical proximity to, another person or the pet, service animal, emotional support animal, or horse of that person, or that would violate such a portion of a protection order in the jurisdiction in which the

order was issued, and subsequently engages in such conduct, shall be punished as provided in subsection (b) which provides A person who violates this section shall be fined under this title, imprisoned— (1) for life or any term of years, if death of the victim results;

(2) for not more than 20 years if permanent disfigurement or life threatening bodily injury to the victim results;

(3) for not more than 10 years, if serious bodily injury to the victim results or if the offender uses a dangerous weapon during the offense;

(4) as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison); and

(5) for not more than 5 years, in any other case, including any case in which the offense is committed against a pet, service animal, emotional support animal, or horse,

or both fined and imprisoned.

**Federal, State, and International Legal Remedies**:

The Defendants shall be liable for any and all legal fees, costs, and expenses incurred by the Plaintiff as a result of these ongoing crimes unlawful activities committed against the Plaintiff and her relatives. The Plaintiff is further entitled to relief under the First Amendment in the United States Constitution, Title 42 U.S.C 2000e-5(e)(3); Civil Rights Act of 1991 codified as Title 42 U.S.C 3553; American Disabilities Act of 1990 section 501 codified as 42 U.S.C Sec. 12117; Title 42 U.S.C 2000e-4; Title 42 U.S.C 2000e-5; Title 42 U.S.C 2000e-6; Title 42 U.S.C 2000e-8. Title 42 U.S.C 2000e-9 of this title shall be the

powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

The Victims Rights and Restitution Act of 1990 codified as 42 U.S.C 10607 also provides relief for the Plaintiff who is the Aggrieved and Injured Party who is also entitled to relief pursuant to Title 18 U.S.C 1595 (a), (b)(1),(b)(2),(c ) (1), (c )(2); as well as Title 42 U.S.C 2000ff-6 which provides power and procedures and remedies in sections 705, 706, 707, 709, 710, and 711 of Title 42 U.S.C 2000e-4 – Title 42 U.S.C 2000e-6 and Title 42 U.S.C 2000e-8 - Title 42 U.S.C 2000e-10 to the person alleging the violation of title VII of that Act codified as Title 42 U.S.C 2000e shall be the powers procedures and remedies this chapter provided to the person alleging an unlawful employment practice in violation of this chapter. Amendments to Title VII in 1972 and 1991extended protection to public sector employees and authorizes awards of both compensatory and punitive damages. Congress and the Courts have extended the prohibition against sex discrimination to include prohibitions against sexual harassment.

Title 29 U.S.C 1132 (a)(1); (B); (2); (3);(4);(5);provides that "a civil action may be brought by a participant or beneficiary for the relief provided for in subsection (c) of the section, or to recover benefits due to him under this terms of his plan, to enforce his rights under the terms of the plan, or to clarify his right s to future benefits under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates

any provision of this subchapter or the terms of the plan, or  (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title."

"Article V, § 7 of the New York Constitution provides protection as 'a contractual relationship' the benefits of membership in a public pension or retirement system against diminishment and impairment. The provision 'fix[es] the rights of the employees at the time of commencement of membership in [a pension or retirement] system, rather than as previously at retirement." *Ballentine v Koch (89 NY2d 51, 56 [1996]).* As the Court of Appeals stated in (*Matter of Guzman v New York City Employees' Retirement Sys., 45 NY2d 186, 190-191*, citing Birnbaum v New York State Teachers Retirement Sys., 5 NY2d 1, 9), and thus prohibits unilateral action by either the employer or the Legislature that impairs or diminishes the rights established by the employee's membership (*Matter of Village of Fairport v Newman, 90 AD2d 293, 295, as well as* State Laws including the Alabama Criminal Laws, Georgia Criminal Laws, Texas Criminal Laws, Tennessee Criminal Laws and International Human Rights Frameworks.

The Court refers the matter for criminal prosecution based on the evidence retrieved and presented regarding violations of federal criminal statutes and international law, including Terrorism, Interstate Stalking, Genocide; Hate Crimes; Conspiracy; Premeditated Murders, Fraud, Theft.

The Plaintiff shall be provided with law enforcement protection and resources to ensure that these violations permanently cease and that the Plaintiff and her relatives are kept safe from further harm.

CONCLUSION

The Defendants have failed to appear and defend against these serious claims, and the Court finds that the Plaintiff is entitled to relief on all counts. This Judgment shall be effective immediately and enforced across all relevant jurisdictions. The Plaintiff is awarded all remedies as set forth above, including damages in the sum of $8,000,000,000.00, Eight Billion Dollars 00/100, and Indefinite Interstate Injunctive Relief, and the issuance of a Permanent Interstate Restraining Order.

**The Defendants are hereby Ordered to immediately pay the Plaintiff $10,000,000.00, Ten Million Dollarsd upon the issuance of this order and then $7,990,000,000.00 Seven Billion Nine Hundred and Ninety Million Dollars 00/100 within 21 days unless other arrangements are agreed to and stipulated.**

March 2, 2026                                        IT IS SO ORDERED.

                                        _____
                                        Honorable Dale E. Ho
                                        United States District Judge

---

26-CV-914

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

## CERTIFICATE OF SERVICE

_____

The Plaintiff affirms under the penalty of perjury that the Attorney of Record for the all
of the above Defendants, Kayla Coles Esq. c/o The City of New York Law Department /
Corporation Counsel located 100 Church Street, New York, New York 10007 were served
the Plaintiff's Notice of Entry of Judgment in favor of the Plaintiff with the Approved
Order on March 10, 2026 .

Date: March 10, 2026                    *Vicky Ware Bey*

_____

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

**Vicky Ware Bey**
**168-42 127ᵗʰ Avenue, #7A**
**Jamaica Territory, New York Republic [11434]**
**c21res@aol.com * 347-869-8529**

March 12, 2026

**Via Certified Mail # 9589 0710 5270 1576 2556 16 & Email**

**THE CITY OF NEW YORK et al.**
100 Church Street
New York, New York 10007
Attention: Kayla Coles Esq., Attorney of Record for the Defendants
                c/o The City of New York Law Department / Corporation Counsel

**Re: Formal Demand for Satisfaction of Federal Court Judgment**
    Case: Vicky Ware Bey v. The City of New York et al., Case 26-CV-914
    United States District Court for the Southern District of New York

Dear Ms. Kayla Coles Esq., Attorney of Record for the Defendants:

I am Vicky Ware Bey the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured party in the above-captioned matter and the judgment creditor.

On March 10, 2026, the United States District Court for the Southern District of New York entered judgment against you, the Defendants (Docket #37) in the sum of $8,000,000,000.00, Eight Billion Dollars, plus post-judgment interest accruing under 28 U.S.C. § 1961, and any costs allowed by law with An Indefinite Interstate Restraining Order which was also approved by the United States District Court for the Southern District of New York in which you are, and have been in violation of this Indefinite Interstate Restraining Order as of March 10, 2026.

As of the date of this letter March 12, 2026, the approved judgment remains unpaid. This letter constitutes a formal demand for immediate payment of 10,000,000.00, Ten Million Dollars and the total amount due within seven day in the amount of $7,990,000,000.00 Seven Billion Nine Hundred Ninety Million Dollars within seven days, in which accrued post-judgment interest will not apply during this seven day period through in which the total sum of $8,000,000,000.00, Eight Billion Dollars is due.

Pursuant to Federal Rule of Civil Procedure 69(a), a money judgment entered by a federal court is enforceable through execution and other proceedings consistent with the law of the state in which the

court sits. Accordingly, enforcement remedies under New York CPLR Article 52 are available and will be pursued if payment is not received promptly. These remedies may include, without limitation:

- Bank account levies and restraints

- Wage garnishment

- Property liens and seizures

- Turnover proceedings and post-judgment discovery

Demand is hereby made that you remit the immediate payment of $10,000,000.00, Ten Million Dollars, via direct deposit, and then the remaining sum of $7,990,000,000.00, Seven Billion Nine Hundred Ninety Million Dollars within seven (7) calendar days from the date of this letter, in which interest will not accrue during this seven day period. Payment for the remaining balance after the immediate payment of $10,000,000.00, Ten Million Dollars should be made via a Cashiers Check.

Please be advised that failure to comply with this demand will result in immediate initiation of all available enforcement actions, without further notice, which may result in additional costs, interest, and legal fees being added to your obligation.

This letter is sent without prejudice to any rights or remedies available to the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured party Vicky Ware Bey, who is the Judgment Creditor, all of which are expressly reserved.

Your prompt attention to this matter will prevent unnecessary escalation and additional legal consequences.

Date: March 12, 2026                                    Sincerely,

*Vicky Ware Bey*

_____

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]


cc:      United States District Court For The Southern District Of New York

26-CV-914

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

## CERTIFICATE OF SERVICE

_____

The Plaintiff affirms under the penalty of perjury that the Attorney of Record for the all of the above Defendants, Kayla Coles Esq. c/o The City of New York Law Department / Corporation Counsel located 100 Church Street, New York, New York 10007 was served the Plaintiff's Demand for the Satisfaction of Judgment on March 12, 2026 via Certified Mail and email at Kcoles@law.nyc.gov and ServiceECF@law.nyc.gov

Date: March 12, 2026                    *Vicky Ware Bey*

                                        _____
                                        Vicky Ware Bey, In Propria Persona
                                        Vicky Ware, Ex Relational
                                        All Rights Reserved, Without Prejudice
                                        168-42 127th Avenue, #7A
                                        Jamaica Territory, New York Republic
                                        [11434]



**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

New York, NY 10007

Certified Mail Fee  $5.30

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)       $0.00
☐ Return Receipt (electronic)     $0.00
☐ Certified Mail Restricted Delivery  $0.00
☐ Adult Signature Required        $0.00
☐ Adult Signature Restricted Delivery  $

Postage  $0.78

Total Postage and Fees
$6.08

The City of New York Law Department
Kayla Coss Esq  100 Church Street
New York, New York 10007

PS Form 3800, January 2023                     See Reverse for Instructions

9589 0710 5270 1576 2526 16

JAMAICA, NY 11434 18
MAR 12 2026
Postmark Here
03/12/2026
ROCHDALE VILLAGE STATION

---

**UNITED STATES POSTAL SERVICE.**

ROCHDALE VILLAGE
165100 BAISLEY BLVD
JAMAICA, NY 11434-9997
www.usps.com

03/12/2026                    11:31 AM

TRACKING NUMBERS
9589 0710 5270 1576 2526 16

TRACK STATUS OF ITEMS WITH THIS CODE
(UP TO 25 ITEMS)

TRACK STATUS BY TEXT MESSAGE
Send tracking number to 28777 (2USPS)
Standard message and data rates may apply

TRACK STATUS ONLINE
Visit https://www.usps.com/tracking
Text and e-mail alerts available

PURCHASE DETAILS

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| First-Class Mail® Letter | 1 | | $0.78 |
| New York, NY 10007 | | | |
| Weight: 0 lb 0.50 oz | | | |
| Estimated Delivery Date | | | |
| Sat 03/14/2026 | | | |
| Certified Mail® | | | $5.30 |
| Tracking #: | | | |
| 9589 0710 5270 1576 2526 16 | | | |

Total                                  $6.08

Grand Total:                           $6.08

Cash                                  $10.00
Change                                -$3.92

TO REPORT AN ISSUE
Visit https://emailus.usps.com

All hazardous labels/markings on reused
boxes MUST be completely
removed/obliterated if they no longer
match the contents.

PREVIEW YOUR MAIL AND PACKAGES
Sign up for FREE at
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Customer Service
1-800-ASK-USPS
(1-800-275-8777)

Agents do not have any additional
information other than what is provided on
USPS.com.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
Or scan this code with your mobile device.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

**WRIT OF EXECUTION
FOR JUDGMENT**

**DOCKET # 26-CV-914**

**Honorable Dale E. Ho**

**TO:** The United States Marshal for the Southern District of New York or any authorized enforcement officer.

**WHEREAS**, on March 10, 2026 judgment was entered in favor of Vicky Ware Bey against THE CITY OF NEW YORK ET AL. in the amount of $8,000,000,000.00

AND WHEREAS the judgment remains unsatisfied;

NOW THEREFORE, pursuant to Federal Rule of Civil Procedure 69 and New York Civil Practice Law and Rules Article 52, you are hereby commanded to satisfy the judgment from the non-exempt property of THE CITY OF NEW YORK et al.

You are directed to:

1. Levy upon any personal or real property belonging to the Judgment Debtor.

2. Seize and sell such property in accordance with applicable law.

3. Apply proceeds to the satisfaction of the judgment.

Immediate Amount due: $10,000,000.00

Judgment: $8,000,000,000.00


TOTAL: $8,000,000.000.00


Dated: March 10, 2026

CLERK OF COURT
United States District Court
Southern District of New York




By: _____

     Deputy Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

**NOTICE OF MOTION FOR
WRIT OF EXECUTION
OF JUDGMENT**


**DOCKET # 26-CV-914**

**Honorable Dale E. Ho**

**PLEASE TAKE NOTICE** that upon the accompanying declaration of Vicky Ware Bey, dated March 10, 2026, and the records and proceedings in this action, Judgment Creditor Vicky Ware Bey, will move this Court before the Honorable Dale E. Ho United States District Judge, at the United States Courthouse for the Southern District of New York, located at 500 Pearl Street, New York, New York, for an Order issuing a Writ of Execution against property of The City of New York et al.

The motion is made pursuant to Federal Rule of Civil Procedure 69 and New York Civil Practice Law and Rules Article 52, on the grounds that:

1. A valid judgment was entered in favor of the Judgment Creditor on March 10, 2026.

2. The judgment in the sum of $8,000,000,000.00 remains unsatisfied in whole.

3. The Judgment Creditor is entitled to enforcement through levy upon the Judgment Debtor's non-exempt property.

WHEREFORE, Judgment Creditor respectfully requests issuance of a Writ of Execution, together with such other and further relief as the Court deems just and proper.

Respectfully submitted,

Date: March 10, 2026

*Vicky Ware Bey*

_____

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

 Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)
_____

**DECLARATION IN SUPPORT
OF MOTION FOR A WRIT OF
OF EXECUTION OF
JUDGMENT**

**DOCKET # 26-CV-914**

**Honorable Dale E. Ho**

Vicky Ware Bey, the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and

the Aggrieved and Injured Party affirms under the penalty of perjury that she is

personally knowledgeable of the facts and circumstances involved in this matter files this

Declaration in Support of her Motion for a Writ of Execution of Judgment is based on the

following: Judgment has been approved in favor of Vicky Ware Bey, the Plaintiff /

Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured Party

on March 10, 2026, in the sum of $8,000,000,000.00 of which $10,000,000.00 must be paid

immediately and the remaining sum of $7,990,000,00.00 thereafter and an Indefinite Interstate / National Restraining Order is in effect.

The Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured Party, Vicky Ware Bey declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that

the following is true and correct:

1. I am the Judgment Creditor in this action.

2. On March 10, 2026, the Court entered judgment in favor of Plaintiff and against Defendant in the amount of $8,000,000,000.00, and an Indefinite Interstate Restraining Order.

3. Post-judgment interest continues to accrue pursuant to 28 U.S.C. § 1961.

4. The judgment remains unpaid in the amount of $8,000,000,000.00.

5. Judgment Creditor seeks issuance of a Writ of Execution to enforce the judgment against the property of the Judgment Debtor.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 10, 2026.

Date: March 10, 2026                   *Vicky Ware Bey*

_____
Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

MEMORANDUM OF LAW
IN SUPPORT OF A OF A
MOTION FOR A WRIT
OF EXECUTION OF
JUDGMENT

DOCKET # 26-CV-914

Honorable Dale E. Ho

## I. Legal Standard

Under Federal Rule of Civil Procedure 69, a money judgment is enforced by a writ of execution unless the court directs otherwise.

The rule further provides that the procedure on execution must follow the law of the state where the court is located.

## II. New York Enforcement Procedure

In New York, judgment enforcement is governed by New York Civil Practice Law and Rules Article 52, which authorizes:

- Writs of execution

- Levy on personal property

- Bank restraints

- Turnover orders

- Information subpoenas

## III. Application

Because the judgment remains unpaid, the Judgment Creditor is entitled to enforcement through issuance of a Writ of Execution and supplemental enforcement procedures.

Date: March 10, 2026

*Vicky Ware Bey*

———————————————————————

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

**Ho NYSD Chambers**

---

| | |
|---|---|
| **From:** | Vicky <c21res@aol.com> |
| **Sent:** | Tuesday, March 24, 2026 1:10 PM |
| **To:** | Ho NYSD Chambers |
| **Attachments:** | MOTION FOR ENFORCEMENT AND PROPOSED ORDER FOR THE ENFORCEMENT OF JUDGMENT 26-CV-914.pdf |

CAUTION - EXTERNAL:

Judge Ho:

This was also filed yesterday before I received your order in the mail today, March 24, 2025. With all do respect Judgment was already granted after the Defendants defaulted.

The Oder you filed on March 18, 2026, is untimely and after the Defendants defaulted in this matter iwhich this court has jurisdiction over all matters involving federal claims and matters involving the United States Constitution. Respectfully, res Judica and collateral estoppel doesn't apply to this matters in which the relations back doctrine applies to this matter pursuant to FRCP 15, especially when the Defendants criminal course of conduct against my family and I have never ceased and is ongoing.

Judgment against the Defendants who already defaulted by more than 30 days in this matter is appropriate.

Sincerely
Vicky Ware Bey, All Rights Reserved
Plaintiff/ Petitioner/ Claimant/Crime Victim and Aggrieved and Injured Party
----- Forwarded Message -----
**From:** Vicky <c21res@aol.com>
**To:** prose@nysd.uscourts.gov <prose@nysd.uscourts.gov>
**Sent:** Monday, March 23, 2026 at 05:54:45 AM EDT
**Subject:**

March 23, 2026

Good Morning Attached is a Motion to enforce Judgment with attachments for filing

Vicky Ware Bey v The City of New York et al. 29-cv-914

Vicky Ware Bey, All Rights Reserved
Plaintiff / Petitioner / Claimant / Crime Victim / Aggrieved and Injured Party
168-42 127 Avenue, # 7A
Jamaica Territory, New York Republic [11434]
c21res@aol.com
347-869-8529

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

 Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

**NOTICE OF MOTION /
MOTION TO ENFORCE
JUDGMENT**

**DOCKET # 26-CV-914**

**Honorable Dale E. Ho**

**PLEASE TAKE NOTICE** that, upon the annexed Motion to Enforce Judgment, the exhibits thereto, and all prior pleadings and proceedings in this action, the Plaintiff Vicky Ware Bey, In Propria Persona will move this Court, before the Honorable Dale E. Ho United States District Judge, at the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York 10007, on March 24, 2026 at 10:30 AM or soon thereafter to be determined by the Court, for an Order:

Enforcing the judgment entered on March 10, 2026 in the amount of $8,000,000,000.00 Eight Billion, plus accrued interest and costs, against the Defendants The City of New York et al. Authorizing installment payments if immediate full payment is not feasible; Allowing Plaintiff to utilize lawful collection mechanisms against receivables; and Granting any other relief the Court deems just and proper.

PLEASE TAKE FURTHER NOTICE that, pursuant to Local Rule FRCP 62, any opposition to this Motion must be filed within 14 days of service of this Notice.

Date: March 23, 2026



_____

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

CC:   Attorney of Record for the Defendants
      Kayla Coles Esq
      c/o The City of New York Law Department / Corporation Counsel
      100 Church Street
      New York, New York 10007
      Kcoles@law.nyc.gov and via S.D.N.Y CM / ECF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

 Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

**AFFIRMATION IN SUPPORT
OF MOTION TO ENFORCE
JUDGMENT**

 DOCKET # 26-CV-914

**Honorable Dale E. Ho**

Vicky Ware Bey, the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured Party affirms under the penalty of perjury that she is personally knowledgeable of the facts and circumstances involved in this matter and respectfully files the Affirmation in support of her Motion to Enforce Judgment against Defendants, The City of New York et al.and stating the following:

## I. INTRODUCTION

Plaintiff seeks enforcement of a judgment entered on March 10, 2026 in the amount of $8,000,000,000.00 plus accrued interest and costs pursuant to Federal Rule of Civil Procedure 69(a), Title 28 U.S.C. § 1331, the United States Constitution and applicable Federal Laws and State Laws which are invoked.  The Defendants have failed to satisfy the judgment voluntarily, necessitating judicial intervention.

## II. BACKGROUND

1. On March 10, 2026, this Court entered judgment in favor of Plaintiff and against Defendant in the sum of $8,000,000,000.00 Eight Billion Dollars.

2. Plaintiff attempted to contact the Attorney of Record for the Defendants by phone to resolve and settle this matter on March 12, 2026, and the Plaintiff's call was not returned. On March 12, 2026, the Plaintiff demanded payment in writing electronically via email and by Certified Mail # 9589 0710 5270 1576 2556 but Defendant has failed to remit full and partial payment.

3. On February 2, 2026, the Plaintiff proceed Informa Pauper by filing an Affidavit of Financial Statement with a Summons and Complaint in which a trial by jury was demanded. February 5, 2026, this matter was assigned a case number and the Authorized Agent for the Defendants, by appointment and by law via The Defendants Attorney of Record, Muriel Good e Trufant Esq. c/o The City of New York Law Department / Corporation Counsel located the Defendant's / Municipality's place of Incorporation at 100 Church Street, New York, New York 10007 was served the Affidavit of Financial Statement, and the Summons and Complaint pursuant to FRCP 4(h)(1)(B) providing the court with proof and acceptance of service upon the Defendants pursuant to FRCP 5(B)(1),(F) in which the Defendants were given 21 days to answer, and the Defendants have not not answered or denied any of the Plaintiff's Claims for which relief could be granted, Causes of Action or Grievances she's seeking to be redressed within 21 or 30 days. February 6, 2026 the Plaintiff requested a Preliminary Conference for March 6, 2026, upon the Plaintiff appearing for the Preliminary Conference and finding out that this a Preliminary Conference was not scheduled she filed a Notice of Special Appearance and the Proposed Case Management Plan and Scheduling Order she prepared for this Preliminary Conference she requested. On February 17, 2026, the Defendants requested an extension of time to answer the Plaintiff's Summons and Complaint at which time the Plaintiff opposed it and did not consent to the Defendants request for an extension of time and their time to answer has already expired. Therefore, judgment should be entered and executed in the sum of $8,000,000,000.00, Eight Billion Dollars with an Indefinite Interstate Restraining Order and enforced as a matter of law because there are no genuine disputes in material facts or issues. The Plaintiff's Application for the entry of Judgment has already been approved and the Plaintiff moves the court to enforce Judgment which arises from the Defendants intentional and actionable employment discrimination based upon the Plaintiffs sex/gender, national origin, race, age, religion, occupational disability she sustained during the performance of her duties while interacting with an inmate upon responding to alarms for inmate disturbances, in terms of compensation, and her current status as a stalking / crime victim which is directly employment related, and a result of the Defendants negligent hiring and retention practices. The Defendants actionable and intentional employment discrimination are in direct violation of Title 42 U.S.C 2000e-17 et seq. Title 42 U.S.C 11217, Title 29 C.F.R 623 ADEA, ADA. Judgment also arises from the Defendants ongoing criminal course of conduct against the Plaintiff and her relatives arising from the Defendants acts of employment retaliation against the Plaintiff because she objected to being sexually

harassed at work, which the Defendants who controlled the conditions of employment and had the obligation to provide reasonable care and protection for the Plaintiff remained recklessly indifferent and exasperated her injuries by conspiring to deprive her of her rights in direct violation of Title 18 U.S.C 241, by immediately stalking her and her relative interstate resulting in multiple wrongful deaths that were premeditated murders, hate crimes and acts of genocide in which these crimes involve conspiracy, transcends national boundaries, violates Federal Laws, Criminal Laws and are dangerous to human life in which the are also in direct violation of Title 18 U.S.C 2261A, Title 18 U.S.C 1111, Title 18 U.S.C 249, Title 18 U.S.C 1091 in which the Defendants stalked, monitored and watched the Plaintiff and her relatives interstate daily inside of their houses and effects after criminally trespassing, breaking into, and invading their houses and effects interstate and unlawfully installing surreptitious eavesdropping and surveillance equipment inside of their houses and effects where they have a reasonable expectation of privacy in which the Defendants and their accomplices whom they act in concert with interstate unlawfully monitor, record and publicly disseminate unlawful live and recorded unlawful intimate surveillance images of the Plaintiff and her relatives interstate over the world wide web and over closed circuit TV without their expressed or implied consent and without their knowledge in which the Defendants and their accomplices /conspirators interstate knowingly and willfully, and with complete disregard for the Plaintiff's and her relatives rights violate the Fourth Amendment in the United States Constitution, Title 18 U.S.C 2331, Title 18 U.S.C 2332, Title 18 U.S.C 2261A, Title 18 U.S.C 1801, Title 47 U.S.C 230, Title 18 U.S.C 242, State Criminal Laws: New York Penal Laws 245.05, 245.15, 250.05, 25.45; Alabama Code 15, Article 5, Section 13A-6-90, 13A-6-240; 13A-6-240; 13A-4-1, 13A-4-2, 13A-4-3, 13A-4-4, OCGA 16-11-90; Tennessee Code, Chapter 872 as well as other State Laws. Some of the Plaintiff's relatives who were murdered were witness to the Defendants and their accomplices crimes in which the Defendants are in violation of Title 18 U.S.C 1512 as well as applicable State Criminal Laws. The Defendants further retaliated against the Plaintiff by unlawfully intercepting and publicly disseminating all of the Plaintiff's and her relatives who are located in different states and territories oral, wire, wireless, electronic communications in direct violation of Title 18 U.S.C 2511 and the Fourth Amendment in the United States Constitution for asserting her rights and participating in a protected activity by reporting the Defendants unfair employment practices to The New York City Commission of Human Rights. The Defendants further retaliated against the Plaintiff by intentionally and knowingly violating Article V Section VII in New York State Constitution, by intentionally impairing and diminishing her ordinary pension benefits, and arbitrarily and capriciously denying her performance of duty disability pension in error of law, breaching their fiduciary duties, embezzling and withholding her material benefits, and committing fraud by changing her pension number intentionally causing her additional economic injuries. The Defendant are liable for the Plaintiff's and her relatives injures pursuant to Title 42 U.S.C 1983.  The Defendants ongoing felonious criminal course of conduct against the Plaintiff and her relatives has caused the Plaintiff emotional distress and anguish, and has caused her to suffer a physical adverse health condition resulting from the Defendants and their accomplices ongoing felonious criminal course of conduct that has gone on for eleven years, and three months becoming worse over time and has

**not ceased,** in which the Relations Back Doctrine applies to this matter pursuant to FRCP 15.

**The enforcement of the Indefinite Interstate Restraining Order is required** to enjoin the Defendants ongoing felonious criminal course of conduct which transcends national boundaries, involves conspiracy and has already been proven to be dangerous to human life. This crime has gone of for 11 years, and three months and it seems that the Defendants and their accomplices interstate do not have any intentions of stopping their ongoing felonious criminal course of conduct against the Plaintiff and her relatives interstate, and this matter recently became worse, because now the Plaintiff is not getting all of her mail, her incoming emails have been blocked as of March 17, 2026, and she has not been able to log onto the internet from within her home over the weekend, and one of her relatives are suffering from abuse at the behest of the Defendants and their accomplices who continue to conspire against the Plaintiff and her relatives while harassing and intimidating other people to continue their felonious criminal course of conduct and to obstruct justice.

## III. LEGAL BASIS FOR ENFORCEMENT

1. Federal Rule of Civil Procedure 69(a) allows judgment enforcement according to the procedures of the state in which the court sits.

2. New York CPLR Article 52 permits enforcement against property, subject to sovereign immunity; courts retain discretion to authorize payment from non-essential municipal funds or through installment payments.

3. Plaintiff seeks enforcement consistent with federal and state law, including collection from non-exempt municipal assets or receivables.

## IV. EFFORTS TO COLLECT

Plaintiff has made good faith efforts to collect the judgment through a written notice, and two phone calls, and negotiation attempts were all unsuccessful.

## V. REQUESTED RELIEF

Plaintiff respectfully requests that the Court:

1. Direct Defendant to satisfy the judgment from legally available municipal funds.
2. Authorize installment payments if immediate full payment is impracticable.
3. Permit enforcement actions against non-essential municipal property or receivables.
4. Award post-judgment interest and any collection costs.
5. Enforce the Indefinite Interstate Restraining Order
6. Grant any other relief the Court deems just and proper.

## VI. SUPPORTING DOCUMENTS

Plaintiff attaches:
- Certified copy of judgment
- Proof of notice to Defendant regarding demand for payment
- Documentation of collection attempts
- Calculation of amounts due, including interest and fees

Date: March 23, 2026

*Vicky Ware Bey*

_____

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]


CC:    Attorney of Record for the Defendants
       Kayla Coles Esq
       c/o The City of New York Law Department / Corporation Counsel
       100 Church Street
       New York, New York 10007
       Kcoles@law.nyc.gov and via S.D.N.Y CM / ECF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

 Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

**ORDER ENFORCING JUDGMENT**

**DOCKET # 26-CV-914**

**Honorable Dale E. Ho**

Upon consideration of Plaintiff's Motion to Enforce Judgment and all supporting documentation, and for good cause shown, it is hereby:

**ORDERED, ADJUDGED, AND DECREED that:**

The Defendants The City of New York et al. shall satisfy the judgment entered on March 10, 2026 in the total amount of $8,000,000,000.00 Eight Billion, plus accrued interest and costs.

If immediate full payment is not feasible, Defendant shall immediately make a payment to the Plaintiff by direct deposit into her account in the amount of $15,000,000.00 Fifteen Million by March 25, 2026, and make installment payments to the Plaintiff in the amount and duration to be discussed if applicable in which additional payments are to begin on April 1, 2026 until judgment is fully satisfied.

The Plaintiff may seek post-judgment interest and additional collection costs from Defendant as permitted by law.

The Court retains jurisdiction to enforce this Order and to resolve disputes concerning payments and/or collection.

**And it is further ORDERED, ADJUDGED, AND DECREED that:**

An Indefinite Interstate Restraining Order is hereby issued to the Defendants, enjoining them and their agents and accomplices from engaging in any further acts of Terrorism, Interstate Stalking; Coordinated Stalking / Gang Stalking / Organized Stalking; Conspiracy; Surveillance; Eavesdropping; Criminal Harassment; Harassment; Defamation; Retaliation; Sexual Coercion and Abuse; All types of thefts as well as any other unlawful activities, and crimes against the Plaintiff and her relatives. This Order shall apply nationwide and across International Borders.

**PLEASE TAKE NOTICE, YOU WERE NOTIFIED THAT IT IS A FEDERAL CRIME TO:**
- Cross state lines to violate this order or to stalk, harass or commit domestic violence against Plaintiff and her relatives in New York and Interstate; Cross International lines to violate this order or to stalk, harass or commit domestic violence against the Plaintiff and her relatives Nationally pursuant to Executive Order 13107 and Treaties entered into by the United States;
- Buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect

(Note: there is a limited exception for military or law enforcement officers but only while they are on duty) ; and

- Buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of physical force or a deadly weapon against a relative, even after this Order has expired.. (18 U.S.C. "922(g)(8), 922(g)(9), 2261, 2261A, 2262).

**THE DEFENDANTS WERE NOTIFIED THAT** the license of the person against whom this order is issued to carry, possess, repair, sell or otherwise dispose of a firearm or firearms, if any, pursuant to Penal Law §400.00, is hereby revoked all persons against whom this order is issued shall remain ineligible to receive a firearm license during the period of this order.

The Defendants, their predecessors, successors and their accomplices / conspirators in this matter are **hereby ordered** to immediately CEASE and DESIST and to forever refrain from all illegal, unlawful, and criminal activities they intentionally commit against the Plaintiff and her relatives interstate in this matter immediately.

**THE DEFENDANTS, THEIR, PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED** to immediately cease and desist and to permanently and indefinitely refrain from all and every illegal, unlawful and criminal activities they and their Accomplices / Conspirators are

committing against the Plaintiff and her relatives nationally and internationally which includes all acts of terrorism, genocide but are not limited to Interstate stalking, International Stalking, Criminal Harassment, Burglary, Theft of all types, Criminal Trespassing, Trespassing of any sort, and are to immediately cease and desist and permanently and indefinitely refrain from all illegal, unlawful and unconsented surveillance, monitoring, recording and dissemination of unconsented intimate images, all acts of sexual exploitation as well as the illegal and unlawful interception and dissemination of the Plaintiff's and her relatives and associates oral, wire, wireless, electronic communications nationally and internationally.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever enjoined and barred from illegally and unlawfully installing surveillance and eavesdropping equipment inside of the Plaintiff and her relatives homes interstate and in places where they have a reasonable expectation of privacy and from illegally and unlawfully surveilling, eavesdropping and recording and disseminating images of the Plaintiff and her relatives nationally and internationally intimate body parts, dressing and disrobing and or engaging in private familial activities which is also referred to as revenge porn and are forever enjoined from intercepting and disseminating all and any of the Plaintiff and her relatives and associates nationally and internationally oral, wire, wireless, electronic communications.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever barred and enjoined from being within 1000 yards of the Plaintiff's and her relatives and associates nationally and internationally.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever barred and enjoined from Stalking Plaintiff and her relatives and their associates interstate, internationally and, are forever enjoined and barred from criminally harassing, committing any and all forms of violence against the Plaintiff and her relatives nationally and internationally.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever barred and enjoined from burglarizing, interfering with the Plaintiff's and her relatives mail and medical service, obstructing justice, criminally trespassing and trespassing of any sort upon the Plaintiff and her relatives nationally and internationally.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever barred and enjoined from destroying, damaging, stealing the personal and private property belonging to the Plaintiff and her relatives nationally and internationally.

**THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED** THAT they are forever barred and enjoined from all acts of discrimination and unfair employment practices against the Plaintiff and her relatives and are further enjoined from soliciting others into committing crimes against the Plaintiff and her relatives nationally and internationally indefinitely.

**This Indefinite Restraining Order is effective immediately** and is warranted to prevent a continuing and substantial injury to Plaintiff and her relatives nationally pursuant to Title 18 U.S.C 2521.

This Indefinite Restraining Order is necessary to prevent the Defendants and their accomplices / conspirators from knowingly and continuing to engage in harmful conduct causing bodily injury to Plaintiff and her relatives nationally and internationally and from damaging their property or threatening to do, with the intentions of retaliating against them for giving testimonies in an official proceeding via a record document or any other means.  This Indefinite Interstate Restraining Order and Injunction is in effect to prevent the further commissions of Federal and State Crimes against the Plaintiff and her relatives interstate, and it is to enjoin the existing crimes committed against them by the Defendants and their accomplices / conspirators in this matter.

**This Indefinite Interstate Restraining Order is relevant to Title 18 U.S.C 2266 (5)(A) which provides: "any injunction, restraining order, or any other order issued by a civil or criminal court for the purpose of preventing violent or threatening acts or harassment against, sexual violence, or contact or communication with or physical proximity to, another person, including any temporary or final order issued by a civil or criminal court whether obtained by filing an independent action or as a pendente lite order in another proceeding so long as any civil or criminal order was issued in response to a complaint , petition, or motion filed by or on behalf of a person seeking protection: and (B) any support, child custody or visitation provisions, orders, remedies or relief issued as part of a protection order, restraining order or injunction pursuant to State, tribal, territorial, or local law authorizing the issuance of protection orders, restraining orders, or injunctions for the protection of victims of** domestic violence, sexual assault, dating violence or stalking."

*Furthermore, the* Plaintiff who bought this action against the Defendants is a stalking victim / crime victim at the behest of the Defendants and their accomplices / conspirators interstate as well as her relatives nationally and internationally.

"**Victim" means the individual harmed as a result of a commission of a crime under this chapter including, in the case of a victim who is under 18 years of age, incompetent, incapacitated, or decreased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, but in no event shall the defendant be named as such representative or guardian."** Pursuant to Title 18 U.S.C 2264 (4)( c).

Therefore this Notice and Order issued is necessary enjoin the Deprivation of the Plaintiff's and her relatives rights interstate, to prevent irreparable harm and to stop the

continuation of multiple crimes against the Plaintiff and her relatives nationally and internationally.

THIS NOTICE AND ORDER PREVENTS THE DEFENDANTS AND THEIR ACCOMPLICES / CONSPIRATORS FROM CONTINUING THEIR CRIMINAL COURSE OF CONDUCT AGAINST THE PLAINTIFF AND HER RELATIVES NATIONALLY AND INTERNATIONALLY, IT DOES NOT PREVENT THE DEFENDANTS FROM PERFORMING THEIR LAWFUL STATUTORY DUTIES.

NOTICE TO DEFENDANTS: YOUR FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO SUPREME COURT PROSECUTION AND PENALTIES FOR CONTEMPT OF COURT. IF YOU FAIL TO APPEAR IN COURT WHEN YOU ARE REQUIRED TO DO SO, THIS ORDER MAY BE EXTENDED IN YOUR ABSENCE AND THEN CONTINUES IN EFFECT UNTIL A NEW DATE SET BY THE COURT.

THIS ORDER OF PROTECTION / RESTRAINING ORDER WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS ISSUED. THIS ORDER OF PROTECTION / RESTRAINING ORDER CAN ONLY BE MODIFIED OR TERMINATED BY THE INJURED PARTY AND COURT. THE PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS ORDER.

PLEASE TAKE FURTHER NOTICE  THAT THE PENALTIES FOR VIOLATING THIS NOTICE AND ORDER IS PUNISHABLE BY TITLE 18 U.S.C 2262 AS WELL AS OTHER FEDERAL AND STATE LAWS

TITLE 18 U.S.C 2262
A person who travels in interstate or foreign commerce, or enters or leaves Indian country or is present within the special maritime and territorial jurisdiction of the United States, with the intent to engage in conduct that violates the portion of a protection order that prohibits or provides protection against violence, threats, or harassment against, contact or communication with, or physical proximity to, another person or the pet, service animal, emotional support animal, or horse of that person, or that would violate such a portion of a protection order in the jurisdiction in which the order was issued, and subsequently engages in such conduct, shall be punished as provided in subsection (b) which provides A person who violates this section shall be fined under this title, imprisoned— (1) for life or any term of years, if death of the victim results;
(2) for not more than 20 years if permanent disfigurement or life threatening bodily injury to the victim results;
(3) for not more than 10 years, if serious bodily injury to the victim results or if the offender uses a dangerous weapon during the offense;

(4) as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison); and
(5) for not more than 5 years, in any other case, including any case in which the offense is committed against a pet, service animal, emotional support animal, or horse,
or both fined and imprisoned.

**Federal, State, and International Legal Remedies:**

The Defendants shall be liable for any and all legal fees, costs, and expenses incurred by the Plaintiff as a result of these ongoing crimes unlawful activities committed against the Plaintiff and her relatives interstate. The Plaintiff is further entitled to relief under the First Amendment in the United States Constitution, Title 42 U.S.C 2000e-5(e)(3); Civil Rights Act of 1991 codified as Title 42 U.S.C 3553; American Disabilities Act of 1990 section 501 codified as 42 U.S.C Sec. 12117; Title 42 U.S.C 2000e-4; Title 42 U.S.C 2000e-5; Title 42 U.S.C 2000e-6; Title 42 U.S.C 2000e-8. Title 42 U.S.C 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

The Victims Rights and Restitution Act of 1990 codified as 42 U.S.C 10607 also provides relief for the Plaintiff who is a crime victim and the Aggrieved and Injured Party is entitled to relief pursuant to Title 18 U.S.C 1595 (a), (b)(1),(b)(2),(c ) (1), (c )(2); as well as Title 42 U.S.C 2000ff-6 which provides power and procedures and remedies in sections 705, 706, 707, 709, 710, and 711 of Title 42 U.S.C 2000e-4 – Title 42 U.S.C 2000e-6 and Title 42 U.S.C 2000e-8 - Title 42 U.S.C 2000e-10 to the person alleging the violation of title VII of that Act codified as Title 42 U.S.C 2000e shall be the powers procedures and remedies this chapter provided to the person alleging an unlawful employment practice in violation of this chapter. Amendments to Title VII in 1972 and 1991extended protection to public sector employees and authorizes awards of both compensatory and punitive damages. Congress and the Courts have extended the prohibition against sex discrimination to include prohibitions against sexual harassment.

Title 29 U.S.C 1132 (a)(1); (B); (2); (3);(4);(5);provides that "a civil action may be brought by a participant or beneficiary for the relief provided for in subsection (c) of the section, or to recover benefits due to him under this terms of his plan, to enforce his rights under the terms of the plan, or to clarify his right s to future benefits under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or  (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title."

"Article V, § 7 of the New York Constitution provides protection as 'a contractual relationship' the benefits of membership in a public pension or retirement system against diminishment and impairment. The provision 'fix[es] the rights of the employees at the time of commencement of membership in [a pension or retirement] system, rather than as previously at retirement." *Ballentine v Koch (89 NY2d 51, 56 [1996]).* As the Court of Appeals stated in (*Matter of Guzman v New York City Employees' Retirement Sys., 45 NY2d 186, 190-191,* citing Birnbaum v New York State Teachers Retirement Sys., 5 NY2d 1, 9), and thus prohibits unilateral action by either the employer or the Legislature that impairs or diminishes the rights established by the employee's membership (*Matter of Village of Fairport v Newman, 90 AD2d 293, 295, as well as* State Laws including the Alabama Criminal Laws, Georgia Criminal Laws, Texas Criminal Laws, Tennessee Criminal Laws and International Human Rights Frameworks.

The Court refers the matter for criminal prosecution based on the evidence retrieved and presented regarding violations of federal criminal statutes and international law, including Terrorism, Interstate Stalking, Genocide; Hate Crimes; Conspiracy; Premeditated Murders, Fraud, Theft.

The Plaintiff shall be provided with law enforcement protection and resources to ensure that these violations permanently cease and that the Plaintiff and her relatives interstate are kept safe from further harm.

## CONCLUSION

The Defendants have failed to appear and defend against these serious claims, and the Court finds that the Plaintiff is entitled to relief on all counts. This Judgment shall be effective immediately and enforced across all relevant jurisdictions. The Plaintiff is awarded all remedies as set forth above, including damages in the sum of $8,000,000,000.00, Eight Billion Dollars 00/100, and Indefinite Interstate Injunctive Relief, and the issuance of a Permanent Interstate Restraining Order.

SO ORDERED.

DATED: March 24, 2026
         New York, New York


_____
UNITED STATES DISTRICT JUDGE

26-CV-914

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

## CERTIFICATE OF SERVICE

_____

The Plaintiff affirms under the penalty of perjury that the Attorney of Record for the all of the above Defendants, Kayla Coles Esq. c/o The City of New York Law Department / Corporation Counsel located 100 Church Street, New York, New York 10007 was served the Plaintiff's Demand for the Satisfaction of Judgment on March 12, 2026 via Certified Mail and email at Kcoles@law.nyc.gov and ServiceECF@law.nyc.gov

Date: March 12, 2026                    *Vicky Ware Bey*

_____
Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]



**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

New York, NY 10007

| Certified Mail Fee | $5.30 |
| | |
| Extra Services & Fees (check box, add fee as appropriate) | |
| ☐ Return Receipt (hardcopy) | $0.00 |
| ☐ Return Receipt (electronic) | $0.00 |
| ☐ Certified Mail Restricted Delivery | $0.00 |
| ☐ Adult Signature Required | $0.00 |
| ☐ Adult Signature Restricted Delivery | |
| Postage | $0.78 |
| Total Postage and Fees | $6.08 |

MAR 12 2026
03/12/2026

The City of New York Law Department
Kayla Coles Esq 100 Church Street
New York, New York 10007

PS Form 3800, January 2023                See Reverse for Instructions

9589 0710 5270 1576 2526 16

---

**UNITED STATES**
**POSTAL SERVICE.**

ROCHDALE VILLAGE
165100 BAISLEY BLVD
JAMAICA, NY 11434-9997
www.usps.com

03/12/2026                              11:31 AM

TRACKING NUMBERS
9589 0710 5270 1576 2526 16

TRACK STATUS OF ITEMS WITH THIS CODE
(UP TO 25 ITEMS)

TRACK STATUS BY TEXT MESSAGE
Send tracking number to 28777 (2USPS)
Standard message and data rates may apply

TRACK STATUS ONLINE
Visit https://www.usps.com/tracking
Text and e-mail alerts available

PURCHASE DETAILS

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| First-Class Mail® Letter | 1 | | $0.78 |

New York, NY 10007
Weight: 0 lb 0.50 oz
Estimated Delivery Date
Sat 03/14/2026
Certified Mail®                         $5.30
Tracking #:
9589 0710 5270 1576 2526 16

| Total | $6.08 |
| Grand Total: | $6.08 |
| Cash | $10.00 |
| Change | -$3.92 |

TO REPORT AN ISSUE
Visit https://emailus.usps.com

All hazardous labels/markings on reused
boxes MUST be completely
removed/obliterated if they no longer
match the contents.

PREVIEW YOUR MAIL AND PACKAGES
Sign up for FREE at
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Customer Service
1-800-ASK-USPS
(1-800-275-8777)
Agents do not have any additional
information other than what is provided on
USPS.com.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
Or scan this code with your mobile device.

**Vicky Ware Bey**
**168-42 127th Avenue, #7A**
**Jamaica Territory, New York Republic [11434]**
**c21res@aol.com * 347-869-8529**

March 12, 2026

**Via Certified Mail # 9589 0710 5270 1576 2556 16 & Email**

**THE CITY OF NEW YORK et al.**
100 Church Street
New York, New York 10007
Attention: Kayla Coles Esq., Attorney of Record for the Defendants
         c/o The City of New York Law Department / Corporation Counsel

**Re: Formal Demand for Satisfaction of Federal Court Judgment**
     Case: Vicky Ware Bey v. The City of New York et al., Case 26-CV-914
     United States District Court for the Southern District of New York

Dear Ms. Kayla Coles Esq., Attorney of Record for the Defendants:

I am Vicky Ware Bey the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured party in the above-captioned matter and the judgment creditor.

On March 10, 2026, the United States District Court for the Southern District of New York entered judgment against you, the Defendants (Docket #37) in the sum of $8,000,000,000.00, Eight Billion Dollars, plus post-judgment interest accruing under 28 U.S.C. § 1961, and any costs allowed by law with An Indefinite Interstate Restraining Order which was also approved by the United States District Court for the Southern District of New York in which you are, and have been in violation of this Indefinite Interstate Restraining Order as of March 10, 2026.

As of the date of this letter March 12, 2026, the approved judgment remains unpaid. This letter constitutes a formal demand for immediate payment of 10,000,000.00, Ten Million Dollars and the total amount due within seven day in the amount of $7,990,000,000.00 Seven Billion Nine Hundred Ninety Million Dollars within seven days, in which accrued post-judgment interest will not apply during this seven day period through in which the total sum of $8,000,000,000.00, Eight Billion Dollars is due.

Pursuant to Federal Rule of Civil Procedure 69(a), a money judgment entered by a federal court is enforceable through execution and other proceedings consistent with the law of the state in which the

court sits. Accordingly, enforcement remedies under New York CPLR Article 52 are available and will be pursued if payment is not received promptly. These remedies may include, without limitation:

- Bank account levies and restraints

- Wage garnishment

- Property liens and seizures

- Turnover proceedings and post-judgment discovery

Demand is hereby made that you remit the immediate payment of $10,000,000.00, Ten Million Dollars, via direct deposit, and then the remaining sum of $7,990,000,000.00, Seven Billion Nine Hundred Ninety Million Dollars within seven (7) calendar days from the date of this letter, in which interest will not accrue during this seven day period. Payment for the remaining balance after the immediate payment of $10,000,000.00, Ten Million Dollars should be made via a Cashiers Check.

Please be advised that failure to comply with this demand will result in immediate initiation of all available enforcement actions, without further notice, which may result in additional costs, interest, and legal fees being added to your obligation.

This letter is sent without prejudice to any rights or remedies available to the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured party Vicky Ware Bey, who is the Judgment Creditor, all of which are expressly reserved.

Your prompt attention to this matter will prevent unnecessary escalation and additional legal consequences.

Date: March 12, 2026                                    Sincerely,

*Vicky Ware Bey*

_____
Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]


cc:      United States District Court For The Southern District Of New York

## ABSTRACT OF JUDGMENT

Re: Vicky Ware Bey v. The City of New York et al

| Name(s) and Address(es) of Parties against whom Judgment(s) have been obtained | Name(s) and Address(es) of Parties in whose favor Judgment(s) have been obtained |
|---|---|
| Eric Adams, Mayor The City of New York Lynelle Maginley · Liddie Commissioner For New York City Department Of Corrections, New York City Department Of Corrections, Melanie Whinnery, Executive Director For New York City Employee Retirement System , New York City Employee Retirement System, John Doe 1-10,000, Jane Doe 1-10,000  c/o Attorney of Record for the Defendants: Muriel Goode Trufant City of New York Law Department / Corporation Counsel 100 Church Street New York, New York 10007 | Vicky Ware Bey, In Proper Persona Vicky Ware, Ex Relatione All Rights Reserved 168-42 127 Avenue, # 7A Jamaica Territory, New York Republic [11434] |

| Amount of Judgment(s) | Name(s) and Address(es) of Attorney(s) | Entry Date of Judgment |
|---|---|---|
| $8.000,000,000.00 | Vicky Ware Bey, In Proper Persona Plaintiff – Appellant (non Attorney) Vicky Ware, Ex Relatione All Rights Reserved 168-42 127th Avenue, #7A Jamaica Territory, New York Republic [11434] | 03/24/2026 |

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK
I CERTIFY that the foregoing is a correct Abstract of the Judgment

_____

BY CHIEF CLERK

**Ho NYSD Chambers**

| | |
|---|---|
| From: | Vicky <c21res@aol.com> |
| Sent: | Tuesday, March 24, 2026 12:53 PM |
| To: | Ho NYSD Chambers |
| Subject: | Fw: AFFIRMATION AND REQUEST FOR UNPAID WAGES AND OTHER EMPLOYMENT BENEFITS EARNED |
| Attachments: | AFFIRMATION REQUEST FOR IMMEDIATE BACK PAY AND PAYMENT FOR UNPAID WAGES AND EMPLOYMENT 26-CV-914.pdf |

CAUTION - EXTERNAL:

Good Afternoon Judge Ho:

This was filed yesterday, and it was not placed on the courts docket yet. Its a request for unpaid wages and employment benefits.

I just received your Order in the mail today, March 24, 2024. The Defendants in this matter have already defaulted more than thirty days ago and the entry of Default Judgment is appropriate in this matter.

Sincerely,
Vicky Ware Bey, All Rights Reserved
Plaintiff/ Petitioner/ Claimant/ Crime Victim and Aggrieved and Injured Party

----- Forwarded Message -----
From: Vicky <c21res@aol.com>
To: prose@nysd.uscourts.gov <prose@nysd.uscourts.gov>
Sent: Monday, March 23, 2026 at 12:45:08 PM EDT
Subject: AFFIRMATION AND REQUEST FOR UNPAID WAGES AND OTHER EMPLOYMENT BENEFITS EARNED

March 23, 2026

Good Afternoon:

Attached is an Affirmation and Request for Unpaid wages and Other Employment Benefits earned with attachments for filing

RE: Vicky Ware Bey v. The City of New York et al 26-CV-914

Vicky Ware Bey, All Rights Reserved
Plaintiff / Petitioner / Claimant / Crime Victim / Aggrieved and Injured Party
168-42 127 Avenue, #7A
Jamaica Territory, New York Republic [11434]
Endworkplaceviolence@aol.com    347-869-8529

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

 Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)
_____

REQUEST FOR BACK
PAY AND UNPAID
WAGES AND PENSION
BENEFITS, AND SPECIAL
ASSIGNMENT PAY

DOCKET # 26-CV-914

Honorable Dale E. Ho

Vicky Ware Bey, the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and

the Aggrieved and Injured Party affirms under the penalty of perjury that she is

personally knowledgeable of the facts and circumstances involved in this matter, and

respectfully files this Affirmation / Request for Back Pay and Unpaid Wages and Pension

Benefits.

The Plaintiff's / Petitioner's / Claimant's / Crime Victim's / Aggrieved and Injured Party's

average salary was $95,701.88 which equates to $3,987.53 montly.  The Plaintiff initially

received $2,868.00 which was impaired and diminished by $1,119.53 initially at which

time she personally appeared at NYCERS notifying them that her pension was impaired and diminished at which time the Defendants made a fraudulent misrepresentation stating that the Plaintiff would recieve a partial pension until its correctly adjusted. The Plaintiff waited another 30 days expecting her ordinary pension to be correctly adjusted and it wasn't, she appeared at NYCERS again, and the same fraudulent misrepresentation was made to her again. The Plaintiff received a letter stating that she did not file any pension options and that her pension would permanently discontinued unless she files an option. The Plaintiff had already filed pension options in advance, and she refiled it again for 100% joint survivorship her ordinary pension was impaired and diminihsed again by and additonal $50.00, the Plaintiff called NYCERS and was told that it was a fee for the 100% joint survivorship option which is another fraudulent misreprestation which further dimiishes her ordinary pension which was unbeknownst to the Plaintiff at that time. Another thirty days passed and the Plaintiffs ordinary pension still had not been correctly adjusted, at which time the Plaintiff personally spoke with NYCERS Executive Director, Melanie Whinnery about her ordinary pension being impaired and diminished and about matters concerning her performance of duty disability pension benefits which she eligble for according to RSSL Section 14, 507-c and other laws which she had already applied for, in which the Plaintiff was medically separated from employment under Civil Service Law 73 for the same occupational injuries she sustained during the performance of her duties while interacting with an inmate upon responding to alarms for inmate distrubances which is the direct and proximate casuse of her permanent physical disabilities. The Defendants failed to correct the Plaintiff's impaired and diminished ordinary pension benefits which the

Defendants now owes the Plaintif $107,596.76 in back payments in ordinary pension benefits and $95,000.00 in terminal benefits that were never paid to the Plaintiff. The Plaintiff did not receive a disability pension because the Defendants arbitrarily and capriciously denied it in error of law at which time the Plaintiff followed up with NYCERS Executive Director, Melanie Whinnery in persona and with online inquires and letters concerning these matters which were ignored and still unresolved. Based upon the Plaintiff's average salary she is elgible and entitled to recieve $5,987.00 per month in disability pension benefits from NYCERS based upon the occupational injuries she sustained during the performance of her duties while interacting with an inmate which the direct and proximate cause of her physical disabilities.

The Plaintiff was a tenured employee who was employed by the City of New York / New York City Department of Corrections who was constructively and medically discharged from employment in retaliaton for objecting to being sexually harassed by another employee and for the occupational injuries she sustained during the performance of her duties while interacting with an inmate which is the direct and proximate cause of her permenant physical disabilities. The Plaintiff was deprived of a year and half salary in the amount of $210,000.00 which includes projected overtime, in addition to being wrongfully denied and deprived of speical assignment pay / hazard pay while she was assiged to and working in the Central Punitive Segregation Unit "CPSU" which is an additional 12% the Defendants did not pay her and owes her which shall now be added into her salary. The Central Punitive Segregation Unit houses the most violent and assaultive inmates and is one of the most hazardous places to work within New York City Department of Corrections because of the increased propensity for violence and assaults

on staff as well as the increased risk of employees contracting infections diseases while performing their duties because they are constantly exposed to bodily fluids which carries various infectious diseases bodily fluids such as blood, urine, feces, saliva thrown on employee during the performance of their duties in which the Defendants are required to maintain documents of all employees who encountered having bodily fluids thrown on their person during the performance of their duties for 50 years because these hazards alone could result in employees being infected with infectious diseases during the course of thier employment resulting in life long injuries.  All employees which includes the Plaintiff who have inmate contact while working in C.P.S.U are subjected to these hazards daily, this is why special assignment pay / hazard pay added to the salaries of employees who have inmate contact and who are assigned to and are working in the Central Punitive Segregation Unit, which the Plaintiff was wrongfully denied.  The Plaintiff was assigned to and working in the Central Punitive Segragation Unit and was elgible for and entitled to receive special assignment pay / hazard pay while employed, which is an additional 12% that should be added into her salary, which increases her average salary from $95,701.88 to $107,186.10 making her ordinary pension $53,593.05 anually,  and $4,466.08  monthly and increasing her disability pension which is ¾ of her average salary from $71,776.41, to  $80,389.57 annually, and  $6,699.13 Monthly which she moves the court to issue an order directing the Defendants to immediatly correct her monthly pension benefits and giving her back pay for a year and a half of lost wages, paying her the difference that was withheld from her the whole time her ordinary pension benefits were diminished and impaired in addition to paying $6,699.13 monthly. in disability pension benefits if the attached Proposed Order is not granted or signed by a

Judge.  The Plaintiff moves the court to order the Defendants to  pay the Plaintiff a performance of duty disabiity pension which now equates to $6,699.13 monthly from July 2018 to the present month March 2026 in the sum of $205,443.36 in addition to the disability pension the Plaintiff did not receive from January 2017 to July 2018 in the sum of $120,584.34, and $210,000.00 in back pay for lost wages for a year and half. The Defendants owe the Plaintiff an additonal $478.55 in pension benefits which is for the special assignment / hazard pay the Plaintiff was wrongfully denied which is an additonal 12% that is to be added to her average highest salary which is an additonal $478.55 per month to be added to her pension benefits and back pay from July 2018 to the present Month March 2026 in the sum of $44,026.60.  The Defendants failed to pay the Plaintiff the variable supplement of  $78,000.00 over the course of nine years in which the **Defendants owe the Plaintiff  $860,651.06 in back pay, for the payment of impaired and disminished ordinary pension benefits, unpaid performance of duty disablity pension benefits, unpaid terminal pay, unpaid variable supplements, and unpaid Special Assignment / Hazard Pay, all which excludes the Cost of Living Adjustment which she did not receive either.**

This excludes other damages the Plaintiff claims for injures the Defendants and their criminal accomplices whom they conspire with and act in concert with interstate have intentionally inflicted upon her and her relatives interstate during this 11 year and three month ordeal which has not ceased and involves Conspiracy, Terrorism, Interstate Stalking / Coordinated Stalking resulting multiple wrongful deaths that were premeditated murders and hate crimes, in additon to the Defendants and their accomplices continue to stalk, and forcibly exploit the Plaintiff and her relatives 24/7 in

which they criminal trespass upon the Plaintiff's and her relatives houses and effects where they have a reasonable expectation of privacy, while unlawfully installing surreptitious eavesdropping and surveillance equipment monitoring, recording and publicly disseminating unlawful surveillance images of them over the world wide web and closed circuit tv without their knowledge and without their implied and expressed consent, in addition to the defendants unlawfully intercepting and publicly disseminating all of the Plaintiff and her relatives oral, wire, wireless electronic communications in addition to other egregious inhumane abuses in which the relations back doctrine applies. Upon the Plaintiff filing her Complaint she demanded a Trial by Jury.  February 6, 2026 the Plaintiff requested a Preliminary Conference for March 6, 2026, upon the Plaintiff appearing for the Preliminary Conference and finding out that this a Preliminary Conference was not scheduled she filed a Notice of Special Appearance and the Proposed Case Management Plan and Scheduling Order she prepared for this Preliminary Conference she requested.

March 17, 2026, the Plaintiff requested that this unscheduled Preliminary Conference be rescheduled for March 24, 2026 as a Preliminary / Settlement Conference.

Please take notice that the Plaintiff is not receiving all of her mail, and as of March 17, 2026 her incoming email has been blocked, and she does not have access to the courts CM /ECF System to know the status of her case or to veiw any Orders filed or changes in her case status. The Plaintiff requested access to the courts CM / ECF System.

Date: March 23, 2026

*Vicky Ware Bey*

_____
Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

CC:     Attorney of Record for the Defendants
        Kayla Coles Esq
        c/o The City of New York Law Department / Corporation Counsel
        100 Church Street
        New York, New York 10007
        Kcoles@law.nyc.gov and via S.D.N.Y CM / ECF

FILED: KINGS COUNTY CLERK 10/16/2019 01:38 PM    INDEX NO. 518540/2019
NYSCEF DOC. NO. 146    a114    RECEIVED NYSCEF: 10/16/2019



**NEW YORK CITY DEPARTMENT OF CORRECTION**
Joseph Ponte, Commissioner

Nadene M. Pinnock, Deputy Commissioner
Claudette Wynter, Assistant Commissioner
Human Resources
75-20 Astoria Blvd., Suite 320
East Elmhurst, NY 11370
718 • 546 • 3100
Fax 718 • 278 • 6064

January 19, 2017

Vicky Ware
80 Patton Avenue
Wyandanch, N.Y 11798

TITLE: Correction Officer:   EmpLID: █████

Re:  Notice of Medical Separation/Termination Under the Civil Service Law Section 73

Dear Officer Ware:

On November 22, 2016, a letter was sent to you by first class mail requesting that you resolve your employment status with the Agency by October 1, 2016.  As of the date of this letter, we have not received a response from you, therefore, your employment status with this Agency is terminated effective **January 22, 2017,** in accordance with the provisions of Section 73 of the Civil Service Law.

Pursuant to Section 73 of the Civil Service Law, you may within one year after the termination of your medical disability, to make an application to the **Office of the Director of Medical Appeals and Reinstatements, Corinne Stahl, at the New York City Department of Citywide Administrative Services, One Centre Street, New York, New York 10007;** for the purpose of determining whether you are mentally and physically fit to perform the duties of your position.  Your application for reinstatement **MUST** include a copy of this letter along with a letter and report from your physician, dated within 2 months of the date of your application for reinstatement, certifying that you are fit to perform the duties of your position.  Forms can be acquired on-line at: http://nyc.gov/html/dcas/downloads/pdf/misc/appl_reinstatement.pdf

If after a city medical examination, you are found physically and mentally fit to perform all essential tasks and duties required for your position, you may be reinstated to your former position, if vacant, or to a vacancy in a similar position in a lower grade within the same occupational field.  If no appropriate vacancies exist, or if you are reinstated to a position in a lower grade, your name will be placed on a preferred list for your former position and you will be eligible for reinstatement to such former position. The eligibility period for reinstatement is four (4) years).

Sincerely,



Dahlia Grant, Director, Employee Services
DRG:sc

c:  Helena Smith, Deputy Warden In Command, HMD
     Personnel file

*Visit NEW YORK'S BOLDEST on the Web at: www.nyc.gov/boldest*

E002

## NYCERS
NYC Employees' Retirement System

March 23, 2018

Vicky Ware
80 Patton Avenue
Wyandanch, NY 11798

**Regular and Certified Mail Return Receipt Requested**

M# ▮▮▮▮

Dear Vicky Ware:

This office is in receipt of an application for Disability Retirement pursuant to §507-a and §507-c of Article 14 of the Retirement and Social Security Law (RSSL) filed on **February 13, 2017.**

A review of the records show that you became a member of the New York City Employees' Retirement System (NYCERS) on **July 6, 1998** and are a **Tier 3** member covered under the provisions of Article 14 of the RSSL.

Your claim of disability is based on incidents, which occurred **in May of 2010, on May 22, 2013** and **December 13, 2014.**

Please be advised that your employer, the **Department of Correction**, has reported to us that they do not have any records of incidents that occurred in **May of 2010** and **December 13, 2014.**

Therefore, the Medical Board can only consider the incident that occurred on **May 22, 2013**.

If you have any questions, please contact the appropriate personnel at the **Department of Correction** in this regard.

Sincerely,

Medical Unit

cc: E. Husamudeen, COBA
     Law Offices of Stuart Salles

WALK-IN    340 Jay Street
CENTER    Brooklyn, NY 11201
         (347) 643-3000

FORMS AND    30-30 47th Avenue, 10th Floor
CORRESPONDENCE    Long Island City, NY 11101
MAILING ADDRESS    www.nycers.org

EXECUTIVE    335 Adams
OFFICES    Street 2nd
         Floor

E003

Case 1:26-cv-00914-DEH-SN   Document 52   Filed 03/25/26   Page 102 of 353

**NOTICE TO EMPLOYEE:**

**Do you have to file?** Refer to the Form 1040 Instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2014 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2014 or if income is earned for services provided while you were an inmate at a penal institution. For 2014 income limits and more information, visit www.irs.gov/eitc. Also see Pub. 596, Earned Income Credit. Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. The amount reported with code DD is not taxable.

**Credit for excess taxes.** If you had more than one employer in 2014 and more than $7,254 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $3,828 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit.

See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

**Instructions for Employee**

**Box 1.** Enter this amount on the Wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 10.** This amount is the total dependent care benefits your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5000 also is included in Box 1. Complete form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $17,500 ($12,000 if you only have SIMPLE plans; $20,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $17,500.

However, if you were at least age 50 in 2014, your employer may have allowed an additional deferral of up to $5,500 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D, E, G, AA, BB or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**D )** Elective deferrals to a Section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E )** Elective deferrals under a section 403(b) salary reduction agreement.

**G )** Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan.

**AA )** Designated Roth contributions to a section 401(k) plan.

**BB )** Designated Roth contributions under a section 403(b) plan.

**DD )** Cost of employer-sponsored health coverage. The amount reported with code DD is not taxable.

**EE )** Designated Roth contributions under a governmental section 457(b) plan. The amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement Plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub.590, Individual Retirement Arrangements (IRAs).

**Note.** Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help protect your social security benefits, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008    THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE

| W-2 WAGE & TAX STATEMENT | A) | | DUPLICATE 02/20/2018 72 0001 |
|---|---|---|---|

| B) EMPLOYER IDENTIFICATION NUMBER | 1. WAGES & OTHER COMPENSATION | 2. FEDERAL INCOME TAX WITHHELD |
|---|---|---|
| 13-6400434 | 86,738.16 | 14,848.30 |

| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | 3. SOCIAL SECURITY WAGES | 4. SOCIAL SECURITY TAX WITHHELD |
|---|---|---|
| CITY OF NEW YORK | 89,935.17 | 5,575.98 |
| 450 WEST 33RD STREET, 4TH FL. | 5. MEDICARE WAGES | 6. MEDICARE TAX WITHHELD |
| NEW YORK, NY 10001 | 89,935.17 | 1,304.06 |

| D) CONTROL NUMBER | 10 DEPENDENT CARE BENEFITS |
|---|---|

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 | |
|---|---|---|---|
| | | CODE | AMOUNT |
| VICKY WARE | | 12A DD | 7,685.50 |
| 80 PATTON AVENUE | | 12B | |
| WYANDANCH NY 11798 | | 12C | |
| | 13 [X] RETIREMENT PLAN | 12D | |
| | | 12E | |
| | | 12F | |

| 2014 TAX YEAR | COPY C | EMPLOYEE'S COPY |
|---|---|---|

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 86,738.16 | 4,896.46 | IRC 414H | 3,197.01 |
| 20A LOCALITY NAME | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 345.33 |
| NYC | | | FRINGE | 619.96 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008    THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE

| W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO. | DUPLICATE 02/20/2018 72 0001 |
|---|---|---|

| B) EMPLOYER IDENTIFICATION NUMBER | 1. WAGES & OTHER COMPENSATION | 2. FEDERAL INCOME TAX WITHHELD |
|---|---|---|
| 13-6400434 | 86,738.16 | 14,848.30 |

| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | 3. SOCIAL SECURITY WAGES | 4. SOCIAL SECURITY TAX WITHHELD |
|---|---|---|
| CITY OF NEW YORK | 89,935.17 | 5,575.98 |
| 450 WEST 33RD STREET, 4TH FL. | 5. MEDICARE WAGES | 6. MEDICARE TAX WITHHELD |
| NEW YORK, NY 10001 | 89,935.17 | 1,304.06 |

| D) CONTROL NUMBER | 10 DEPENDENT CARE BENEFITS |
|---|---|

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 | |
|---|---|---|---|
| | | CODE | AMOUNT |
| VICKY WARE | | 12A DD | 7,685.50 |
| 80 PATTON AVENUE | | 12B | |
| WYANDANCH NY 11798 | | 12C | |
| | 13 [X] RETIREMENT PLAN | 12D | |
| | | 12E | |
| | | 12F | |

| 2014 TAX YEAR | COPY B | TO BE FILED WITH EMPLOYEE'S FEDERAL TAX RETURN |
|---|---|---|

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 86,738.16 | 4,896.46 | IRC 414H | 3,197.01 |
| 20A LOCALITY NAME | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 345.33 |
| NYC | | | FRINGE | 619.96 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

| W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO. | DUPLICATE 02/20/2018 72 0001 |
|---|---|---|

| B) EMPLOYER IDENTIFICATION NUMBER | 1. WAGES & OTHER COMPENSATION | 2. FEDERAL INCOME TAX WITHHELD |
|---|---|---|
| 13-6400434 | 86,738.16 | 14,848.30 |

| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | 3. SOCIAL SECURITY WAGES | 4. SOCIAL SECURITY TAX WITHHELD |
|---|---|---|
| CITY OF NEW YORK | 89,935.17 | 5,575.98 |
| 450 WEST 33RD STREET, 4TH FL. | 5. MEDICARE WAGES | 6. MEDICARE TAX WITHHELD |
| NEW YORK, NY 10001 | 89,935.17 | 1,304.06 |

| D) CONTROL NUMBER | 10 DEPENDENT CARE BENEFITS |
|---|---|

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 | |
|---|---|---|---|
| | | CODE | AMOUNT |
| VICKY WARE | | 12A DD | 7,685.50 |
| 80 PATTON AVENUE | | 12B | |
| WYANDANCH NY 11798 | | 12C | |
| | 13 [X] RETIREMENT PLAN | 12D | |
| | | 12E | |
| | | 12F | |

| 2014 TAX YEAR | COPY 2 | TO BE FILED WITH EMPLOYEE'S STATE, CITY OR LOCAL TAX RETURN |
|---|---|---|

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 86,738.16 | 4,896.46 | IRC 414H | 3,197.01 |
| 20A LOCALITY NAME | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 345.33 |
| NYC | | | FRINGE | 619.96 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

**Do you have to file?** Refer to the Form 1040 Instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).**
You may be able to take the EIC for 2015 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2015 or if income is earned for services provided while you were an inmate at a penal institution. For 2015 income limits and more information, visit www.irs.gov/eitc. Also see Pub. 596, Earned Income Credit. Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. The amount reported with code DD is not taxable.

**Credit for excess taxes.** If you had more than one

employer in 2015 and more than $7,347 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $4,321.80 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

**Note.** If a year follows code D, E, G, AA, BB or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**Instructions for Employee**

**Box 1.** Enter this amount on the Wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 10.** This amount includes the total dependent care benefits your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5000 also is included in Box 1. Complete form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $18,000 ($12,500 if you only have SIMPLE plans; $21,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $18,000.

However, if you were at least age 50 in 2015, your employer may have allowed an additional deferral of up to $6,000 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher

for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D, E, G, AA, BB or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**D )** Elective deferrals to a Section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E )** Elective deferrals under a section 403(b) salary reduction agreement.

**G )** Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan.

**AA )** Designated Roth contributions to a section 401(k) plan.

**BB )** Designated Roth contributions under a section 403(b) plan.

**DD )** Cost of employer-sponsored health coverage. The amount reported with code DD is not taxable.

**EE )** Designated Roth contributions under a governmental section 457(b) plan. The amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement Plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub.590, Individual Retirement Arrangements (IRAs).

**Note.** Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help protect your social security benefits, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008    THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE

| W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO. ▓▓▓ | DUPLICATE 02/20/2018 72 0001 | |
|---|---|---|---|
| B) EMPLOYER IDENTIFICATION NUMBER ▓▓▓ | | 1. WAGES & OTHER COMPENSATION 93,784.46 | 2 FEDERAL INCOME TAX WITHHELD 16,664.87 |
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE CITY OF NEW YORK 450 WEST 33RD STREET, 4TH FL. NEW YORK, NY 10001 | | 3. SOCIAL SECURITY WAGES 97,269.63 | 4 SOCIAL SECURITY TAX WITHHELD 6,030.72 |
| | | 5 MEDICARE WAGES 97,269.63 | 6 MEDICARE TAX WITHHELD 1,410.41 |
| D) CONTROL NUMBER | | | 10 DEPENDENT CARE BENEFITS |

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 | |
|---|---|---|---|
| | | CODE | AMOUNT |
| VICKY WARE 80 PATTON AVENUE WYANDANCH NY 11798 | | 12A DD | 8,436.44 |
| | | 12B | |
| | 13 [X] RETIREMENT PLAN | 12C | |
| | | 12D | |
| | | 12E | |
| | | 12F | |

| 2015 TAX YEAR | COPY C | EMPLOYEE'S COPY | |
|---|---|---|---|

| 15 NAME OF STATE NEW YORK | 16 STATE WAGES, ETC 93,784.46 | 17 STATE INCOME TAX WITHHELD 5,427.49 | 14 OTHER IRC 414H 3,485.17 |
|---|---|---|---|
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 372.56 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | |

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008    THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE

| W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO. ▓▓▓ | DUPLICATE 02/20/2018 72 0001 | |
|---|---|---|---|
| B) EMPLOYER IDENTIFICATION NUMBER ▓▓▓ | | 1. WAGES & OTHER COMPENSATION 93,784.46 | 2 FEDERAL INCOME TAX WITHHELD 16,664.87 |
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE CITY OF NEW YORK 450 WEST 33RD STREET, 4TH FL. NEW YORK, NY 10001 | | 3. SOCIAL SECURITY WAGES 97,269.63 | 4 SOCIAL SECURITY TAX WITHHELD 6,030.72 |
| | | 5 MEDICARE WAGES 97,269.63 | 6 MEDICARE TAX WITHHELD 1,410.41 |
| D) CONTROL NUMBER | | | 10 DEPENDENT CARE BENEFITS |

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 | |
|---|---|---|---|
| | | CODE | AMOUNT |
| VICKY WARE 80 PATTON AVENUE WYANDANCH NY 11798 | | 12A DD | 8,436.44 |
| | | 12B | |
| | 13 [X] RETIREMENT PLAN | 12C | |
| | | 12D | |
| | | 12E | |
| | | 12F | |

| 2015 TAX YEAR | COPY B | TO BE FILED WITH EMPLOYEE'S FEDERAL TAX RETURN | |
|---|---|---|---|

| 15 NAME OF STATE NEW YORK | 16 STATE WAGES, ETC 93,784.46 | 17 STATE INCOME TAX WITHHELD 5,427.49 | 14 OTHER IRC 414H 3,485.17 |
|---|---|---|---|
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 372.56 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | |

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

| W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO. ▓▓▓ | DUPLICATE 02/20/2018 72 0001 | |
|---|---|---|---|
| B) EMPLOYER IDENTIFICATION NUMBER ▓▓▓ | | 1. WAGES & OTHER COMPENSATION 93,784.46 | 2 FEDERAL INCOME TAX WITHHELD 16,664.87 |
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE CITY OF NEW YORK 450 WEST 33RD STREET, 4TH FL. NEW YORK, NY 10001 | | 3. SOCIAL SECURITY WAGES 97,269.63 | 4 SOCIAL SECURITY TAX WITHHELD 6,030.72 |
| | | 5 MEDICARE WAGES 97,269.63 | 6 MEDICARE TAX WITHHELD 1,410.41 |
| D) CONTROL NUMBER | | | 10 DEPENDENT CARE BENEFITS |

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 | |
|---|---|---|---|
| | | CODE | AMOUNT |
| VICKY WARE 80 PATTON AVENUE WYANDANCH NY 11798 | | 12A DD | 8,436.44 |
| | | 12B | |
| | 13 [X] RETIREMENT PLAN | 12C | |
| | | 12D | |
| | | 12E | |
| | | 12F | |

| 2015 TAX YEAR | COPY 2 | STATE, CITY | TO BE FILED WITH EMPLOYEE'S OR LOCAL TAX RETURN |
|---|---|---|---|

| 15 NAME OF STATE NEW YORK | 16 STATE WAGES, ETC 93,784.46 | 17 STATE INCOME TAX WITHHELD 5,427.49 | 14 OTHER IRC 414H 3,485.17 |
|---|---|---|---|
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 372.56 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | |

NYSCEF DOC. NO. 282

INDEX NO. 518540/2019

RECEIVED NYSCEF: 10/08/2019

Case 1:20-cv-00914-DEH-SN  Document 52  Filed 03/25/26  Page 104 of 353

### W-2 WAGE & TAX STATEMENT — COPY C — EMPLOYEE'S COPY — 2016 TAX YEAR

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE

DUPLICATE 02/20/2018 72 0001

| Field | Value |
|---|---|
| A) EMPLOYEE'S SOCIAL SECURITY NO. | [redacted] |
| B) EMPLOYER IDENTIFICATION NUMBER | [redacted] |
| 1 WAGES & OTHER COMPENSATION | 96,343.21 |
| 2 FEDERAL INCOME TAX WITHHELD | 17,114.54 |
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | CITY OF NEW YORK, 450 WEST 33RD STREET, 4TH FL., NEW YORK, NY 10001 |
| 3 SOCIAL SECURITY WAGES | 99,900.86 |
| 4 SOCIAL SECURITY TAX WITHHELD | 6,193.85 |
| 5 MEDICARE WAGES | 99,900.86 |
| 6 MEDICARE TAX WITHHELD | 1,448.56 |
| D) CONTROL NUMBER | |
| 10 DEPENDENT CARE BENEFITS | |
| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | VICKY WARE, 80 PATTON AVENUE, WYANDANCH NY 11798 |
| 11 NONQUALIFIED PLANS | |
| RETIREMENT PLAN | X |

12 SEE INSTRUCTIONS FOR BOX 12

| CODE | AMOUNT |
|---|---|
| 12A DD | 8,579.51 |
| 12B | |
| 12C | |
| 12D | |
| 12E | |
| 12F | |

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 96,343.21 | 5,622.12 | IRC 414H | 3,557.65 |
| 20A LOCALITY NAME | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 367.31 |
| NYC | | | FRINGE | 619.96 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

### W-2 WAGE & TAX STATEMENT — COPY B — TO BE FILED WITH EMPLOYEE'S FEDERAL TAX RETURN — 2016 TAX YEAR

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE

DUPLICATE 02/20/2018 72 0001

| Field | Value |
|---|---|
| A) EMPLOYEE'S SOCIAL SECURITY NO. | [redacted] |
| B) EMPLOYER IDENTIFICATION NUMBER | [redacted] |
| 1 WAGES & OTHER COMPENSATION | 96,343.21 |
| 2 FEDERAL INCOME TAX WITHHELD | 17,114.54 |
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | CITY OF NEW YORK, 450 WEST 33RD STREET, 4TH FL., NEW YORK, NY 10001 |
| 3 SOCIAL SECURITY WAGES | 99,900.86 |
| 4 SOCIAL SECURITY TAX WITHHELD | 6,193.85 |
| 5 MEDICARE WAGES | 99,900.86 |
| 6 MEDICARE TAX WITHHELD | 1,448.56 |
| D) CONTROL NUMBER | |
| 10 DEPENDENT CARE BENEFITS | |
| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | VICKY WARE, 80 PATTON AVENUE, WYANDANCH NY 11798 |
| 11 NONQUALIFIED PLANS | |
| RETIREMENT PLAN | X |

12 SEE INSTRUCTIONS FOR BOX 12

| CODE | AMOUNT |
|---|---|
| 12A DD | 8,579.51 |
| 12B | |
| 12C | |
| 12D | |
| 12E | |
| 12F | |

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 96,343.21 | 5,622.12 | IRC 414H | 3,557.65 |
| 20A LOCALITY NAME | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 367.31 |
| NYC | | | FRINGE | 619.96 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

### W-2 WAGE & TAX STATEMENT — COPY 2 — TO BE FILED WITH EMPLOYEE'S STATE, CITY OR LOCAL TAX RETURN — 2016 TAX YEAR

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

| Field | Value |
|---|---|
| A) EMPLOYEE'S SOCIAL SECURITY NO. | [redacted] |
| B) EMPLOYER IDENTIFICATION NUMBER | [redacted] |
| 1 WAGES & OTHER COMPENSATION | 96,343.21 |
| 2 FEDERAL INCOME TAX WITHHELD | 17,114.54 |
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | CITY OF NEW YORK, 450 WEST 33RD STREET, 4TH FL., NEW YORK, NY 10001 |
| 3 SOCIAL SECURITY WAGES | 99,900.86 |
| 4 SOCIAL SECURITY TAX WITHHELD | 6,193.85 |
| 5 MEDICARE WAGES | 99,900.86 |
| 6 MEDICARE TAX WITHHELD | 1,448.56 |
| D) CONTROL NUMBER | |
| 10 DEPENDENT CARE BENEFITS | |
| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | VICKY WARE, 80 PATTON AVENUE, WYANDANCH NY 11798 |
| 11 NONQUALIFIED PLANS | |
| RETIREMENT PLAN | X |

DUPLICATE 02/20/2018 72 0001

12 SEE INSTRUCTIONS FOR BOX 12

| CODE | AMOUNT |
|---|---|
| 12A DD | 8,579.51 |
| 12B | |
| 12C | |
| 12D | |
| 12E | |
| 12F | |

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 96,343.21 | 5,622.12 | IRC 414H | 3,557.65 |
| 20A LOCALITY NAME | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 367.31 |
| NYC | | | FRINGE | 619.96 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

Vicky Ware
c/o 80 Patton Avenue
Wyandanch Territory, New York Republic [11798]

August 27, 2018

Melanie Whinnery, Executive Director
NEW YORK CITY EMPLOYEE'S RETIREMENT SYSTEM
335 Adams Street, Suite 2300
Brooklyn Territory, New York Republic [11798]
Certified Mail Return Receipt Requested: 7017 2400 0000 9860 0198

RE:  Vicky Ware Pension # ███████,
      Reference / request numbers 1-1-1608671205, and 1-1-1609578038

Dear Ms. Melanie Whinnery, Executive Director:

I am writing to you regarding reference and service request number # 1-1-1608671205 (see attachment) dated August 24, 2018, pertaining to the error N.Y.C.E.R.S made with my pension number.  Recently NYCERS made a mistake pertaining to my pension number and confused it with another number.  My pension number is 511681, and has been confused with pension number 411346-0, which is not my pension number.  Please correct this error as soon as possible.

I am also contacting you regarding my pension benefits under Disability Retirement.  March 23, 2018, I received a letter from N.Y.C.E.R.S stating that this office is in receipt of an application for Disability Retirement pursuant to 507-a, and 507-c of Article 14 of the Retirement and Social Security Law (RSSL) filed on February 13, 2017.  My claim for disability is based on incidents which occurred in May 2010, May 2013, and December 13, 2014. Please see attached letter from N.Y.C.E.R.S Medical Unit.

I was employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS July 1, 1998 and became a NYCERS member July 6, 1998, and I am a Tier 3 member who is covered under the provisions of Article 14 of the RSSL.  I have also sent this inquiry directly to you via NYCERS Email system please locate reference/service request number 1-1-1609578038 (see attachment).

Thank you, for your consideration and attention in this matter, please feel free to contact me at 347-869-8529.

Sincerely,

All Rights Reserved

Vicky Ware
80 Patton Avenue
Wyandanch Territory, New York Republic [11798]

November 6, 2018

Melanie Whinnery, Executive Director
New York City Employee Retirement Systems
335 Adams Street, Suite 2300
Brooklyn Territory, New York Republic [11201]

RE: Disability Retirement, Pension #

Dear Melanie Whinnery:

I am contacting you again in good faith regarding my disability retirement. October 2018, I received a letter from NYCERS requesting an option package, I submitted an option package to NYCERS in person and then resubmitted a copy of the option package to NYCERS via email. I am contacting you again in good faith because I received a letter dated March 2018 from NYCERS Medical Board stating I am covered under Article 14 of the RSSL 507a and 507C . This letter also stated that New York City Department of Corrections claimed they did not have any other records pertaining to some of my other work and inmate related injuries. I have also filed applications for disability retirement prior to February 2017 while I was an active member with a sufficient amount of medical documentation, and I have more that 17 years of active service with New York City Department of Corrections.

February 2017, I filed an application for disability retirement, my employer New York City Department of Corrections did not allow me to return to work because of my physical work and inmate related injuries which resulted in my physical disability in addition to my employer claiming to perceive me as having a mental disability. New York City Department of Corrections never cleared me to return to work based upon my work and inmate related physical injuries that are the proximate cause of my physical disabilities, and the Departments claim of perceiving me as having a mental disability which is occupationally related.

November 2017, I submitted another application for disability retirement provided NYCERS with medical documentation and a medical separation / termination letter

from my employer again which has already proven my eligibility for disability retirement under Article 14 RSSL 507c.

Recently, I received a letter from NYCERS requesting additional medical documentation, I have already submitted a sufficient amount of medical documentation to NYCERS pertaining to my applications for disability retirement, and as a result of being discriminated against by my employer NEW YORK CITY DEPARTMENT OF CORRECTIONS who constructively forced me out of employment based upon my work and inmate related injuries that caused my disabilities I am enduring an undue hardship because of their unlawful discriminatory actions towards me. I was already deprived of hazard pay while I was working for them and now, I don't have medical insurance because the Department refused to complete the medical change form I sent to them. They refuse to complete it because I didn't have a pension payability receipt. NYCERS sent a letter to me stating my pension payability date, I submitted this letter to the Department and they still refused to complete section J of the health insurance change form. This is causing an another hardship in addition to not receiving full disability retirement benefits I am eligible for.

The regular retirement pension benefits I received from July to the present time have been incorrect. The last three consecutive years I worked for Corrections I earned 99,900.86 ; 97,269.63 and 89,935.17, my average earnings are 95,701.88 per year, which means at this time I should at least be receiving 3,987.53 in regular pension benefits until my disability pension benefits become effective. So far I have been getting 2,868.00 which is 1,119.53 short.

As a Tier 3 Member who sustained work and inmate related physical injuries that resulted in my physical disabilities I am eligible for disability retirement pursuant to Article 14, RSSL 507c.

Sincerely,

Cc:    Thomas P. DiNapoli
OFFICE OF THE NEW YORK STATE COMPTROLLER
110 State Street,
Albany Territory, New York Republic [12236]

Thomas P. DiNapoli
OFFICE OF THE NEW YORK STATE COMPTROLLER
59 Maiden Lane
New York Territory, New York Republic [10038]

From: reply <reply@customerservice.nyc.gov>
  To: C21RES <C21RES@AOL.COM>
Subject: City of New York Auto Acknowledgment Correspondence # 1-1-1690201978
  Date: Mon, Mar 4, 2019 5:25 am

Dear VICKY WARE:

Thank you for contacting the City of New York. Your message has been forwarded to the appropriate agency for review and handling.

For future reference, your service request number is 1-1-1690201978.

Sincerely,

The City of New York

This is an auto-generated system message. Please do not reply to this message. Messages received through this address are not processed.

Thank you.

The information you have provided is as follows:
Form: Customer Comment
Topic: Other
Name: VICKY WARE
Street Address: 80 PATTON AVENUE
City, State Zip: WYANDANCH, NY 11798
Country: United States
Email: C21RES@AOL.COM
Company:
Work Phone:
Message:
Good Morning Ms. Whinnery:

I am contacting you regarding a letter I received dated February 25, 2019, On or about January 21, 2019 I completed another option package and mailed it to NYCERS at 30-30 47th Avenue, Long Island City Territory, New York Republic

From: Vicky <c21res@aol.com>
    To: MelanieWhinnery <MelanieWhinnery@nycers.gov>
Subject: Fwd: OPTION SELECTION FORM
    Date: Mon, Mar 4, 2019 5:24 am

-----Original Message-----
From: Vicky <c21res@aol.com>
To: melaniewhinnery <melaniewhinnery@nycers.gov>
Sent: Mon, Mar 4, 2019 5:15 am
Subject: OPTION SELECTION FORM

Good Morning Ms. Whinnery:

I am contacting you regarding a letter I received dated February 25, 2019, On or about January 21, 2019 I
completed another option package and mailed it to NYCERS
at 30-30 47th Avenue, Long Island City Territory, New York Republic [11101] along with my beneficiaries birth
certificate.

Please contact them to see what happened to it or confirm if they have it. The letter I received dated February 25,
2019 did not have the form I needed to resubmit to you.
If you still require these forms again with my beneficiaries birth certificate. Please email it to me and I will return it
back to you as soon as possible.

Please feel free to contact me at 347-869-8529. If you would like I could email the copy of the letter that was sent to
me (Pension # 511681)

Sincerely,
Vicky Ware Bey
All Rights Reserved, UCC 1-207, 1-308, 1-103

a115



**NYCERS**

NYCERS USE ONLY      F610

REC'D NYCERS
MEDICAL

2017 FEB 13  PM 12:43

**Receipt For Disability Retirement Application**

Please retain this document for future reference.

Name
Vicky Ware

Member Number

Title
Correction Officer Dept of Correction

This will acknowledge receipt of the Disability Retirement Application filed with the New York City Employees' Retirement System on
(MM/DD/YYYY):
2/18/17

**Processing of the Disability Retirement Application**

The NYCERS Medical Division will determine your eligibility. You will be notified in writing if you are not eligible. If eligible, in order for your application to be processed, you must provide sufficient medical evidence to support the claim for Disability Retirement.

Upon receipt of the required medical evidence, the Medical Division will schedule you to appear before the NYCERS Medical Board for an interview and/or examination.

If the Medical Board recommends approval of the application, you will be entitled to receive an advance disability payment until your case is finalized.

If the Medical Board recommends denial of the application, we will provide you with a copy of the Medical Board report which will state the reasons for the denial. You will also be notified of the appeal process if it is applicable in your case.

Issued by:    NYCERS Medical Division
340 Jay Street
Mezzanine Level
Brooklyn, NY 11201

R12/16   WALK-IN  340 Jay Street
CENTER   Brooklyn, NY 11201
(347) 643-3000

Take a trip to NYCERS
submit your question or request
www.nycers.org

MAIL ONLY   30-30 47th Avenue, 10th Floor
DROP-OFF   Long Island City, NY 11101   Page 1 of 1

**NYCERS**  Mail completed form to:
30-30 47th Avenue, 10th Fl
Long Island City, NY 11101

*INR-ISSUED*

NYCERS USE ONLY    **F603**

RCC'D NYCERS
MEDICAL
2017 FEB 13 PM 12: 42

## Application for Disability Retirement
## Tier 3 Uniformed Correction Force Only

Member Number                Last 3 Digits of SSN          Home Phone Number              Date of Birth (MM/DD/YYYY)

**Select a Benefit:**
Be sure to read the requirements on the Terms page to determine which you qualify under. All applicants will be processed as
indicated. I am applying for (Mark all that apply)

☑ 507-a  Disability Retirement    ☐ 507-c  Performance of Duty Disability Retirement

☐ 207-a Heart Bill              ☐ 506 Ordinary Disability        ☐ 507 Accidental Disability

☐ Disability Retirement under the World Trade Center Law (see WTC Fact Sheet for more information)

This application is for Tier 3 Correction members who wish to apply for Disability Retirement. In order for NYCERS to process this
application, this form must be filled out in its entirety and notarized before submitting it for review. Please be sure you read and
understand the requirements for filing for Disability Retirement found on the terms pages. In addition to this form, you must also
submit (to NYCERS Medical Board):
- Applicant's Report of Personal Disability (form 605)
- Physician's Report of Disability (form 606)                    General Authorization (form 608)
                                                                 NYCERS Questionnaire (form 609)
**NOTE: If the address you provide on this form is different from your address in our system, the new address will become your
official address in our records.** Should you have any questions, please contact our Medical Unit at 347-643-3000.

First Name:  Vicky                        M.I.        Last Name:  Winge

Address:  80 Pattons Avenue                                                      Apt. Number

City:  Wyandanch                                          State  New York      Zip Code  11798

Agency:  NYC Department of Corrections Accardian Officer

**Select a Temporary Option:**
This section allows you to select a temporary option, which determines what will happen to your benefit if you should die before the
date of your first full payment. If you select either the Ten Year Certain or 100% Joint-And-Survivor option, you must select a
beneficiary on the next page. If you should die before selecting an option, or if you fail to name a beneficiary, **NO DEATH BENEFIT
WILL BE PAYABLE FROM NYCERS.** If you wish to select a different option, please contact NYCERS to get detailed
information. Please choose only one of the following:

☐ **Ten Year Certain** - Under this option, if you die within ten years of your retirement, the reduced monthly payment benefit will
be paid to your surviving primary beneficiary for the unexpired balance of the ten-year period. If the designated primary
beneficiary predeceases you, the balance of the payment amount to your contingent beneficiary. If none exists, it is paid in a
lump-sum to your estate. Should a primary beneficiary die after receiving payments, the balance will be paid in a lump-sum to your contingent
beneficiary. If none exists, the lump-sum balance is paid to the estate of the primary beneficiary. You may nominate both a
primary and a contingent beneficiary under this option.

☐ **100% Joint-and-Survivor** - This option insures you and your designated beneficiary a reduced benefit for lifetime. Should you
die, your designated beneficiary will receive a percentage of your benefit. Because this option guarantees two specific people an
income for life, the life expectancies of the retiree as well as the beneficiary are taken into consideration. Therefore, once you
designate a beneficiary and the option is in force, you cannot change your beneficiary designation, even if he/she precedes you
in death. You may only nominate a primary beneficiary under this option.

☑ **The Maximum Retirement Allowance** - This option provides the greatest benefit payment to you while you are retired, for
as long as you live. However, under the Maximum Retirement Allowance, no further payments will be made after your death.

**Sign this form and have it notarized. Page 2**

R12/16    WALK-IN    340-5 [...]        [...]              MAIL ONLY    30-30 47th Avenue, 10th Floor    Page 1 of 3
          CENTER    Brooklyn, NY 11201                    NO DROP-OFF    Long Island City, NY 11101



**Performance of Duty Disability Retirement §507-a** To apply for this benefit a member must have a minimum of ten or more years of credited service (of which 2 years must be member service)

There is no minimum service requirement if you apply for disability retirement from a line of duty injury that occurred while you are a member and will be you were on City service and is a natural and proximate result of an accidental injury, not caused by your own negligence.

**Performance of Duty Disability Retirement §507-c** If you apply for a performance of duty disability there is no minimum service requirement. However, you must be disabled by ... its ... natural and proximate cause of an act of an inmate. You may also apply under §507-c if you have contracted HIV through the bodily fluids of an inmate, tuberculosis or hepatitis while in the performance of your duties.

**Heart Bill §207-k** You may apply for a disability retirement benefit under the Heart Bill for heart disease which will be presumed to have been contracted in the course of your performance of duty.

**You may apply for Disability retirement under all of the above provisions.**

**Eligibility requirements for Disability under §507-a and §507-c of Article 14 and under §207-o of the General Municipal Law** You must file the application while you are actually employed in City service or within three months from the last day you were being paid on the payroll, or no later than 12 months after the end of the natural period for which you were entitled to regular pay if you were on leave of absence for medical reasons, including Workers' Compensation.

Sign this form and have it notarized. **THIS PAGE**

E012

a118

**NYCERS**  Mail completed form to:
30-30 47th Avenue, 10th Fl
Long Island City, NY 11101

NYCERS USE ONLY    F266

Member Number ▮    Last 4 Digits of SSN ▮

☑ **100% Joint-and-Survivor**

This option assures you and your designated beneficiary a reduced lifetime benefit. Upon your death, your designated beneficiary will receive the same lifetime benefit. Because this option guarantees two specific people an income for life, the life expectancies of the retiree as well as the beneficiary are taken into consideration. Therefore, once you designate a beneficiary and the option is in force, you cannot change your beneficiary designation, even if he/she precedes you in death. You may nominate only a primary beneficiary under this option.

First Name: Osmond    M.I.    Last Name: Weste

Full Social Security Number    Date of Birth (MM/DD/YY)    Relationship: Son

Address: 80 Phylens Avenue    Apt. Number

City: Wyandanch    State: NY    Zip Code: 11798

☐ If the beneficiary is a minor, check here and complete the guardian information on Form #137. If Form #137 is not submitted, NYCERS will require Letters of Guardianship for the Estate of the minor in order to pay a benefit to a minor.

-OR-

☐ **Ten-Year Certain**

If you die within ten years from the date of your retirement, a reduced monthly retirement benefit will continue to be paid to your surviving primary beneficiary for the unexpired balance of the ten-year period. If the designated primary beneficiary predeceases you, the balance of the payments due for the remainder of the ten-year period will be paid in a lump sum to your contingent beneficiary or, if none exists, to your estate. Should a primary beneficiary die after receiving payments, the balance will be paid in a lump sum to your contingent beneficiary. If none exists, the lump sum balance is paid to the estate of the primary beneficiary. You may nominate both a primary and a contingent beneficiary under this option.

**Tier 3 and 22-Year Plan members:** You may nominate your Estate instead of a person. You may name a Trust or nonprofit organization as a Contingent Beneficiary only. NYCERS will not pay a continuing benefit to a Trust or nonprofit organization, only to a person.

**Tier 4, Tier 6 and Special Plan members:** You may not name your estate as either the Primary or Contingent Beneficiary. You may name a Trust or nonprofit organization as a Contingent Beneficiary only. NYCERS will not pay a continuing benefit to a Trust or nonprofit organization, only to a person.

First Name    M.I.    Last Name

Full Social Security Number    Date of Birth (MM/DD/YY)    Relationship

Address    Apt. Number

City    State    Zip Code

☐ If this beneficiary is a minor, check here and complete the guardian information on Form #137. If Form #137 is not submitted, NYCERS will require Letters of Guardianship for the Estate of the minor in order to pay a benefit to the minor.

NYCERS USE ONLY    F206

**NYCERS**  Mail completed form to:
20-30 47th Avenue, 10th Fl
Long Island City, NY 11101

Member Number          Last 4 Digits of SSN

**Ten-Year Certain Contingent Beneficiary**

First Name                     M.I.    Last Name

Full Social Security Number    Date of Birth (MM/DD/YYYY)    Relationship

Address                                                       Apt. Number

City                                              State    Zip Code

**-OR-**

**Designation of Estate as Beneficiary — TIER 3 and 22-YEAR PLAN MEMBERS ONLY**

☐ I understand that by checking this box, the benefit payable under the Ten-Year Certain option will be payable to my Estate.

**Federal Tax Withholding**

Federal tax law provides that all payors are required to withhold federal income tax on periodic payments (similar to wages), unless you elect to be excluded from such withholding. This election will remain in effect until revoked by you. If you do not complete this election, Federal income tax will be withheld at the rate of a married individual claiming three exemptions.

**Please indicate your withholding selection by marking the appropriate choice below:**

1. ☐ Do not withhold Federal income tax from my pension. (Do not complete 2 or 3 if you select this option)

2. ☐ Withhold based on _____ number of exemptions using the following status. (You may also enter a dollar amount in choice 3.)

   (Check one only)    ☐ Single    ☐ Married    ☐ Married, but withhold at higher "Single" rate

3. ☐ In addition to the amount withheld based on my exemptions and filing status in choice 2,

   I would like to withhold $ _____ per Month (Must specify dollar amount only)

Note: You cannot enter an amount here without entering a number of exemptions in choice 2 (even if that number is zero).

I, the undersigned, hereby make application for payment of a vested Retirement Benefit under the applicable provision of the Retirement and Social Security Law (RSSL).

Signature of Member                                        Date

_____

**This form must be acknowledged before a Notary Public or Commissioner of Deeds**

State of _____ County of _____    On this _____ day of _____ , 20 ___ personally appeared

before me the above named,
me to be the individual described in and who executed the foregoing instrument, and he or she acknowledged to me that he or she executed the same, and that the statements contained therein are true.

Signature of Notary Public or
Commissioner of Deeds

Official Title

Expiration Date of Commission

WALK-IN    340 Jay Street
CENTER    Brooklyn, NY 11201
          (347) 643-3000

Visit us to log in to NYCERS or
Activate your account at MyNYCERS, the secure account at
www.nycers.org

MAIL ONLY    20-30 47th Avenue, 10th Floor
             Long Island City, NY 11101

F1206    Page 1 of 1





**NYCERS**

November 23, 2011

Vicky Ware

███████████

M# ████

Dear Ms. Ware:

As you were previously advised, the NYCERS' Medical Board recommended denial of the application filed on May 31, 2011 for disability retirement. In this regard, please find enclosed a copy of the Medical Board report based on the findings of the NYCERS' Medical Board.

Very truly yours,

*Oneta Killebrew*

Oneta Killebrew
Manager, Medical Unit
Operations Division

OK: dc

cc: M. Kalmus, Esq.

FW: Relinquishment of DOC Property re: Vicky Ware, Sh#10901,...    8134        https://mail.aol.com/webmail-std/en-us/PrintMessage

New York City Department of Correction
Health Management Division / C.A.R.E.
59-17 Junction Boulevard – Suite 1403
Rego Park, New York 11368

Office: 718 595-2554
Fax:  718 595-2573
Cell:  917 832-0059

From: Grant, Dahlia
Sent: Monday, January 30, 2017 9:30 AM
To: Smith, Helena <Helena.Smith@doc.nyc.gov>
Cc: Pinnock, Nadene M. <Nadene.Pinnock@doc.nyc.gov>; Wynter, Claudette <Claudette.Wynter@doc.nyc.gov>;
Villalona, Angel <Angel.Villalona@doc.nyc.gov>; Juarbe, David Jr. <david.juarbe@doc.nyc.gov>
Subject: FW: Employment Status re: Vicky Ware, Sh#10901, Ref#0448823, OBCC

Good morning,

Ms. Ware is Medically Separated from DOC. That action is correct. See PMS screen below.

When she reaches her 20 year anniversary, which, according to NYCERS, **is something in July 2018**, she will be
eligible to receive pension benefits through NYCERS. This information was explained to her by a NYCERS
representative when she submitted her Vesting application to them. Thereafter, David Juarbe spoke with Ms.
Ware and once again explained the Vesting process to her as well as her status with the agency. *According to
David, Ms. Ware does not seem to comprehend the Vesting process/status with agency.

Since she is Medically separated from the agency, she must relinquish her departmental properties.

*We are willing to send her something in writing regarding the above.

```
EMPLOYEE ID:  ████          EMP NAME:  WARE        VICKY
PAY NO:  072          JOB SEQ#:  1        CURR LV STAT: A
EFF DATE:  01/30/17
         RSN TYPE
CHG NO  EFF DATE  B T M L X  RSN CD  ----------DESCRIPTION--------- LV STAT
 01  01/22/17    -     F37    DISMISSED MED DISABI SEC 71/73   A
```

Thanks.

Best Regards,

Dahlia R. Grant - Director, Employee Services - Human Resources|
Phone: 718-546-3172 | Mobile: 347-415-6024
75-20 Astoria Boulevard, Suite 320, E. Elmhurst, NY 11370

## CITY OF NEW YORK DEPARTMENT OF CORRECTION
### PERSONNEL DIVISION
### DEPARTMENTAL PROPERTY RECEIPT FORM

| FORM # 887 | REV. 12/87 | REFERENCE: GEN. ORDER #008/87 |
|---|---|---|

### SECTION #1 - TO BE COMPLETED BY MEMBER'S COMMAND

| RECEIVED FROM (EMPLOYEE'S NAME) | Wares, Vicky |
|---|---|

| RANK/TITLE | C.O. | SHIELD # | 10901 | COMMAND | OBCC |
|---|---|---|---|---|---|

| REASON (CHECK ONE) | [X] RETIREMENT   [ ] RESIGNATION   [ ] SUSPENSION |
|---|---|
| | [ ] TERMINATION   [ ] OTHER (SPECIFY) |

| FIREARMS INFORMATION | SERIAL NUMBER | | PISTOL PERMIT (CHECK ONE) |
|---|---|---|---|
| | MAKE | N/A | |
| [ ] CHECK IF APPLICABLE | MODEL NUMBER | | [ ] YES   [ ] NO |

| RECEIVED BY (PRINT NAME) | | RANK/TITLE | | SHIELD# |
|---|---|---|---|---|
| SIGNATURE | | | DATE | |

### SECTION #2 - TO BE COMPLETED BY THE APPLICANT INVESTIGATION UNIT, OR HR

| ITEMS (CHECK) | | | |
|---|---|---|---|
| | | SHIELD # | 10901 |
| [1] SHIELD | M | HAT PIECE # | — |
| [2] HAT PIECE | [ ] | RULES & REGULATIONS # | yes |
| [3] RULES & REGULATIONS | N | | |
| [4] IDENTIFICATION CARD | M | ID CONTROL # | ████ |
| [5] STAB/SLASH VEST | [ ] | STAB/SLASH VEST # | — |
| [6] BALLISTIC VEST | [ ] | | |
| [7] PARKING PASS | [ ] | BALLISTIC VEST # | — |

| PROPERTY IN SECTION #2 RECEIVED BY | PRINT NAME | Coshtan | DATE | 2/10/17 |
|---|---|---|---|---|
| | SIGNATURE | | | |
| | RANK/TITLE | C.O.I. | SHIELD # | 2096 |

| IDENTIFICATION CARD RETURNED TO MEMBER  (CHECK ONE) | [ ] YES   [X] NO |
|---|---|

| SIGNATURE OF MEMBER CONCERNED | |
|---|---|

### SECTION #3 - DISTRIBUTION

| ORIGINAL TO BE FILED AT MEMBER'S COMMAND | COPY TO PERSONNEL DIVISON |
|---|---|
| | COPY TO MEMBER |



November 23, 2011

Vicky Ware

███████████

M# ████

Dear Ms. Ware:

As you were previously advised, the NYCERS' Medical Board recommended denial of the application filed on May 31, 2011 for disability retirement. In this regard, please find enclosed a copy of the Medical Board report based on the findings of the NYCERS' Medical Board.

Very truly yours,

Orneta Killebrew
Manager, Medical Unit
Operations Division

OK: do

cc: M. Kalinus, Esq.

NYC Health

DIVISION OF HEALTH CARE ACCESS AND IMPROVEMENT
CORRECTIONAL HEALTH SERVICES    NAME: WARE

Facility: DBCC    Shield: 10501

**MEDICAL EVALUATION AND TREATMENT OF CORRECTION OFFICER / CIVILIAN**

Date/Time: 5/27/13

Employee reported for medical attention at Time: 7 AM / **PM**

S: ___ ___ in a use of force with Inmate ___
___ ___. I hurt my left knee & left ___ ___

O: VITAL SIGNS: T 97.2 lower back ___ P 16 R 18 BP 77 O2 ___ 12/85
HEENT: ___ ___ ___ ___ ___
Lungs: CTA Bil    A&O: Benign
Ext: Mild tenderness behind patella (L) knee ___
Skin: ___ ___ tenderness (L) ___ ___
Assessment / plan: ___ ___ pain

A/P (1) (L) knee pain
    ___ ___ ___, F/U c
    ___ ___ ortho if need
(2) Low back pain
    - Analgesic ___
    F/U c

[ x ] Follow up with PVT physician / DOC health management division
[ ] Transfer to ER/ hospital
COMPLETED COPY OF THIS FORM MUST BE FAXED TO PHS Employee H# 718 546 -3645

COMPLETED BY ___    PRINT / STAMP: ___
Clearly document all treatment and times.
Use an additional blank progress note to document as needed.
Employee discharged from medical clinic at Time ___ AM / **PM**

*FILED*
#0371J#

# TED L. GUNDERSON & ASSOCIATES

6230-A Wilshire Blvd., Suite 6
Los Angeles, California 90048
Phone: (337) 344-8876

I, Ted L. Gunderson, hereby swear under the pains and penalties of
jury that the following statements are true and correct:

1.   My name is Ted L. Gunderson. I am the owner and operator of Ted
     L. Gunderson & Associates, an international security and
     consulting firm based out of Santa Monica, California. I am
     currently a licensed private investigator in the state of California. I
     have performed private investigation and security work for
     numerous individuals, companies, and governments worldwide
     since founding my firm in 1979. I have worked for, amongst
     others, F. Lee Bailey, Esq., The California Narcotics Authority by
     appointment of Governor Jerry Brown, The 1984 Los Angeles
     Olympic Committee, and The 1979 Pan American Games in San
     Juan, Puerto Rico by appointment of then U.S. Attorney General
     Griffin Bell.

2.   Previous to my work as a private investigator I spent nearly three
     decades in the F.B.I. Between 1951 and 1960 I was an F.B.I.
     Special Agent. In 1960 I was promoted as a supervisor at F.B.I.
     Headquarters in Washington, D.C., where I was in charge of
     Organized Crime and Racketeering investigations covering 26
     F.B.I. Field Offices nationwide. Following the assassination of
     President John F. Kennedy, I was re-assigned to Special Inquiry
     White House Matters at F.B.I. Headquarters. In 1965 I was
     promoted again to Assistant Special Agent-In-Charge of Internal
     Security and Anti-Terrorism of the F.B.I. New Haven, Connecticut
     Field Office. In 1970 I was promoted to Assistant Special Agent-
     In-Charge of the F.B.I. Philadelphia, Pennsylvania Field Office.
     On July 12, 1972 I successfully negotiated with two terrorist
     hijackers of National Airlines Flight 496 for the release of 119
     passengers at Philadelphia International Airport. In 1973 I was
     promoted to Chief Inspector at F.B.I. Headquarters. I also served

as Special Agent-In-Charge of the F.B.I. Memphis and Dallas Field Offices. I retired from the F.B.I. as Senior Special Agent-In-Charge of the Los Angeles Field Office of the F.B.I. with over 700 employees and a budget of over 22 million dollars in 1979.

3. I have read the Complaint in the current action of Mr. Keith Labella against F.B.I. and D.O.J. It is my professional opinion, based on information, knowledge and belief that the information sought by Mr. Labella in this F.O.I.A. suit regarding "gang stalking", "gang stalking groups" and "gang stalking methods" reasonably describes an ongoing, active, covert nationwide program that is in effect today, and, based on my investigations and experience, has been operational since at least the early 1980's. Since the 1980's gang stalking has increased in scope, intensity and sophistication by adapting to new communications and surveillance technology. These programs are using the codenames Echelon Program, Carnivore System, and Tempest Systems. The Echelon Program is administered by the N.S.A. out of Fort Meade, Maryland, and monitors all email and phone calls in the world. Carnivore System is administered by the N.S.A. out of Fort Meade, Maryland, and can download any computer system without being traced or otherwise known to the owner. Tempest Systems can decipher what is on any computer screen up to a quarter of a mile away. These programs are negatively impacting thousands of Americans and severely abusing their civil rights on a daily basis.

4. Based on my investigative work, which includes intelligence from sources such as active and former members of the Intelligence Services (including the F.B.I., the C.I.A., the N.S.A. and Military Intelligence), information from informants active in criminal enterprises, and, victim testimonies, I have come to the conclusion that thousands of victims have been targeted by an illegal government rogue criminal enterprise that is active 24 hours a day within the U.S. This conspiracy is far too active to be controlled or operated by private enterprise whose goals are achieving financial gain. These operations require extensive financing with no return on the investment. This program's operations are financed by illegal black operations, i.e., narcotics, prostitution, child

2

kidnapping (children sell at covert auctions for up to $50,000 per child), human trafficking, gambling and other rackets.

5. I have documentation and know that throughout the U.S., operating 24 hours-a-day and 7 days-a-week, there is a Central Command, located within the U.S., with multiple satellite offices, whose administrators can instantly initiate surveillance, phone taps and harassment against any individual in the country. They have the technology, financing and manpower to dispense illegal surveillance and harassment against anyone at any time, day or night. I have files on numerous cases of active, programmatic, illegal government harassment currently being conducted against thousands of Americans. This makes the F.B.I.'s former COINTELPRO program, which I worked on, including in a supervisory capacity, look like a Sunday school program by comparison.

6. I firmly believe that most individuals working in the F.B.I., other intelligence agencies, and the government overall are honest, law-abiding public servants. However, a sophisticated network of rogue operatives has secretly infiltrated the F.B.I., other intelligence agencies including the C.I.A., and other key government positions. This rogue element seeks personal power and wealth and considers themselves above the law and the Constitution. They are carrying out the aforementioned surveillance and harassment activities in conjunction with organized crime, the cult movement in America including Satanic cults, other commercial and political interests, and even misguided civic organizations and neighborhood groups. This illegal surveillance and harassment program is being called gang stalking and organized stalking by the victims targeted by it. The victims are targeted for a variety of reasons including government and corporate whistleblowers, parties to financial and employment disputes, parties to marital disputes (usually divorced women), and even jilted paramours. Journalists covering controversial issues, and, even attorneys and private investigators representing unpopular clients or interests, have been targeted by this program.

7. Individuals targeted by this program have been subjected to illegal and unconstitutional phone taps, illegal re-routing of business and

private phone calls for purposes of harassment, illegal audio "bugging", surreptitious entry into home, office, and vehicle, visual surveillance in the home conducted by illegal placement of miniature remote, wireless cameras (often accessible via internet), illegal internet spyware, illegal GPS tracking (often through their own mobile phones), regular fixed and mobile surveillance, mail misdirection, mail theft and tampering, financial and employment sabotage, slander campaigns and community ostracizing , internet disinformation and smear campaigns, poisoning, assaults and murder, illegal set-ups on drug charges and other felony charges, amongst many other civil rights abuses.

8.   In addition to high-ranking members of the F.B.I., other intelligence services, and the government overall, wealthy, powerful members of criminal syndicates, multi-millionaires and the corporate elite are using the government gang stalking program to harass enemies. They can get a targeted individual harassed for the rest of that individual's life (individual cases of gang stalking lasting for over a decade are common). The higher status members of the gang stalking conspiracy initiate the gang stalking and coordinate logistics and funding. Lower echelon government rogue operatives, lower ranking members of the military (in violation of Posse Comitatus), petty criminals and street thugs perform the actual grunt work of daily monitoring and harassment of individuals targeted by the program.

9.   Based on my professional experience, extensive intelligence information and belief, it is my professional opinion that the F.B.I. is involved in and has investigative files on the subject of gang stalking, related gang stalking methods, and gang stalking groups in the F.B.I.'s vast intelligence files, that are responsive to Mr. Labella's F.O.I.A. Complaint. Furthermore, I have personally referred numerous victims of gang stalking to the appropriate agents at the F.B.I. for investigation of their cases. I have also furnished the F.B.I. with documentation of an active, international child kidnapping ring probably operated by rogue C.I.A. agents. The F.B.I. has ignored my requests to investigate even though it is their responsibility to investigate kidnappings. I have a contact in Germany who advises me that the C.I.A. has set up secret operations on U.S. military bases for the kidnapping, sale and

4

trafficking of children worldwide. The F.B.I. may be using a unique codename and nomenclature for the gang stalking phenomenon in its records. However, this is a semantic difference, and, in no way changes my professional opinion that the F.B.I. has investigative files on the nationwide phenomenon of gang stalking described in reasonable and specific detail in Mr. Labella's F.O.I.A. Complaint. These F.B.I. files contain information responsive to Mr. Labella's F.O.I.A. Complaint regarding the subject of gang stalking. The F.B.I. and other intelligence agencies are administering and covering up the rogue, covert, government criminal enterprise of gang stalking. The gang stalking phenomenon appears in the records of both the F.B.I. and the N.S.A. in their records pertaining to the Echelon Program, Carnivore System, and Tempest Systems. In addition, the gang stalking phenomenon appears in the records of both the F.B.I. and the N.S.A. in their records pertaining to information collected by Narus systems. Narus is a wholly owned subsidiary of defense contractor Boeing that produces sophisticated, mass surveillance computer systems currently being used by both the F.B.I. and the N.S.A.

Dated this 26 day of April 2011.

Los Angeles, California

_Ted L. Gunderson_
Ted L. Gunderson

_____
NOTARY

5

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of L.S Angeles

On 4-25-2011 before me, Robert R.S. Propp.
<sub>Here Insert Name and Title of the Officer</sub>

personally appeared Ted L Gundelson
<sub>Name(s) of Signer(s)</sub>

---

[Notary seal:]
ROBERT R.S. PROPP
COMM. 1795936.
NOTARY PUBLIC CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires April 20, 2012

Place Notary Seal Above

who proved to me on the basis of satisfactory evidence to
be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws
of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature _____
<sub>Signature of Notary Public</sub>

--- OPTIONAL ---

Though the information below is not required by law, it may prove valuable to persons relying on the document
and could prevent fraudulent removal and reattachment of this form to another document.

**Description of Attached Document**

Title or Type of Document: Statement of Ted L Gundeson &associates

Document Date: 4-26-2011                    Number of Pages: (5)

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: Ted L. Gundorson

☒ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

[RIGHT THUMBPRINT OF SIGNER — Top of thumb here]

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

[RIGHT THUMBPRINT OF SIGNER — Top of thumb here]

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org  Item #5907  Reorder: Call Toll-Free 1-800-876-6827

## TED L. GUNDERSON
FBI Bureau Chief,
Senior Special Agent In Charge, (Ret.)
Head of the Los Angeles Office of the
Federal Bureau of Investigation
6230 A Wilshire Blvd.
Los Angeles, CA   90048
Direct Line:   (337)344-8876
California Investigation License Number:  12878

---

## PROFESSIONAL EXPERIENCE

**1979 – Present**    Ted L. Gunderson & Associates.
Founder, owner and operator of this international security consulting and investigation firm in 1979. Investigator for F. Lee Bailey Esq., Mr. Bailey describes Ted Gunderson as a person "whose investigative skills are unsurpassed by anyone I know or have known". At the time of retirement from the Federal Bureau of Investigations, Ted had 700 personnel under his command and he operated an annual budget of Twenty Two Million dollars (USD 22,000,000.00).

Ted is a renowned lecturer, published author and researcher. National Television and radio appearances include "The Geraldo Show", "48 Hours Mysteries", "Unsolved Mysteries" and "Larry King Live". He has been regularly featured on Discovery Channel and Lifetime.

**1984**    Los Angeles Olympics Committee Consultant.

**1981 – 1982**    California Narcotics Authority – Consultant appointed by Governor Jerry Brown.

**1979**    Pan American Games, San Juan, Puerto Rico – Security Coordinator
Special Appointee of United States Attorney General Griffin B. Bell.

**1951 – 1979**    Federal Bureau of Investigations

| | |
|---|---|
| 1977 – 79 | Senior Special Agent-In-Charge, Los Angeles, California |
| 1973 – 77 | Special Agent-In-Charge, Memphis, Tennessee and Dallas, Texas |
| 1973 | Chief Inspector |
| 1965 – 73 | Assistant Special Agent-In-Charge, New Haven, Connecticut and Philadelphia, Pennsylvania |
| 1960 – 65 | Special Agent Supervisors – Federal Bureau of Investigations Headquarters, Washington, D.C. |
| 1951 – 60 | Special Agent |

**PUBLICATIONS**    1989    "How To Locate Anyone Anywhere Without Leaving Home" – E.P. Dutton

**EDUCATION**    1950    Bachelor of Science – University of Nebraska

**AWARDS**    1979    Distinguished Alumnus Award in Recognition of Distinguished and Devoted Service to His Country – University of Nebraska

1977    Alumni Highest Effort Award in the Field of law Enforcement, Sigma Alpha Epsilon Social Fraternity

1977    Law enforcement Officer of the Year – AFL-CIO Metal Trades Counsel, Los Angeles, California

> **"There exists a shadowy government with its own Air Force, its own Navy, its own fundraising mechanism, and the ability to pursue its own ideas of national interest, free from all checks and balances, and free from the law itself."**
> **—    Senator Daniel K. Inouye (1987)**

*Presentation submitted to the Senate Hearing on*
*"The State of Civil and Human Rights in the United States"*

*Tuesday December 9, 2014.*

My name is Dr. Daniel Lebowitz.   I'm a medical doctor.   Over the past two years, I have worked with a Human Rights organization called Freedom From Covert Harassment and Surveillance, or FFCHS. People in this organization state that they are being targeted by an illegal and unethical government program that represents a modern version of COINTELPRO and MK-ULTRA combined. These victims call themselves **targeted individuals, or T.I.'s**.

I have worked with the leadership of FFCHS, and I have worked with the medical committee as well as with the Board of directors. As a result, **I have communicated with hundreds of self-described targeted individuals.** Additionally, I have worked with two other activist physicians on behalf of targeted individuals: Dr. John Hall and Dr. Terry Robertson. **I have also worked with Dr. Robert Duncan, a scientist turned whistleblower, who states that he has worked on some of the very weapons systems that are used in the remote electronic harassment that many targeted individuals say they experience.**

My presentation today is entitled:

**Targeted Individuals: Covert Repression in the 21st Century**

**OVERVIEW**

To understand the Targeted Individual phenomenon, you need to understand several things about it. You need to understand the societal and political and human rights trends which allow it to occur. You need to understand what the program is. You need to understand what the goals and the purpose of the program are. You need to understand who gets targeted. You need to understand where the program came from, in other words, compare it to counterintelligence programs and unethical human experimentation of the past. And you need to understand the implications of the program, and what it means for the future. Finally, we'll take a look about what must be done about it.

**STATE OF HUMAN AND CIVIL RIGHTS IN THE US: THE EMERGING POLICE AND SURVEILLANCE STATE**

In the United States, in short, we are seeing the emergence of a police and surveillance state. Former **President Jimmy Carter** recently wrote in the *New York Times*, "**The United States is abandoning its role as the global champion of human rights.**" In his article, Carter points out that top US officials are now **openly targeting US citizens for political assassination, "disappearance," unlimited surveillance, and other forms of gross human rights abuse. Are people prepared to call a former U.S. President a conspiracy theorist? Or has the U.S. strayed far from its roots as a democracy where rule of law and human rights are uniformly respected?**

**THE PROGRAM**

What is the Targeted Individual program that these people are complaining of? It is many things all at once. It is a discrediting and disruption campaign, similar to COINTELPRO. In some cases (not all) it is a torture/trauma-based brainwashing and mind-control program like MK-Ultra. It is a secret form of repression, persecution and psychological warfare, carried out in the community largely by regular people, along the lines of Stasi or Zersetzen torture. It is a political abuse of psychiatry, as has been carried out in many countries as a way to torture and discredit dissidents. Finally, it is unethical non-consensual human experimentation on unwitting subjects with advanced directed energy and psychotronic weapons systems.

**Overall, it represents a coming together of the most vicious and effective tools and weapons for covert harassment and political control of dissidents, activists, whistleblowers, agitators, and other so-called "undesirables" that the world has ever seen.**

What are the goals and purposes of the program? Again, they are many. **But, in a word, the neutralization of the target**. Let's start with understanding the mindset of the state. President Obama's information czar, former Harvard Law professor Cass Sunstein, co-authored a paper in 2008 which advocated that the government should "cognitively infiltrate" and "disable" those who have ideas the government finds threatening, for example, 9/11 truth activists. **Now, at a minimum, this suggests running illegal COINTELPRO-type disruption campaigns against people**. But, more interestingly, let's parse the words carefully: "cognitively infiltrate" and "disable". Cognition refers to the mind, or to thought. Infiltrate means to penetrate with hostile intent. **So, literally, this means to penetrate the minds or thought processes of so-called "troublesome" individuals, with the intent to disable them. Fascinating, in light of what targeted individuals say that they experience.** So, more specifically, what are the goals of the program?

1. Force the target to stop "unacceptable" activity (whistleblowing, activism, exposing corruption, etc.). Silence the target both about their original activism and about their targeting.
2. Subject target to noise campaigns, swarming, colors, or repetitive behaviors as a form of harassment.
3. Attack any psychological weaknesses. Cause target to blame themselves for their targeting and as such destroy the will to fight back.
4. Create a track record of so-called "mental illness", useful for both discrediting and plausible deniability.
5. Discredit the target.
6. Isolate the target from all forms of support using secret notifications, slander, and covert harassment carried out largely by regular people.
7. Encourage the target to lose hope and lash out in suicidal or homicidal rage secondary to covert harassment, and destruction of the target's life.
8. Set target up for possible institutionalization or arrest.
9. Damage or ruin the career and/or finances. In some cases, break up the family. In some cases, cause the target to lose their home.

10. After breaking the target's will to fight, in some cases, attempt to change the mindset, politics, ethics of the target. Create a mindset more useful to the state. Evaluate the potential for corruption or even recruitment.

11. **To summarize: the goal is the neutralization of the target. Exactly the goal pursued by the former COINTELPRO.**

**THE TARGETS**

Ok. So, who gets targeted by this program? There's a lot of overlap with COINTELPRO. COINTELPRO targeted "Perceived threats to the Established Political and Social Order". Which, in practice during COINTELPRO meant primarily those pursuing greater social and economic equality, peace activists, dissidents, so-called "unfriendly" politicians, and even non-conformists. In some cases, it can be proven that counter-intelligence operations have been undertaken against those aware of high-level criminality or wrong-doing. Like everyone else, many targets have weaknesses, foibles, flaws, problems, etc. Some have addictions. Any

perceived weaknesses (manufactured, real, or exaggerated) are used viciously to aid in the discrediting of the target. Let's learn from some actual examples of people who became targets for covert operations:

1. **Thomas Drake**, NSA Whistleblower: **Forced out of his job, blacklisted, financially ruined, forced to defend himself against criminal charges, placed under physical and electronic surveillance.**

1. **Jean Seberg**. Actress and civil rights activist. Supporter of the Black Panther Party. Experienced FBI **Surveillance, harassment, stalking, break-ins, intimidation, defamation and discrediting.** Victim of a false FBI story that she was pregnant by a Black Panther Party member, while married to a white husband. The stress of this caused premature delivery of her baby, which died at 2 days of age. The baby was white. Eventually committed suicide.

1. **Arnold Lockshin**. A Cancer researcher and supporter of socialism. **Experienced surveillance, harassment and threats by strangers, break-ins, psychological warfare, implied death threats through the 1970's and 1980's. Eventually sought asylum from Russia and was immediately fired, blacklisted, accused in retrospect of mental instability and deteriorating work performance. Notably, reported that even his children's classmates and his own father had been brought into a Stasi-like campaign against him and his family.** Wrote a book about the ordeal in 1988 called "Silent Terror: One family's history of political persecution in the US." The book was never published or distributed in the US. On the web: ArnoldLockshin.Wordpress.com. By the way, his work performance and mental stability in Russia are apparently just fine.

1. **Adrian Schoolcraft**. Blew the whistle on corruption, wrongful arrests, arrest quotas, and the stop and frisk program within the NYPD in 2009. **Received on the job harassment and was shunted to the NYPD psychologist. Within 3 weeks after reporting corruption he was involuntarily committed to a psychiatric ward, handcuffed to a bed and prevented from using a telephone. He was portrayed as paranoid during his hospital stay, which lasted 6 days. After discharge, he was suspended from the force without pay. Tapes he had made were eventually reported by the New York Times and others and he has been largely vindicated.**

1. **Dr. Lawrence Doerr**. Orthopedic surgeon. As reported in the NY Times, wrote an

open letter to fellow surgeons in 2008 warning about a flawed hip prosthesis. Subsequently **became the target of a whisper-campaign that questioned his skills and competence as a surgeon.**

1. **Russell Roderick**. Insulted a powerful, politically connected firm by refusing continued employment. Unclear if he was aware of high-level wrong-doing. Has been the target of a 25 year, **multi-national campaign (you will find that these programs are multi-national and follow targets wherever they go) including slander, character assassination, allegations of incompetence, paranoia, drug-addiction, sexual deviance, and being "a deranged, suicidal maniac." Has experienced blacklisting, financial devastation, isolation, stalking and overt surveillance, street theather, telephone/computer and mail tampering, Stasi-like manipulation of people into a campaign against him, death threats, intimidation, harassment, and a shut-down of all avenues of support.** He refers to this as Zersetzen torture. On the web: Zersetzen.wikispaces.com.

1. **Greenham Common Women's Peace Protestors**. In the 1980's, were protesting the presence of US cruise missiles at an English air force base. **Came under microwave weapon attack in 1984. Scientists from Electronics Today demonstrated the presence of electromagnetic waves.** Dr. Robert Becker, twice nominated for the Nobel prize, found their symptoms were consistent with exposure to a microwave weapon. Every time a cruise missile convoy was ready to drive by, these women were experiencing severe headaches and unbearable fatigue, etc.

1. **Andy Lewis and friends**. A group of former British soldiers. Became targets of full-on gang stalking in 1996 after attempts to draw attention to what they viewed as an unethical experimental vaccine program that had been given to Gulf War soldiers in 1991. These men have experienced **blacklisting, covert harassment, directed energy and psychotronic weapons attacks, overt and covert surveillance, stalking, secret notifications, etc.** They have made two excellent websites: targeted-individuals.com and gang-stalking.com.

1. **A long list of 9/11 truth activists** have reported being **targeted with electromagnetic weapons and death threats. Some have died under suspicious circumstances. US Army Major Doug Rokke, PhD physics from University of Illinois, former head of the US Army depleted uranium cleanup project after Gulf War I, says these weapons are very real, and commonly used in military circles. He has described how he personally used such weapons on a regular basis while training with Special Forces at US Army facilities: "We had them van-mounted, truck-mounted, plane-mounted, and hand-carried. We would go around zapping each other for fun. This was during exercises, or sometimes just as a practical joke." Rokke further stated that, based on his firsthand knowledge of US military mind-set and capabilities, 9/11 truth activists have undoubtedly been targeted by exotic non-lethal (and lethal) weapons.** Remember again Cass Sunstein, who openly advocated cognitive infiltration and disabling of 9/11 truth activists. Is he talking about psychotronic weapons attacks?

10. **Jill Hansen**. Professional surfer, model and entrepreneur. She received wide acclaim for her performance in a TED speech in 2010 about her spiritual values and altruistic beliefs, Entitled "Open Mind, Open Heart". In the talk she espouses values including compassion, honesty, integrity, generosity, belief in God, charity, hope, faith and love. She concludes by stating that the world would be a more beautiful place if we all thought this way. **Within weeks after this talk, which received a lot of publicity, she found herself the victim of stalking and electronic harassment.** Fast forward a few years. Unfortunately, In May 2014, she was charged with attempted homicide for allegedly running over a woman intentionally with her car. TI's report that attempting to get them to act out inappropriately with strangers is a common protocol. A couple interesting facts: **1) none of the news stories mention that she considered herself a TI and 2) Interestingly, The local Neighborhood Watch Group's 500 members had been alerted about Hansen—supposedly for reckless driving. A representative of the group was reported as saying, "We need everybody to be on the lookout for her, it's that scary." So here we have someone reporting being a victim of organized stalking, and it turns out that—HELLO—there was a group of at least 500 people deliberately on the lookout for her.**

11. **Ted Gunderson**. Worked for the FBI from 1950 – 1979. Former head of the Los Angeles FBI, where he was in charge of 700 personnel and had a budget of over 22 million dollars. **In 1979 he was one of a handful interviewed for the job of FBI director, which ultimately went to William H. Webster.** He retired and started a private investigation firm. He became a whistleblower and eventually filed an affidavit in support of attorney and targeted individual Keith Labella in his FOIA request from the FBI regarding gang stalking. Gunderson explained: "**It is my professional opinion based on information, knowledge and belief that the information sought by Mr. Labella in this FOIA suit regarding gang stalking…reasonably describes an ongoing, active, covert, nationwide program that is in effect today and…has been in effect since at least the 1980's…[and] has increased in scope, intensity and sophistication by adapting to new communications and surveillance technology.**" As a whistleblower, Gunderson was himself targeted. He experienced whisper campaigns, surveillance, phone tapping, computer hacking, poisonings, group stalking, aerial stalking and more. **Stated that based on his experience, victims are targeted for a variety of reasons including government and corporate whistleblowers, parties to financial and employment disputes, parties to marital disputes (usually divorced women), and even jilted paramours. Journalists covering controversial issues, and, even attorneys and private investigators representing unpopular clients or interests.** Gunderson's affidavit can be viewed on the internet, and in my opinion, is a fascinating read.

12. **William Binney**- An NSA whistleblower. **Has stated he is well-aware of mind control technologies.**

13. There has been a steady increase of **mass shootings** every year since 2000 from 5 per year until now, about 16 per year. Many of them were complaining of electronic harassment and/or organized stalking, stating that this led them to attack. This is being largely ignored and/or covered up by the media. **Does a faction of our government actually want gun violence in the US, perhaps as a pretext to reversing gun rights, or even individual rights in general?** Let's discuss 3 mass shooters.

14. **Jiverly Wong**- Chinese Immigrant. Reported being targeted with covert harassment for 18 years. Reported experiencing: stalking, harassment, chemical attacks, nausea, shortness of breath, job harassment and job loss, spreading of rumors, phantom touching at night while sleeping, home entry and theft of funds from his home, vehicular stalking and harassment, electronic body shocks. Became a mass shooter of 14 people including himself. Blamed his harassers for the killings. **Paranoid? Or victim of a high-tech covert operation that he could not even begin to understand? Let's not forget that some goals of COINTELPRO included trying to get people to commit suicide (e.g. MLK) or trying to get people to commit serious crimes (e.g. Black Panther Party members) in order to discredit and destroy them.**

15. **Aaron Alexis**- Ex-Navy veteran. Navy yard shooter. Contacted FFCHS stating he was under ELF weapons attack and was being stalked and surveilled, and he believed this was at the hands of the Navy. Interesting things about his case. **1) Although he corresponded with FFCHS, thus identifying himself as a TI, and stating his belief that the Navy was attacking him, the FBI after investigating and speaking with FFCHS Board members, insisted that he was a random shooter with no motive.**

1. **A heavily armed SWAT team was in the vicinity of the Navy Yard when Alexis started his shooting rampage and was on site within 5 minutes. Inexplicably, they were ordered to stand down and leave the area. The shooting rampage subsequently went on for 45 minutes.**

16. **Myron May**. A promising, young black attorney. Worked first for a well-known law firm and subsequently trying to help disadvantaged children. Cared about people and about God. Reported being recently targeted with directed-energy weapons and law enforcement harassment. Decided to draw attention to the abuse by mailing packages of information to 10 people, shooting people, and "suicide by cop". **He made his goal clear by ending his letter saying, "what targeted individuals need more than anything is media attention." These packages were confiscated by Federal agents.** His suicide note described, "financial, emotional, and psychological pain….a living hell" inflicted upon him as a targeted individual. He stated: "**Our government is able to capitalize on [the] lack of knowledge among the general population to curb sentiments toward questioning the mental health of targeted individuals rather than admitting the truth: that there is a system of covert torture of ordinary innocent citizens that is happening within our borders.**" He believed there was no hope for him and so he stated, "Consequently, I am making a sacrifice so that others in my same position might have a chance at a normal, harassment-free life." **He shot three people. None of them died. I wonder if, even when driven to extremes by secret government torture, whether he was still too moral to bring himself to kill…**
Ok, so we know who it happens to. We know this is the most sophisticated take-down program the world has ever seen. So, where do all these tactics and techniques come from? Well, as I mentioned before, a look at historical programs is highly instructive here.

## RELEVANT HISTORY: COINTELPRO, MK-ULTRA, STASI / ZERSETZEN TORTURE
So- COINTELPRO. Known tactics included: Discrediting, smearing, character assassination. Covert campaigns to destroy interpersonal relationships, Harassment, Conspicuous surveillance (also known as stalking), anonymous letters and phone calls, IRS tax audits, legal harassment, Manipulation or strong-arming of parents, employers, landlords, school officials and others to create problems for targets. Threats, intimidation,

surreptitious home searches and "black bag" jobs, vandalism, Constant surveillance.
MK-ULTRA features and goals included: Create a subject who is easier to control and manipulate, create programmed assassins, develop more effective means of torture and interrogation, break down the personality of the subject and insert new belief systems, ethics, politics, personality traits; performed on unwitting and unwilling subjects; manipulate mental states and alter brain function; surreptitious drugging; isolation; verbal and sexual abuse; various forms of torture employed; promote illogical thinking and impulsiveness in the subject so that they will be discredited in public; attempt to produce amnesia for periods of time; surreptitious production of shock or confusion in subject over extended periods of time; attempt to alter the subject's personality to become dependent on the tormentors; attempt to lower the subject's ambition and work efficiency; attempt to impair eyesight and/or hearing; attempt to activate specific behavior by remote means.

Stasi tactics, also known as Zersetzen torture, included such features as: secret persecution, secret methods of control and manipulation, involved even the personal relationships of the target, extensive use of unofficial collaborators--also known as regular people; used the State's influence to turn public and private institutions against the target, psychological attack intended to deprive the target of the ability to mount hostile political action, often causes irreversible damage to the target, attempt to gain influence over the target in in such a way that undesirable attitudes and beliefs would be slowly changed to more preferable traits over time, Attempt to cause fragmentation, paralysis, disorganization and isolation of target, Attempt political and ideological "re-education", used in situations when judicial procedures are not convenient for political reasons, a.k.a. extrajudicial punishment, attempts to frame or entrap targets, slander/character assassination involving some true and some false, but always degrading information, orchestrating a series of social and professional failures in order to damage self-confidence, creation of doubts about future, stimulation of mistrust or paranoia, exploitation of target's personality weaknesses, addictions etc., shaming due to the spreading of rumors to those around the target, overt and covert surveillance, intercepting mail, calls, etc., tampering with property and vehicles, poisoning the food and tampering with medications, entering the residence and leaving traces of evidence in order to threaten or intimidate the target by adding removing or modifying objects.

The items on these lists will sound very familiar to targeted individuals. Nearly all of them apply to the current program. And nearly all of them are reported by Targeted Individuals. I have no reason to not believe them. Now, add in the use of advanced directed energy and neuro-weapons, and you have a very potent takedown program.

**THE WEAPONS**
Ok so at this point we have a pretty good understanding of the program. But there's one more thing that needs to be understood about this program. The advanced weaponry that is being used.

Evidences/Examples:

1. **The Moscow Signal**: low-power microwave beams were directed into the US embassy for more than two decades, from 1953 until 1976. Discovered in 1962, US scientists studied the signal until the 1970's before finally telling the diplomats it was there, and offering them hazard pay. Many got sick, some died. Was not exposed to the public until 1976 when unearthed by an investigative reporter. This led to DoD's ARPA Project Pandora

   2. From 1965 through to 1970, Defense Advanced Projects Research Agency (DARPA), with up to 70-80% funding provided by the military, set in motion operation **PANDORA** to study the health and psychological effects of low intensity microwaves with regard to the so called "Moscow signal**". This project was quite extensive and included (under US Navy funding) studies demonstrating the ability to: induce heart stoppage, create leaks in**

**the blood brain barrier, and production of auditory hallucinations. Nervous system function could easily be degraded with properly pulsed signals. Memoranda of Richard Cesaro, Director, DARPA, confirmed that the program's initial goal was to "discover whether a carefully controlled microwave signal could control the mind." Cesaro urged that further studies be made "for potential weapons applications." This was 1970, and very specific neurological and physiological weapons capabilities of microwaves had already been recognized.**

1. **Jose Delgado**—the scientist who stopped the charging bull by remote control. Dr. Jose Delgado's secret work in Project Pandora was directed towards the creation of a "psycho-civilized" society. In his paper "Intracerebral Radio Stimulation and recording in Completely Free Patients", using radio waves, Delgado observed that: "Radio Stimulation on different points in the amygdala and hippocampus in the four patients produced a variety of effects, including **pleasant sensations, elation, deep thoughtful concentration, odd feelings, super relaxation, colored visions (hallucinations), and other responses.**" Speaking in **1966**, Delgado asserted that his research "supported the distasteful **conclusion that motion, emotion and behaviour can be directed by electrical forces and that humans can be controlled like robots by push buttons. Delgado stated that EM weapons were "more dangerous than atomic destruction." "With knowledge of the brain, we may transform, we may shape, direct, roboticize man. I think the great danger of the future is that we will have roboticized human beings who are not aware that they have been roboticized." He created a brain transponder that was IN FACT used to roboticize human subjects.**

1. **Dr Ross Adey**, formerly of the Brain Research Center at the University of Southern California, worked on the CIA's infamous Pandora project. His research involved inducing of specific behavior modifications by electromagnetic means. In his pioneering work, **Dr. Ross**

**Adey determined that emotional states and behavior can be remotely influenced merely by placing a subject in an electromagnetic field. He also demonstrated that EM radiation, properly modulated and pulsed, can induce calcium efflux events to interfere with brain's function---the so-called "confusion weaponry". Again, this is by 1970.**

1. **Lawrence Pinneo**, a neurophysiologist and electronic engineer working for Stanford Research Institute (which is a leading military contractor), "**developed [in 1974] a computer system capable of reading a person's mind. It correlated brain waves on an electroencephalograph (EEG) with specific commands.**

1. **Dr. Eldon Byrd, a Navy medical engineer with a graduate degree from George Washington University,** worked on the Polaris weapon system as an engineer, worked for Naval Surface Weapons Office, **was tasked in 1980- 1981 by the US Marine Corps as**

**Project manager to develop non-lethal electromagnetic weapons for purposes including "riot control", clandestine operations and hostage removal. Worked on ELF, non-linear magnetics**. He worked with Ross Adey, Dr. Elizabeth Roscher, Michael Persinger **on the ability to entrain human brainwaves at a distance. And he said, "We accomplished it." 1980. His project went dark after that. It was taken away from him. He had it confirmed from a senator—Senator Pell—confirmed for him that his project went dark. Byrd was quoted in a lecture around 2001 as saying, "Is Mind Control Possible? Absolutely. There is a**

**mountain of evidence." He went on to say that, "Today we know there are technologies that can induce sound into the brain at a**
distance, **can monitor and alter brainwaves at a distance, can alter behavior at a distance, can induce images into the brain at a distance, can target individual organs at a distance. Can disrupt the calcium ions binding on individual cell surfaces at a distance, creating pain and other effects anywhere in the body. Mind control technology exists, without a question."** Less than a year later, Dr. Byrd was dead. Maybe it was a coincidence.

1. A 1980 NASA document [*NASA abstract Report Number: AD-A090426*, June 1, **1980]** described that one can **remotely create the perception of noise in the heads of personnel by exposing them to low power, pulsed microwave…. By proper choice of pulse characteristics, intelligible speech may be created** . 1980. Yes, **1980.**

1. For further documentation, I recommend the following webpage: **http://educate-yourself.org/mc/listofmcsymptoms05jun03.shtml**. **This webpage documents that there is truly a mountain of evidence about these terrifying weapons**. Some highlight include the PROVEN capabilities **to induce false memories** in the brain, **Subliminal command implantation into the brain to modify behavior (including suppressing dissidents).**

1. Finally, In July 1996, the Spotlight, a widely circulated right-wing U.S. newspaper, reported that well-placed DoD sources have confirmed a classified Pentagon contract for the development of "high-power electromagnetic generators that interfere with human brain waves."

Dr. Emery Horvath, a professor of physics at Harvard University, has stated in connection to these generators,**"These electronic 'skull-zappers' are designed to invade the mind and short circuit its synapses... in the hands of government technicians, it may be used to disorient entire crowds, or to manipulate individuals into self-destructive acts. It's a terrifying weapon**."

To quote José Delgado in his book Physical Control of the Mind: Toward A Psychocivilized Society, p. 116:

Individuals whose brain centers are electrically stimulated believe their evoked actions are their own ideas; their conscious mind rationalizes the evoked actions away. People experiencing this electrical stimulation aren't consciously aware of an external influence.

**In summary, these weapons have the ability to mentally and physically torture people, and to influence human psychological behavior. With, or even WITHOUT the target's knowledge or awareness.**

**SUMMARY OF THE PROGRAM AND ITS IMPLICATIONS**

In summary, we have a program which includes the earmarks of past programs including COINTELPRO and MK-Ultra. It also uses collaboration of regular people to carry out much of the harassment, similar to Stasi or

Zersetzen torture of the prior East Germany. Furthermore, it uses advanced neuro-weapons to mentally and physically torture victims from a distance-- whether in their homes, workplaces, or wherever they may go. The goals of the program are many, but ultimately boil down to torture, control, discrediting, and neutralization-- exactly the same goals as the prior COINTELPRO, MK-ULTRA, and Stasi or Zersetzen torture. While some victims may be chosen at random, many cases, upon examination, are shown to be perpetrated against activists, whistleblowers, and those who have spoken out against corruption. The consequences are severe. Most targets lose their jobs, homes, and/or their families. Many end up on dangerous medications or institutionalized. Some end up committing suicide or homicide.

Of course, the implications for humanity are frightening. Is it possible we are heading toward a synthetic reality, where people's thoughts, conversations, hopes, dreams, illnesses, major life events are controlled by supercomputers and handlers, all without their knowledge?  Is our society becoming one in which no-one can be trusted, with everyone spying on everyone else? With a large percentage of the population becoming government informants and spying collaborators?

Are we developing a class of people with "less" rights, who can be harassed at will, even as we all slowly have our rights eroded? If so, doesn't that sound like a totalitarian regime such as Nazi Germany?

**WHAT NEEDS TO BE DONE ABOUT THE PROGRAM**

Several things. First of all, **targets must speak out. Especially those who have their wits about them. This program is highly disruptive, and is specifically designed to make even the most solid citizen look as if they have become delusional**. Compounding the problem, many targets are either forced to, or willingly take powerful psychiatric medications in hopes of decreasing the severe attacks they are suffering, or to appease skeptical friends and family members. In the case of real mental illness, this should resolve the symptoms. In the case of TI's, it does not stop the torture and harassment and manipulation of their lives.

So, that leads to the next point. **If you know someone who this is happening to—don't count them as crazy. They may be a victim of this program**. Recognize that the issues they were speaking about before they got into their current situation are still just as valid now as they were before . **In fact, it was probably the very legitimacy of their issues that led powerful forces to want to discredit them so thoroughly. Remember that.**

**Whistleblowers must come forward** who are aware of this program.

**Fearless journalists must pursue the story**. It was investigative journalists who brought widespread attention to MK-ULTRA, COINTELPRO, and much of the unethical experimentation that has occurred in the USA. **Targets must come together.** There is strength in numbers. Targets should never give up the fight.

**Finally, Congress MUST thoroughly investigate the intelligence agencies, DOD research programs, and black operations. The targeted individual program is happening. It's not science fiction. It needs to be EXPOSED AND SHUT DOWN FOREVER.** Thank you for your attention.

**NON-CONSENSUAL EXPERIMENTATION WITH ELECTROMAGNETIC WEAPONS**


TO WHOM IT MAY CONCERN:

I am writing you on the behalf of victims both in the United States and abroad. As you are aware, many revelations surrounding the National Security Agency's extensive electronic dragnet have recently come to light through released records by the intelligence insider Mr. Edward Snowden. During the course of the LIBE Committee hearings even more first-hand testimony was heard from other former NSA insiders regarding the extent of NSA privacy invasion and lack of oversight regarding their methods of data collection. Their statements begin to come very close to an issue that those of us in the medical community in the United States and abroad have been keenly watching for several years now.

Over the last decade we have seen a sharp rise in the number of people coming forward with complaints of non-consensual experimentation with electromagnetic weapons designed to target both electronic hardware and the human central nervous system. While this was typically disregarded as mental illness in the past, the total global population voicing these identical complaints has exponentially grown to numbers that can no longer be attributed to delusional disorder, schizophrenia or any other described mental illness. You may be unaware that the safeguards against experimenting on the public without their consent in the United States are very lax and are included in legislation referred to as The Common Rule which is the Federal Policy regarding human subjects protection. It is written with several loopholes for the allowance of non-consensual experimentation, mostly by intelligence agencies. Hence, we have seen the necessity for the Bioethics Commission hearings in the United States after it was brought to light that Guatemalan prisoners were experimented on with contagions by the National Institutes of Health. During the course of the Bioethics Hearings, their directive was to determine if any other non-consensual experimentation was ongoing in the United States or abroad. At each of the four meetings there was included a public forum for the committee to address concerns by the public at large. Over one hundred individuals were in attendance at each of the four meetings voicing complaints of exposure and experimentation with electromagnetic weapons technologies. The effects of these technologies on the human body can only be described as torture.

Several years ago another National Security Agency insider, John St. Clair Akwei, described in detail the frequencies used by the NSA and other intelligence agencies to access and influence the human body and nervous system in his civil action against the NSA. His descriptions of technologies used to track, monitor and alter a subject's perceptions, moods and motor control are similar to the complaints we are hearing today from victims alleging non-consensual experimentation and torture. Moreover, Vladimir Putin, in a speech in 2012, admitted that Russia is following suit in funding development of weapons that will attack the human central nervous system. His defense minister, Anatoly Serdyukov, described the weapons as directed energy weapons, wave energy weapons, genetic weapons and psychotronic weapons based upon new physics principles. Obviously, Russia intends to go down the same path of directed energy weapons research that the United States has long been on. The unfortunate truth regarding this type of technology is the ease with which it can be used remotely and non-consensually on the public without the recommended safeguards of an Institutional Review Board or any appreciable ethical oversight. In the United States this research is typically done clandestinely under the guise of

national security concerns just as the NSA electronic data mining was done which is currently being covered in the LIBE Committee.

Over the last decade I have consulted with thousands of people in the United States complaining of exposure and experimentation with electromagnetic weapons technologies which include, but are not limited to, complaints of mood alteration, heart palpitations, involuntary body movements, severe headaches, blurred vision, burns to the skin, non-consensual micro-chipping and neurocognitive perturbation. It is my belief, based upon former and current publically released government research documents as well as victims complaints of torture, that this technology is being used in a non-consensual manner on the global public.

I would like to express my deepest gratitude to you for meeting with our representative from the International Center Against Abuse of Covert Technologies and taking the time out of your busy schedule to hear these complaints and read my letter. On behalf of the whole of humanity, I sincerely hope that these technologies will eventually be addressed in the Subcommittee on Human Rights of the European Parliament, as the use of these currently can only be described as torture and dehumanizing.

Thank You,

Dr. John R. Hall, D.O.
5282 Medical Drive # 200, San Antonio, Texas 78229, USA
tel: 210-614-6432

www.satweapons.com
www.drjohnrhall.com


(Note:  Dr Hall retired in 2019)

NEWS • Remarks

# Written Testimony for NYC Board of Correction's Special Hearing on Sexual Abuse and Sexual Harassment in New York City Correctional Facilities

April 23, 2019

### Written Testimony by Supervising Attorney for the Sex Crimes Unit Vanessa Puzio

### New York City Board of Correction Special Hearing on Sexual Abuse and Sexual Harassment in New York City Correctional Facilities

Good Morning Chairman Cephas and Members of the Board. My name is Vanessa Puzio. I am a Supervising Attorney in the Sex Crimes Unit and Attorney-in-Charge of Work-Related Sexual Violence Initiatives. Thank you for the opportunity to speak today about DA Vance's strategies to combat sexual violence in the workplace, specifically within New York City Correctional Facilities.

Recently, our office received a letter from an anonymous group of female corrections officers. The letter detailed sexual harassment and sexual abuse within the Department of Corrections. Specifically, the letter detailed sexual misconduct committed by supervisors against the female staff. It was anonymous, but the writer made it clear that she and other female officers needed help.

After reading the letter, I reached out to the Corrections Officer Benevolent Association Union and was subsequently invited to Manhattan Detention Complex to give a training on sex crimes in the workplace. The overwhelming majority of officers I spoke to that day stated that inmates routinely groped and touched both male and female officers. The sentiment amongst the corrections officers I spoke to at Manhattan Detention Complex was that being touched in a sexual way had become "part of the job" and reporting it was "not worth it." I urged the officers to report to law enforcement and spoke to them about potential sex offender registration.

Clearly there are significant challenges for corrections officers that are not necessarily reflected in the number of sexual assault cases that are reported by or against corrections officer at the Manhattan Detention Complex. For example, in 2018, there were 597 post-arrest sex crimes cases handled by our office and, out of those, 0 were from Manhattan Detention Complex. In 2017, we again had 0 sex crimes cases originating out of MDC. Not one was a sexual assault committed against a corrections officer. There is also a dearth of complaints that come to our office concerning sexual assaults where inmates are the victim and the perpetrator is also an inmate. As stated in your audit, these case are occurring and being reported to in-house investigators, but they are not making their way to our office. Why is that?

Under the current system, when an individual reports a sexual assault, the case is investigated by your trained in-house investigators. As seen in the NYC Department of Corrections Audit Report, these investigations are not being done in a thorough manner. The cases are then forwarded to DOI, but if the initial investigation was not done properly, the victim in that case is never given an opportunity to have law enforcement appropriately investigate his or her case.

The current system at Correction is reminiscent of the now reformed systems at colleges and universities where victims' complaints were dealt with in-house and where victims of sexual assault were not given options on reporting directly to law enforcement. Victims of a sex crime should not only be given access to medical care as mandated in your rules, but information and swift access to law enforcement, and not simply an in-house investigator.

Sexual violence is a devastating crime that leaves a lasting impact on the survivor. This impact can be acutely felt when the sexual abuse is suffered at the workplace. The Manhattan District Attorney's Office is committed to investigating and prosecuting these crimes and to achieve justice.

In the wake of #MeToo our office saw not only a spike in reporting but countless media reports detailing sexual abuse at the workplace. In an effort to encourage further reporting and engage survivors, the Manhattan DA created the first-of-its-kind Work-Related Sexual Violence Unit. The Unit recognizes the inherent power imbalance and fear of reprisal that survivors face in reporting. But when an act of work-related sexual misconduct constitutes a crime, it is not enough that the abuser loses his or her job. Justice demands and survivors deserve that criminal abusers be held accountable in court.

DA Vance asked me to lead the work-related sexual violence initiatives with our main goal being to encourage further reporting of crimes. As a prosecutor, I continue to work directly with victims of workplace violence but I also go out into the community to speak about our office and encourage reporting. We contact businesses and organizations directly and ask them to circulate our materials to their members and employees. We also offer trainings to employees to let them know who we are and what our office can do to help in terms of referrals to the NYC Commission on Human Rights or in-house counseling. We consider this to be a more holistic approach when dealing with work-related sexual violence.

Our hotline number is 212- 335-9373. When I spoke at the Manhattan Detention Complex, I stressed that we are not just a faceless telephone number at a government agency. We are there to answer questions and provide support for victims of sexual violence.

I would suggest that, going forward, our office further collaborate to assist officers at Manhattan Detention Complex with training and information so that they can make informed decisions about reporting acts of sexual misconduct to law enforcement and to follow through with their complaints to see real change. Furthermore, anyone reporting a crime within a correctional facility should be given the information and resources to have their case investigated directly by law enforcement and not be left to the discretion of in-house investigators.

 **Manhattan District Attorney's Office**

MAIN OFFICE

One Hogan Place

New York, NY 10013

212.335.9000

HARLEM OFFICE

163 West 125th Street

New York, NY 10027

212.864.7884

WASHINGTON HEIGHTS OFFICE

530 West 166th Street, Suite 600A

New York, NY 10032

212.335.3320

ABOUT THE OFFICE

OUR WORK

EVENTS

NEWS

VICTIM RESOURCESESPANOL 繁體中文

CONTACT US

CAREERS & TRAINING

Keep up with us! Sign up for our newsletter.

SIGN UP

# Keep up with us.

SIGN UP TO RECEIVE OUR NEWSLETTER

First NameLast NameEmail Address

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 142 of 353

# EXHIBIT 8

# PROOF OF NEW YORK CITY DEPARTMENT OF CORRECTIONS MALADMINISTRATION AND NEGLIGENT HIRING AND RETENTION PRACTICES

*Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 143 of 353*

b001

## The New York Times

# Rikers Tumult Rises: Prison Official Accused of Spying on Investigator

By William K. Rashbaum and Michael Schwirtz

May 8, 2017

New York City's Department of Investigation has picked apart practically every facet of the troubled Rikers Island jail complex in recent years, including abuses committed by guards and inmates and the misuse of official cars by the commissioner and his staff.

Now it is taking aim at the very person who is supposed to prevent wrongdoing at the jail from within — the head of the Correction Department's Investigation Division.

The Department of Investigation believes the jail official, Gregory Kuczinski, has orchestrated a spying campaign against it and has called for his removal. On Monday morning, Mr. Kuczinski was removed from his position and placed on modified duty.

In a long letter to Mayor Bill de Blasio, the Department of Investigation said Mr. Kuczinski and his subordinates violated city rules and regulations by repeatedly listening in on telephone calls between an investigator with the agency and inmates who were serving as informants, several people with knowledge of the letter said.

In an interview late on Sunday, the Correction Department commissioner, Joseph Ponte, insisted that "there was no improper eavesdropping." As soon as Correction Department investigators determined that they had been listening in on a conversation involving a Department of Investigation staff member, he said, they stopped the surveillance.

"Clearly there was no intent to interfere with D.O.I. and anything they were doing," he said.

Mr. Kuczinski, in a separate phone interview on Sunday, denied wrongdoing and called the reaction of officials at the investigation agency "ridiculous," saying: "Are they trying to cover something up? I don't know."

The letter from the head of the department, Mark G. Peters, was sent to Mayor de Blasio on Wednesday, according to the people. They spoke on the condition of anonymity because the contents of the letter were confidential.

The letter said that Mr. Ponte had learned of the surveillance in February, after another official had shut it down, the people said. But Mr. Ponte did not report the surveillance to the investigation agency, nor did he take any action against Mr. Kuczinski, whom he had promoted into his current job.

The accusation came just a week after the Department of Investigation issued a report sharply rebuking Mr. Ponte, Mr. Kuczinski and two other top correction officials for misusing their city cars. It was the latest in a series of embarrassing revelations of deep systemic problems in the city jails uncovered by the agency.

Paired with the rebuke over the cars, the accusations in the letter underscore how Rikers continues to be plagued with problems, including brutality on the cell blocks, corruption in the correction officer ranks and a disturbing level of mismanagement from the commissioner's suite on down.

But the accusations against the city jails' chief investigator, by another department's investigators, represent a low point for the jails system. They suggest that the very person responsible for ferreting out wrongdoing at Rikers may have been focused instead on protecting the jail, and those who work there, from further scrutiny.

The mayor, in a statement issued by his press secretary, Eric F. Phillips, acknowledged the gravity of the accusations and suggested that they would lead to change.

"These are serious and troubling allegations," the statement said. "We will work with the Department of Correction and the Department of Investigation to determine what happened and what changes must occur to ensure that it doesn't happen again."

Two city officials said the mayor was expected to order that Mr. Kuczinski be removed from his post as early as Monday and that he be placed on modified duty.

Mr. Kuczinski, in the interview on Sunday, defended his actions and disputed some aspects of the Department of Investigation's account. He said he learned of the recordings only in early February, soon after he took over the unit that monitors phone calls, when Mr. Ponte asked him to investigate the suspicions of a senior Correction Department official. That official, Mr. Kuczinski said, believed that four of the calls suggested that someone from the investigations agency was trying to frame Correction Department officials.

Mr. Kuczinski said he never listened to the recorded calls himself. Instead, he said, he assigned two members of his staff to investigate, but because of the demands of his new role, it took him two weeks to do so. It took the staff members several weeks to review the recordings and conclude that the calls did not indicate an attempt to frame anyone, he said. He said he did not initially notify the Department of Investigation about the matter in February because he believed it would have posed a conflict for the agency.

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 145 of 353



Gregory Kuczinski
City of New York Department of Corrections

Mr. Ponte defended Mr. Kuczinski, affirming Mr. Kuczinski's assertion that he was not initially involved with the call monitoring unit that had picked up the conversation between the Department of Investigation employee and an inmate informant. Mr. Ponte acknowledged that better communication with the Department of Investigation could have prevented the monitoring of the investigator's calls, but he placed some of the blame on the investigation agency.

"There are ways that D.O.I. could have told us that, these numbers, don't listen to them," he said.

The hiring of Mr. Kuczinski at the Correction Department remains something of a mystery.

As the deputy commissioner in charge of the agency's Investigation Division, he is responsible for uncovering administrative misconduct in the ranks of the department's 10,000 officers and investigating crimes committed by inmates.

But when he joined the jail agency in March 2015 as the division's No. 2 official, Mr. Kuczinski, a retired New York Police Department sergeant and a lawyer, had little investigative and no internal affairs experience from his police tenure. Nonetheless, Mr. Ponte promoted him to the division's top position about a year later, just days after he was rebuked and fined $1,500 for assigning an on-duty subordinate to drive him and his family to the airport for a summer vacation.

Officials at City Hall, the Department of Investigation and the Correction Department [b004] could not explain how Mr. Ponte came to hire and then promote Mr. Kuczinski despite his limited relevant experience. Mr. Kuczinski said he was hired after responding to a newspaper advertisement.

The investigation agency did not conclude that the spying was undertaken because of the report on vehicle misuse, the people with knowledge of the letter said. But the letter "did note concerns of the timing of certain actions regarding monitoring of D.O.I. investigator phone calls, especially at the direction of Kuczinski, that immediately followed D.O.C. being notified about the vehicle investigation," one of the people said.

Mr. Kuczinski's investigators at the Department of Correction are permitted to listen to inmate calls, but not when they know they are with lawyers, clergy, doctors or investigators with the Department of Investigation. If Mr. Kuczinski believed he had uncovered a corrupt investigator, the person said, he should have notified the agency or some other city or law enforcement official. There is no indication, the person said, that he did so.

In recent years, the Department of Investigation has prioritized inquiries into corruption and brutality at Rikers Island. Its investigations have identified officers who have smuggled drugs and weapons into the jails and determined that the Correction Department had hired gang members and people with criminal backgrounds as officers. Since 2014, 38 jail staff members have been arrested as a result of Department of Investigation inquiries.

The Department of Investigation report on the misuse of city vehicles by Mr. Ponte, Mr. Kuczinski and other senior officials said they had been referred to the city's ethics watchdog, the Conflicts of Interest Board, for possible discipline.

Mayor de Blasio is facing increasing criticism for his vocal support of Mr. Ponte — and by implication, other correction officials. The mayor has said he accepts Mr. Ponte's defense that he inadvertently violated city rules by repeatedly driving his government vehicle to Maine, where he spent a total of 90 days last year, because he had been advised by unnamed staff members that he was allowed to do so.

The mayor's support of the commissioner and other correction officials has prompted comparisons by department critics with the fate of low-level city employees who in recent years have been docked as much as 10 vacation days for using a city car for personal reasons for one day.

Mr. Ponte has made a number of questionable appointments and promotions since becoming commissioner in April 2014. Months into his tenure, Mr. Ponte promoted William Clemons to chief of department, the top uniformed position, despite an objection

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 147 of 353

Rikers Tumult Rises: Prison Official Accused of Spying on Investigator - The New York ...    Page 5 of 5

from the Department of Investigation. Several years earlier, an internal Correction[b006] Department audit had recommended Mr. Clemons be fired for presenting distorted data that made it appear as if violence was decreasing when in fact it was going up. Mr. Ponte's predecessor ignored the recommendation and also promoted Mr. Clemons.

Mr. Clemons was forced to resign after a New York Times investigation into the distorted data.

The Correction Department's Investigation Division has been in disarray for a long time. In August 2014, Preet Bharara, then the United States attorney for the Southern District of New York, published a report documenting astounding brutality at city jails and singled out the division for aiding what was described as a "deep-seated culture of violence" by failing to properly discipline guards.

Shortly after, Mr. Ponte appointed Michael Blake, a former senior official with the Police Department, to lead the division. Mr. Blake was another unusual appointment. Previous division heads had spent many years as prosecutors. Mr. Blake had never been a prosecutor, and his only experience investigating officer misconduct came during a stint that lasted less than two years in the Patrol Services Bureau two decades ago.

Mr. Blake lasted a little more than a year in the position. He left in December 2015, replaced by Mr. Kuczinski, who served as acting head of the division until April 2016.

Although the unit has expanded in recent years and closes cases more rapidly than in the past, under Mr. Kuczinski it has still suffered from many of the same deficiencies outlined in Mr. Bharara's report three years ago.

In a report last month, a federal monitoring team responsible for overseeing the reform effort at Rikers harshly criticized the division, accusing it of failing "to pursue disciplinary action in cases where there was objective evidence of wrongdoing."

A version of this article appears in print on May 7, 2017, on Page A1 of the New York edition with the headline: Rikers Tumult Rises: Monitor Accused of Spying

READ 64 COMMENTS



b006

The City of New York
Department of Investigation

**MARK G. PETERS**
**COMMISSIONER**

90 MAIDEN LANE
NEW YORK, NY 10038
212-825-5900

Release #22-2018
nyc.gov/doi

**FOR IMMEDIATE RELEASE**
**THURSDAY, MAY 3, 2018**

**CONTACT: DIANE STRUZZI**
**NICOLE TURSO**
**(212) 825-5931**

## DOI INVESTIGATION REVEALS CONTINUING FAILURES BY THE DEPARTMENT OF CORRECTION (DOC) TO PROPERLY SCREEN RECRUITS FOR RED FLAGS
*Failures identified by DOI in 2015 remain and recommended changes were never adopted by DOC*

Mark G. Peters, Commissioner of the New York City Department of Investigation ("DOI") today issued a Report detailing the findings of a year-long probe of the City Department of Correction's ("DOC") hiring practices for Correction Officers ("COs"), exposing persistent problems at the agency's Applicant Investigation Unit ("AIU"). DOI's investigation found a significant number of the COs hired in the January, June, and December 2016 classes continued to have red flags signaling corruption and safety hazards that should have precluded their hiring or required them to undergo monitoring once they were hired, including previous arrest records, employment termination, and contact with inmates. This investigation is a follow up to DOI's 2015 Report, which is linked here (2015 report) and uncovered vulnerabilities and breakdowns in the AIU's screening processes, including antiquated and haphazardly filed personnel documents and a failure to perform basic background and credit checks on individuals applying to become COs, that allowed recruits with significant background issues to be hired. As a result of its 2015 investigation, DOI made several recommendations to improve and strengthen DOC's hiring processes. DOI began looking at whether DOC had strengthened its protocols around hiring after a December 2016 arrest of a CO charged with bringing in contraband. When DOI reviewed that CO's file, it found significant red flags that should have precluded his hiring.

The Report released today demonstrates that DOC did not implement some recommendations and only partially implemented others, leading to the continued hiring of underqualified candidates. A copy of DOI's Report is attached to this release and can be found at the following link: DOI's 2018 Report.

DOI Commissioner Mark G. Peters said, "DOI continues to arrest correction officers who have red flags in their backgrounds that should have precluded their hiring. Until the City Department of Correction (DOC) creates and implements a proper screening system, we will not solve the problems that plague Rikers and DOI arrests of DOC staff will likely only increase. This was a systemic problem in 2015 when we released our first Report and DOC's failure to act on DOI's findings continues to be a problem."

As part of DOI's investigation, a random sample of 291 candidate files from the January, June and December 2016 classes were examined using factors set out in the Notice of Examination for COs and DOC's own automatic disqualifiers. The review found that more than a quarter -- and almost a third -- of the candidates (88 of the 291 candidates) should not have been hired or should have been monitored after their hiring because of red flags. Specifically in its review, DOI found:

- 42 files, or 40% of files reviewed from the January 2016 Class, indicated friends and relatives who were or had been previously incarcerated.
- 33 files, or 33% of files reviewed from the June 2016 Class, indicated a past employment termination.
- 28 files, or 30% of the files reviewed from the December 2016 Class, indicated candidates had at least one prior arrest. Seven of these files indicated that the candidate had been arrested more than once.

Nonetheless, these candidates were hired by DOC.

*more*

E094

Case 1:26-cv-00914-DEH-SN     Document 52     Filed 03/25/26     Page 149 of 353

b007

DOI's review identified a number of troubling examples of underqualified individuals with red flags being hired by DOC in these sensitive positions, including:

- A candidate that DOC knew was previously employed by the New York State Department of Correction and Community Supervision ("DOCCS") and had left his employment after he had an inappropriate relationship with an inmate.

- A candidate that DOC knew had been previously arrested for criminal possession of a weapon and harassing a fellow worker at a prior job.

- A candidate who, prior to applying to be a CO, had multiple visits to inmates with gang affiliations and failed to list those inmate visits as required in the application submitted to DOC.

The review also exposed continued vulnerabilities in DOC's screening process first brought to light in DOI's 2015 Report, including the failure of AIU investigators to conduct thorough applicant background checks, relying instead on self-reported information from candidates to meet time constraints; a lack of field visits to assess a candidate's suitability; and a failure to wait for third-party employment verifications when candidates reported being terminated or resigning from a past employer. DOI found that AIU still does not verify personal information through public record databases and infrequently obtains paperwork on police contacts or inmate phone calls when a candidate notes an association with a past or present inmate. The investigation also revealed that despite DOI's 2015 recommendation to computerize AIU record-keeping, AIU's files are still paper-based and, as a result, many were incomplete.

DOI's investigation demonstrates that its original recommendations have not been fully realized or implemented, and underscores the critical need for DOC to make significant improvements to its screening process for those applicants seeking to become COs in City jails. DOC should now implement the following recommendations from the 2015 Report:

- DOC should have a more thorough and standardized applicant review process; the application and review process should be computerized;

- DOC should implement in-house training for investigators in investigative and interview techniques that is relevant to recruiting and evaluation COs, and have a written AIU investigator manual;

- AIU investigators should use law enforcement and public databases as investigative tools and as collateral checks on applicants;

- DOC should staff AIU properly to enable investigators to thoroughly investigate and vet candidates;

- DOC should engage in a more rigorous review of the psychological testing presently employed and decisions by supervisors should be more thoroughly explained in writing; and

- DOC should have a system in place to proactively monitor applicants who are hired despite red flags.

DOI Commissioner Mark G. Peters thanked DOC Commissioner Cynthia Brann, and her staff, including General Counsel Heidi Grossman, for their cooperation in this investigation.

This investigation was conducted by DOI's Inspector General for DOC, specifically Special Investigators Lawrence Bond, Robert Ellis, LaShana M. Taylor, Cindy Tsui, Vincent Valerio, Lauren Kerstein, Rhonda Young, and Ferdinand Torres, Chief Investigator Anthony DeLeo, Confidential Investigators Matthew London, Kelly Melendez, and Zoe Swenson, Assistant Inspector General Michael Garcin, and Deputy Inspector General Richard Askin, under the supervision of Inspector General Dana A. Roth, Associate Commissioner Paul Cronin, Deputy Commissioner/Chief of Investigations Susan Lambiase, and First Deputy Commissioner Lesley Brovner.

*DOI is one of the oldest law-enforcement agencies in the country and New York City's corruption watchdog. Investigations may involve any agency, officer, elected official or employee of the City, as well as those who do business with or receive benefits from the City. DOI's strategy attacks corruption comprehensively through systemic investigations that lead to high-impact arrests, preventive internal controls and operational reforms that improve the way the City runs.*

DOI's press releases can also be found at twitter.com/NYC_DOI
Bribery and Corruption are a Trap. Don't Get Caught Up. Report it at 212-3-NYC-DOI.

E095

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 150 of 353

b008



# New York City Department of Investigation
# Report on the Recruiting and Hiring Process for
# New York City Correction Officers

**MARK G. PETERS**
**COMMISSIONER**

**January 2015**

b008

Over the past year, the Department of Investigation (DOI) has conducted an extensive investigation into systemic illegal conduct at the Department of Correction (DOC) Rikers Island facility. As a result, DOI has already arrested or referred for discipline 23 Rikers staff and more than 30 inmates for crimes related to violence, contraband smuggling and falsification of documents and evidence. DOI has also issued a detailed report on the problem of contraband smuggling that resulted in unprecedented changes in security and screening, including the agreement to use drug-detecting canines.

Related to these problems is a failure to recruit and hire consistently excellent staff at the Correction Officer (CO) level. Most COs perform a difficult and dangerous job in a professional and competent manner. However, DOI's investigation reveals that DOC's hiring process has failed to recruit sufficient talented COs and has failed, in some instances, to weed out those who would abuse their position.

As an integral part of DOI's investigation of DOC's recruitment and applicant screening procedures, DOI has now reviewed over 150 applications of recently hired COs. Of these, 54 had significant red flags that should have either precluded their hiring altogether or at least required significant follow up or monitoring.[1] For example, among the more than 150 files DOI reviewed, we observed the following:

- Ten of the CO files indicated that the applicant had been arrested more than once. One CO had pleaded guilty to harassment in a domestic violence case. Another had several arrests and had previously been fired as a security guard after being caught stealing from the store he was hired to guard.

- 65 of the CO files indicated that the applicant's psychological exam raised some form of concern about his/her ability to perform his/her duties. More troubling, several raised significant red flags. In one case, the applicant's psychological exam indicated "low personality development" and the applicant was rejected by the Director of the Applicant Investigation Unit (AIU). However, despite this finding, a DOC Deputy Commissioner reversed that decision and hired the CO anyway. A detailed explanation for the reversal is missing and the file includes notation that the applicant was a "family friend of [Correction Officers Benevolent Association President] Norman Seabrook."

- 79 of the CO files indicated that the applicant had friends or relatives who were or had been incarcerated. More troubling, a number of these included current inmates and situations in which significant contact could not be explained. Such relationships between inmates and COs present a considerable security threat, especially as inmates often use these relationships to extort, coerce and control COs. One applicant had nine relatives who had been incarcerated.

---

[1] We note that during our review, DOI identified many more files that had at least some cause for concern. However, these 54 files are representative of those that DOI identified as having multiple and/or significant red flags.

1

b010

Another received calls from inmates on her personal telephone and could provide no viable explanation to AIU for the calls.

- In 54 of the CO files, the applicants clearly failed to demonstrate the "good character and satisfactory background" required of every CO. The failures ranged from significant personal debt of over $400,000, to a candidate with multiple arrests and previous employment at a strip club that was the target of prior criminal investigations.

All of the above applicants were hired.

Beyond the specific problems noted above, DOI conducted over 200 hours of interviews with DOC staff and site visits and review of more than 75,000 documents related to the hiring process. This review demonstrated significant systemic problems that clearly contributed to a process in which many applicants with significant red flags could be hired. For example:

- DOC did not properly train the staff assigned to handle candidate screening: Many red flags in files were simply missed or the staff had no ability to evaluate or follow up on the problems. Indeed, while staff evaluated all candidates on a scale of 1 to 5, interviews indicated confusion even on the basic fact of whether a "1" or a "5" was the best score. In any event 90 percent of applicants received a "3" rating, thus making the rating system effectively useless.

- DOC did not make use of basic background screening tools: DOC did not check credit reports nor did it effectively verify personal information for candidates. Most troubling, DOC did not require screening staff to check DOC's Visitor Express database to find out whether applicants have visited inmates in jail – a sign that applicants may have connections to the very people they are to guard.

- Until recently, DOC had no significant process to screen applicants for gang affiliation. Even where DOC was aware of gang affiliation in newly hired recruits, it previously failed to coordinate with its own gang intelligence unit to take appropriate precautions. While DOC has now corrected this problem in its screening process, DOC's Correction Intelligence Bureau (CIB) still estimates that there are dozens of staff with gang affiliations.

- DOC did not have a meaningful recruitment strategy: DOC disbanded its Recruitment Unit in 2009 and since then has had no real recruitment outreach efforts. As a result, DOC is not able to recruit sufficient, qualified applicants such that even after a rigorous screening process there will be the requisite number of candidates to fill the ranks of new COs.

2

b011

The failure of DOC to properly screen CO applicants has had real world consequences. Of the 23 staff that DOI arrested or recommended for discipline in the past year, DOC was able to readily produce 13 of their applicant files. Of these, six had red flags of the type described in this Report. In other words, proper recruitment and screening should have eliminated at least 25% percent of the arrests and disciplinary referrals that DOI was forced to make last year alone. Moreover, of the 54 newly hired staff with red flags noted above, already three no longer work for DOC after being implicated in incidents of misconduct and two have since resigned for unknown reasons.

This report describes all of these problems in further detail and makes recommendations for improvements going forward. We hasten to note that these problems are the result of a decade or more of institutional neglect. They cannot be quickly or easily solved. This is especially so now, given the numerous, and immediate issues that DOC management must confront. However, these problems must be tackled as part of any long lasting reform.

Since DOI's review of the AIU, DOC has already made some improvements. Notably, both the Director and Deputy Commissioner who were responsible for the hiring of the applicants DOI reviewed have been replaced. DOC has also allocated additional staff to the unit, including COs. Finally, DOC has now agreed to implement the additional recommendations contained in this report. At a recent meeting, DOC outlined a series of further aggressive steps to solve this problem that are addressed in the recommendation section below. We are encouraged by these changes.

## I.      Background: DOC's CO Application Process

The DOC CO application process begins when the Department of Citywide Administrative Services (DCAS) publishes a Notice of Examination (NOE) on its website. The NOE provides the public with basic information about the job of CO and the application process, as well as the basic qualifications required for the position.[2] Anyone who wants to become a CO first must take a Civil Service examination, administered by DCAS. After the applicants have completed the examination, it is rated. Once the exam is rated and scores are finalized, the civil service list resulting from the exam is made public and eligibles receive a Notification of Results (NOR) card with their score and civil service list number. The civil service list, which is issued by DCAS, ranks the applicants by their score.[3] DOC's AIU List Management Unit

---

[2] These published standards include the requirement that applicants successfully complete the requirements established by the State of New York for Peace Officers and that they maintain their status as Peace Officers for the duration of their employment.

[3] DOI learned that there is a delay of over three years between the test date and the date that AIU receives a certified copy of the list from DCAS. In October 2014, DCAS certified CO Exam 1318, which was held in June 2011. AIU Executive Director Larry Johnson told DOI that this delay costs DOC the opportunity to hire high-quality applicants who will find employment elsewhere. DCAS confirmed that lists must be published and then established in exam date order. This does not prevent hiring opportunities as lists are established based on DOC's hiring needs and the timeframe for DOC to exhaust older lists. This particular list was made public in

3

(LMU) then contacts every applicant on this civil service list to begin the investigation process to ensure that they meet certain criteria, including possessing a valid driver's license, being a United States citizen, and meeting educational and work experience requirements. The list is established, as needed, and certified to the agency to make appointments.

As part of the recruitment process, LMU invites eligible applicants to an orientation program. During this program, AIU, among other things, informs the applicants about the duties of a CO and initiates a criminal history check.

Following this orientation, the candidates undergo medical and psychological screenings – by DOC's Medical and Psychology Units, respectively – and a background investigation. For the background investigation, an AIU "case coordinator" interviews the applicant to review his or her background questionnaire, which includes questions about the applicant's current and prior residences, family, education, employment record, criminal background, family's criminal background, driver's license, financial debts, and drug and alcohol use. The case coordinator then contacts the applicant's former employers, reviews his or her social media pages, examines some inmate visitation and telephone call history, and confirms information that the applicant has provided on the background questionnaire.

Once both the Medical and Psychology Units have found the applicant qualified, and the background investigation is complete, the case coordinator prepares an analysis of the candidate on a Case Review Sheet, which is sent to AIU's Executive Director.[4] In turn, the AIU Executive Director examines the file and Case Review Sheet, makes a hiring recommendation, and forwards the applicant's Case Review Sheet and medical reports to the Deputy Commissioner of Operations.[5] The Deputy Commissioner has final say over whether to hire the applicant, pending an agility test, and may reject the AIU Executive Director's recommendation.[6]

AIU can determine that a list eligible is Not Qualified for medical, psychological, or character reasons. If DOC determines that an eligible is not qualified, he or she may appeal to the Civil Service Commission. Absent a successful appeal, however, eligible is removed from the Civil Service list. After unqualified

March of 2012. The list remains public until the agency requests that it be established. DOC requested that the list be established in May of 2014 and DOC requested that the list be certified to them for hiring in October 2014.

[4] Since August 18, 2014, Larry Johnson, Ed.D., has been AIU's Executive Director. Before Director Johnson's appointment, the position was held by AIU Director David A. Safran, Ph.D., who resigned on August 1, 2014.

[5] Deputy Commissioner of Operations Errol Toulon, Jr. currently is in charge of hiring. At the time that AIU completed its review of the files that DOI examined, the Deputy Commissioner for Human Resources and Training Alan Vengersky was in charge of hiring. Vengersky retired effective August 9, 2014. At the time that these files were processed by AIU, the first round of review was done by a civilian investigator, the second by then AIU Director Safran, and the third by then Deputy Commissioner Vengersky.

[6] The agility test, also known as the physical ability test, measures, among other things, an applicant's strength and endurance. Components of the test include running, lifting the weight of an inmate, and ascending stairs.

4

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 155 of 353

b013

candidates are removed from the list, DOC must choose who to hire from the remaining candidates using the "1 in 3" rule. This rule requires DOC to hire one of the top three candidates on the list for the first available CO position, and fill each remaining CO position by choosing one of the next three eligible candidates. The remaining two candidates who are not selected will be considered as part of the next group of three. If a candidate is considered but not selected three times, that person is removed from the list without the opportunity to appeal DOC's decision.

Once hired, the CO commences employment subject to a two-year probationary period where the CO can be terminated without many of the civil service protections afforded to officers who have completed their probationary period.

## II.    DOI Reviewed Over 150 Random Applicant Files For Recently Hired COs. In Many Cases the Applicants Were Not Fit for Service and Should Not Have Been Hired.

As noted above, DOI reviewed a random sample of 153 applicant files for recently hired COs.[7] 54 files, 35%, presented significant red flags that should have either precluded their hiring outright or required further follow-up or monitoring. None of these necessary safety measures occurred. Moreover, in just the past year, at least three of the applicants with red flags have already had some sort of disciplinary issue.

Below, we discuss some of the significant red flags that went unaddressed in the DOC hiring process.

### A.    The Applicant File Review Revealed that AIU Hired 54 COs Despite the Fact Their Files Showed Potentially Disqualifying Criteria

According to DCAS's NOE, "proof of good character and satisfactory background" is an "absolute" prerequisite to appointment. The most recent NOE lists the following specific factors as possible causes for disqualification: "(a) conviction of a felony; (b) conviction of any offense, the nature of which indicates lack of good moral character or disposition towards violence or disorder; (c) repeated convictions of an offense, where such convictions indicate a disrespect for the law; (d) discharge from employment, where such discharge indicates poor behavior or inability to adjust to discipline; (e) dishonorable discharge from the Armed Forces; (f) conviction for petit larceny and (g) conviction of domestic violence." The NOE also states that DOC may reject an applicant for intentional misrepresentations on his or her application forms.[8]

---

[7] The majority of the files were chosen at random from one recently hired class of new COs. DOI also reviewed files from recent subjects of DOI investigations who were hired in 2012 or later. In total, over 160 files were reviewed. These additional files should not significantly influence the overall numbers in our findings.
[8] DCAS issues a new NOE for each examination, but the factors listed here were used at the time that all the COs, whose files were reviewed by DOI, took the CO examination, and they were listed on the most recent NOE posted by DCAS.

5

E101

Case 1:26-cv-00914-DEH-SN     Document 52     Filed 03/25/26     Page 156 of 353

b014

DOI found that, using these criteria, 25 of the hired COs lacked the "good character" that DOC requires for its COs and therefore should have been rejected as "not qualified." For example, one application indicated that the applicant had several prior arrests, was fired from his former employment as a security guard, and was arrested after he was caught stealing from the store he was hired to guard. A second CO's application indicated that he had pleaded guilty to disorderly conduct in a domestic violence case, had been fired from a job for poor behavior, and failed the NYPD's background check. Both officers were hired without any monitoring put in place.

DOC also hired COs whose files had evidence of generalized poor character, although not any of the specific attributes found on the NOE's list. Although these CO's did not have any of the specifically prohibited factors, their applications cast serious doubt about whether the COs had the "good character and satisfactory background" required of every CO. Moreover, even if such problems would not eliminate the candidates for character reasons, AIU had the option of not selecting them from the civil service list – an option it failed to exercise.

For example, ten of the hired COs whose files DOI reviewed had been arrested more than once, and some of the COs had significant signs of financial instability. In one instance, DOC hired one CO with $400,000 in debt, despite the Director's acknowledgement in his recommendation that this put him at risk for corruption.

Moreover, DOC hired 79 COs with friends and relatives who were or had been incarcerated, including one CO who listed nine relatives who had been incarcerated. More troubling, a number of these included current inmates and situations in which significant contact could not be explained. Other hired COs had received calls from inmates on their personal telephones, and the assigned case coordinator failed to offer any reasonable explanation for why they received those calls. Such relationships between inmates and COs present a considerable security threat, especially as inmates often use these relationships to extort, coerce, and control the COs. Through its investigations, DOI has found that inappropriate contact with inmates is associated frequently with criminal conduct, including taking bribes for contraband smuggling and committing sexual offenses.[9]

DOI found that twelve of the hired COs had previously been rejected for employment by the NYPD. While it is not surprising that someone would apply to both agencies, DOI found that DOC used significantly lower hiring standards than the NYPD. (As discussed below, DOC's failure to maintain a robust recruitment process may partly contribute to its lower hiring standards.) Of the twelve applicants subsequently hired by DOC, the NYPD rejected six for psychological reasons, one for failing a drug test, one for excessive Vehicle and Traffic Law (VTL) violations, one for

---

[9] DOC prohibits uniformed staff members from having "unduly familiar" relationships with inmates, and requires them to notify DOC whenever a relative, friend, or someone else with whom they have a relationship is incarcerated and housed in the same facility. Failure to make such a notification can result in disciplinary charges. *See* DOC Rules & Regulations §§ 3.25.040, 3.25.041, 3.25.050, 3.25.060.

6

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 157 of 353

problems uncovered during the background review process, and one because she "failed to appear for appointment or [was] uncooperative," according to a letter from the NYPD Applicant Processing Division (APD).[16] In addition to the twelve applicants rejected by the NYPD, the NYPD had fired one hired CO from a position as Police Cadet for her failure to disclose an arrest for petit larceny. Thus, it appears that most of these candidates were simply unfit for law enforcement – whether working on the streets of New York City as police officers or in its jails.

DOC's hiring of six applicants previously disqualified by the NYPD based on psychological exam results suggests that the NYPD's psychological examination process is more stringent. DOI's visits to both DOC and NYPD psychological testing facilities revealed that the NYPD obtains more information from applicants by giving a lengthier psychological exam and administering a drawing test aimed at revealing personality traits. Thus, while the exams are subjective, the NYPD obtains more information from its applicants to enhance the examination process.

**B.    DOC Failed to Document Its Determinations Properly: The Director of AIU Excused Bad Conduct for Inadequate Reasons and the Deputy Commissioner at Times Hired CO's after the Director Rejected Them, But Provided No Viable Explanation. At Times, Political Rather than Merits Based Reasoning Applied.**

In any hiring system, it is important that decisions be documented, especially where senior staff overrule the initial determination of line investigators. Not only does this provide an important record of the agency's overall thinking and process, but it forces supervisors to explain their decisions and thus increases the chances that they will be made thoughtfully. Such documentation was woefully absent in 25 of the files reviewed by DOI.

DOI found that, at each stage of the process, AIU officials lacked a clear system of recommendation for CO hires. Case coordinators often did not give recommendations. The Director, who is responsible for recommending hires, until recently, used a number system that offered little guidance. And the former Deputy Commissioner, who had final authority over hires, wrote only brief notes by hand in the reviewed files that offered little to no reasoning behind his hiring decisions.

DOI further found that AIU case coordinators summarized their findings for an application, but, in many cases, did not clearly recommend or exclude candidates. Further, former AIU Director Safran evaluated candidates on an apparent scale of 1 to 5, but this system offered little guidance as to whether a candidate should be hired. DOI was unable to determine the meaning of this rating system, even after speaking with former Deputy Commissioner Vengersky, who stated on nearly all applications reviewed by DOI that he "agreed" with Safran's candidate assessments. This, despite

---

[16] Another CO failed the Police Officer civil service exam and a CO was rejected from a position as a police cadet for a reason unclear from the AIU file.

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 158 of 353

the fact that Vengersky told DOI that he was unsure of whether 1 or 5 is the highest rating. DOI did not speak to former Director Safran, who left DOC in early August 2014.

In any event, the 5-point scale was meaningless because almost all of the applicants received the same score regardless of their merit. Of the 153 reviewed files, the AIU Director rated approximately ninety percent of the applicants a "3" and rated approximately eight percent of the applicants a "4." Two percent received no rating.[11] No applicants from the reviewed group received a rating of 1, 2, or 5.

Further, the quality of applicants whom the Director rated a "3" varied drastically. For example, Candidate A was working in a federal government security position at the time of her application and had no inmate associations, no prior arrests, no prior terminations, slight debt from credit cards and school loans, and no psychological issues. Candidate B was terminated from his prior employment as a security guard after he was caught stealing from the store he was assigned to guard, and he was arrested four times. Yet both applicants received a rating of "3." Nor were the Deputy Commissioner's handwritten comments of any use. Typically, he gave only limited, generalized comments, such as "Agree. Some risk. Hire pending agility test." This level of "analysis," or a slight variation of it, appears in nearly every file examined by DOI.

When the process got to the AIU Director it was further flawed. DOI found that, in 18 files, approximately 12% of those reviewed, the AIU Director excused serious red flags without adequate explanation. Indeed, in several applications, the AIU Director excused prior arrests and other bad conduct as isolated incidents or youthful indiscretions.

In one case, the CO's application file contained signs of potential corruption, including serious financial instability, that were dismissed as mere "immaturity." This CO was arrested earlier this year after meeting with a DOI undercover investigator, accepting money and placebos that he believed to be real drugs, and delivering them to an inmate who was a DOI confidential informant. The fee he charged and accepted for this delivery was $500. DOI's investigation determined that the CO had engaged in similar conduct, and accepted similar fees, on multiple occasions. In this CO's AIU Case Review Sheet, then Director Safran commented, "He has shown no major issues in the vocational sphere, albeit he has quite a few jobs and appears to be unable to focus on career choices. Given his age, much of this behavior may be due to immaturity." He further stated, "His traffic violations and lack of due diligences with regard to paying his student loan may indicate some issues with impulse control, but again this may also be attributed to immaturity. As such, he will be qualified and rated a 3." While these traits might not be an absolute bar to hiring, the Director offered a notably weak excuse for the serious problems identified and

---

[11] Seven applicants received no rating number – all of them because they were not recommended by the Director who gave the ratings, a decision which was later overturned.

8

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 159 of 353

b017

failed to provide sufficient justification for recommending this applicant for hire.

DOI further observed flawed and arbitrary hiring decisions by the former Deputy Commissioner in charge of the applicant review process, including seven cases where the Deputy Commissioner hired an applicant whom the Director had rejected. In all cases, as demonstrated below, the Deputy Commissioner – despite the unusual nature of his action – gave only a brief, and barely legible, handwritten justification for his decision.

In one file, the Director rejected the applicant, whom the file notes was a "family friend of Norman Seabrook," president of the Correction Officers Benevolent Association, because he was concerned, based upon the nature of her past employment, that she could not handle the stress of working as a CO. In addition, the Director noted that, due to the low personality development score of three on a scale of seven that she received in her psychiatric exam, she was a poor candidate for law enforcement and that she would be too deferential to other people, including inmates. Initially, the Deputy Commissioner, in his note, asked whether DOC had hired COs with a personality development score of only three. But, later, without explanation, he overruled the Director and recommended her hire.

In a second case, the Director found that the CO's application had several problems – including questionable receipt of public assistance and a potentially false statement about her termination from a prior job. In hiring this CO, the Deputy Commissioner offered no explanation except for sparse, illegible notes, and a reference to the candidate's internship on Rikers Island.

In a third case, the Director, in his summary, found that the candidate "present[ed] as a sycophantic individual who ha[d] some questionable moral undertakings in his life." In addition, the applicant had over one million dollars in the bank, and the Director questioned why the candidate "would desire [the CO position] unless there was some secondary gain that he had in mind." In overruling the Director, however, the Deputy Commissioner merely wrote, "Reviewed; hire pending agility test results."

In the fourth case, among other cited issues, the Director stated that the candidate's "psychological exam was indicative of being inattentive and defensive, characteristics which are not ideal in a prospective CO." The Deputy Commissioner, however, approved the hire, writing a brief, illegible comment before recommending, "Some issues, but hire pending agility test results."

In the fifth case, the Director noted that the candidate had failed the NYPD psychological exam three times and the DOC psychological exam one time – all for poor stress tolerance – but the results of the DOC exam were overturned on appeal. The Director recommended not hiring her "based on poor stress tolerance and poor adjust [sic] to the demands of adulthood." The Deputy Commissioner then approved her hire with a brief illegible note.

9

b016

In the sixth case, the Director stated that it was unclear that the candidate could accede to the demands of correctional work, as he had no work experience until he was 30 years old and seemed to have substantial "off time" for travel at his prior job. He also questioned his ability to adjust to the demands of adulthood. He did not recommend the candidate for hire. The Deputy Commissioner overruled the Director, with a brief, illegible note.

In the seventh case, the candidate had previously been shot by a gang member in a street altercation. He had a prior employment termination and an arrest record. The Director disapproved the candidate, but the Deputy Commissioner overruled the Director noting only: "Disagree. Some risk, but hire pending agility test results."

With all of these applications, the Deputy Commissioner had the duty and responsibility to overrule the Director if he disagreed with his decision. However, in each instance he failed to explain why the Director's judgment was incorrect or address the serious issues raised by the Director.

C.    **AIU's Files Lacked Any Indication that the Applicants Had Been Screened for Gang Affiliation.**

Significantly, prior to recent changes to the applicant screening process, AIU did not screen the reviewed applications for gang affiliation. Indeed, DOI found no notations in the files that AIU screened for gang affiliation or consulted with the DOC's Correction Intelligence Bureau (CIB).[12] As DOI has learned through interviews with CIB personnel, CO gang membership is potentially the greatest threat to DOC's security because gang members generally place their gang allegiance above their CO duties. CIB estimates that dozens of DOC employees are members of gangs and states that inmates frequently report that COs are involved in gang activity.

More concerning, DOI discovered one file during review where the applicant admitted to prior associations with known gang members during his psychological exam. Also concerning was that he initially denied these associations in the screening sheet he completed for AIU, apparently only admitting to such after it was discovered in the psychological exam. Although the candidate denied gang membership, he submitted a detailed statement to supplement his admission explaining that a close family friend was an identified gang member, and the applicant regularly socialized with him and his fellow gang members during his teenage years. He also admitted to still having limited contact with some of these individuals during the time of his AIU background investigation.

What is not clear from the file is whether the association was discovered through AIU's background screening or was merely self-reported by the applicant. Notwithstanding having the applicant resubmit his screening sheet to indicate he had

---

[12] CIB is responsible for policing the City's jails. Among other things, it monitors gang activity in the facilities, investigates crimes committed by inmates, including slashings and stabbings, and processes arrests.

10

b019

prior associations, the file lacks any further follow up or targeted investigation on the matter once the information was reported. Instead, AIU staff made a notation of the risk this association presented, noting in the applicant's file that "if he is approved for hire his past gang associations should be made known to [DOC's] gang intelligence." The candidate was hired. However, DOI has confirmed that no such notification was made to DOC's gang intelligence unit.

DOI investigators, however, have learned that CIB is now assisting AIU in screening applicants for gang membership. The AIU medical unit photographs applicants' tattoos and sends the photos to CIB, which then analyzes the tattoo alone, without any other identifying information on the candidate, to determine gang affiliation in an objective manner. According to Director Johnson and Medical Unit Supervisor Pamela Eanes, DOC has rejected six applicants after CIB found that their tattoos suggested gang membership.

**III.    DOI's Review of the Hiring Process Showed Various Systemic Flaws that Led to the Hiring Problems Found in the DOI Case Review Discussed Above.**

In addition to the extensive review of CO applicant files detailed above, DOI also interviewed eleven AIU staff and made multiple visits to AIU's offices to understand their hiring process. To assist in our evaluation of DOC, DOI also consulted with DCAS staff responsible for developing the NOE and tracking DOC's CO hiring decisions and consulted with the NYPD APD to learn their hiring process. As a result, we found various systemic failures that directly contributed to the problems identified in the case review. The most important of these problems are discussed below.

**A.    DOC Does Not Properly Train its AIU Staff. As a Result, the Staff Does Not Conduct Thorough Investigations and Does Not Make Use of Modern Investigative Tools.**

Through its discussions with AIU staff, DOI investigators discovered that AIU lacks a regimented training program. AIU does not train its case coordinators in interviewing techniques, case management, or basic investigative practices. Indeed, AIU lacks a written manual describing its investigative strategies and procedures.

By contrast, supervisors at the NYPD informed DOI that the APD provides a two-week training course for new investigators, offers refresher training courses, and has written guidelines for the unit. The two-week course includes training in investigator responsibilities, use of computer databases, processing candidates, interview techniques, preparing reports, and using APD forms. Further, investigators within APD's Computer Investigations Unit have special training in identifying signs of gang membership.

11

Case 1:26-cv-00914-DEH-SN   Document 52   Filed 03/25/26   Page 162 of 353

b020

The contrast in the DOC and NYPD process is striking. As a result, DOC screening is not sufficiently thorough, does not follow up on obvious issues and does not make use of modern investigative technology. We discuss these specific concerns below.

### i. AIU fails to thoroughly investigate applicants' backgrounds.

DOI found that AIU case coordinators do not thoroughly investigate applicants' backgrounds. DOI investigators discovered, through their interviews with AIU personnel, as well as their examination of applicant files discussed above, that case coordinators rarely made field visits and failed sufficiently to investigate applicants with past problems that may be a basis for disqualification.

AIU case coordinators reported to DOI that they visit applicants' personal references and homes infrequently. Director Johnson told DOI, and case coordinators confirmed, that case coordinators make these field visits in their discretion, and only if a problem is uncovered during the applicant's background investigation. For instance, a case coordinator reported that he once visited an applicant's former employer with his supervisor's permission. AIU ultimately rejected the applicant after the visit uncovered negative information in the applicant's work history.

By contrast, the NYPD APD has a "Residency Unit" that conducts field investigations and completes personal reference reports for every viable candidate eligible for the position of Police Officer. This unit ensures that the applicants comply with residency requirements, and it interviews the applicants' friends, coworkers, and/or neighbors.

Further, DOI, in reviewing the files discussed below, found that AIU hired several applicants without ever obtaining key background information required in their applications. For example, DOI found eleven questionnaires where the hired applicants did not answer whether they had ever been disqualified or barred from employment by any City, State, or Federal agency, and the case coordinators never addressed the omission.

These types of omissions are not possible in an NYPD application because its APD uses computerized application forms that require the applicant to answer every question.

Moreover, in its file review, DOI found more than one file in which a CO applicant denied knowing inmates who called his or her phone number and the CO was still hired without further inquiry. For example, one CO reported that she did not have any current or former incarcerated associates, but her cell phone was called once by an inmate in 2010 and she received over 20 calls to her home phone, one lasting 15 minutes, from five inmates between 2002 and 2007. She gave AIU a statement saying that she did not know any of the people who called her home phone, but provided no further information, including who was living with her at the time

12

b021

and might have received the calls. Nor did she give a statement about the call to her cell phone. The AIU Director did not address these phone contacts in his comments, and the CO was hired without any further follow-up or explanation of the phone calls.

In addition, DOI found files where AIU failed to address applicants' suspicious explanations of inmate contact adequately. For example, one hired CO initially told AIU, in her application, that she had no incarcerated associates. After her case coordinator found that an inmate had called the CO's cell phone twenty times, she claimed that she had not spoken to anyone and that she could think only of one possible caller. In a notarized statement the CO said that she met the caller in her neighborhood, had a few brief conversations with him when he was on Rikers Island, tried to "disassociate herself" from him, and knew only his nickname. In the Case Review Sheet, the case coordinator appeared skeptical, but the AIU Director, in his summary statement on the case review sheet, completely ignored the issue, approving the CO for hire. The Deputy Commissioner gave final approval, commenting only: "Agreed, some risk, hire pending agility test results."

### ii. AIU fails to make use of modern investigative technology.

DOI investigators discovered that AIU has failed to provide its case coordinators with the necessary tools to conduct thorough background investigations. AIU does not check credit scores or personal information in a LexisNexis database, use "Virtual Identity Reports" to find all applicant social media sites,[13] or listen to recorded conversations between applicants and inmates at DOC facilities when they are detected by DOC's call monitoring system.

DOI found that AIU does not check the credit histories of its applicants, despite the known risk for corruption associated with personal debt. Nor does it use a database, like LexisNexis, to verify personal information of all candidates, including their addresses, telephone numbers, and household members, and to determine whether they have associations with inmates. Indeed, DOI discovered that AIU case coordinators currently lack access to LexisNexis or similar databases, in part, because AIU's current director mistakenly believed that a case coordinator had access to LexisNexis, when the coordinator did not.

By contrast, the NYPD APD checks the credit history and personal information of every Police Officer applicant to verify the information provided by the candidates.

In addition, DOI found that, until recently, case coordinators lacked access to social media sites, including Facebook, YouTube, Instagram, and Twitter. Instead, case coordinators had applicants display their social media accounts on their own

---

[13] Virtual Identity Reports are generated by the LexisNexis Accurint service and can tell whether a person's email address is linked to certain social networking sites, including Facebook and LinkedIn, and can provide links to the person's profiles on those sites.

13

b022

phones during interviews. Even now, AIU has not provided its case coordinators with access to "Virtual Identity Reports," which can identify applicants' unreported social media websites. As a result, case coordinators must rely upon the applicants to disclose their social media websites.

By contrast, DOI learned that the NYPD APD has a "Computer Inquiry Unit" that completes a comprehensive computer background check. Among other things, this unit is trained in identifying signs of gang activity among the applicants, which are often apparent from an applicant's social media presence.

Further, AIU does not require its case coordinators to check DOC's Visitor Express database to find out whether applicants have visited inmates in jail. Although case coordinators regularly check DOC's Inmate Information System (IIS) to see if applicants have visited inmates, Visitor Express is newer, is updated more regularly, and allows users to view photos of the visitors to confirm identity. Not utilizing Visitor Express could result in AIU failing to uncover applicant relationships with inmates that present significant integrity concerns.

Also, DOI found that AIU fails to listen to DOC recorded telephone calls between applicants and inmates, even though inappropriate personal relationships between inmates and COs are a serious corruption risk that have surfaced in previous DOI investigations. The Inmate Financial Commissary Management System (IFCOM) is a telephone monitoring system that tracks inmate telephone calls, and AIU has the ability to use it to investigate whether applicants have had telephone conversations with inmates. DOI's file review, however, found at least two files where the case coordinator had failed to run an applicant's telephone number in IFCOM.

Moreover, DOI found that case coordinators, upon identifying a telephone call between an applicant and a DOC inmate, do not listen to the recording of that telephone call. Indeed, of the approximately 150 files discussed above, seven files had IFCOM printouts showing calls from inmates to the hired CO's telephone that lasted over a minute and that were recent enough for AIU to obtain a recording.[14] When DOI investigators asked about the general failure to obtain recordings, case coordinators responded that they believed that DOC policy prohibited them from listening to inmate calls in the context of a background investigation. Director Johnson informed DOI that he did not know whether anything prohibited coordinators from listening to these recordings and said that he would review this matter.[15]

---

[14] DOC records inmate telephone calls and maintains those calls for eighteen months. Inmates are warned by posted signs and recordings before the call that the contents of their conversations are being recorded.

[15] One case coordinator told DOI that he was denied permission to listen to an applicant's telephone calls after submitting a formal request. During DOI's conversations with former Deputy Commissioner Vengersky, he said that uniformed executive staff resisted giving AIU this authority because they thought that a unit outside of AIU should listen to the calls. But AIU never pursued the matter, and nobody at DOC, in AIU or any other unit, listens to inmate calls for AIU background investigations.

14

b023

## B.    DOC Does Not Have A Meaningful Recruitment Strategy.

In order to have sufficient qualified candidates to put through a rigorous screening, DOC must first have a proper recruitment plan. However, as discussed below, no such plan exists or has existed since at least 2009.

During conversations with AIU Director Johnson, DOI investigators, learned that DOC does not have a meaningful CO recruitment strategy. DOC does not have an advertising campaign, recruitment pamphlets to distribute to the public, or a functioning recruitment website. Furthermore, DOC does not have any program to reach out to college students with an interest in careers as COs. According to Director Johnson, DOC's only recent recruitment event took place at Briarcliffe College, and only because that institution reached out to DOC.

DOI investigators learned that DOC previously had a Recruitment Unit under the DOC Office of the Chief of Administration, which was located at the Correction Academy and was run by at least one Captain and eight to ten COs. The Recruitment Unit was established in 2004 but was disbanded in 2009 because of budget cuts and because DOC executives were satisfied that the program had recruited approximately 8,000 candidates to take the CO exam. When the Unit was active, the recruitment officers would attend job affairs in New York City, Long Island, and at military bases. The Unit also had a website which no longer functions, and an automated telephone hotline. That number – 877-NY1-BOLD – is still in service, providing inaccurate information about the availability of walk-in CO examinations and referring people to the defunct website.

In addition, DOI learned from a former member of the Recruitment Unit that, until about 2008, DOC had participated in the New York City Law Enforcement Exploring Program, a law enforcement education, outreach, and training program aimed at young people aged fourteen to twenty years old. [16] This is a popular recruitment tool with a range of law enforcement agencies, including the FBI and NYPD, and, at the end of 2013, it had 4,271 youth participants. DOI asked the citywide coordinator[17] for Law Enforcement Exploring why DOC withdrew from the program, and he responded that the woman who had run the program retired from DOC. The citywide coordinator also said that the Boy Scouts of America, a partner in the program, has tried to renew DOC's participation, but their attempts have been unsuccessful.

By contrast, the NYPD maintains a recruitment website at www.nypdrecruit.com. This website contains a variety of useful information about benefits and salary, the hiring process, the police exam, and job requirements. It even has special features, including an interactive overview of the hiring process, a "Day in

---

[16] www.nyexploring.org
[17] The citywide coordinator is a detective with the NYPD who oversees the Law Enforcement Exploring Program for the NYPD and is the liaison to all other NYC Law Enforcement agencies with Law Enforcement Exploring programs.

15

the Life" video of a police officer, an interactive video precinct tour, and the opportunity to chat online with a recruiter.

DOC has informed DOI that it has discussed the recruitment issue internally and currently is developing ideas for recruiting, but nothing has been finalized and there is no set date for implementation.

> **C.** **DOC does not continue to investigate COs after they are hired, even if problems were uncovered during their background investigation.**

When a questionable CO is hired, DOC does not continue to investigate issues that arose during the application process. The former AIU Director wrote in two Case Review Sheets that DOC should continue to monitor the applicants for concerns raised during their background investigation, but DOC lacks procedures to monitor these applicants once they are hired. Indeed, the current AIU director has told DOI that he is unaware of any such procedure.

One of these two hired COs, whom the former AIU director suggested for monitoring because of concern that she might be too conciliatory toward inmates, was subsequently fired for having an "unduly familiar" relationship with an inmate, in violation of DOC rules, following an investigation by DOI. Even more concerning, the CO was linked to the inmate's criminal activities after he was released from DOC custody, and she was present when the inmate met with an undercover officer posing as a "hitman." The inmate was subsequently arrested for his involvement in a murder-for-hire conspiracy.

The CO had listed this same inmate as an incarcerated friend during her AIU background investigation. IFCOM detected many telephone calls between the two, and, in response to the IFCOM information, the CO submitted supplementary forms for her application, admitting that she spoke to the inmate and visited him, but advised she would cease contact with this inmate.

In the applicant's case review sheet, based in part upon her prior associations with inmates, the Director wrote, "It is possible that she may relate to inmates she is charged to watch in a more conciliatory fashion than would be desired. Thus, if she is approved for hire, it is recommended that she be monitored while on the job." The Director, giving her a rating of "3," then approved her for hire. As discussed above, however, DOC lacked any procedure to monitor this applicant, and, as DOI learned, her relationship with the inmate continued in violation of DOC rules. During an interview with DOI after the inmate's arrest, the officer denied involvement in any criminal activity, but admitted that she failed to notify DOC of her continued contact with the inmate as she was required to do. She was subsequently terminated, less than a year after her start date.

16

b025

**D.**     **AIU uses pen and paper applications and its computer system cannot process basic statistical information about applicants.**

DOI investigators found that AIU uses a highly inefficient pen and paper application system, keeping each application and its supporting documents in a paper folder instead of storing that information in a computer. Moreover, AIU's computerized tracking system tracks only the status of files and is unable to generate useful statistical information, including how many applicants it rejects and the reasons for those rejections.

In addition, DOI found that applicant files are deficient beyond AIU's failure to use available technology. The files lack uniform components and have no checklists to document what the files contain. The application questionnaire itself appears unprofessional and apparently was copied from NYPD's form. Indeed, page 17 of the AIU background questionnaire mistakenly tells CO applicants that they must adhere to the NYPD's Patrol Guide procedure 203-10 "Public Contact/Prohibited Conduct" if appointed to the "New York City Police Department."

By contrast, as DOI found, the NYPD APD uses both a computerized application form, which is completed by applicants online, and a computerized investigator case review sheet that tracks the status of each case and whether or not specific materials have been collected. The computer case review sheet allows investigators to comment on each form or piece of information they gather and record when the form was obtained or the candidate provided the information. The computer system is also accessible by supervisors, allowing them to monitor the status of pending applications.

**E.**     **DOC does not allow investigators to eliminate candidates efficiently.**

During their conversations with DOI's investigators, AIU case coordinators complained most about the time that they wasted investigating a large number of severely deficient candidates. According to the case coordinators, even if they find a candidate unqualified early in the background investigation, they still must complete the entire background process before officially eliminating the applicant. One case coordinator told DOI that she had investigated an applicant with a felony conviction for statutory rape. She ultimately convinced the applicant to withdraw, but did not reject him automatically because she thought that rules prohibited her from doing so.

The current Director initially confirmed to DOI that investigations must continue even after case coordinators discover that applicants are clearly unqualified. During ongoing conversations with Director Johnson, however, the Director said that AIU recently eliminated an applicant for the first time in his tenure without reviewing the entire file, based upon gang affiliation and an arrest history.

17

E113

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 168 of 353

b028

Increasing the difficulty of eliminating bad candidates, AIU has no background and character factors that it uses to disqualify candidates automatically. The NOE tells exam takers: "Proof of good character and satisfactory background will be absolute prerequisites to appointment." But the NOE's listed character and background factors, discussed in detail in Section II A above, are mere guidelines to determine whether candidates are qualified. Even the felon, who had a statutory rape conviction discussed above, could have been hired as a CO because DOC still could have found him "qualified" despite his criminal background.

By contrast, the NYPD Police Officer NOE specifically states what will automatically disqualify a candidate. For example, the NYPD NOE states that convictions of a felony or a domestic violence misdemeanor automatically disqualify a person from becoming a police officer. In addition, NYPD APD stops its investigation immediately if it uncovers a felony conviction, a domestic violence misdemeanor conviction, or a dishonorable discharge from the military, and then begins procedures to eliminate the candidate from the applicant pool.

## IV.  Based upon its findings, DOI recommends a series of changes to the hiring process.

DOC must improve its procedures for recruiting, screening, and hiring to ensure it hires the most qualified COs. To do this, DOC must invest resources in AIU to ensure that it has the best trained personnel and most effective technology. Hiring COs of the highest talent and character is necessary both to handle the difficult tasks facing the City jails today and to nurture the future supervisors and leaders of DOC. Therefore, DOI makes the following recommendations for DOC to increase its applicant pool, improve its screening process, and, if needed, to monitor new hires.

### A.  DOC needs an aggressive recruitment strategy and clear disqualification standards to improve the applicant pool.

DOC currently has no viable plan to recruit COs. It lacks a recruitment unit, does not participate in job fairs, and fails to recruit at local universities. Nor does it have a recruitment website, brochure, or any other reasonable means to inform the public about DOC job opportunities.

Having failed to develop a recruitment strategy, DOC can consider only a limited number of quality applicants for hire. Often, DOC applicants already have been rejected for hire by other city agencies, including the NYPD.[18] As discussed above, DOC has hired many candidates with suspect backgrounds, relationships with inmates, and other corruption risks. The lack of a more robust pool of candidates clearly contributes to this problem.

---

[18] DOC also has hired COs rejected by the Bridge & Tunnel police, the Port Authority police, the New York State Department of Correction, the Human Resources Administration, and the Department of Probation.

18

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 169 of 353

b027

Additionally, as DOI has found, AIU wastes considerable resources investigating applicants who are clearly at risk for corruption instead of eliminating them early in the process. As DOI has determined, DOC's lack of clear standards for disqualifying certain candidates automatically contributes to this waste.

In order to remedy these failings, DOI makes the following recommendations:

1. DOC should reestablish its Recruitment Unit. This Unit should advertise and recruit aggressively, especially at law enforcement oriented schools, and should ensure that its recruitment materials and website are accessible and professional. In addition, DOC should resume participation in the Law Enforcement Exploring program, which, as discussed in Section III B above, has the potential to recruit many young people with a genuine interest in law enforcement. DOC is slated to meet with DCAS to discuss the scheduling of future exams after the current exam schedule ends on June 30, 2015. DOC should have a recruitment plan to attract candidates for those exams.

2. DOC should adopt automatic disqualifying factors, including the conviction of certain crimes, with a goal to eliminate unqualified applicants as quickly and efficiently as possible. Once it becomes clear that a candidate lacks the "good character" required of a CO, such as felony convictions or dishonorable discharge from the armed forces, case coordinators should have the discretion to reject the applicant as "not qualified" without going through the entire process. AIU has eliminated at least one candidate in this manner, and DOI hopes that this represents a change in its practice.

3. DOC should expand its list of potential disqualifying factors to include corruption risks unique to DOC. For instance, DOC should list financial instability because it makes a CO vulnerable to accepting bribes in exchange for contraband smuggling. It should also list current and prior associations with inmates because these associations potentially increase the risk that a CO will have inappropriately familiar relationships with inmates. Finally, it should list present affiliation with gang members as this too presents a considerable risk.

4. In an attempt to curb the number of unqualified applicants, DOC should meet with DCAS to update the language in the Correction Officer NOE. These updates should include any new automatically disqualifying criteria developed by DOC, and be tailored, as necessary, to specific corruption vulnerabilities

19

Case 1:26-cv-00914-DEH-SN     Document 52     Filed 03/25/26     Page 170 of 353

b028

unique to the agency. Implementing this list and using strict criteria to eliminate certain candidates immediately would allow AIU to devote resources to the background investigations of truly qualified candidates.

**B.     DOC must make AIU's candidate screening uniform, thorough, and tailored to the unique corruption vulnerabilities at DOC. Decisions must be properly documented.**

Throughout DOI's investigation, investigators received conflicting information about the screening process from AIU staff, and at times staff was not even able to articulate a clear policy in response to investigators' questions. Equally as concerning, AIU investigators reported that they were not trained in conducting background investigations, and that they failed to use all available investigative resources. Finally, decisions by supervisors were at times not properly documented.

In general, DOC's applicant screening process sharply contrasts that of the NYPD APD. The NYPD investigators receive formal training that includes interview techniques and the use of law enforcement databases. Moreover, the APD tracks applicant files in an efficient electronic database, has strict standards to disqualify certain candidates automatically, and employs multiple layers of supervisory review before selecting an applicant. DOI also found evidence that the NYPD's process is more stringent. For example, several of the reviewed AIU files included a notation that the candidate was previously rejected by the NYPD.

To improve DOC's application process, DOI makes the following recommendations:

1. DOC should have a more thorough applicant review process. DOC should adopt a system, comparable to the NYPD APD, in which each applicant must pass through multiple levels of review, by both civilian and uniformed staff, before being approved by a panel of executives. On August 6, 2014, DOC announced vacancies for COs and a Captain in AIU. Since that time, DOC has assigned seven COs and one Captain to AIU.

2. AIU should create a standard detailed checklist identifying all documents that it requires applicants to submit and all AIU investigative steps necessary to complete the background investigation. This, along with a new computer system, should help ensure that all required information is obtained for every applicant.

3. DOC should ensure that all case coordinators are using IFCOM as an investigative tool. Specifically, not only should DOC check

20

b029

IFCOM databases for telephone contact with inmates, but it should listen to the recorded telephone calls between the inmate and the applicant. The identification of an applicant's phone number in the inmate database is concerning, and only a review of the content of these calls will allow DOC to determine the extent of the relationship and whether it should disqualify the candidate.

4. DOC should implement standardized training for case coordinators in investigative and interview techniques, to explain the application process, to teach them to use computer databases and other law enforcement tools, and to provide guidance on appropriate hiring recommendations. In particular, gang identification and disqualifying factors related to gang activity must be part of the training course as this type of affiliation by a CO presents a serious threat to the safety and security of DOC facilities. The NYPD APD's two-week training course for investigators with follow-up refresher courses provides one effective model.

5. DOC, using the NYPD APD system as a model, should computerize its applicant file review system. At present, all AIU files are paper based, and many that DOI reviewed were incomplete. Computerization would enhance DOC's ability to store and access information, and ensure that a standard process is followed for every applicant. Additionally, an electronic application questionnaire similar to that used by NYPD would prevent applicants from advancing in the process without filling out required information and allow AIU to develop useful statistical information to help guide its hiring practices.

6. DOC must engage in a more rigorous review of the psychological testing presently employed.

7. Decisions by supervisors, especially the Director and Deputy Commissioner that overrule the judgment of subordinates, must be explained in writing.

C.    **DOC must have a system in place to proactively monitor applicants who are hired but are considered vulnerable to corruption.**

Once a CO is hired, DOC fails to investigate issues that arose during the application process and has no procedure to monitor problematic applicants after

21

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 172 of 353

b030

they become COs. DOI, however, found more than one instance where the AIU Director recommended that DOC continue to monitor the applicants for questions raised during their background investigation. As discussed above, a hired CO continued her unduly familiar relationship with an inmate after she was working inside DOC facilities and after telling AIU that the relationship would stop after she was hired. No monitoring was done, and this officer was ultimately fired less than a year after her start date for continuing to this unduly familiar relationship.

It is particularly important for DOC to monitor newly hired COs, because they are on probation for two years, and, therefore, can be fired summarily without a lengthy disciplinary process. Terminating the COs at this stage is far easier than eliminating corrupt COs who have tenure and all the procedural rights that it carries.

Therefore, DOI recommends that DOC continue the investigation after hiring the candidate if any issues implicating integrity concerns arose during the application process. At the very least, DOC should monitor these identified candidates on a regular basis to ensure they are not engaging in prohibited conduct. The monitoring should include regular checks of IFCOM, more frequent evaluations by supervisors and enhanced training for the officer.

V.     **DOC is in agreement with the above recommendations, and has already outlined a series of further aggressive steps to address the problems DOI uncovered.**

In a recent meeting with DOC, DOI discussed the findings contained in this report in further detail. We were encouraged to learn that DOC has started outlining a plan to implement DOI's recommendations, has already scheduled a meeting with the NYPD APD to discuss their process, and that they have outlined further aggressive steps to address these problems. Of particular importance:

- DOC will seek to modify their NOE so that it is in line with the standards in place for the NYPD. This will result in stricter disqualifiers for prior convictions, prior summonses and traffic violations, and prior job terminations. DOC is also prepared to adopt an automatic disqualifier for individuals who have previously been terminated from government employment.

- DOC is prepared to adopt an additional disqualifier for individuals who have had prior contact with two or more inmates. Additionally, DOC will use the CIB to listen to recorded phone calls uncovered between applicants and inmates. Candidates will be disqualified based on the nature of these calls.

- DOC will begin using additional investigative tools, including running full credit report checks for applicants. DOC will also use databases to check for

22

b031

additional phone numbers, social media sites, and other things that candidates may have not reported in their application.

- DOC will implement a formal training program for staff assigned to the AIU and responsible for screening candidates. This training program will cover not only interview techniques and database training, but staff will also be trained by DOC's CIB to learn about gang affiliation.

- DOC will enhance the oversight of hiring decisions. Specifically, a "disapproval" decision by anyone in the hiring process can no longer be unilaterally overturned. Additionally, DOC will enhance the review process for probationary officers, before they become tenured.

We are encouraged by DOC's prompt response to these findings and will continue to monitor the implementation of these and all of the recommendations contained in this report.

## VI. Conclusion

DOI's investigation has demonstrated that significant flaws in AIU's hiring system have contributed to the hiring of corrupt COs. DOI discovered that poor recruitment efforts, inadequate training of AIU investigators, and a deficient applicant evaluation process have all contributed to serious problems within AIU, and ensured that DOC is not meeting its goal of hiring "the most qualified" individuals to become COs. Although DOC has taken some initial steps to remedy this problem, the findings of this investigation conclusively demonstrate that DOC must continue to reform its hiring process. The people entrusted with the care and custody of the City's inmates are essential to any plan to reform its jails. Finding quality candidates to fill this role, and ultimately ensuring that quality candidates are available for promotion to higher ranks, begins with AIU.

In order to achieve the desired goal of a safe and corruption free jail system, DOC must hire applicants with the strength of character to handle the stress of the demanding job of a CO and the integrity required to reject the temptations of corruption. COs must consistently ensure the safety of inmates without resorting to excessive force, refuse to accept bribes for smuggling contraband, and enforce DOC regulations without favor to any particular group of inmates. Therefore, AIU must improve its vetting process to screen for corruption vulnerabilities unique to DOC. Particularly, screening for prior associations with inmates, gang affiliation, and prior arrests or misconduct indicative of poor moral character is of paramount importance. DOC must also consistently monitor any CO that, while ultimately hired, showed signs of corruption vulnerabilities during the screening process. Quick implementation of these recommendations will improve the quality of the men and women who will be tasked with the immense challenge of reforming the City's jails.

E119

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 174 of 353

- Appointed, Commissioner of Corrections, State of Maine, January 24, 2011

## Caucuses/Non-Legislative Committees (#)

- No caucus information on file.

## Professional Experience (#)

- Warden, Pahrump County, Nevada Southern Detention Center, Corrections Corporation of America, 2006
- Administrator, Shelby County Jail, Memphis, Tennessee, 2001
- Administrator, Union County, New Jersey State Prison, 1996
- Head, East Coast Operations, Cornell Corrections Corporation, 1992
- Assistant Warden, Walpole, Massachusetts State Prison, 1980
- Correctional Officer, Massachusetts Department of Corrections, 1969

## Religious, Civic, and other Memberships (##)

- No organizational membership information on file.

Site Search Form

Search site...     SUBMIT

## About Vote Smart

- Background (/about)
- Board (/about/board)
- Staff (/about/staff)
- Advisors (/about/advisors)
- Finances (/about/finances)
- Jobs (/jobs)
- News Room (/media)
- Contact Us (/about/contact)

## WAYS TO HELP

- Donate (/donate?utm_source=votesmart&utm_medium=bottomnav&utm_campaign=donate)
- Volunteer (/volunteer?utm_source=votesmart&utm_medium=bottomnav&utm_campaign=donate)
- Ambassador (/ambassadors) (/ambassadors)
- (/ambassadors)Leave a Legacy (/legacy) (/legacy)
- (/legacy)Internships (/internships)

## EDUCATION

- Government 101 (/education/government)
- For Teachers (/education)

b033



# New York City Department of Investigation

## Persistent Problems in the Hiring of City Correction Officers

**MARK G. PETERS**
**COMMISSIONER**

Dana A. Roth
Inspector General for the Department of Correction

May 2018

E121

## I. Executive Summary

The New York City Department of Investigation (DOI) has conducted a year-long probe of the City Department of Correction's hiring procedures for Correction Officers (COs), finding that serious problems continue to plague the Applicant Investigation Unit (AIU) within the Department of Correction (DOC). These findings are especially troublesome in light of DOI's 2015 Report that examined the same issue and uncovered similar hiring vulnerabilities that allowed underqualified individuals and individuals with serious arrest records and gang affiliations to become COs. Most significantly, this investigation, a follow up to the 2015 Report, found that while DOC stated it would implement DOI's 2015 recommendations to improve and strengthen DOC's hiring process, in fact, DOC did not implement some recommendations and only partially implemented others.

In this investigation, DOI examined AIU files for recently hired COs from the January, June and December 2016 classes and found that many of the same vulnerabilities found in DOI's 2015 investigation continue to exist. DOI's investigation found that for the files reviewed of COs hired in 2016, after DOC claimed it had implemented the recommendations DOI called for in 2015, over one-quarter of these COs continued to have red flags that should have precluded their hiring. For example, DOC hired:

- A candidate that DOC knew was previously employed by the New York State Department of Correction and Community Supervision (DOCCS) and had left his employment after he had an inappropriate relationship with an inmate (the candidate's file contained a report from DOCCS).

- A candidate that DOC knew had previously been arrested on charges related to domestic violence (the candidate's file contained the candidate's rap sheet, and the Court's Certificate of Disposition).

- A candidate that DOC knew had previously been arrested for criminal possession of a weapon and harassing a fellow worker at a prior job (the candidate's file contained the Court's Certificate of Disposition).

- A candidate who, prior to applying to be a CO, had made multiple visits to inmates with gang affiliations and failed to list those inmate visits as required in the application submitted to DOC. DOC visitor records clearly demonstrated the visits.

1

Case 1:26-cv-00914-DEH-SN   Document 52   Filed 03/25/26   Page 177 of 353

One of the candidates hired with red flags has since been arrested by DOI as part of its ongoing investigation into prison contraband smuggling. Other candidates remain employed by DOC.[1]

This investigation underscored the critical need for DOC not only to accept, but also to actually implement the recommendations DOI has issued that would strengthen DOC's hiring process and help to close multiple vulnerabilities that are allowing individuals with serious integrity issues to be hired in the City's jails. Specifically, DOC should now implement the following recommendations from DOI's 2015 Hiring Report:

- DOC should have a more thorough and standardized applicant review process; the application and review processes should be computerized;

- DOC should implement in-house training for investigators in investigative and interview techniques that is relevant to recruiting and evaluating COs, and have a written AIU investigator manual;

- AIU investigators should use Securus[2] and other law enforcement and public databases as investigative tools and as collateral checks on applicants;

- DOC should engage in a more rigorous review of the psychological testing presently employed; decisions by supervisors, especially the Director and Deputy Commissioner of AIU, should be more thoroughly explained in writing; and finally

- If DOC is going to continue to hire applicants who are considered vulnerable to corruption, DOC should have a system in place to proactively monitor those applicants.

Furthermore, this investigation also found that while the above recommendations are crucial to improving hiring protocols, AIU has yet to determine ideal staffing for its workload. DOI recommends that DOC review its AIU staffing, including staffing sufficient personnel and supervisors to thoroughly investigate and vet candidates, and report its results back to DOI.

DOC must immediately implement these policy and procedure recommendations.

---

[1] The names of those who remain employed have been withheld to protect the integrity of DOC's disciplinary process.

[2] DOC inmate calls were previously recorded and maintained on DOC's Inmate Financial Commissary Management System (IFCOM). Beginning around March 2015, DOC began recording and maintaining recorded inmate calls on a secure call platform through Securus Technologies (Securus).

2

b036

## II. Summary of DOI's 2015 Hiring Report

### i. DOI's 2015 Findings and Recommendations

DOI's 2015 Hiring Report highlighted the need for reform in DOC's hiring practices. DOI discovered that out of the over 150 files of then-recently hired COs reviewed: 10 COs had more than one arrest; 65 COs' psychological exams raised concerns about their ability to perform the job duties; 79 COs had friends or relatives who had been incarcerated (a number of whom had significant contact with inmates over DOC phone calls that AIU failed to follow up on); 54 COs files failed to show the "good character and satisfactory background" of a correction officer; and 25 COs lacked the "good character" listed on the New York City Department of Citywide Administrative Services' (DCAS) Notice of Examination (NOE), which is also required by DOC.[3]

Furthermore, through review of the 2014 files, interviews with DOC staff, and site visits, DOI identified systemic problems that fostered an environment in which many applicants with significant red flags were nonetheless hired. For example, DOI found that DOC's AIU did not properly train its staff to handle candidate screenings, and did not have a written manual describing its investigative strategies and procedures. AIU staff failed to evaluate the severity of red flags when they were discovered, and simply missed other red flags altogether. AIU did not use basic investigative tools, including running credit checks and verifying personal information through public record database checks such as LexisNexis or CLEAR (a law enforcement database). AIU utilized an inefficient pen and paper application questionnaire and submission system.

Additionally, AIU rated all candidates on a scale of 1 to 5, but DOI found AIU staff demonstrated confusion on whether "1" or "5" was the best score and that 90 percent of candidates were rated at a "3," making the system effectively useless. In 12% of the files reviewed by DOI, the AIU Director excused serious red flags without adequate explanation, as isolated incidents, or as youthful indiscretions. AIU had no system in place to detect gang affiliations among applicants, nor did AIU staff cross-reference applicants with DOC's Visitor Express database to uncover connections between applicants and their incarcerated friends or family. AIU staff further failed to run applicants' phones numbers in the inmate telephone system. When an applicant's number was found to have been contacted by an inmate, AIU staff often failed to review recorded phone calls, despite their availability. DOI found DOC did not continue to proactively monitor applicants who were hired but considered vulnerable to corruption. Finally, DOI found DOC did not have a meaningful CO recruitment strategy, an advertising campaign, recruitment pamphlets, a functioning

---

[3] DCAS puts out Notices of Examination to fill civil service job vacancies. The NOE for COs does not define the term "good character." DOC should request that in the NOE for COs, DCAS include a definition, which likely would provide significant guidance as to the traits that a candidate needs to become an exemplary CO.

3

b037

recruitment website, or any programs to reach out to college students interested in careers as COs.

As a result of the foregoing findings in DOI's 2015 Hiring Report, DOI made a number of policy and procedure recommendations to DOC, including expanding recruitment outreach, adopting automatic disqualifying factors, increasing use of the inmate phone system to cross-check applicants' phone numbers, and implementing a system to monitor applicants who were hired but considered vulnerable to corruption.

ii.    DOC's 2015 Response to DOI

In response to DOI's 2015 Hiring Report, DOC agreed to adopt most of DOI's recommendations and reported that they began implementing the requested policy changes in stages. DOC stated that they revamped their external marketing to attract qualified applicants. To that end, they showcased DOC's specialized units to help market DOC to potential candidates, and participated in recruiting events.

DOC also reported they adopted in-house automatic disqualifiers related to the following areas: employment, felony and domestic violence misdemeanor convictions, and total numbers of criminal court summonses and driving record violations.[4] DOC also reported that they provided the AIU investigators with access to various web-based investigative tools, including IFCOM, upon their appointment to the unit. DOC partially accepted DOI's recommendation that it computerize the process; it reported AIU would use an electronic system to track applicants' appointments and documents submitted through the hiring process, but AIU's candidate files would remain paper-based. DOC reported AIU's Psychological Unit would establish a tiered system of review, whereby investigators' findings would be initially reviewed by a member of AIU's Psychological Unit, and finally by AIU's Executive Director or Deputy Commissioner. According to Dr. Christopher Sbaratta, Assistant Director of AIU's Psychological Unit, he and two colleagues established this system in August 2015, in time for the 2016 classes of incoming COs. DOC further reported that AIU's Executive Director or Deputy Commissioner would provide a written summary on an applicant's file, whether for approval or disqualification. DOC stated that AIU proposed a monitoring system for probationary COs who were hired but identified as "questionable" during their background investigation. DOC reported AIU investigators would be required to take an in-house training course. AIU also implemented a dedicated Field Team Unit to conduct site visits to candidates' homes and neighborhoods.

---

[4] These disqualifiers are enumerated in DOC's Response to DOI's 2015 Report, attached in the Appendix.

4

### III. DOI's 2018 AIU Follow-Up Investigation

#### i. DOI's Arrest of CO Brown Revealed DOC's Misrepresentation that it Had Implemented DOI Recommendations

In December 2016, less than a year after he was hired, DOI arrested probationary CO James Brown at the Otis Bantum Correctional Center (OBCC) front gate after a DOI K-9 alerted to the presence of contraband on his person. Probationary CO Brown was transporting alcohol camouflaged in an iced tea bottle, and eight Ziploc bags containing tobacco and marijuana concealed in his underwear. He was one of the 665 recruits in DOC's January 2016 academy class. After his arrest, DOI reviewed probationary CO Brown's applicant file and found significant red flags that should have precluded his hiring.

First, probationary CO Brown had a spotty employment history. In 2001, the City Parks and Recreation Department terminated him for excessive lateness, and in 2004, he resigned from the United States Park Police, having failed a probationary evaluation.

Second, during his psychological examination, probationary CO Brown falsely stated he was not delinquent on child support payments. DOI interviewed CO Brown post-arrest and he indicated he had significant debt and defaults. Indeed, when DOI investigators questioned him following his December 2016 arrest, probationary CO Brown stated his reason for attempting to smuggle the contraband into OBCC for inmates was because he had been having great financial difficulty, due in large part to owing approximately $8,000 in child support. The information collectively detailed above should have prevented CO Brown's hiring, especially in light of the hiring reforms DOC said it had implemented. DOC's reforms should have flagged CO Brown but failed to do so, illustrating the same flaws DOI identified.

CO Brown's arrest, coupled with other DOI investigations into probationary COs, raised suspicions that DOC had not adopted all of DOI's recommendations, and was not adhering to the NOE's specific factors as causes for disqualification which would have covered several of the red flags in CO Brown's file.[5]

---

[5] The full list of factors includes: (a) arrest record or conviction of an offense, the nature of which indicates lack of good moral character or disposition towards violence or disorder; (b) repeated arrests or convictions of an offense, where such convictions or arrests indicate a disrespect for the law; (c) discharge from employment, where such discharge indicates poor behavior or an inability to adjust to discipline; (d) dishonorable discharge from the Armed Forces; (e) conviction of petit larceny; and (f) conviction of a felony or domestic violence misdemeanor. Under the "Penalty for Misrepresentation" section of the NOE, any intentional misrepresentation on the application or examination, even after appointment, may result in disqualification. Probationary CO Brown had been discharged from employment, and included several intentional misrepresentations on his application, either of which should have disqualified him from being hired as a CO.

5

b039

### ii.     DOI Review of 2016 DOC Probationary CO Applicant Files

DOI reviewed a random sample of 291 candidate files for the January, June, and December 2016 classes.[6] For each class, DOI used the factors set out in the NOE, along with DOC's in-house automatic disqualifiers. DOI's review concluded that 88 of the 291 candidates, equaling more than a quarter and almost a third of the files DOI reviewed, should not have been hired or should have been monitored after hire.

DOI reviewed 102 files of the 665 total number of files for candidates appointed to the January 2016 CO class. Twenty-seven presented significant red flags that either should have precluded their hiring outright or required follow-up or monitoring. Twenty-seven of the 103 candidates indicated a past employment termination. Forty-two had friends and relatives who were or had been incarcerated. Twenty-seven candidates had at least one prior arrest; six had been arrested more than once. One of the candidates who reported multiple arrests prior to his appointment, including one for harassment, was subsequently arrested again for assault and harassment after starting with DOC. That CO is still an active employee with DOC (although his probationary period was extended).[7]

In one case, AIU did conduct a follow-up investigation after hiring a probationary CO. During his background investigation, the candidate disclosed he was previously employed with DOCCS and resigned because his long commute led to child care issues. However, a re-review of his file during the follow-up showed DOCCS' documented response was in the file, and contained information contrary to information the candidate provided. That response reported the candidate had an inappropriate relationship with an inmate after he was found in a female parolee's home, and made false statements to the New York State Office of the Inspector General (NYSIG). It appears the AIU investigator did not address the DOCCS response in the CO candidate's case review sheet (CRS)[8] -- whether by oversight or design is not clear -- and cleared the candidate to be hired by DOC. DOC terminated the probationary CO for his intentional misrepresentation, once it was discovered during the follow up investigation.

DOI reviewed 98 files of the 756 total number of files for candidates appointed to the June 2016 CO class. Thirty-two files presented significant red flags that either should have precluded their hiring outright or required follow-up or monitoring. Thirty-three of the 98 candidates indicated a past employment termination. Thirty-three had friends and relatives who were or had been incarcerated. Another 28 candidates had at least one prior arrest; six had been arrested more than once.

---

[6] In addition to the files selected at random from the three DOC CO classes, DOI also reviewed seven files from recent subjects of DOI investigations.

[7] This candidate's history is discussed in further detail commencing on page 11, Example C.

[8] The CRS is a summary of the AIU investigator's findings regarding the candidate's background investigation.

b040

DOI reviewed 91 files of the 950 total number of files for candidates appointed to the December 2016 CO class. Twenty-nine files presented significant red flags that either should have precluded their hiring outright or required follow-up or monitoring. Eighteen of the 91 candidates indicated a past employment termination. Forty-two had friends and relatives who were or had been incarcerated. Twenty-eight candidates had at least one prior arrest; seven had been arrested more than once.

**Summary Table of DOI Review of 2016 CO Candidate Files[9]**

| | | Correction Officer Class | | |
|---|---|---|---|---|
| | | January 2016 Class Size: 618 (102 files reviewed) | June 2016 Class Size: 156 (98 files reviewed) | December 2016 Class Size: 950 (91 files reviewed) |
| **DOI Findings** | Significant Red Flags[10] | 27 files or 26% | 32 files or 33% | 29 files or 32% |
| | Past Employment Termination | 27 files or 26% | 39 files or 36% | 18 files or 19% |
| | Incarcerated Associates | 42 files or 40% | 29 files or 73% | 42 files or 46% |
| | Prior Arrests | 27 files or 26% | 26 files or 28% | 28 files or 30% |

iii.   **DOC's Ongoing Vulnerabilities Regarding AIU Hiring Procedures**

DOI's 2017 review revealed that AIU's hiring procedures and policies remain vulnerable. As demonstrated above, DOI found AIU investigators often do not thoroughly investigate applicants' backgrounds. AIU staff often approved candidate files based on self-reported information, and did not do independent, collateral checks to corroborate that information, simply to meet DOC's time constraints, based on interviews with staff. AIU's lack of field visits and failure to obtain third party

---

[9] The percentages are greater than 100% for each of the January, June, and December 2016 classes because there were multiple findings for some of the candidate files reviewed.

[10] DOI defines a significant red flag to be an explicit, objective violation of NOE's or DOC's automatic disqualifying factors (detailed in Appendix), or, more subjectively, a candidate having multiple or a combination of factors, including prior criminal arrests, past employment termination, incarcerated associates, poor driving record, and insufficient college credits (a single deficiency in any of those criteria may not be sufficient to preclude hiring).

7

FILED: KINGS COUNTY CLERK 11/09/2020 00:09:00 PM    INDEX NO. 518940/2019

NYSCEF DOC. NO. 102    RECEIVED NYSCEF: 09/09/2020

b041

employment verifications were referenced in the *Nunez* Independent Monitor's[11] Reports as potential problems.

Through interviews with several AIU personnel, including AIU then-Executive Director – now Assistant Commissioner - Dr. Larry Johnson, DOI determined AIU was significantly backlogged on conducting field visits for CO candidates. Dr. Johnson acknowledged there were only four investigators assigned to the Field Team Unit and the unit wasn't large enough to handle the amount of work allotted. DOI's arrest of a probationary CO in December 2016 for contraband smuggling, referenced in Section III, above, shows just how important field visits are to assessing a candidate's suitability. Assessing appropriate levels of staffing, including supervisory personnel, to thoroughly investigate candidates is of paramount necessity.

The Fourth Report of the *Nunez* Independent Monitor[12] found it was reasonable, and DOI agrees, for AIU to continue with a candidate's appointment without third party employment verifications if the rest of the candidate's background appears spotless. However, DOI found AIU frequently failed to wait for third-party employment verifications when the candidate reported being terminated or resigning in lieu of termination from a past employer, circumstances that blemish a candidate's record and can be disqualifying per NOE's specific factors. If a candidate reported being terminated from a past employer, especially if it was fairly recent and close to DOC's background investigation, AIU should make every effort to contact that candidate's employer for a collateral check.

DOI found AIU still does not verify personal information through public record databases, such as LexisNexis or CLEAR. These public record databases provide investigators with a detailed listing of a person's past and present addresses and telephone numbers, and are useful in ascertaining objective and truthful information. DOI also found AIU infrequently obtains New York City Police Department (NYPD) paperwork to corroborate a candidate's description of police contacts and AIU rarely contacts outside correctional institutions, including DOCCS, to obtain documentation

---

[11] As part of a November 1, 2015, consent judgment in the federal class action lawsuit *Nunez v. City of New York et al.*, Case 1:11-cv-05845-LTS (SDNY), entered in the Southern District of New York, the court appointed Independent Monitor Steven J. Martin to oversee and report on DOC reforms intended to prevent use of unnecessary and excessive force, protect inmates from inmate-on-inmate violence, and prevent inappropriate placement of 16- to 18-year-old male inmates in punitive segregation for excessive periods of time. The *Nunez* Independent Monitor found AIU's background checks were largely adequate. However, the Independent Monitor's focus was on whether or not AIU reported it had conducted checks, rather than whether those checks occurred or resulted in proper hiring decisions.

[12] This report covered the monitoring period from January 1, 2017 through June 30, 2017, and can be found at

https://www1.nyc.gov/assets/doc/downloads/pdf/Fourth_Report_Nunez_Independent_Monitor_10.10.17.pdf.

8

b042

and inmate phone calls, if applicable, when a candidate notes a past or present incarcerated associate at that institution.

At present, and as noted in the *Nunez* Independent Monitor's Third and Fourth Reports, AIU still lacks a written AIU investigator manual, another tool to establish standardized, thorough and objective hiring investigations. By contrast, the NYPD has written policy and procedures that provide its investigators with guidance relating to the standards to be used while conducting an investigation, what information should be collected, and how the information should be documented in candidate files. Without a comprehensive investigator manual and standardized background investigation specific training, AIU investigations are inconsistent and hiring decisions are subjective.

DOI's review found that AIU files are still paper-based and, as a result, many are incomplete. For example, if the file was computerized, it could be designed so that an applicant could not finalize an application without finishing every question. DOI found that candidates oftentimes failed to completely fill out the screening sheet and application questionnaire booklet and that AIU investigators failed to address the omissions. As previously addressed in DOI's 2015 Hiring Report, errors in the application questionnaire booklet still appear uncorrected, with page 17 of the booklet telling CO applicants that they must adhere to the NYPD's Patrol Guide if appointed to the "New York City Police Department."

Although DOI found that DOC implemented a "New Investigator Training Plan" for AIU investigators, its curriculum devoted several weeks to subjects such as conducting a compelled statement pursuant to Mayoral Executive Order, and medical reports and Medical Examiner consults, training not applicable to conducting background investigations.

While DOC implemented a monitoring system for probationary COs who were hired but identified as "questionable" during their background investigation, DOI determined that this system entailed a mere cursory review of all candidates approximately three months prior to expiration of probation (probation is generally 24 months). This undercuts the effectiveness of consistent and ongoing monitoring of truly problematic candidates.

DOI's recent review of CO candidate files also found that, although Dr. Larry Johnson and then-Deputy Commissioner Errol Toulon did complete summaries in the CRS, they were generic and were not indicative that the author had reviewed the full files.

9

## IV.    Specific Hiring Failures as a Result of DOC's Flawed Hiring Practices

In January 2017, former Deputy Commissioner Toulon informed DOI that under Commissioner Joseph Ponte, the DOC Administration had been pressuring AIU to process larger academy classes in a shorter amount of time than had previously been done. Although AIU increased the staff size and number of investigators from 2014, in 2016, the average number of background investigations per investigator also increased. Since that time, in 2017 and 2018, the average number of files per investigator has decreased. However, DOI still sees the same issues in 2017 and 2018 (DOC hiring candidates who are deficient and cannot make it through their probationary period without being reprimanded, modified, administratively punished, or terminated), showing that there is a problem in practice and supervision that still needs to be rectified.

DOI has not conducted an intensive review of DOC's hiring practices for the 2017 and 2018 classes, but when probationary COs of those classes have been administratively or legally charged, and DOI has reviewed their applicant files, some files contain red flags that should have been addressed. DOI recommends DOC to conduct the same or similar type of review for their 2017 and 2018 classes that DOI conducted for the 2016 classes, and to report their findings back to DOI.

Former Deputy Commissioner Toulon reported concern that DOC pressure to hire increasingly large classes was leading AIU to hire candidates who otherwise would not have cleared the screening process. DOI spoke with several AIU investigators who corroborated Toulon's information. DOI's review found that in order to meet the new time constraints, investigators were relying on candidates' self-reported information without obtaining corroboration through objective sources, checking boxes on the checklist AIU developed without completing the required tasks, and submitting files for closure without obtaining essential information.

Additionally, the individual investigations DOI has conducted indicate that from the end of 2016 to present, there has been an increase in the number of allegations against probationary COs, some of which have resulted in arrests and terminations. While increased allegations against probationary COs may be partially explained by the fact there are simply more probationary COs being hired, DOI investigations have found these allegations also reflect the continued hiring of problematic probationary COs, who are susceptible to corruption hazards due to deficiencies that were overlooked during the hiring process, and otherwise should have excluded them from the applicant pool.

10

E131

b044

## V.     Examples from Recent DOI Investigations[18]

a)     Probationary CO ▮▮▮▮▮▮▮▮▮▮▮ (January 2016 class) was arrested on August 3, 2017 for Strangulation in the Second Degree, a class D felony. In her background file, probationary CO ▮▮▮▮ listed two prior arrests, one in 2010 for driving with a suspended license, the other in 2012 for shoplifting. She reported being employed by a police department in Georgia at the time of both arrests, but AIU did not make contact with this previous employer prior to hiring her. Probationary CO ▮▮▮▮'s background file also showed she had four accounts in collection, and her license was suspended in 2014. According to NOE's and DOC's criteria, she should not have been hired. A review of her background file showed on the two occasions (in the screening sheet and in the application questionnaire booklet) probationary CO ▮▮▮▮ was asked to list her social media accounts; she left those sections blank. AIU never addressed the omissions, and should have. Nevertheless, AIU reported an investigator reviewed probationary CO ▮▮▮▮'s Instagram and Facebook accounts, and found no derogatory information (the background file does not set forth the name of the social media accounts the investigator checked, if indeed the check was done, nor were there any printouts of the accounts to reference for comparison). However, the NYPD complaint report associated with probationary CO ▮▮▮▮'s arrest did list her Instagram account name, which DOI investigators reviewed and observed the notation "Loc Nation" and two pitchforks, references to possible Crip gang affiliation. DOI could not determine whether the gang-related red flags found after her 2017 arrest were present in her social media accounts during her DOC background investigation due to the lack of specificity in the AIU file. Because of the 2017 arrest, DOC terminated probationary CO ▮▮▮▮ on November 11, 2017.

b)     Probationary CO ▮▮▮▮▮▮▮ (January 2016 class) was previously employed by DOCCS. He claimed that he resigned from DOCCS because his long commute led to child care issues. DOC conducted a follow-up review of probationary CO ▮▮▮▮ file and found DOCCS' documented response in it, which refuted probationary CO ▮▮▮▮ claims. DOCCS' response stated probationary CO ▮▮▮▮ had been found in a parolee's home, had had an inappropriate relationship with an inmate, and made false statements to the NYSIG. There is no indication the AIU investigator addressed DOCCS' response in candidate ▮▮▮▮ a case review sheet and cleared the candidate to be hired by DOC. DOC terminated probationary CO ▮▮▮▮ for his intentional misrepresentation October 19, 2017.

c)     Probationary CO ▮▮▮▮▮▮▮ (January 2016 class) had two arrests prior to being hired; one for driving under the influence, and one for aggravated harassment related to a domestic dispute with his wife. On March 8, 2017, after he was hired, he was arrested (off duty) for assault and harassment related to another

---

[18] All names have been redacted except in the one case where DOI arrested the CO.

11

b045

domestic dispute with his wife.[14] A review of his background file indicates that in addition to the two reported arrests, the candidate's credit check showed that several of his accounts were in collection. Probationary CO ███████ also reported two incarcerated associates, his brother and a friend. He had visits with and calls from his brother from 2012 - 2015, and stated that his brother was transferred to state prison. AIU investigators made no attempt to obtain visitor logs, documents, or recorded calls from DOCCS. Visitor Express also showed two visits to his friend in 2011. Thus, with all of these issues considered together, according to NOE's and DOC's criteria (mainly "proof of good character and satisfactory background"), this candidate should not have been hired. Probationary CO ███████ remains employed.[15]

d)    Probationary CO ████████████ (January 2016 class) was hired despite his failure to have the 39 college credits required by the NOE. However, his background file contains a notation that an AIU investigator verified official educational transcripts showing that probationary CO ███████ met NOE's college credit requirement. Additionally, there was a discrepancy by the AIU investigator about how many credits the candidate actually earned. In one section of the CBS, the AIU investigator reported probationary CO ███████ had 52 credits, and in another section, the AIU investigator reported probationary CO ███████ had 61 college credits. The Executive Director and Deputy Commissioner both approved the candidate for hire. In his decision section, the Executive Director noted "[t]here is evidence of good vocational and educational skills with no difficulties in either area."[16] In reality, the only college transcript in the file indicated probationary CO ███████ earned only 14 credits. Thus, according to NOE's and DOC's criteria, this candidate should not have been hired. Probationary CO ███████ remains employed.

e)    Probationary CO ██████████████ (January 2016 class) was the subject of an administrative investigation conducted by DOC's ID in regards to excessive use of force. ID concluded probationary CO ███████ utilized unnecessary force against an inmate, and did not provide an accurate account of the incident. As a result, ID recommended CO ███████'s probation be extended six months. A review of her background file indicates that in 2006, she was arrested for menacing, criminal possession of a weapon, and harassment after a fight in the bathroom with a co-worker. The case was ultimately dismissed, but she was terminated from her employment following the incident. Probationary CO ███████'s background file further showed her salary was garnished to repay defaulted student loans, and in 2015, she was issued a summons for boarding a bus without a ticket. According to NOE's and DOC's criteria (mainly "proof of good character and satisfactory

---

[14] When a member of service is arrested off-duty, the investigation goes to DOC's Investigation Division (ID), which then may refer the member for disciplinary proceedings.

[15] ID originally sought to terminate probationary CO ███████. However, on January 9, 2018, ID/Correction Intelligence Bureau Acting Deputy Commissioner Antonio J. Cruz reviewed probationary CO ███████'s case and recommended no action. First Deputy Angel Villalona recommended that CO ███████'s probation be extended six months, to September 13, 2018. Neither Cruz nor Villalona explained their decisions.

[16] ███████ CRS, page five, dated January 2, 2016.

12

b046

background" NOE designation), this candidate should not have been hired. Probationary CO ███████ resigned on January 9, 2017.

f)    Probationary CO ██████████████ (June 2016 class) also failed to meet the college credit threshold. In his background file, the AIU investigator noted probationary CO ██████ met the NOE requirements. However, the only college transcript in the file indicated he had 49 attempted credits, but earned only 13. The Executive Director and Deputy Commissioner both approved the candidate for hire. In his decision section, Executive Director Dr. Johnson noted "[t]here is evidence of good vocational and educational skills with no difficulties in either area."[17] In addition, probationary CO ██████'s Department of Motor Vehicles abstract indicated he had eight suspensions from 2012 to 2015. As per DOC's response to DOI's 2015 Hiring Report, one of the added in-house automatic disqualifier was "[m]ore than five (5) suspensions on different dates" and "[m]ore than two (2) suspensions on different dates" within less than five years.[18] Thus, according to NOE's and DOC's criteria, this candidate should not have been hired. Probationary CO ██████ remains employed.

g)    Probationary CO ██████████ (June 2016 class) initially was not recommended for hire by the AIU investigator. One of the reasons was she was not truthful on her application; she disclosed only one incarcerated associate until IFCOM results revealed calls to her telephone number by other inmates (including her child's father). In addition, on her CRS, probationary CO ████ denied having ever been disciplined. However, a DOI check with the New York City Department of Homeless Services (DHS) (her employer at the time of her background investigation) indicated she currently had an open matter in the disciplinary unit. A review of the background file showed AIU never followed up with DHS about that pending disciplinary matter. The CRS also noted she failed to appear for her initial appointment with the AIU investigator. DOI investigators found Securus logged attempted calls to a telephone number listed in the probationary CO ██████'s AIU application questionnaire booklet, and both attempted and completed Securus calls (from incarcerated inmates) to her listed cellphone number. A review of probationary CO ██████'s background file revealed AIU conducted an IFCOM search but failed to conduct a Securus check, and therefore did not ask her about these inmate calls and possible additional incarcerated associates. Thus, according to NOE's and DOC's criteria, this candidate should not have been hired. Probationary CO ████ remains employed.

h)    Probationary CO ██████████████ (December 2016 class) was found to be having an unduly familiar relationship with an inmate in her facility, and received 39 calls to her home telephone number from the inmate after she was hired. A review of her background file indicated the AIU investigator found IFCOM hits to that same telephone number in 2013 and 2014. Probationary CO ██████ reported she did not

---

[17] ██████ CRS, page five, dated April 28, 2016.
[18] See Appendix, at page three.

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 189 of 353

b047

know the inmate placing the calls and the home telephone number wasn't issued to her until 2014. The AIU investigator accepted this response at face value. Probationary CO ███████ also had calls to her cellphone number from 2012 to 2014 from an inmate listed in her Declaration of Incarcerated Associates form and reported visiting him as well. Probationary CO ███████ listed two additional incarcerated associates – her brother in Alexandria City Jail, and a friend in Augusta Correctional Center, who she reported visiting and from whom she received calls. The AIU investigator made no attempts to contact those jurisdictions to get phone calls or visitor information during the background investigation. Although this doesn't necessarily mean that probationary CO ███████ should not have been hired based on the NGE's and DOC's criteria, her extensive communication with incarcerated associates is a good example of a potential corruption hazard. She should have been proactively monitored after being hired. Probationary CO ███████ was terminated from employment on August 1, 2017.

i) Probationary CO Torray Riles (December 2016 class) was arrested on January 21, 2018, and charged with Promoting Prison Contraband in the Second Degree, a class A misdemeanor. On that date, DOI's K-9 Unit alerted on probationary CO Riles as he entered the front gate of OBCC. When searched, he produced two medium-sized clear bags containing approximately 26 grams of marijuana he had concealed in his underwear. He also carried a clear backpack with four packs of Newport cigarettes (DOC rules prohibit COs from bringing in more than one pack at a time). A review of his background file showed probationary CO Riles was arrested in April 2016 for assault, menacing, and harassment. He had two driver's license suspensions in 2013 and 2014. Although probationary CO Riles listed no incarcerated associates, in April 2015 he received two calls to his previous cellphone number from an inmate. He reported lending his phone to a friend, and denied having any association with the inmate who made the calls. A discrepancy was noted in his CRS – the two phone calls had no duration, but they were forwarded to Correction Intelligence Bureau for further investigation. A review of the calls by DOI investigators revealed there was, in fact, duration to the calls and the conversations suggested that probationary CO Riles was the recipient of the calls, indicating he provided an intentional misstatement to AIU during his background investigation process. Thus, according to NGE's and DOC's criteria, this candidate should not have been hired. On January 22, 2018, probationary CO Riles was suspended, pending termination.

j) Probationary CO ████████████ (December 2016 class) listed contact with her brother in her Declaration of Incarcerated Associates form. However, a review of Visitor Express showed visits as recently as 2015 by probationary CO ███████ to additional inmates, who were not listed in her Declaration of Incarcerated Associates form. Several were gang-affiliated. AIU investigators did not address probationary CO ███████'s omissions. Probationary CO ███████ reported visits to her brother in upstate prisons, but the AIU investigator never reached out to DOCCS for documentation or phone calls. AIU conducted a search in Securus for the telephone

14

b048

number probationary CO ▮▮▮▮ reported belonging to her with negative findings. However, DOI conducted a CLEAR check that revealed that probationary CO ▮▮▮▮ had an additional number that received multiple Securus calls from 2015 to 2016, predominantly by one gang-affiliated inmate who probationary CO ▮▮▮▮ did not list on her Declaration of Incarcerated Associates form. The nature of the calls corroborate probationary CO ▮▮▮▮ was the recipient of the calls. Additionally, some conversations contradicted information probationary CO ▮▮▮▮ provided during her background investigation. For instance, during her background investigation, probationary CO ▮▮▮▮ denied ever using or abusing controlled substances. However, during one call with an inmate, her statements asserted otherwise, which should have prompted AIU to conduct further checks. If AIU had collateral checks for a candidate's telephone numbers, they might have caught her deception and not hired her. Probationary CO ▮▮▮▮ intentionally omitted reporting the additional telephone number during her background investigation and, according to NOE's and DOC's criteria, this candidate should not have been hired. Probationary CO ▮▮▮▮ remains employed.

## VI.    Conclusion and Recommendations

AIU's applicant hiring process remains flawed and deficient despite DOC's statements that it would reform its hiring practices. While DOC accepted DOI's recommendations in 2015, DOC's implementation has fallen short of what is necessary to adequately reform the hiring process. The following 2015 policy and procedure recommendations remain unimplemented or incompletely implemented:

1.    DOC should have a more thorough applicant review process. DOC should adopt a system, comparable to the NYPD's Candidate Assessment Section (CAS), in which each applicant must pass through multiple levels of review, by both civilian and uniformed staff, before being approved by a panel of executives. Failure to adequately review a candidate's application should subject an AIU investigator to disciplinary review.

2.    DOC should create a written manual for AIU, describing its investigative strategies and procedures, and containing the standards to be used while conducting an investigation, the information to be collected, and how to properly document information in candidate files. The investigative manual must clearly set out the factors that constitute automatic disqualifiers, detail how to gather third-party employment verifications, and describe circumstances necessitating field visits. The manual should also have clear guidelines related to reviewing Securus calls (running inmates' calls with candidates' telephone numbers, and clearly delineating responsibility for this task). This, along with a new computerized application processing system, should help ensure that all required information is obtained for every applicant.

15

b049

3.  DOC should implement standardized in-house training for AIU investigators tailored to conducting background investigations, including interviewing techniques, understanding the application process, and using social media, computer databases, and other law enforcement tools. In particular, gang identification and disqualifying factors related to gang activity must be part of the training course as this type of affiliation by a CO presents a serious threat to the safety and security of DOC facilities. The NYPD's CAS two-week training course for investigators with follow-up refresher courses provides one effective model.

4.  DOC, using the NYPD's CAS system as a model, should computerize its applicant file review system. At present, all AIU files are paper based, and many DOI reviewed were incomplete. DOC should require the screening sheet and application questionnaire booklet be filled out electronically by the applicant, and the CRS be filled out electronically by the AIU investigator. Computerizing the process would force applicants to answer every question in the screening sheet and application questionnaire booklet before they could successfully submit documents to AIU for review, enhance DOC's ability to store and access information, ensure a standard process is followed for every applicant, and require AIU investigators to fill out every section prior to submitting the applicant's file for a supervisor's review. Computerization would enhance DOC's ability to store and access information. Additionally, an electronic application questionnaire similar to that used by NYPD would allow AIU to develop useful statistical information to help guide its hiring practices.

5.  DOC should engage in a more rigorous review of the psychological testing presently employed. There must be more communication between AIU background investigators and AIU's psych unit when it comes to possibly conflicting or omitted information provided by the candidate at different stages of the hiring process. It should be mandated that DOC's PsyQ Personal History Report be completed by the applicant prior to the commencement of the background investigation. That way, AIU investigators and AIU psychologists will be in a better position to question applicants on any conflicting information (and possible misstatements or omissions) they might provide.

6.  Decisions by supervisors, especially the Director and Deputy Commissioner that overrule the judgment of subordinates, should be explained in writing.

16

b050

7. DOC should have a system in place to proactively monitor applicants who are hired but are considered vulnerable to corruption.

8. AIU should focus on conducting more collateral checks. AIU too often relies on the information provided solely by the candidate.

9. AIU investigators should have access to public record database checks, such as LexisNexis or CLEAR. This will provide the investigators with a way to conduct collateral checks related to information the candidate provides about their current and former residences and telephone numbers. These public record database checks can also provide collateral checks for information related to a candidate's criminal history outside of New York State and their social media accounts (via use of the LexisNexis "Virtual Identity Report").

10. AIU should liaise with the NYPD to obtain paperwork related to arrest and complaint history, police contact, Domestic Incident Report history, etc. A review of the files showed AIU investigators relied on the candidate's description of certain incidents without obtaining paperwork for corroboration.

11. When a candidate discloses associations with incarcerated inmates in other correctional institutions and jurisdictions, including NYS DOCCS, AIU investigators should contact that jail or prison to obtain relevant documentation and phone calls, if applicable.

Implicit in these recommendations is the requirement that where adverse information on a candidate is developed, DOC will act on that information, including not hiring candidates with significant red flags. To the extent this implicit requirement should be made explicit, DOI now does so.

In addition, DOI is issuing a new policy and procedure recommendation:

12. DOC should staff AIU properly to enable investigators to thoroughly investigate and vet candidates. DOC should review and determine what the suitable workload for their AIU investigative staff should be. This review should include allocating supervisory personnel for auditing and spot monitoring, to ensure that background investigations and decisions are appropriate.

DOC reviewed a draft of this report. DOC agreed that AIU will audit and spot monitor background investigations and hiring recommendations.

17

Case 1:26-cv-00914-DEH-SN     Document 52     Filed 03/25/26     Page 193 of 353

b051

## New York City Department of Correction's Response to the January 2015 Department of Investigation's Report on Hiring Practices

In its report, DOI recommended a series of changes to the hiring process. Specifically, DOI strongly advised the DOC to improve procedures for recruiting, screening, and hiring to ensure it hires the most qualified COs and to invest resources in AIU to ensure that it has the best trained personnel and most effective technology.

A. **DOC needs an aggressive recruitment strategy and clear disqualification standards to improve the applicant pool.  DOI made the following recommendations:**

1. **DOC should re-establish its Recruitment Unit and execute a recruitment plan to attract candidates for upcoming civil service exams. In addition, DOC should resume participation in the Law Enforcement Exploring program.**

   In June 2015, the DOC began executing a Recruitment Plan designed to ensure that we have sufficient quantity and quality of Officers.

   Recruitment Plan
   * Revamped DOC external marketing to enhance recruitment efforts:
     o Rolled out a new DOC recruitment website for uniform and non-uniform positions.
     o Created a full scale social media platform (Facebook, Instagram and Twitter) to bolster recruitment efforts.
     o Used external HR tools including DOC LinkedIn, Glassdoor to market the DOC as a quality employer.
     o Launched a full scale print media campaign with Metro Newspaper, NY Times, NY Daily News, NY Post, Newsday, Queens Courier, and other ethnic media outlets.
     o Collaborated with i-Heart Radio to increase the awareness of our November 2015 exam.
     o As a result of the Recruitment team's efforts, approximately 2,761 applicants sat for the November 2015 examination; a rate higher than the past several exams. The next exam periods are January 2016, March 2016, and May 2016. We are currently in negotiations with DCAS regarding scheduling 4 additional correction officer exams for the second half of the 2016.
     o Designed a Human Resources Journal entitled Correction Quarterly which gives potential recruits an overall snapshot of the current state of the agency. Fall Issue: http://issuu.com/jointheboldest/docs/oct_cq_mag_1 Winter Issue: http://issuu.com/jointheboldest/docs/cqwinter

   * Hired staff to execute this initiative.

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 194 of 353

b062

- o New recruitment team consists of: 12 Uniformed staff and 5 Civilians.

- Improved Processes:
  - o Designed a candidate attrition journey to make the process clear to potential candidates.
  - o Created an exit interview process for candidates that resign from the CO title within 90 days.
  - o Identified the gaps in our current and future workforce and developed a strategic recruitment plan to address these gaps.
  - o Defined and outlined DOC's specialized units to help market DOC to potential candidates.

- Held and participated in multiple events in order to recruit potential candidates.

- The next step in the Recruitment Plan seeks to refine its process while continuing to be progressive and meeting the following objectives that aim to transform the way the agency recruits, selects, and hires staff:
  - o Establish a DOC branded Career Fair tour throughout the 5 boroughs of New York City and on Long Island in 2016.
  - o Create stronger community relations with faith-based institutions and community based organizations across the city.
  - o Launch a DOC Youth Explorers program in partner with selected Department of Education schools.
  - o Meet with DCAS to discuss post exams results.
  - o Develop a survey to monitor the status of probationary officers for retention purposes.

2. DOC should adopt automatic disqualifying factors, including the conviction of certain crimes, with a goal to eliminate unqualified applicants as quickly and efficiently as possible.

DOC's Applicant Investigation Unit has adopted the following automatic disqualifiers, effective January 2015:

1. Current Civil Service Law has only five (5) automatic disqualifiers for appointment. Therefore, the DOC established objective criteria for determining the character fitness of candidates by creating a group of "in-house" disqualifiers, similar to the NYPD.

2. DOC decided to empower the in-house automatic disqualifiers by utilizing the Department of Correction Commissioner's discretion to not hire under the 1 in 3 rule as stated in New York City Civil Service Law Section 61 and in Section 4.7.1 of the Rules and Regulations of the City Personnel Director. The in-house

b083

Automatic Disqualifiers are as follows (they are in three (3) important character areas)*[1]:

A. EMPLOYMENT*
- Dismissal from employment while a tenured member of a governmental or other public employer.

B. FELONY AND DOMESTIC VIOLENCE MISDEMEANOR CONVICTION.*
- Any felony conviction
- Domestic violence misdemeanor conviction

C. CRIMINAL COURT SUMMONSES TOTAL*
- More than FIVE (5) "C" Summonses
- Less than five (5) years
  - More than three (3) "C" Summonses
- Less than two (2) "C" Summonses

D. DRIVING RECORD TOTAL*
- More than seven (7) moving violations on separate occasions, other than related to employment
- More than five (5) hazardous moving violations
- More than five (5) suspensions on different dates
- More than one (1) license revocation
- Less than five (5) years:
  - More than four (4) moving violations on separate occasions, other than related to employment
  - More than three (3) hazardous moving violations
  - More than two (2) suspensions on different dates
  - Any license revocation
- Less than two (2) years:
  - More than three (3) moving violations on separate occasions, other than related to employment
  - More than two (2) hazardous moving violations

_____

[1] Symbol represents disqualifiers documented in New York City Police Department's In-House disqualifiers to All Applicant Division Personnel, July 19, 1995, A.P.D. Memo # 143.

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 196 of 353

b054

        o  More than one (1) license suspension

3.  **DOC should expand its list of potential disqualifying factors to include corruption risks unique to DOC including financial instability, inappropriately familiar relationships with inmates, and present affiliation with gang members.**

Effective August 2014, the Applicant Investigation Unit's utilizes the following criminal background-check applications:
- ✓ E-Justice
- ✓ WebCrims
- ✓ Family Watch Dog

A brief description of each application and its use, are as follows:

- **E-Justice:** Investigators utilize this application for integrity check of a Candidate's driver's license, any outstanding Order of Protection or status of Order of Protection. This application is also used to print out the results of fingerprints from the nationwide federal data base. **Benefit:** This application has proven beneficial for preliminary investigation purpose and is vital to the vetting process to cultivate Candidates who fulfill the conditions of employment and are void of criminal records.

- **WebCrims:** This application is utilized by the investigators to determine the status of a Court Case the Candidate may have reported during the Candidate-to-Investigator interview process. WebCrims is also used to check the Court case status of a spouse or family member that reside with the Candidate.
  **Benefit:** This is important to know, especially if the Candidate failed to report this information or the individual in question has felony charges.

- **Family Watch Dog:** This application is utilized to check if the Candidate is a registered sex offender on any level.
  **Benefit:** Ensuring that the Department cultivate the best Candidate and supplying the Department with facts; to make a viable decision regarding the hiring of a Candidate.

Additionally, investigators are provisioned with the below accounts the day of appointment.
- Email Account
- Full Internet Access
- IFCOM
- IIS w/ VINQ, VINQH, QHIN, VIST

Lastly, DOC is currently procuring a system to run credit checks on applicants.

b055

4. DOC should meet with DCAS to update the language in the Correction Officer NOE. These updates should include any new automatically disqualifying criteria developed by DOC, and be tailored, as necessary, to specific corruption vulnerabilities unique to the agency.

In July 2015, the Recruitment Unit worked with DCAS to revise the job description portion of the notice of exam. Specifically, sections regarding "What The Job Involves", "Special Working Conditions", and a more detailed description of the physical work activities performed and environmental conditions were updated. The changes appeared on the November 2015 and January 2016 exams.

B. DOC must make AIU's candidate screening uniform, thorough, and tailored to the unique corruption vulnerabilities at DOC. DOI makes the following recommendations:

1. DOC should have a more thorough applicant review process. DOC should adopt a system, comparable to the NYPD APD, in which each applicant must pass through multiple levels of review, by both civilian and uniformed staff, before being approved by a panel of executives.

   Since DOI has issued its recommendations on DOC's applicant review process, AIU has implemented more stringent standards regarding automatic disqualifications, additional levels of review by the psychological unit, more intensive background investigations through use of additional tools such as IFCOM and credit checks, and a system of tracking the flow of applicant files. Please see responses to questions 2-7 for further explanation.

   The changes to AIU have been phased-in during the review period of the last four recruit classes.

   - October 2014 Class- 155
   - March 2015 Class- 398
   - August 2015 Class- 626
   - January 2016 Class-631

2. AIU should create a standard detailed checklist identifying all documents that it requires applicants to submit and all AIU investigative steps necessary to complete the background investigation.

   Please see attached Checklist created in January 2015.

3. DOC should ensure that all case coordinators are using IFCOM as an investigative tool.

b066

As previously mentioned, every AIU Investigator is provided access to and training on IFCOM upon their appointment to the Unit. It has become a consistently used investigative tool by AUI in conducting background investigations.

4. DOC should implement standardized training for case coordinators in investigative and interview techniques, in particular, gang identification and disqualifying factors related to gang activity must be part of the training course as this type of affiliation by a CO presents a serious threat to the safety and security of DOC facilities.

Effective January 2015, the following DOC in-house investigative training courses have been implemented.

*New Investigator Training Plan*

I.   Week 1: Three (3) Full day sessions divided between immediately relevant topics and database familiarization
   a. Day 1: Familiarization with Investigation Division
   b. Day 2: Phases and Documents of an Investigation
   c. Day 3: Documentation

II.   Week 2: Case Management and Organization (4 hrs.)
   a. View video in advance of session: 003 *Case Management and File Organization*
   b. Why do we need standardized file organization?
   c. How should a folder be organized?
   d. Vouchering and associated processes
   e. Tracking your work

III.   Week 3: Conducting an MEO / formal interviews (4 hrs.)
   a. View video in advance of session: 004 *ID Investigator Training Course on Interviewing*
   b. What is an MEO?
   c. Use Immunity
   d. Scheduling an MEO
   e. Preparing for an MEO
   f. Conducting an MEO

IV.   Week 4: Confidential Allegations: PREA and Special Considerations for Victims of Sexual Assault (4 hrs.)
   a. View video in advance of session: 010 *Investigating Sexual Misconduct and Abuse*
   b. What is PREA?

b057

  c. What makes the callout and case different?

  d. Impact on Interviews

 V. **Week 5: Medical Reports and ME Consults (4 hrs.)**

  a. View video in advance of session: 007 Office of the Chief Medical Examiner (elective video 006 Obtaining and Analyzing Medical Evidence)

  b. Requesting medical records

  c. What to look for

  d. Codes and acronyms

  e. ME consults

 VI. **Week 6: Closing a Case (4 hrs.)**

  a. View video in advance of session: 002 Overview of the Disciplinary Process

  b. Organize all materials and ensure everything is accounted for in final report

  c. Reexamine charges – is everything still relevant?

  d. Agree on charges

  e. Draft MOC, PDR, Facility Referrals and Trials

 VII. **Week 7: Potpourri (4 hrs.)**

  a. SRG

  b. Internet and Social networking

  c. Evidence Analysis

  d. Photographic identification procedures

  e. Securpass

  f. Databases

 VIII. **Week 8: Final Considerations (4 hrs.)**

  a. Current challenges

  b. Case work workshop

  c. Mentoring matchup?

Note: Some weekly sessions for civilian investigators may be extended to 6 hours due to the need for more extensive familiarization with DOC policy, practice, and procedure.

During the four "off" days each week, new investigators are expected to review ID policy and procedure videos and manual (in preparation for upcoming sessions), attend MEO interviews and transcribe related audio, complete facility video reviews, and shadow

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 200 of 353

b058

experienced investigators in their daily operations. Each new investigator will paired with an experienced investigator for the duration of the 7 weeks of follow up training.

5.  **DOC, using the NYPD APD system as a model, should computerize its applicant file review system. At present, all AIU files are paper based, and many that DOI reviewed were incomplete.**

AIU's files remain paper-based in conjunction with an electronic tracking system which follows an applicant during the process. It tracks the documents that the applicant has submitted, when the applicant's physical and psychological appointments are scheduled, and what remains outstanding. DOC will continue to assess the use of a computerized system.

6.  **DOC must engage in a more rigorous review of the psychological testing presently employed.**

AIU's Psychological Unit uses the same vendor as the NYPD's APD to purchase materials for the psychological testing of correction officer applicants. The testing not only mirrors the same types of exams administered by the NYPD APD, but are the national standard for law enforcement. In effort to enhance the applicant review process, in August 2015, the AIU Psychological Unit established a Tiered System of review. After the collecting the results of both the background investigation and written psychological exam, the results are filtered by Psychology Leadership to a reviewer with the appropriate level of skill and education. Candidates are then sorted by Tier; Tier #1 cases are completed by Examiners and/or Psychologists under supervision of Psychology Leadership. Tier #2 and Tier #3 cases are completed by Psychologists under supervision of Psychology Leadership. This method promotes ongoing training and clinical supervision while expediting candidate evaluation and capitalizing on experience-based distribution of responsibilities.

7.  **Decisions by supervisors, especially the Director and Deputy Commissioner that overrule the judgment of subordinates, must be explained in writing.**

Every determination, whether an approval or disqualification made on an applicant's file is now accompanied by a written summary by either the AUI's Executive Director or Deputy Commissioner.

C. **DOC must have a system in place to proactively monitor applicants who are hired but are considered vulnerable to corruption.**

AIU proposed a monitoring system for probationary correction officers identified as 'questionable' due to information learned during the background investigation.

E146

b059

- o The monitoring system is triggered approximately 3 months before "questionable" correction officers' probation ends. AIU would contact DOC Human Resource Unit for a master list of probationary officers by class.
- o This Master List would be divided amongst Squad A & B of investigators based on who conducted the initial background check.
  - Some programs/background checks can be ran again to ensure candidate compliance.
- o For candidates whom declared knowing and associating with inmates (family and friends):
  - IIS (Inmate Information system)
  - Visitor Express
  - Inmate Lookup Services (ILS)
  - IFCOM (phone dump – request updated annual Personnel sheet from facility – which would show any new numbers and/or addresses)
- o Additionally, general inquiries should be conducted:
  - Unified Court system (any undisclosed new arrests)
  - Order of Protection
  - Drivers license check (suspension, unpaid tickets and etc.
- o For candidates who had a questionable background (possible gang affiliation):
  - Social media lookup (Facebook, Instagram, Snapchat and etc.)

b060



The City of New York
Department of Investigation
MARK G. PETERS
COMMISSIONER

80 MAIDEN LANE
NEW YORK, NY 10038
212-825-5900

Release 01-2015
nyc.gov/html/doi

**FOR IMMEDIATE RELEASE**
**THURSDAY, JANUARY 15, 2015**

**CONTACT: NICOLE TURSO**
**(212) 806-5225**

**BETSY PISIK**
**(212) 825-5931**

### DOI REPORT REVEALS BROKEN RECRUITMENT SYSTEM AT RIKERS ISLAND AND DEEPLY FLAWED APPLICATION PROCESS FOR NEWLY HIRED CORRECTION OFFICERS

*More than a third of new officers hired despite significant red flags*
*DOC commits to aggressive changes*

Department of Investigation (DOI) Commissioner Mark G. Peters today issued a comprehensive review of the Department of Correction's (DOC) hiring process for correction officers at Rikers Island, uncovering a deeply flawed system in which more than a third of officers were hired despite numerous corruption and safety hazards, including multiple prior arrests and convictions, prior associations with gang members, or relationships with inmates. Equally troubling, the Applicant Investigation Unit (AIU), responsible for screening potential recruits, relied on antiquated and haphazardly filed paper personnel documents and had little to no access to software necessary to perform basic background and credit checks. As a result, DOC has already replaced both its Director and Deputy Commissioner responsible for oversight of the AIU and responsible for the hiring of the applicants DOI reviewed, assigned additional staff to the screening process and committed to an aggressive set of reforms in this area.

DOI Commissioner Mark G. Peters said, "DOI's latest investigation on Rikers Island exposes a shockingly inadequate screening system, which has led to the hiring of many officers that are underqualified and unfit for duty. Applicants with a history of violence or gang affiliations should not be patrolling our jails. Positions as law enforcement officers demand better. We are pleased DOC has listened to our recommendations and is taking the necessary steps, after a decade of neglect, to strengthen its recruitment to attract candidates with only the highest talent and character."

DOC Commissioner Joseph Ponte said, "Improving staff recruitment, training and retention is a key part of my agenda of meaningful reform. My earliest actions as commissioner included providing new leadership for our staff recruiting and training operations. We have subsequently made significant changes to the Applicant Investigation Unit, including many based on recommendations from the DOI. Because at the end of the day, our performance is only as strong as the men and women who fill the posts that keep our facilities operating 24/7."

This report is another piece of DOI's ongoing investigation into criminal activity and civil disorder at Rikers Island. As part of the probe, which began in early 2014, investigators spent over 200 hours interviewing staff, conducting site visits, and reviewing over 75,000 documents related to the hiring process. For this report, DOI

E148

**Ho NYSD Chambers**

| | |
|---|---|
| **From:** | Vicky <c21res@aol.com> |
| **Sent:** | Monday, March 23, 2026 9:24 AM |
| **To:** | Ho NYSD Chambers |
| **Subject:** | Motion to Enforce Judgment |
| **Attachments:** | MOTION FOR ENFORCEMENT AND PROPOSED ORDER FOR THE ENFORCEMENT OF JUDGMENT 26-CV-914.pdf |

CAUTION - EXTERNAL:

March 23, 2026

To:       Justice Dale E. Ho

From:   Vicky Ware Bey, Plaintiff / Petitioner / Claimant / Crime Victim / Aggrieved and Injured Party

RE:       Vicky Ware Bey v. The City of New York et al. 26-CV-914

Attached is a Motion to enforce Judgment for the unanswered Summons and Complaint served upon the Defendants.

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

 Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000                    NOTICE OF MOTION /
                                                     MOTION TO ENFORCE
Plaintiff / Petitioner / Claimant / Crime            JUDGMENT
Victim / Aggrieved And Injured Party
                                                     DOCKET # 26-CV-914
VS
                                                     Honorable Dale E. Ho
Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)
_____

**PLEASE TAKE NOTICE** that, upon the annexed Motion to Enforce Judgment, the exhibits thereto, and all prior pleadings and proceedings in this action, the Plaintiff Vicky Ware Bey, In Propria Persona will move this Court, before the Honorable Dale E. Ho United States District Judge, at the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York 10007, on March 24, 2026 at 10:30 AM or soon thereafter to be determined by the Court, for an Order:

Enforcing the judgment entered on March 10, 2026 in the amount of $8,000,000,000.00 Eight Billion, plus accrued interest and costs, against the Defendants The City of New York et al. Authorizing installment payments if immediate full payment is not feasible; Allowing Plaintiff to utilize lawful collection mechanisms against receivables; and Granting any other relief the Court deems just and proper.

PLEASE TAKE FURTHER NOTICE that, pursuant to Local Rule FRCP 62, any opposition to this Motion must be filed within 14 days of service of this Notice.

Date: March 23, 2026



_____

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

CC:   Attorney of Record for the Defendants
      Kayla Coles Esq
      c/o The City of New York Law Department / Corporation Counsel
      100 Church Street
      New York, New York 10007
      Kcoles@law.nyc.gov and via S.D.N.Y CM / ECF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

 Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

**AFFIRMATION IN SUPPORT
OF MOTION TO ENFORCE
JUDGMENT**

 **DOCKET # 26-CV-914**

**Honorable Dale E. Ho**

Vicky Ware Bey, the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured Party affirms under the penalty of perjury that she is personally knowledgeable of the facts and circumstances involved in this matter and respectfully files the Affirmation in support of her Motion to Enforce Judgment against Defendants, The City of New York et al.and stating the following:

## I. INTRODUCTION

Plaintiff seeks enforcement of a judgment entered on March 10, 2026 in the amount of $8,000,000,000.00 plus accrued interest and costs pursuant to Federal Rule of Civil Procedure 69(a), Title 28 U.S.C. § 1331, the United States Constitution and applicable Federal Laws and State Laws which are invoked.  The Defendants have failed to satisfy the judgment voluntarily, necessitating judicial intervention.

## II. BACKGROUND

1. On March 10, 2026, this Court entered judgment in favor of Plaintiff and against Defendant in the sum of $8,000,000,000.00 Eight Billion Dollars.

2. Plaintiff attempted to contact the Attorney of Record for the Defendants by phone to resolve and settle this matter on March 12, 2026, and the Plaintiff's call was not returned. On March 12, 2026, the Plaintiff demanded payment in writing electronically via email and by Certified Mail # 9589 0710 5270 1576 2556 but Defendant has failed to remit full and partial payment.

3. On February 2, 2026, the Plaintiff proceed Informa Pauper by filing an Affidavit of Financial Statement with a Summons and Complaint in which a trial by jury was demanded. February 5, 2026,  this matter was assigned a case number and the Authorized Agent for the Defendants, by appointment and by law via The Defendants Attorney of Record, Muriel Good e Trufant Esq. c/o The City of New York Law Department / Corporation Counsel located the Defendant's  / Municipality's place of Incorporation at 100 Church Street, New York, New York 10007 was served the Affidavit of Financial Statement, and the Summons and Complaint pursuant to FRCP 4(h)(1)(B) providing the court with proof and acceptance of service upon the Defendants pursuant to FRCP 5(B)(1),(F) in which the Defendants were given 21 days to answer, and the Defendants have not not answered or denied any of the Plaintiff's Claims for which relief could be granted, Causes of Action or Grievances she's seeking to be redressed within 21 or 30 days. February 6, 2026 the Plaintiff requested a Preliminary Conference for March 6, 2026, upon the Plaintiff appearing for the Preliminary Conference and finding out that this a Preliminary Conference was not scheduled she filed a Notice of Special Appearance and the Proposed Case Management Plan and Scheduling Order she prepared for this Preliminary Conference she requested.  On February 17, 2026, the Defendants requested an extension of time to answer the Plaintiff's Summons and Complaint at which time the Plaintiff opposed it and did not consent to the Defendants request for an extension of time and their time to answer has already expired.  Therefore, judgment should be entered and executed in the sum of $8,000,000,000.00, Eight Billion Dollars with an Indefinite Interstate Restraining Order and enforced as a matter of law because there are no genuine disputes in material facts or issues.  The Plaintiff's Application for the entry of Judgment has already been approved and the Plaintiff moves the court to enforce Judgment which arises from the Defendants intentional and actionable employment discrimination based upon the Plaintiffs sex/gender, national origin, race, age, religion, occupational disability she sustained during the performance of her duties while interacting with an inmate upon responding to alarms for inmate disturbances, in terms of compensation, and her current status as a stalking / crime victim which is directly employment related, and a result of the Defendants negligent hiring and retention practices.  The Defendants actionable and intentional employment discrimination are in direct violation of Title 42 U.S.C 2000e-17 et seq. Title 42 U.S.C 11217, Title 29 C.F.R 623 ADEA, ADA.  Judgment also arises from the Defendants ongoing criminal course of conduct against the Plaintiff and her relatives arising from the Defendants acts of employment retaliation against the Plaintiff because she objected to being sexually

harassed at work, which the Defendants who controlled the conditions of employment and had the obligation to provide reasonable care and protection for the Plaintiff remained recklessly indifferent and exasperated her injuries by conspiring to deprive her of her rights in direct violation of Title 18 U.S.C 241, by immediately stalking her and her relative interstate resulting in multiple wrongful deaths that were premeditated murders, hate crimes and acts of genocide in which these crimes involve conspiracy, transcends national boundaries, violates Federal Laws, Criminal Laws and are dangerous to human life in which the are also in direct violation of Title 18 U.S.C 2261A, Title 18 U.S.C 1111, Title 18 U.S.C 249, Title 18 U.S.C 1091 in which the Defendants stalked, monitored and watched the Plaintiff and her relatives interstate daily inside of their houses and effects after criminally trespassing, breaking into, and invading their houses and effects interstate and unlawfully installing surreptitious eavesdropping and surveillance equipment inside of their houses and effects where they have a reasonable expectation of privacy in which the Defendants and their accomplices whom they act in concert with interstate unlawfully monitor, record and publicly disseminate unlawful live and recorded unlawful intimate surveillance images of the Plaintiff and her relatives interstate over the world wide web and over closed circuit TV without their expressed or implied consent and without their knowledge in which the Defendants and their accomplices /conspirators interstate knowingly and willfully, and with complete disregard for the Plaintiff's and her relatives rights violate the Fourth Amendment in the United States Constitution, Title 18 U.S.C 2331, Title 18 U.S.C 2332, Title 18 U.S.C 2261A, Title 18 U.S.C 1801, Title 47 U.S.C 230, Title 18 U.S.C 242, State Criminal Laws: New York Penal Laws 245.05, 245.15, 250.05, 25.45; Alabama Code 15, Article 5, Section 13A-6-90, 13A-6-240; 13A-6-240; 13A-4-1, 13A-4-2, 13A-4-3, 13A-4-4, OCGA 16-11-90; Tennessee Code, Chapter 872 as well as other State Laws. Some of the Plaintiff's relatives who were murdered were witness to the Defendants and their accomplices crimes in which the Defendants are in violation of Title 18 U.S.C 1512 as well as applicable State Criminal Laws. The Defendants further retaliated against the Plaintiff by unlawfully intercepting and publicly disseminating all of the Plaintiff's and her relatives who are located in different states and territories oral, wire, wireless, electronic communications in direct violation of Title 18 U.S.C 2511 and the Fourth Amendment in the United States Constitution for asserting her rights and participating in a protected activity by reporting the Defendants unfair employment practices to The New York City Commission of Human Rights. The Defendants further retaliated against the Plaintiff by intentionally and knowingly violating Article V Section VII in New York State Constitution, by intentionally impairing and diminishing her ordinary pension benefits, and arbitrarily and capriciously denying her performance of duty disability pension in error of law, breaching their fiduciary duties, embezzling and withholding her material benefits, and committing fraud by changing her pension number intentionally causing her additional economic injuries. The Defendant are liable for the Plaintiff's and her relatives injures pursuant to Title 42 U.S.C 1983. The Defendants ongoing felonious criminal course of conduct against the Plaintiff and her relatives has caused the Plaintiff emotional distress and anguish, and has caused her to suffer a physical adverse health condition resulting from the Defendants and their accomplices ongoing felonious criminal course of conduct that has gone on for eleven years, and three months becoming worse over time and has

**not ceased,** in which the Relations Back Doctrine applies to this matter pursuant to FRCP 15.

**The enforcement of the Indefinite Interstate Restraining Order is required** to enjoin the Defendants ongoing felonious criminal course of conduct which transcends national boundaries, involves conspiracy and has already been proven to be dangerous to human life.   This crime has gone of for 11 years, and three months and it seems that the Defendants and their accomplices interstate do not have any intentions of stopping their ongoing felonious criminal course of conduct against the Plaintiff and her relatives interstate, and this matter recently became worse, because now the Plaintiff is not getting all of her mail, her incoming emails have been blocked as of March 17, 2026, and she has not been able to log onto the internet from within her home over the weekend, and one of her relatives are suffering from abuse at the behest of the Defendants and their accomplices who continue to conspire against the Plaintiff and her relatives while harassing and intimidating other people to continue their felonious criminal course of conduct and to obstruct justice.

## III. LEGAL BASIS FOR ENFORCEMENT

1. Federal Rule of Civil Procedure 69(a) allows judgment enforcement according to the procedures of the state in which the court sits.

2. New York CPLR Article 52 permits enforcement against property, subject to sovereign immunity; courts retain discretion to authorize payment from non-essential municipal funds or through installment payments.

3. Plaintiff seeks enforcement consistent with federal and state law, including collection from non-exempt municipal assets or receivables.

## IV. EFFORTS TO COLLECT

Plaintiff has made good faith efforts to collect the judgment through a written notice, and two phone calls, and negotiation attempts were all unsuccessful.

## V. REQUESTED RELIEF

Plaintiff respectfully requests that the Court:

1. Direct Defendant to satisfy the judgment from legally available municipal funds.
2. Authorize installment payments if immediate full payment is impracticable.
3. Permit enforcement actions against non-essential municipal property or receivables.
4. Award post-judgment interest and any collection costs.
5. Enforce the Indefinite Interstate Restraining Order
6. Grant any other relief the Court deems just and proper.

## VI. SUPPORTING DOCUMENTS

Plaintiff attaches:
- Certified copy of judgment
- Proof of notice to Defendant regarding demand for payment
- Documentation of collection attempts
- Calculation of amounts due, including interest and fees

Date: March 23, 2026

*Vicky Ware Bey*

_____

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]


CC:     Attorney of Record for the Defendants
        Kayla Coles Esq
        c/o The City of New York Law Department / Corporation Counsel
        100 Church Street
        New York, New York 10007
        Kcoles@law.nyc.gov and via S.D.N.Y CM / ECF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)
_____

**ORDER ENFORCING JUDGMENT**

**DOCKET # 26-CV-914**

**Honorable Dale E. Ho**

Upon consideration of Plaintiff's Motion to Enforce Judgment and all supporting documentation, and for good cause shown, it is hereby:

**ORDERED, ADJUDGED, AND DECREED that:**

The Defendants The City of New York et al. shall satisfy the judgment entered on March 10, 2026 in the total amount of $8,000,000,000.00 Eight Billion, plus accrued interest and costs.

If immediate full payment is not feasible, Defendant shall immediately make a payment to the Plaintiff by direct deposit into her account in the amount of $15,000,000.00 Fifteen Million by March 25, 2026, and make installment payments to the Plaintiff in the amount and duration to be discussed if applicable in which additional payments are to begin on April 1, 2026 until judgment is fully satisfied.

The Plaintiff may seek post-judgment interest and additional collection costs from Defendant as permitted by law.

The Court retains jurisdiction to enforce this Order and to resolve disputes concerning payments and/or collection.

**And it is further ORDERED, ADJUDGED, AND DECREED that:**

An Indefinite Interstate Restraining Order is hereby issued to the Defendants, enjoining them and their agents and accomplices from engaging in any further acts of Terrorism, Interstate Stalking; Coordinated Stalking / Gang Stalking / Organized Stalking; Conspiracy; Surveillance; Eavesdropping; Criminal Harassment; Harassment; Defamation; Retaliation; Sexual Coercion and Abuse; All types of thefts as well as any other unlawful activities, and crimes against the Plaintiff and her relatives. This Order shall apply nationwide and across International Borders.

**PLEASE TAKE NOTICE, YOU WERE NOTIFIED THAT IT IS A FEDERAL CRIME TO:**
- Cross state lines to violate this order or to stalk, harass or commit domestic violence against Plaintiff and her relatives in New York and Interstate; Cross International lines to violate this order or to stalk, harass or commit domestic violence against the Plaintiff and her relatives Nationally pursuant to Executive Order 13107 and Treaties entered into by the United States;
- Buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect

(Note: there is a limited exception for military or law enforcement officers but only while they are on duty) ; and

- Buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of physical force or a deadly weapon against a relative, even after this Order has expired.. (18 U.S.C. "922(g)(8), 922(g)(9), 2261, 2261A, 2262).

**THE DEFENDANTS WERE NOTIFIED THAT** the license of the person against whom this order is issued to carry, possess, repair, sell or otherwise dispose of a firearm or firearms, if any, pursuant to Penal Law §400.00, is hereby revoked all persons against whom this order is issued shall remain ineligible to receive a firearm license during the period of this order.

The Defendants, their predecessors, successors and their accomplices / conspirators in this matter are **hereby ordered** to immediately CEASE and DESIST and to forever refrain from all illegal, unlawful, and criminal activities they intentionally commit against the Plaintiff and her relatives interstate in this matter immediately.

**THE DEFENDANTS, THEIR, PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED** to immediately cease and desist and to permanently and indefinitely refrain from all and every illegal, unlawful and criminal activities they and their Accomplices / Conspirators are

committing against the Plaintiff and her relatives nationally and internationally which includes all acts of terrorism, genocide but are not limited to Interstate stalking, International Stalking, Criminal Harassment, Burglary, Theft of all types, Criminal Trespassing, Trespassing of any sort, and are to immediately cease and desist and permanently and indefinitely refrain from all illegal, unlawful and unconsented surveillance, monitoring, recording and dissemination of unconsented intimate images, all acts of sexual exploitation as well as the illegal and unlawful interception and dissemination of the Plaintiff's and her relatives and associates oral, wire, wireless, electronic communications nationally and internationally.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever enjoined and barred from illegally and unlawfully installing surveillance and eavesdropping equipment inside of the Plaintiff and her relatives homes interstate and in places where they have a reasonable expectation of privacy and from illegally and unlawfully surveilling, eavesdropping and recording and disseminating images of the Plaintiff and her relatives nationally and internationally intimate body parts, dressing and disrobing and or engaging in private familial activities which is also referred to as revenge porn and are forever enjoined from intercepting and disseminating all and any of the Plaintiff and her relatives and associates nationally and internationally oral, wire, wireless, electronic communications.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever barred and enjoined from being within 1000 yards of the Plaintiff's and her relatives and associates nationally and internationally.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever barred and enjoined from Stalking Plaintiff and her relatives and their associates interstate, internationally and, are forever enjoined and barred from criminally harassing, committing any and all forms of violence against the Plaintiff and her relatives nationally and internationally.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever barred and enjoined from burglarizing, interfering with the Plaintiff's and her relatives mail and medical service, obstructing justice, criminally trespassing and trespassing of any sort upon the Plaintiff and her relatives nationally and internationally.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever barred and enjoined from destroying, damaging, stealing the personal and private property belonging to the Plaintiff and her relatives nationally and internationally.

**THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED** THAT they are forever barred and enjoined from all acts of discrimination and unfair employment practices against the Plaintiff and her relatives and are further enjoined from soliciting others into committing crimes against the Plaintiff and her relatives nationally and internationally indefinitely.

**This Indefinite Restraining Order is effective immediately** and is warranted to prevent a continuing and substantial injury to Plaintiff and her relatives nationally pursuant to Title 18 U.S.C 2521.
This Indefinite Restraining Order is necessary to prevent the Defendants and their accomplices / conspirators from knowingly and continuing to engage in harmful conduct causing bodily injury to Plaintiff and her relatives nationally and internationally and from damaging their property or threatening to do, with the intentions of retaliating against them for giving testimonies in an official proceeding via a record document or any other means. This Indefinite Interstate Restraining Order and Injunction is in effect to prevent the further commissions of Federal and State Crimes against the Plaintiff and her relatives interstate, and it is to enjoin the existing crimes committed against them by the Defendants and their accomplices / conspirators in this matter.

**This Indefinite Interstate Restraining Order is relevant to Title 18 U.S.C 2266 (5)(A) which provides: "any injunction, restraining order, or any other order issued by a civil or criminal court for the purpose of preventing violent or threatening acts or harassment against, sexual violence, or contact or communication with or physical proximity to, another person, including any temporary or final order issued by a civil or criminal court whether obtained by filing an independent action or as a pendente lite order in another proceeding so long as any civil or criminal order was issued in response to a complaint , petition, or motion filed by or on behalf of a person seeking protection: and (B) any support, child custody or visitation provisions, orders, remedies or relief issued as part of a protection order, restraining order or injunction pursuant to State, tribal, territorial, or local law authorizing the issuance of protection orders, restraining orders, or injunctions for the protection of victims of domestic violence, sexual assault, dating violence or stalking."**

*Furthermore, the* Plaintiff who bought this action against the Defendants is a stalking victim / crime victim at the behest of the Defendants and their accomplices / conspirators interstate as well as her relatives nationally and internationally.
**"Victim" means the individual harmed as a result of a commission of a crime under this chapter including, in the case of a victim who is under 18 years of age, incompetent, incapacitated, or decreased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, but in no event shall the defendant be named as such representative or guardian."** Pursuant to Title 18 U.S.C 2264 (4)( c).

Therefore this Notice and Order issued is necessary enjoin the Deprivation of the Plaintiff's and her relatives rights interstate, to prevent irreparable harm and to stop the

continuation of multiple crimes against the Plaintiff and her relatives nationally and internationally.

THIS NOTICE AND ORDER PREVENTS THE DEFENDANTS AND THEIR ACCOMPLICES / CONSPIRATORS FROM CONTINUING THEIR CRIMINAL COURSE OF CONDUCT AGAINST THE PLAINTIFF AND HER RELATIVES NATIONALLY AND INTERNATIONALLY, IT DOES NOT PREVENT THE DEFENDANTS FROM PERFORMING THEIR LAWFUL STATUTORY DUTIES.

<u>NOTICE TO DEFENDANTS: YOUR FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO SUPREME COURT PROSECUTION AND PENALTIES FOR CONTEMPT OF COURT. IF YOU FAIL TO APPEAR IN COURT WHEN YOU ARE REQUIRED TO DO SO, THIS ORDER MAY BE EXTENDED IN YOUR ABSENCE AND THEN CONTINUES IN EFFECT UNTIL A NEW DATE SET BY THE COURT.</u>

<u>THIS ORDER OF PROTECTION / RESTRAINING ORDER WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS ISSUED. THIS ORDER OF PROTECTION / RESTRAINING ORDER CAN ONLY BE MODIFIED OR TERMINATED BY THE INJURED PARTY AND COURT. THE PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS ORDER.</u>

<u>PLEASE TAKE FURTHER NOTICE  THAT THE PENALTIES FOR VIOLATING THIS NOTICE AND ORDER IS PUNISHABLE BY TITLE 18 U.S.C 2262 AS WELL AS OTHER FEDERAL AND STATE LAWS</u>

TITLE 18 U.S.C 2262
A person who travels in interstate or foreign commerce, or enters or leaves Indian country or is present within the special maritime and territorial jurisdiction of the United States, with the intent to engage in conduct that violates the portion of a protection order that prohibits or provides protection against violence, threats, or harassment against, contact or communication with, or physical proximity to, another person or the pet, service animal, emotional support animal, or horse of that person, or that would violate such a portion of a protection order in the jurisdiction in which the order was issued, and subsequently engages in such conduct, shall be punished as provided in subsection (b) which provides A person who violates this section shall be fined under this title, imprisoned— (1) for life or any term of years, if death of the victim results;
(2) for not more than 20 years if permanent disfigurement or life threatening bodily injury to the victim results;
(3) for not more than 10 years, if serious bodily injury to the victim results or if the offender uses a dangerous weapon during the offense;

(4) as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison); and

(5) for not more than 5 years, in any other case, including any case in which the offense is committed against a pet, service animal, emotional support animal, or horse,

or both fined and imprisoned.

**Federal, State, and International Legal Remedies:**

The Defendants shall be liable for any and all legal fees, costs, and expenses incurred by the Plaintiff as a result of these ongoing crimes unlawful activities committed against the Plaintiff and her relatives interstate. The Plaintiff is further entitled to relief under the First Amendment in the United States Constitution, Title 42 U.S.C 2000e-5(e)(3); Civil Rights Act of 1991 codified as Title 42 U.S.C 3553; American Disabilities Act of 1990 section 501 codified as 42 U.S.C Sec. 12117; Title 42 U.S.C 2000e-4; Title 42 U.S.C 2000e-5; Title 42 U.S.C 2000e-6; Title 42 U.S.C 2000e-8. Title 42 U.S.C 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

The Victims Rights and Restitution Act of 1990 codified as 42 U.S.C 10607 also provides relief for the Plaintiff who is a crime victim and the Aggrieved and Injured Party is entitled to relief pursuant to Title 18 U.S.C 1595 (a), (b)(1),(b)(2),(c ) (1), (c )(2); as well as Title 42 U.S.C 2000ff-6 which provides power and procedures and remedies in sections 705, 706, 707, 709, 710, and 711 of Title 42 U.S.C 2000e-4 –  Title 42 U.S.C 2000e-6  and Title 42 U.S.C 2000e-8 - Title 42 U.S.C 2000e-10 to the person alleging the violation of title VII of that Act codified as Title 42 U.S.C 2000e shall be the powers procedures and remedies this chapter provided to the person alleging an unlawful employment practice in violation of this chapter.  Amendments to Title VII in 1972 and 1991extended protection to public sector employees and authorizes awards of both compensatory and punitive damages.  Congress and the Courts have extended the prohibition against sex discrimination to include prohibitions against sexual harassment.

Title 29 U.S.C 1132 (a)(1); (B); (2); (3);(4);(5);provides that "a civil action may be brought by a participant or beneficiary for the relief provided for in subsection (c) of the section, or to recover benefits due to him under this terms of his plan, to enforce his rights under the terms of the plan, or to clarify his right s to future benefits under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or  (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title."

"Article V, § 7 of the New York Constitution provides protection as 'a contractual relationship' the benefits of membership in a public pension or retirement system against diminishment and impairment. The provision 'fix[es] the rights of the employees at the time of commencement of membership in [a pension or retirement] system, rather than as previously at retirement.*" Ballentine v Koch (89 NY2d 51, 56 [1996]).* As the Court of Appeals stated in (*Matter of Guzman v New York City Employees' Retirement Sys., 45 NY2d 186, 190-191*, citing Birnbaum v New York State Teachers Retirement Sys., 5 NY2d 1, 9), and thus prohibits unilateral action by either the employer or the Legislature that impairs or diminishes the rights established by the employee's membership (*Matter of Village of Fairport v Newman, 90 AD2d 293, 295, as well as* State Laws including the Alabama Criminal Laws, Georgia Criminal Laws, Texas Criminal Laws, Tennessee Criminal Laws and International Human Rights Frameworks.

The Court refers the matter for criminal prosecution based on the evidence retrieved and presented regarding violations of federal criminal statutes and international law, including Terrorism, Interstate Stalking, Genocide; Hate Crimes; Conspiracy; Premeditated Murders, Fraud, Theft.

The Plaintiff shall be provided with law enforcement protection and resources to ensure that these violations permanently cease and that the Plaintiff and her relatives interstate are kept safe from further harm.

## CONCLUSION

The Defendants have failed to appear and defend against these serious claims, and the Court finds that the Plaintiff is entitled to relief on all counts. This Judgment shall be effective immediately and enforced across all relevant jurisdictions. The Plaintiff is awarded all remedies as set forth above, including damages in the sum of $8,000,000,000.00, Eight Billion Dollars 00/100, and Indefinite Interstate Injunctive Relief, and the issuance of a Permanent Interstate Restraining Order.

SO ORDERED.

DATED: March 24, 2026
          New York, New York


_____
UNITED STATES DISTRICT JUDGE

26-CV-914
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

## CERTIFICATE OF SERVICE
_____

The Plaintiff affirms under the penalty of perjury that the Attorney of Record for the all
of the above Defendants, Kayla Coles Esq. c/o The City of New York Law Department /
Corporation Counsel located 100 Church Street, New York, New York 10007 was served
the Plaintiff's Demand for the Satisfaction of Judgment on March 12, 2026 via Certified
Mail and email at Kcoles@law.nyc.gov and ServiceECF@law.nyc.gov

Date: March 12, 2026                                    *Vicky Ware Bey*

_____
Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]



**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

New York, NY 10007

Certified Mail Fee $5.30

Extra Services & Fees
☐ Return Receipt (hardcopy)       $0.00
☐ Return Receipt (electronic)     $0.00
☐ Certified Mail Restricted Delivery  $0.00
☐ Adult Signature Required        $0.00
☐ Adult Signature Restricted Delivery  $0.00

Postmark Here

MAR 12 2026

Postage $0.78

Total Postage and Fees $6.08

The City of New York Law Department
Kayla Coles Esq   100 Church Street
New York, New York 10007

PS Form 3800, January 2023          See Reverse for Instructions

9589 0710 5270 1576 2526 16

---

**UNITED STATES POSTAL SERVICE.**

ROCHDALE VILLAGE
165100 BAISLEY BLVD
JAMAICA, NY 11434-9997
www.usps.com

03/12/2026                          11:31 AM

TRACKING NUMBERS
9589 0710 5270 1576 2526 16

TRACK STATUS OF ITEMS WITH THIS CODE
(UP TO 25 ITEMS)

TRACK STATUS BY TEXT MESSAGE
Send tracking number to 28777 (2USPS)
Standard message and data rates may apply

TRACK STATUS ONLINE
Visit https://www.usps.com/tracking
Text and e-mail alerts available

PURCHASE DETAILS

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| First-Class Mail® Letter | 1 | | $0.78 |
| New York, NY 10007 | | | |
| Weight: 0 lb 0.50 oz | | | |
| Estimated Delivery Date | | | |
| Sat 03/14/2026 | | | |
| Certified Mail® | | | $5.30 |
| Tracking #: | | | |
| 9589 0710 5270 1576 2526 16 | | | |

Total                              $6.08

Grand Total:                       $6.08

Cash                              $10.00
Change                            -$3.92

TO REPORT AN ISSUE
Visit https://emailus.usps.com

All hazardous labels/markings on reused
boxes MUST be completely
removed/obliterated if they no longer
match the contents.

PREVIEW YOUR MAIL AND PACKAGES
Sign up for FREE at
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Customer Service
1-800-ASK-USPS
(1-800-275-8777)

Agents do not have any additional
information other than what is provided on
USPS.com.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
Or scan this code with your mobile device.

**Vicky Ware Bey**
**168-42 127th Avenue, #7A**
**Jamaica Territory, New York Republic [11434]**
**c21res@aol.com * 347-869-8529**

March 12, 2026

**Via Certified Mail # 9589 0710 5270 1576 2556 16 & Email**

**THE CITY OF NEW YORK et al.**
100 Church Street
New York, New York 10007
Attention: Kayla Coles Esq., Attorney of Record for the Defendants
            c/o The City of New York Law Department / Corporation Counsel

**Re: Formal Demand for Satisfaction of Federal Court Judgment**
    Case: Vicky Ware Bey v. The City of New York et al., Case 26-CV-914
    United States District Court for the Southern District of New York

Dear Ms. Kayla Coles Esq., Attorney of Record for the Defendants:

I am Vicky Ware Bey the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured party in the above-captioned matter and the judgment creditor.

On March 10, 2026, the United States District Court for the Southern District of New York entered judgment against you, the Defendants (Docket #37) in the sum of $8,000,000,000.00, Eight Billion Dollars, plus post-judgment interest accruing under 28 U.S.C. § 1961, and any costs allowed by law with An Indefinite Interstate Restraining Order which was also approved by the United States District Court for the Southern District of New York in which you are, and have been in violation of this Indefinite Interstate Restraining Order as of March 10, 2026.

As of the date of this letter March 12, 2026, the approved judgment remains unpaid. This letter constitutes a formal demand for immediate payment of 10,000,000.00, Ten Million Dollars and the total amount due within seven day in the amount of $7,990,000,000.00 Seven Billion Nine Hundred Ninety Million Dollars within seven days, in which accrued post-judgment interest will not apply during this seven day period through in which the total sum of $8,000,000,000.00, Eight Billion Dollars is due.

Pursuant to Federal Rule of Civil Procedure 69(a), a money judgment entered by a federal court is enforceable through execution and other proceedings consistent with the law of the state in which the

court sits. Accordingly, enforcement remedies under New York CPLR Article 52 are available and will be pursued if payment is not received promptly. These remedies may include, without limitation:

- Bank account levies and restraints

- Wage garnishment

- Property liens and seizures

- Turnover proceedings and post-judgment discovery

Demand is hereby made that you remit the immediate payment of $10,000,000.00, Ten Million Dollars, via direct deposit, and then the remaining sum of $7,990,000,000.00, Seven Billion Nine Hundred Ninety Million Dollars within seven (7) calendar days from the date of this letter, in which interest will not accrue during this seven day period. Payment for the remaining balance after the immediate payment of $10,000,000.00, Ten Million Dollars should be made via a Cashiers Check.

Please be advised that failure to comply with this demand will result in immediate initiation of all available enforcement actions, without further notice, which may result in additional costs, interest, and legal fees being added to your obligation.

This letter is sent without prejudice to any rights or remedies available to the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured party Vicky Ware Bey, who is the Judgment Creditor, all of which are expressly reserved.

Your prompt attention to this matter will prevent unnecessary escalation and additional legal consequences.

Date: March 12, 2026                         Sincerely,

                                             *Vicky Ware Bey*

                                             _____
                                             Vicky Ware Bey, In Propria Persona
                                             Vicky Ware, Ex Relational
                                             All Rights Reserved, Without Prejudice
                                             168-42 127th Avenue, #7A
                                             Jamaica Territory, New York Republic
                                             [11434]


cc:     United States District Court For The Southern District Of New York

## ABSTRACT OF JUDGMENT

Re: Vicky Ware Bey v. The City of New York et al

| Name(s) and Address(es) of Parties against whom Judgment(s) have been obtained | Name(s) and Address(es) of Parties in whose favor Judgment(s) have been obtained |
|---|---|
| Eric Adams, Mayor The City of New York Lynelle Maginley · Liddie Commissioner For New York City Department Of Corrections, New York City Department Of Corrections, Melanie Whinnery, Executive Director For New York City Employee Retirement System , New York City Employee Retirement System, John Doe 1-10,000, Jane Doe 1-10,000  c/o Attorney of Record for the Defendants: Muriel Goode Trufant City of New York Law Department / Corporation Counsel 100 Church Street New York, New York 10007 | Vicky Ware Bey, In Proper Persona Vicky Ware, Ex Relatione All Rights Reserved 168-42 127 Avenue, # 7A Jamaica Territory, New York Republic [11434] |

| Amount of Judgment(s) | Name(s) and Address(es) of Attorney(s) | Entry Date of Judgment |
|---|---|---|
| $8.000,000,000.00 | Vicky Ware Bey, In Proper Persona Plaintiff – Appellant (non Attorney) Vicky Ware, Ex Relatione All Rights Reserved 168-42 127th Avenue, #7A Jamaica Territory, New York Republic [11434] | 03/24/2026 |

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK
I CERTIFY that the foregoing is a correct Abstract of the Judgment

_____

BY CHIEF CLERK

**Ho NYSD Chambers**

| | |
|---|---|
| From: | Vicky <c21res@aol.com> |
| Sent: | Monday, March 23, 2026 1:21 PM |
| To: | Ho NYSD Chambers |
| Subject: | Fw: Motion to Enforce Judgment |
| Attachments: | MOTION FOR ENFORCEMENT AND PROPOSED ORDER FOR THE ENFORCEMENT OF JUDGMENT 26-CV-914.pdf; AFFIRMATION REQUEST FOR IMMEDIATE BACK PAY AND PAYMENT FOR UNPAID WAGES AND EMPLOYMENT 26-CV-914.pdf |

CAUTION - EXTERNAL:

Good Afternoon Justice Ho:

I just realized that my Civil Order to Show Cause was denied and I have not received the your Orders in the mail yet I just heard a small part of your Order(s)
You stated the Preliminary Conference was premature, the Defendants time to answer my complaint has already expired

Attached is a request for unpaid wages and employment benefits. **Please schedule a Preliminary / Pretrial Conference so that this matter could proceed in a**
**timely manner without delay or obstruction. I requested for the Original Preliminary Conference that was supposed to be scheduled for March 6, 2026 in**
**which the court erred by not placing it on your calendar or Judge Swain's calendar be rescheduled for tomorrow March 24, 2026.**

Justice Ho, with all respect, I did not sign up or volunteer to be a stalking victim, these horrific crimes and circumstance are forced upon my relative and I for
over eleven years without ceasing and the Defendants and their accomplices do not have the intention of stopping. I am in court because I don't have any
other choice, and I don't have the connections or the resources my aggressors have.  Too many of my relatives who were stalking victims which is directly
connected to the ongoing crimes against us have already resulted in their wrongful deaths, and the Defendants and their accomplices crimes against us
has not ceased.  Our lives will never be the same again because of the ongoing crimes that are being committed against us 24/7

Attached is an Affirmation / my request for unpaid wages and employment benefits I worked hard for and earned with proof of my claims as well as proof of the Defendants
Official Misconduct and negligent hiring and retention practices.

Sincerely,
Vicky Ware Bey, All Rights Reserved
Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and Aggrieved and Injured Party
168-42 127th Avenue, #7A
Jamaica Territory, New York [11434]
347-869-8529

1

----- Forwarded Message -----
**From:** Vicky <c21res@aol.com>
**To:** honysdchambers@nysd.uscourts.gov <honysdchambers@nysd.uscourts.gov>
**Sent:** Monday, March 23, 2026 at 06:24:01 AM PDT
**Subject:** Motion to Enforce Judgment

March 23, 2026


To:      Justice Dale E. Ho

From:   Vicky Ware Bey, Plaintiff / Petitioner / Claimant / Crime Victim / Aggrieved and Injured Party

RE:      Vicky Ware Bey v. The City of New York et al. 26-CV-914

Attached is a Motion to enforce Judgment for the unanswered Summons and Complaint served upon the Defendants.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)
_____

**NOTICE OF MOTION /
MOTION TO ENFORCE
JUDGMENT**

**DOCKET # 26-CV-914**

**Honorable Dale E. Ho**

**PLEASE TAKE NOTICE** that, upon the annexed Motion to Enforce Judgment, the exhibits thereto, and all prior pleadings and proceedings in this action, the Plaintiff Vicky Ware Bey, In Propria Persona will move this Court, before the Honorable Dale E. Ho United States District Judge, at the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York 10007, on March 24, 2026 at 10:30 AM or soon thereafter to be determined by the Court, for an Order:

Enforcing the judgment entered on March 10, 2026 in the amount of $8,000,000,000.00 Eight Billion, plus accrued interest and costs, against the Defendants The City of New York et al. Authorizing installment payments if immediate full payment is not feasible; Allowing Plaintiff to utilize lawful collection mechanisms against receivables; and Granting any other relief the Court deems just and proper.

PLEASE TAKE FURTHER NOTICE that, pursuant to Local Rule FRCP 62, any opposition to this Motion must be filed within 14 days of service of this Notice.

Date: March 23, 2026



_____

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

CC:    Attorney of Record for the Defendants
       Kayla Coles Esq
       c/o The City of New York Law Department / Corporation Counsel
       100 Church Street
       New York, New York 10007
       Kcoles@law.nyc.gov and via S.D.N.Y CM / ECF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE  1-10,000, JANE DOE 1-10,000

DEFENDANT(S)
_____

AFFIRMATION IN SUPPORT
OF MOTION TO ENFORCE
JUDGMENT

DOCKET # 26-CV-914

Honorable Dale E. Ho

Vicky Ware Bey, the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and
the Aggrieved and Injured Party affirms under the penalty of perjury that she is
personally knowledgeable of the facts and circumstances involved in this matter and
respectfully files the Affirmation in support of her Motion to Enforce Judgment against
Defendants, The City of New York et al.and stating the following:

## I. INTRODUCTION

Plaintiff seeks enforcement of a judgment entered on March 10, 2026 in the amount of
$8,000,000,000.00 plus accrued interest and costs pursuant to Federal Rule of Civil
Procedure 69(a), Title 28 U.S.C. § 1331, the United States Constitution and applicable
Federal Laws and State Laws which are invoked.  The Defendants have failed to satisfy
the judgment voluntarily, necessitating judicial intervention.

## II. BACKGROUND

1. On March 10, 2026, this Court entered judgment in favor of Plaintiff and against Defendant in the sum of $8,000,000,000.00 Eight Billion Dollars.

2. Plaintiff attempted to contact the Attorney of Record for the Defendants by phone to resolve and settle this matter on March 12, 2026, and the Plaintiff's call was not returned. On March 12, 2026, the Plaintiff demanded payment in writing electronically via email and by Certified Mail # 9589 0710 5270 1576 2556 but Defendant has failed to remit full and partial payment.

3. On February 2, 2026, the Plaintiff proceed Informa Pauper by filing an Affidavit of Financial Statement with a Summons and Complaint in which a trial by jury was demanded. February 5, 2026,  this matter was assigned a case number and the Authorized Agent for the Defendants, by appointment and by law via The Defendants Attorney of Record, Muriel Good e Trufant Esq. c/o The City of New York Law Department / Corporation Counsel located the Defendant's  / Municipality's place of Incorporation at 100 Church Street, New York, New York 10007 was served the Affidavit of Financial Statement, and the Summons and Complaint pursuant to FRCP 4(h)(1)(B) providing the court with proof and acceptance of service upon the Defendants pursuant to FRCP 5(B)(1),(F) in which the Defendants were given 21 days to answer, and the Defendants have not not answered or denied any of the Plaintiff's Claims for which relief could be granted, Causes of Action or Grievances she's seeking to be redressed within 21 or 30 days. February 6, 2026 the Plaintiff requested a Preliminary Conference for March 6, 2026, upon the Plaintiff appearing for the Preliminary Conference and finding out that this a Preliminary Conference was not scheduled she filed a Notice of Special Appearance and the Proposed Case Management Plan and Scheduling Order she prepared for this Preliminary Conference she requested.  On February 17, 2026, the Defendants requested an extension of time to answer the Plaintiff's Summons and Complaint at which time the Plaintiff opposed it and did not consent to the Defendants request for an extension of time and their time to answer has already expired.  Therefore, judgment should be entered and executed in the sum of $8,000,000,000.00, Eight Billion Dollars with an Indefinite Interstate Restraining Order and enforced as a matter of law because there are no genuine disputes in material facts or issues.  The Plaintiff's Application for the entry of Judgment has already been approved and the Plaintiff moves the court to enforce Judgment which arises from the Defendants intentional and actionable employment discrimination based upon the Plaintiffs sex/gender, national origin, race, age, religion, occupational disability she sustained during the performance of her duties while interacting with an inmate upon responding to alarms for inmate disturbances, in terms of compensation, and her current status as a stalking / crime victim which is directly employment related, and a result of the Defendants negligent hiring and retention practices.  The Defendants actionable and intentional employment discrimination are in direct violation of Title 42 U.S.C 2000e-17 et seq. Title 42 U.S.C 11217, Title 29 C.F.R 623 ADEA, ADA.  Judgment also arises from the Defendants ongoing criminal course of conduct against the Plaintiff and her relatives arising from the Defendants acts of employment retaliation against the Plaintiff because she objected to being sexually

harassed at work, which the Defendants who controlled the conditions of employment and had the obligation to provide reasonable care and protection for the Plaintiff remained recklessly indifferent and exasperated her injuries by conspiring to deprive her of her rights in direct violation of Title 18 U.S.C 241, by immediately stalking her and her relative interstate resulting in multiple wrongful deaths that were premeditated murders, hate crimes and acts of genocide in which these crimes involve conspiracy, transcends national boundaries, violates Federal Laws, Criminal Laws and are dangerous to human life in which the are also in direct violation of Title 18 U.S.C 2261A, Title 18 U.S.C 1111, Title 18 U.S.C 249, Title 18 U.S.C 1091 in which the Defendants stalked, monitored and watched the Plaintiff and her relatives interstate daily inside of their houses and effects after criminally trespassing, breaking into, and invading their houses and effects interstate and unlawfully installing surreptitious eavesdropping and surveillance equipment inside of their houses and effects where they have a reasonable expectation of privacy in which the Defendants and their accomplices whom they act in concert with interstate unlawfully monitor, record and publicly disseminate unlawful live and recorded unlawful intimate surveillance images of the Plaintiff and her relatives interstate over the world wide web and over closed circuit TV without their expressed or implied consent and without their knowledge in which the Defendants and their accomplices /conspirators interstate knowingly and willfully, and with complete disregard for the Plaintiff's and her relatives rights violate the Fourth Amendment in the United States Constitution, Title 18 U.S.C 2331, Title 18 U.S.C 2332, Title 18 U.S.C 2261A, Title 18 U.S.C 1801, Title 47 U.S.C 230, Title 18 U.S.C 242, State Criminal Laws: New York Penal Laws 245.05, 245.15, 250.05, 25.45; Alabama Code 15, Article 5, Section 13A-6-90, 13A-6-240; 13A-6-240; 13A-4-1, 13A-4-2, 13A-4-3, 13A-4-4, OCGA 16-11-90; Tennessee Code, Chapter 872 as well as other State Laws. Some of the Plaintiff's relatives who were murdered were witness to the Defendants and their accomplices crimes in which the Defendants are in violation of Title 18 U.S.C 1512 as well as applicable State Criminal Laws. The Defendants further retaliated against the Plaintiff by unlawfully intercepting and publicly disseminating all of the Plaintiff's and her relatives who are located in different states and territories oral, wire, wireless, electronic communications in direct violation of Title 18 U.S.C 2511 and the Fourth Amendment in the United States Constitution for asserting her rights and participating in a protected activity by reporting the Defendants unfair employment practices to The New York City Commission of Human Rights. The Defendants further retaliated against the Plaintiff by intentionally and knowingly violating Article V Section VII in New York State Constitution, by intentionally impairing and diminishing her ordinary pension benefits, and arbitrarily and capriciously denying her performance of duty disability pension in error of law, breaching their fiduciary duties, embezzling and withholding her material benefits, and committing fraud by changing her pension number intentionally causing her additional economic injuries. The Defendant are liable for the Plaintiff's and her relatives injures pursuant to Title 42 U.S.C 1983. The Defendants ongoing felonious criminal course of conduct against the Plaintiff and her relatives has caused the Plaintiff emotional distress and anguish, and has caused her to suffer a physical adverse health condition resulting from the Defendants and their accomplices ongoing felonious criminal course of conduct that has gone on for eleven years, and three months becoming worse over time and has

**not ceased,** in which the Relations Back Doctrine applies to this matter pursuant to FRCP 15.

**The enforcement of the Indefinite Interstate Restraining Order is required** to enjoin the Defendants ongoing felonious criminal course of conduct which transcends national boundaries, involves conspiracy and has already been proven to be dangerous to human life.   This crime has gone of for 11 years, and three months and it seems that the Defendants and their accomplices interstate do not have any intentions of stopping their ongoing felonious criminal course of conduct against the Plaintiff and her relatives interstate, and this matter recently became worse, because now the Plaintiff is not getting all of her mail, her incoming emails have been blocked as of March 17, 2026, and she has not been able to log onto the internet from within her home over the weekend, and one of her relatives are suffering from abuse at the behest of the Defendants and their accomplices who continue to conspire against the Plaintiff and her relatives while harassing and intimidating other people to continue their felonious criminal course of conduct and to obstruct justice.

## III. LEGAL BASIS FOR ENFORCEMENT

1. Federal Rule of Civil Procedure 69(a) allows judgment enforcement according to the procedures of the state in which the court sits.

2. New York CPLR Article 52 permits enforcement against property, subject to sovereign immunity; courts retain discretion to authorize payment from non-essential municipal funds or through installment payments.

3. Plaintiff seeks enforcement consistent with federal and state law, including collection from non-exempt municipal assets or receivables.

## IV. EFFORTS TO COLLECT

Plaintiff has made good faith efforts to collect the judgment through a written notice, and two phone calls, and negotiation attempts were all unsuccessful.

## V. REQUESTED RELIEF

Plaintiff respectfully requests that the Court:

1. Direct Defendant to satisfy the judgment from legally available municipal funds.
2. Authorize installment payments if immediate full payment is impracticable.
3. Permit enforcement actions against non-essential municipal property or receivables.
4. Award post-judgment interest and any collection costs.
5. Enforce the Indefinite Interstate Restraining Order
6. Grant any other relief the Court deems just and proper.

## VI. SUPPORTING DOCUMENTS

Plaintiff attaches:

- Certified copy of judgment
- Proof of notice to Defendant regarding demand for payment
- Documentation of collection attempts
- Calculation of amounts due, including interest and fees

Date: March 23, 2026

*Vicky Ware Bey*

_____

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

CC:    Attorney of Record for the Defendants
       Kayla Coles Esq
       c/o The City of New York Law Department / Corporation Counsel
       100 Church Street
       New York, New York 10007
       Kcoles@law.nyc.gov and via S.D.N.Y CM / ECF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

 Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

**ORDER ENFORCING
JUDGMENT**


**DOCKET # 26-CV-914**

**Honorable Dale E. Ho**

Upon consideration of Plaintiff's Motion to Enforce Judgment and all supporting
documentation, and for good cause shown, it is hereby:

## ORDERED, ADJUDGED, AND DECREED that:

The Defendants The City of New York et al. shall satisfy the judgment entered on March
10, 2026 in the total amount of $8,000,000,000.00 Eight Billion, plus accrued interest and
costs.

If immediate full payment is not feasible, Defendant shall immediately make a payment
to the Plaintiff by direct deposit into her account in the amount of $15,000,000.00 Fifteen
Million by March 25, 2026, and make installment payments to the Plaintiff in the amount
and duration to be discussed if applicable in which additional payments are to begin on
April 1, 2026 until judgment is fully satisfied.

The Plaintiff may seek post-judgment interest and additional collection costs from Defendant as permitted by law.

The Court retains jurisdiction to enforce this Order and to resolve disputes concerning payments and/or collection.

**And it is further ORDERED, ADJUDGED, AND DECREED that:**

An Indefinite Interstate Restraining Order is hereby issued to the Defendants, enjoining them and their agents and accomplices from engaging in any further acts of Terrorism, Interstate Stalking; Coordinated Stalking / Gang Stalking / Organized Stalking; Conspiracy; Surveillance; Eavesdropping; Criminal Harassment; Harassment; Defamation; Retaliation; Sexual Coercion and Abuse; All types of thefts as well as any other unlawful activities, and crimes against the Plaintiff and her relatives. This Order shall apply nationwide and across International Borders.

**PLEASE TAKE NOTICE, YOU WERE NOTIFIED THAT IT IS A FEDERAL CRIME TO:**
- Cross state lines to violate this order or to stalk, harass or commit domestic violence against Plaintiff and her relatives in New York and Interstate; Cross International lines to violate this order or to stalk, harass or commit domestic violence against the Plaintiff and her relatives Nationally pursuant to Executive Order 13107 and Treaties entered into by the United States;
- Buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect

(Note: there is a limited exception for military or law enforcement officers but only while they are on duty) ; and

- Buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of physical force or a deadly weapon against a relative, even after this Order has expired.. (18 U.S.C. "922(g)(8), 922(g)(9), 2261, 2261A, 2262).

**THE DEFENDANTS WERE NOTIFIED THAT** the license of the person against whom this order is issued to carry, possess, repair, sell or otherwise dispose of a firearm or firearms, if any, pursuant to Penal Law §400.00, is hereby revoked all persons against whom this order is issued shall remain ineligible to receive a firearm license during the period of this order.

The Defendants, their predecessors, successors and their accomplices / conspirators in this matter are **hereby ordered** to immediately CEASE and DESIST and to forever refrain from all illegal, unlawful, and criminal activities they intentionally commit against the Plaintiff and her relatives interstate in this matter immediately.

**THE DEFENDANTS, THEIR, PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED** to immediately cease and desist and to permanently and indefinitely refrain from all and every illegal, unlawful and criminal activities they and their Accomplices / Conspirators are

committing against the Plaintiff and her relatives nationally and internationally which includes all acts of terrorism, genocide but are not limited to Interstate stalking, International Stalking, Criminal Harassment, Burglary, Theft of all types, Criminal Trespassing, Trespassing of any sort, and are to immediately cease and desist and permanently and indefinitely refrain from all illegal, unlawful and unconsented surveillance, monitoring, recording and dissemination of unconsented intimate images, all acts of sexual exploitation as well as the illegal and unlawful interception and dissemination of the Plaintiff's and her relatives and associates oral, wire, wireless, electronic communications nationally and internationally.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever enjoined and barred from illegally and unlawfully installing surveillance and eavesdropping equipment inside of the Plaintiff and her relatives homes interstate and in places where they have a reasonable expectation of privacy and from illegally and unlawfully surveilling, eavesdropping and recording and disseminating images of the Plaintiff and her relatives nationally and internationally intimate body parts, dressing and disrobing and or engaging in private familial activities which is also referred to as revenge porn and are forever enjoined from intercepting and disseminating all and any of the Plaintiff and her relatives and associates nationally and internationally oral, wire, wireless, electronic communications.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever barred and enjoined from being within 1000 yards of the Plaintiff's and her relatives and associates nationally and internationally.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever barred and enjoined from Stalking Plaintiff and her relatives and their associates interstate, internationally and, are forever enjoined and barred from criminally harassing, committing any and all forms of violence against the Plaintiff and her relatives nationally and internationally.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever barred and enjoined from burglarizing, interfering with the Plaintiff's and her relatives mail and medical service, obstructing justice, criminally trespassing and trespassing of any sort upon the Plaintiff and her relatives nationally and internationally.

THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED THAT they are forever barred and enjoined from destroying, damaging, stealing the personal and private property belonging to the Plaintiff and her relatives nationally and internationally.

**THE DEFENDANTS, THEIR PREDECESSORS, SUCCESSORS AND THEIR ACCOMPLICES / CONSPIRATORS WERE NOTIFIED AND ORDERED** THAT they are forever barred and enjoined from all acts of discrimination and unfair employment practices against the Plaintiff and her relatives and are further enjoined from soliciting others into committing crimes against the Plaintiff and her relatives nationally and internationally indefinitely.

**This Indefinite Restraining Order is effective immediately** and is warranted to prevent a continuing and substantial injury to Plaintiff and her relatives nationally pursuant to Title 18 U.S.C 2521.

This Indefinite Restraining Order is necessary to prevent the Defendants and their accomplices / conspirators from knowingly and continuing to engage in harmful conduct causing bodily injury to Plaintiff and her relatives nationally and internationally and from damaging their property or threatening to do, with the intentions of retaliating against them for giving testimonies in an official proceeding via a record document or any other means. This Indefinite Interstate Restraining Order and Injunction is in effect to prevent the further commissions of Federal and State Crimes against the Plaintiff and her relatives interstate, and it is to enjoin the existing crimes committed against them by the Defendants and their accomplices / conspirators in this matter.

**This Indefinite Interstate Restraining Order is relevant to Title 18 U.S.C 2266 (5)(A) which provides: "any injunction, restraining order, or any other order issued by a civil or criminal court for the purpose of preventing violent or threatening acts or harassment against, sexual violence, or contact or communication with or physical proximity to, another person, including any temporary or final order issued by a civil or criminal court whether obtained by filing an independent action or as a pendente lite order in another proceeding so long as any civil or criminal order was issued in response to a complaint , petition, or motion filed by or on behalf of a person seeking protection: and (B) any support, child custody or visitation provisions, orders, remedies or relief issued as part of a protection order, restraining order or injunction pursuant to State, tribal, territorial, or local law authorizing the issuance of protection orders, restraining orders, or injunctions for the protection of victims of domestic violence, sexual assault, dating violence or stalking."**

*Furthermore, the* Plaintiff who bought this action against the Defendants is a stalking victim / crime victim at the behest of the Defendants and their accomplices / conspirators interstate as well as her relatives nationally and internationally.

**"Victim" means the individual harmed as a result of a commission of a crime under this chapter including, in the case of a victim who is under 18 years of age, incompetent, incapacitated, or decreased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, but in no event shall the defendant be named as such representative or guardian."** Pursuant to Title 18 U.S.C 2264 (4)( c).

Therefore this Notice and Order issued is necessary enjoin the Deprivation of the Plaintiff's and her relatives rights interstate, to prevent irreparable harm and to stop the

continuation of multiple crimes against the Plaintiff and her relatives nationally and internationally.

THIS NOTICE AND ORDER PREVENTS THE DEFENDANTS AND THEIR ACCOMPLICES / CONSPIRATORS FROM CONTINUING THEIR CRIMINAL COURSE OF CONDUCT AGAINST THE PLAINTIFF AND HER RELATIVES NATIONALLY AND INTERNATIONALLY, IT DOES NOT PREVENT THE DEFENDANTS FROM PERFORMING THEIR LAWFUL STATUTORY DUTIES.

NOTICE TO DEFENDANTS: YOUR FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO SUPREME COURT PROSECUTION AND PENALTIES FOR CONTEMPT OF COURT. IF YOU FAIL TO APPEAR IN COURT WHEN YOU ARE REQUIRED TO DO SO, THIS ORDER MAY BE EXTENDED IN YOUR ABSENCE AND THEN CONTINUES IN EFFECT UNTIL A NEW DATE SET BY THE COURT.

THIS ORDER OF PROTECTION / RESTRAINING ORDER WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS ISSUED. THIS ORDER OF PROTECTION / RESTRAINING ORDER CAN ONLY BE MODIFIED OR TERMINATED BY THE INJURED PARTY AND COURT. THE PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS ORDER.

PLEASE TAKE FURTHER NOTICE  THAT THE PENALTIES FOR VIOLATING THIS NOTICE AND ORDER IS PUNISHABLE BY TITLE 18 U.S.C 2262 AS WELL AS OTHER FEDERAL AND STATE LAWS

TITLE 18 U.S.C 2262
A person who travels in interstate or foreign commerce, or enters or leaves Indian country or is present within the special maritime and territorial jurisdiction of the United States, with the intent to engage in conduct that violates the portion of a protection order that prohibits or provides protection against violence, threats, or harassment against, contact or communication with, or physical proximity to, another person or the pet, service animal, emotional support animal, or horse of that person, or that would violate such a portion of a protection order in the jurisdiction in which the order was issued, and subsequently engages in such conduct, shall be punished as provided in subsection (b) which provides A person who violates this section shall be fined under this title, imprisoned— (1) for life or any term of years, if death of the victim results;
(2) for not more than 20 years if permanent disfigurement or life threatening bodily injury to the victim results;
(3) for not more than 10 years, if serious bodily injury to the victim results or if the offender uses a dangerous weapon during the offense;

**(4)** as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison); and

**(5)** for not more than 5 years, in any other case, including any case in which the offense is committed against a pet, service animal, emotional support animal, or horse, or both fined and imprisoned.

**Federal, State, and International Legal Remedies:**

The Defendants shall be liable for any and all legal fees, costs, and expenses incurred by the Plaintiff as a result of these ongoing crimes unlawful activities committed against the Plaintiff and her relatives interstate. The Plaintiff is further entitled to relief under the First Amendment in the United States Constitution, Title 42 U.S.C 2000e-5(e)(3); Civil Rights Act of 1991 codified as Title 42 U.S.C 3553; American Disabilities Act of 1990 section 501 codified as 42 U.S.C Sec. 12117; Title 42 U.S.C 2000e-4; Title 42 U.S.C 2000e-5; Title 42 U.S.C 2000e-6; Title 42 U.S.C 2000e-8. Title 42 U.S.C 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

The Victims Rights and Restitution Act of 1990 codified as 42 U.S.C 10607 also provides relief for the Plaintiff who is a crime victim and the Aggrieved and Injured Party is entitled to relief pursuant to Title 18 U.S.C 1595 (a), (b)(1),(b)(2),(c ) (1), (c )(2); as well as Title 42 U.S.C 2000ff-6 which provides power and procedures and remedies in sections 705, 706, 707, 709, 710, and 711 of Title 42 U.S.C 2000e-4 – Title 42 U.S.C 2000e-6 and Title 42 U.S.C 2000e-8 - Title 42 U.S.C 2000e-10 to the person alleging the violation of title VII of that Act codified as Title 42 U.S.C 2000e shall be the powers procedures and remedies this chapter provided to the person alleging an unlawful employment practice in violation of this chapter.  Amendments to Title VII in 1972 and 1991extended protection to public sector employees and authorizes awards of both compensatory and punitive damages.  Congress and the Courts have extended the prohibition against sex discrimination to include prohibitions against sexual harassment.

Title 29 U.S.C 1132 (a)(1); (B); (2); (3);(4);(5);provides that "a civil action may be brought by a participant or beneficiary for the relief provided for in subsection (c) of the section, or to recover benefits due to him under this terms of his plan, to enforce his rights under the terms of the plan, or to clarify his right s to future benefits under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or  (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title."

"Article V, § 7 of the New York Constitution provides protection as 'a contractual relationship' the benefits of membership in a public pension or retirement system against diminishment and impairment. The provision 'fix[es] the rights of the employees at the time of commencement of membership in [a pension or retirement] system, rather than as previously at retirement.*" Ballentine v Koch (89 NY2d 51, 56 [1996]).* As the Court of Appeals stated in (*Matter of Guzman v New York City Employees' Retirement Sys., 45 NY2d 186, 190-191,* citing Birnbaum v New York State Teachers Retirement Sys., 5 NY2d 1, 9), and thus prohibits unilateral action by either the employer or the Legislature that impairs or diminishes the rights established by the employee's membership (*Matter of Village of Fairport v Newman, 90 AD2d 293, 295, as well as* State Laws including the Alabama Criminal Laws, Georgia Criminal Laws, Texas Criminal Laws, Tennessee Criminal Laws and International Human Rights Frameworks.

The Court refers the matter for criminal prosecution based on the evidence retrieved and presented regarding violations of federal criminal statutes and international law, including Terrorism, Interstate Stalking, Genocide; Hate Crimes; Conspiracy; Premeditated Murders, Fraud, Theft.

The Plaintiff shall be provided with law enforcement protection and resources to ensure that these violations permanently cease and that the Plaintiff and her relatives interstate are kept safe from further harm.

## CONCLUSION

The Defendants have failed to appear and defend against these serious claims, and the Court finds that the Plaintiff is entitled to relief on all counts. This Judgment shall be effective immediately and enforced across all relevant jurisdictions. The Plaintiff is awarded all remedies as set forth above, including damages in the sum of $8,000,000,000.00, Eight Billion Dollars 00/100, and Indefinite Interstate Injunctive Relief, and the issuance of a Permanent Interstate Restraining Order.

SO ORDERED.

DATED: March 24, 2026
　　　　　New York, New York

_____
UNITED STATES DISTRICT JUDGE

26-CV-914

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

## CERTIFICATE OF SERVICE
_____

The Plaintiff affirms under the penalty of perjury that the Attorney of Record for the all of the above Defendants, Kayla Coles Esq. c/o The City of New York Law Department / Corporation Counsel located 100 Church Street, New York, New York 10007 was served the Plaintiff's Demand for the Satisfaction of Judgment on March 12, 2026 via Certified Mail and email at Kcoles@law.nyc.gov and ServiceECF@law.nyc.gov

Date: March 12, 2026                    *Vicky Ware Bey*

_____

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]



**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

New York, NY 10007

Certified Mail Fee    $5.30

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)         $0.00
☐ Return Receipt (electronic)       $0.00
☐ Certified Mail Restricted Delivery $0.00
☐ Adult Signature Required          $0.00
☐ Adult Signature Restricted Delivery $

Postage    $0.78

Total Postage and Fees    $6.08

The City of New York Law Department
Kayla Coles Esq  100 Church Street
New York, New York 10007

PS Form 3800, January 2023    See Reverse for instructions

JAMAICA, NY 11434 18
MAR 12 2026
ROCHDALE VILLAGE STATION
03/12/2026

9589 0710 5270 1576 2526 16

**UNITED STATES POSTAL SERVICE.**

ROCHDALE VILLAGE
165100 BAISLEY BLVD
JAMAICA, NY 11434-9997
www.usps.com

03/12/2026                              11:31 AM

TRACKING NUMBERS
9589 0710 5270 1576 2526 16

TRACK STATUS OF ITEMS WITH THIS CODE
(UP TO 25 ITEMS)

TRACK STATUS BY TEXT MESSAGE
Send tracking number to 28777 (2USPS)
Standard message and data rates may apply

TRACK STATUS ONLINE
Visit https://www.usps.com/tracking
Text and e-mail alerts available

PURCHASE DETAILS

Product              Qty  Unit    Price
                          Price

First-Class Mail®     1          $0.78
Letter
    New York, NY 10007
    Weight: 0 lb 0.50 oz
    Estimated Delivery Date
    Sat 03/14/2026
Certified Mail®                  $5.30
    Tracking #:
    9589 0710 5270 1576 2526 16

Total                            $6.08

Grand Total:                     $6.08

Cash                            $10.00
Change                          -$3.92

TO REPORT AN ISSUE
Visit https://emailus.usps.com

All hazardous labels/markings on reused
boxes MUST be completely
removed/obliterated if they no longer
match the contents.

PREVIEW YOUR MAIL AND PACKAGES
Sign up for FREE at
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Customer Service
1-800-ASK-USPS
(1-800-275-8777)

Agents do not have any additional
information other than what is provided on
USPS.com.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
Or scan this code with your mobile device.

**Vicky Ware Bey**
**168-42 127th Avenue, #7A**
**Jamaica Territory, New York Republic [11434]**
**c21res@aol.com * 347-869-8529**

March 12, 2026

**Via Certified Mail # 9589 0710 5270 1576 2556 16 & Email**

**THE CITY OF NEW YORK et al.**
100 Church Street
New York, New York 10007
Attention: Kayla Coles Esq., Attorney of Record for the Defendants
            c/o The City of New York Law Department / Corporation Counsel

**Re: Formal Demand for Satisfaction of Federal Court Judgment**
     Case: Vicky Ware Bey v. The City of New York et al., Case 26-CV-914
     United States District Court for the Southern District of New York

Dear Ms. Kayla Coles Esq., Attorney of Record for the Defendants:

I am Vicky Ware Bey the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured party in the above-captioned matter and the judgment creditor.

On March 10, 2026, the United States District Court for the Southern District of New York entered judgment against you, the Defendants (Docket #37) in the sum of $8,000,000,000.00, Eight Billion Dollars, plus post-judgment interest accruing under 28 U.S.C. § 1961, and any costs allowed by law with An Indefinite Interstate Restraining Order which was also approved by the United States District Court for the Southern District of New York in which you are, and have been in violation of this Indefinite Interstate Restraining Order as of March 10, 2026.

As of the date of this letter March 12, 2026, the approved judgment remains unpaid. This letter constitutes a formal demand for immediate payment of 10,000,000.00, Ten Million Dollars and the total amount due within seven day in the amount of $7,990,000,000.00 Seven Billion Nine Hundred Ninety Million Dollars within seven days, in which accrued post-judgment interest will not apply during this seven day period through in which the total sum of $8,000,000,000.00, Eight Billion Dollars is due.

Pursuant to Federal Rule of Civil Procedure 69(a), a money judgment entered by a federal court is enforceable through execution and other proceedings consistent with the law of the state in which the

court sits. Accordingly, enforcement remedies under New York CPLR Article 52 are available and will be pursued if payment is not received promptly. These remedies may include, without limitation:

- Bank account levies and restraints

- Wage garnishment

- Property liens and seizures

- Turnover proceedings and post-judgment discovery

Demand is hereby made that you remit the immediate payment of $10,000,000.00, Ten Million Dollars, via direct deposit, and then the remaining sum of $7,990,000,000.00, Seven Billion Nine Hundred Ninety Million Dollars within seven (7) calendar days from the date of this letter, in which interest will not accrue during this seven day period. Payment for the remaining balance after the immediate payment of $10,000,000.00, Ten Million Dollars should be made via a Cashiers Check.

Please be advised that failure to comply with this demand will result in immediate initiation of all available enforcement actions, without further notice, which may result in additional costs, interest, and legal fees being added to your obligation.

This letter is sent without prejudice to any rights or remedies available to the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and the Aggrieved and Injured party Vicky Ware Bey, who is the Judgment Creditor, all of which are expressly reserved.

Your prompt attention to this matter will prevent unnecessary escalation and additional legal consequences.

Date: March 12, 2026                                      Sincerely,

*Vicky Ware Bey*

_____

Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

cc:      United States District Court For The Southern District Of New York

# ABSTRACT OF JUDGMENT

Re: Vicky Ware Bey v. The City of New York et al

| Name(s) and Address(es) of Parties against whom Judgment(s) have been obtained | Name(s) and Address(es) of Parties in whose favor Judgment(s) have been obtained |
|---|---|
| Eric Adams, Mayor The City of New York Lynelle Maginley · Liddie Commissioner For New York City Department Of Corrections, New York City Department Of Corrections, Melanie Whinnery, Executive Director For New York City Employee Retirement System , New York City Employee Retirement System, John Doe 1-10,000, Jane Doe 1-10,000<br><br>c/o Attorney of Record for the Defendants: Muriel Goode Trufant City of New York Law Department / Corporation Counsel 100 Church Street New York, New York 10007 | Vicky Ware Bey, In Proper Persona Vicky Ware, Ex Relatione All Rights Reserved 168-42 127 Avenue, # 7A Jamaica Territory, New York Republic [11434] |

| Amount of Judgment(s) | Name(s) and Address(es) of Attorney(s) | Entry Date of Judgment |
|---|---|---|
| $8.000,000,000.00 | Vicky Ware Bey, In Proper Persona Plaintiff – Appellant (non Attorney) Vicky Ware, Ex Relatione All Rights Reserved 168-42 127th Avenue, #7A Jamaica Territory, New York Republic [11434] | 03/24/2026 |

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

I CERTIFY that the foregoing is a correct Abstract of the Judgment

_____

BY CHIEF CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

 Vicky Ware Bey, In Propria Persona, Sui Juris

John Doe 1-1000, Jane Doe 1-1000

Plaintiff / Petitioner / Claimant / Crime
Victim / Aggrieved And Injured Party

VS

Eric Adams, Mayor
CITY OF NEW YORK

Lynelle Maginley -Liddie Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

Melanie Whinnery Executive Director and her Successors
NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM
NYCERS

JOHN DOE 1-10,000, JANE DOE 1-10,000

DEFENDANT(S)

_____

REQUEST FOR BACK
PAY AND UNPAID
WAGES AND PENSION
BENEFITS, AND SPECIAL
ASSIGNMENT PAY

DOCKET # 26-CV-914

Honorable Dale E. Ho

Vicky Ware Bey, the Plaintiff / Petitioner / Claimant / Complainant / Crime Victim and

the Aggrieved and Injured Party affirms under the penalty of perjury that she is

personally knowledgeable of the facts and circumstances involved in this matter, and

respectfully files this Affirmation / Request for Back Pay and Unpaid Wages and Pension

Benefits.

The Plaintiff's / Petitioner's / Claimant's / Crime Victim's / Aggrieved and Injured Party's

average salary was $95,701.88 which equates to $3,987.53 montly.  The Plaintiff initially

received $2,868.00 which was impaired and diminished by $1,119.53 initially at which

time she personally appeared at NYCERS notifying them that her pension was impaired and diminished at which time the Defendants made a fraudulent misrepresentation stating that the Plaintiff would recieve a partial pension until its correctly adjusted. The Plaintiff waited another 30 days expecting her ordinary pension to be correctly adjusted and it wasn't, she appeared at NYCERS again, and the same fraudulent misrepresentation was made to her again. The Plaintiff received a letter stating that she did not file any pension options and that her pension would permanently discontinued unless she files an option. The Plaintiff had already filed pension options in advance, and she refiled it again for 100% joint survivorship her ordinary pension was impaired and diminihsed again by and additonal $50.00, the Plaintiff called NYCERS and was told that it was a fee for the 100% joint survivorship option which is another fraudulent misreprestation which further dimiishes her ordinary pension which was unbeknownst to the Plaintiff at that time. Another thirty days passed and the Plaintiffs ordinary pension still had not been correctly adjusted, at which time the Plaintiff personally spoke with NYCERS Executive Director, Melanie Whinnery about her ordinary pension being impaired and diminished and about matters concerning her performance of duty disability pension benefits which she eligble for according to RSSL Section 14, 507-c and other laws which she had already applied for, in which the Plaintiff was medically separated from employment under Civil Service Law 73 for the same occupational injuries she sustained during the performance of her duties while interacting with an inmate upon responding to alarms for inmate distrubances which is the direct and proximate casuse of her permanent physical disabilities. The Defendants failed to correct the Plaintiff's impaired and diminished ordinary pension benefits which the

Defendants now owes the Plaintif $107,596.76 in back payments in ordinary pension benefits and $95,000.00 in terminal benefits that were never paid to the Plaintiff. The Plaintiff did not receive a disability pension because the Defendants arbitrarily and capriciously denied it in error of law at which time the Plaintiff followed up with NYCERS Executive Director, Melanie Whinnery in persona and with online inquires and letters concerning these matters which were ignored and still unresolved. Based upon the Plaintiff's average salary she is elgible and entitled to recieve $5,987.00 per month in disability pension benefits from NYCERS based upon the occupational injuries she sustained during the performance of her duties while interacting with an inmate which the direct and proximate cause of her physical disabilities.

The Plaintiff was a tenured employee who was employed by the City of New York / New York City Department of Corrections who was constructively and medically discharged from employment in retaliaton for objecting to being sexually harassed by another employee and for the occupational injuries she sustained during the performance of her duties while interacting with an inmate which is the direct and proximate cause of her permenant physical disabilities. The Plaintiff was deprived of a year and half salary in the amount of $210,000.00 which includes projected overtime, in addition to being wrongfully denied and deprived of speical assignment pay / hazard pay while she was assiged to and working in the Central Punitive Segregation Unit "CPSU" which is an additional 12% the Defendants did not pay her and owes her which shall now be added into her salary. The Central Punitive Segregation Unit houses the most violent and assaultive inmates and is one of the most hazardous places to work within New York City Department of Corrections because of the increased propensity for violence and assaults

on staff as well as the increased risk of employees contracting infections diseases while performing their duties because they are constantly exposed to bodily fluids which carries various infectious diseases bodily fluids such as blood, urine, feces, saliva thrown on employee during the performance of their duties in which the Defendants are required to maintain documents of all employees who encountered having bodily fluids thrown on their person during the performance of their duties for 50 years because these hazards alone could result in employees being infected with infectious diseases during the course of thier employment resulting in life long injuries.  All employees which includes the Plaintiff who have inmate contact while working in C.P.S.U are subjected to these hazards daily, this is why special assignment pay / hazard pay added to the salaries of employees who have inmate contact and who are assigned to and are working in the Central Punitive Segregation Unit, which the Plaintiff was wrongfully denied.  The Plaintiff was assigned to and working in the Central Punitive Segragation Unit and was elgible for and entitled to receive special assignment pay / hazard pay while employed, which is an additional 12% that should be added into her salary, which increases her average salary from $95,701.88 to $107,186.10 making her ordinary pension $53,593.05 anually,  and $4,466.08  monthly and increasing her disability pension which is ¾ of her average salary from $71,776.41, to  $80,389.57 annually, and  $6,699.13 Monthly which she moves the court to issue an order directing the Defendants to immediatly correct her monthly pension benefits and giving her back pay for a year and a half of lost wages, paying her the difference that was withheld from her the whole time her ordinary pension benefits were diminished and impaired in addition to paying $6,699.13 monthly. in disability pension benefits if the attached Proposed Order is not granted or signed by a

Judge.   The Plaintiff moves the court to order the Defendants to  pay the Plaintiff a performance of duty disabiity pension which now equates to $6,699.13 monthly from July 2018 to the present month March 2026 in the sum of $205,443.36 in addition to the disability pension the Plaintiff did not receive from January 2017 to July 2018 in the sum of $120,584.34, and $210,000.00 in back pay for lost wages for a year and half. The Defendants owe the Plaintiff an additonal $478.55 in pension benefits which is for the special assignment / hazard pay the Plaintiff was wrongfully denied which is an additonal 12% that is to be added to her average highest salary which is an additonal $478.55 per month to be added to her pension benefits and back pay from July 2018 to the present Month March 2026 in the sum of $44,026.60.  The Defendants failed to pay the Plaintiff the variable supplement of  $78,000.00 over the course of nine years in which the **Defendants owe the Plaintiff  $860,651.06 in back pay, for the payment of impaired and disminished ordinary pension benefits, unpaid performance of duty disablity pension benefits, unpaid terminal pay, unpaid variable supplements, and unpaid Special Assignment / Hazard Pay, all which excludes the Cost of Living Adjustment which she did not receive either.**

**This excludes other damages the Plaintiff claims for injures the Defendants and their criminal accomplices whom they conspire with and act in concert with interstate have intentionally inflicted upon her and her relatives interstate during this 11 year and three month ordeal which has not ceased and involves Conspiracy, Terrorism, Interstate Stalking / Coordinated Stalking resulting multiple wrongful deaths that were premeditated murders and hate crimes, in additon to the Defendants and their accomplices continue to stalk, and forcibly exploit the Plaintiff and her relatives 24/7 in**

which they criminal trespass upon the Plaintiff's and her relatives houses and effects where they have a reasonable expectation of privacy, while unlawfully installing surreptitious eavesdropping and surveillance equipment monitoring, recording and publicly disseminating unlawful surveillance images of them over the world wide web and closed circuit tv without their knowledge and without their implied and expressed consent, in addition to the defendants unlawfully intercepting and publicly disseminating all of the Plaintiff and her relatives oral, wire, wireless electronic communications in addition to other egregious inhumane abuses in which the relations back doctrine applies.

Upon the Plaintiff filing her Complaint she demanded a Trial by Jury.  February 6, 2026 the Plaintiff requested a Preliminary Conference for March 6, 2026, upon the Plaintiff appearing for the Preliminary Conference and finding out that this a Preliminary Conference was not scheduled she filed a Notice of Special Appearance and the Proposed Case Management Plan and Scheduling Order she prepared for this Preliminary Conference she requested.

March 17, 2026, the Plaintiff requested that this unscheduled Preliminary Conference be rescheduled for March 24, 2026 as a Preliminary / Settlement Conference.

Please take notice that the Plaintiff is not receiving all of her mail, and as of March 17, 2026 her incoming email has been blocked, and she does not have access to the courts CM /ECF System to know the status of her case or to veiw any Orders filed or changes in her case status. The Plaintiff requested access to the courts CM / ECF System.

Date: March 23, 2026

*Vicky Ware Bey*

_____
Vicky Ware Bey, In Propria Persona
Vicky Ware, Ex Relational
All Rights Reserved, Without Prejudice
168-42 127th Avenue, #7A
Jamaica Territory, New York Republic
[11434]

CC:     Attorney of Record for the Defendants
        Kayla Coles Esq
        c/o The City of New York Law Department / Corporation Counsel
        100 Church Street
        New York, New York 10007
        Kcoles@law.nyc.gov and via S.D.N.Y CM / ECF



**NEW YORK CITY DEPARTMENT OF CORRECTION**
Joseph Ponte, Commissioner

Nadene M. Pinnock, Deputy Commissioner
Claudette Wynter, Assistant Commissioner
Human Resources
75-20 Astoria Blvd., Suite 320
East Elmhurst, NY 11370
718 • 546 • 3100
Fax 718 • 278 • 6064

January 19, 2017

Vicky Ware
80 Patton Avenue
Wyandanch, N.Y 11798

TITLE: Correction Officer: EmplID: ███████

Re: Notice of Medical Separation/Termination Under the Civil Service Law Section 73

Dear Officer Ware:

On November 22, 2016, a letter was sent to you by first class mail requesting that you resolve your employment status with the Agency by October 1, 2016. As of the date of this letter, we have not received a response from you, therefore, your employment status with this Agency is terminated effective **January 22, 2017,** in accordance with the provisions of Section 73 of the Civil Service Law.

Pursuant to Section 73 of the Civil Service Law, you may within one year after the termination of your medical disability, to make an application to the **Office of the Director of Medical Appeals and Reinstatements, Corinne Stahl, at the New York City Department of Citywide Administrative Services, One Centre Street, New York, New York 10007;** for the purpose of determining whether you are mentally and physically fit to perform the duties of your position. Your application for reinstatement **MUST** include a copy of this letter along with a letter and report from your physician, dated within 2 months of the date of your application for reinstatement, certifying that you are fit to perform the duties of your position. Forms can be acquired on-line at: http://nyc.gov/html/dcas/downloads/pdf/misc/appl_reinstatment.pdf

If after a city medical examination, you are found physically and mentally fit to perform all essential tasks and duties required for your position, you may be reinstated to your former position, if vacant, or to a vacancy in a similar position in a lower grade within the same occupational field. If no appropriate vacancies exist, or if you are reinstated to a position in a lower grade, your name will be placed on a preferred list for your former position and you will be eligible for reinstatement to such former position. The eligibility period for reinstatement is four (4 years).

Sincerely,

Dahlia Grant, Director, Employee Services
DRG:sc

c: Helena Smith, Deputy Warden In Command, HMD
Personnel file

FILED: KINGS COUNTY CLERK 02/08/2020 00:08 PM

NYSCEF DOC. NO. 212

INDEX NO. 518540/2019

RECEIVED NYSCEF: 02/08/2020

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 252 of 353

FILED: KINGS COUNTY CLERK 10/18/2019 01:38 PM

NYSCEF DOC. NO. 188

a120

RECEIVED NYSCEF: 10/18/2019



**NYCERS**
NYC Employees' Retirement System

March 23, 2018

Vicky Ware
80 Patton Avenue
Wyandanch, NY 11798

**Regular and Certified Mail Return Receipt Requested**

M# ■■■■

Dear Vicky Ware:

This office is in receipt of an application for Disability Retirement pursuant to §507-a and §507-c of Article 14 of the Retirement and Social Security Law (RSSL) filed on **February 13, 2017.**

A review of the records show that you became a member of the New York City Employees' Retirement System (NYCERS) on **July 6, 1998** and are a **Tier 3** member covered under the provisions of Article 14 of the RSSL.

Your claim of disability is based on incidents, which occurred **in May of 2010, on May 22, 2013** and **December 13, 2014.**

Please be advised that your employer, the **Department of Correction,** has reported to us that they do not have any records of incidents that occurred in **May of 2010** and **December 13, 2014.**

Therefore, the Medical Board can only consider the incident that occurred on **May 22, 2013** .

If you have any questions, please contact the appropriate personnel at the **Department of Correction** in this regard.

Sincerely,

Medical Unit

cc: E. Husamudeen, COBA
Law Offices of Stuart Salles

Case 1:26-cv-00914-DEH-SN   Document 52   Filed 03/25/26   Page 253 of 353

## NOTICE TO EMPLOYEE:

**Do you have to file?** Refer to the Form 1040 instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).**
You may be able to take the EIC for 2014 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2014 or if income is earned for services provided while you were an inmate at a penal institution. For 2014 income limits and more information, visit www.irs.gov/eitc. Also see Pub. 596, Earned Income Credit. Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you

should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one

employer in 2014 and more than $7,254 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $3,828 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit.
See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

**Instructions for Employee**

**Box 1.** Enter this amount on the Wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 10.** This amount is the total dependent care benefits your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5000 also is included in Box 1. Complete form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $17,500 ($12,000 if you only have SIMPLE plans; $20,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $17,500.
However, if you were at least age 50 in 2014, your employer may have allowed an additional deferral of up to $5,500 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher

for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.
**Note.** If a year follows code D, E, G, AA, BB or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

| | |
|---|---|
| **D)** | Elective deferrals to a Section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement. |
| **E)** | Elective deferrals under a section 403(b) salary reduction agreement. |
| **G)** | Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan. |
| **AA)** | Designated Roth contributions to a section 401(k) plan. |
| **BB)** | Designated Roth contributions under a section 403(b) plan. |
| **DD)** | Cost of employer-sponsored health coverage. The amount reported with code DD is not taxable. |
| **EE)** | Designated Roth contributions under a governmental section 457(b) plan. The amount does not apply to contributions under a tax-exempt organization section 457(b) plan. |

**Box 13.** If the "Retirement Plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub.590, Individual Retirement Arrangements (IRAs).

**Note.** Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help protect your social security benefits, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008     **THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE**

| W-2 WAGE & TAX STATEMENT | A) [redacted] | | DUPLICATE 02/20/2018 72 0001 |
|---|---|---|---|

| B) EMPLOYER IDENTIFICATION NUMBER | 1. WAGES & OTHER COMPENSATION | 2 FEDERAL INCOME TAX WITHHELD |
|---|---|---|
| 13-6400434 | 86,738.16 | 14,848.30 |

| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | 3. SOCIAL SECURITY WAGES | 4 SOCIAL SECURITY TAX WITHHELD |
|---|---|---|
| CITY OF NEW YORK<br>450 WEST 33RD STREET, 4TH FL.<br>NEW YORK, NY 10001 | 89,935.17 | 5,575.98 |
| | 5 MEDICARE WAGES | 6 MEDICARE TAX WITHHELD |
| | 89,935.17 | 1,304.06 |

| D) CONTROL NUMBER | 10 DEPENDENT CARE BENEFITS |
|---|---|

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 | |
|---|---|---|---|
| | | CODE | AMOUNT |
| VICKY WARE<br>80 PATTON AVENUE<br>WYANDANCH NY 11798 | | 12A DD | 7,685.50 |
| | | 12B | |
| | 13 [X] RETIREMENT PLAN | 12C | |
| | | 12D | |
| | | 12E | |
| | | 12F | |

**2014 TAX YEAR     COPY C     EMPLOYEE'S COPY**

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 86,738.16 | 4,896.46 | IRC 414H | 3,197.01 |
| 20A LOCALITY NAME | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 345.33 |
| NYC | | | FRINGE | 619.96 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008     **THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE**

| W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO. [redacted] | DUPLICATE 02/20/2018 72 0001 |
|---|---|---|

| B) EMPLOYER IDENTIFICATION NUMBER | 1. WAGES & OTHER COMPENSATION | 2 FEDERAL INCOME TAX WITHHELD |
|---|---|---|
| 13-6400434 | 86,738.16 | 14,848.30 |

| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | 3. SOCIAL SECURITY WAGES | 4 SOCIAL SECURITY TAX WITHHELD |
|---|---|---|
| CITY OF NEW YORK<br>450 WEST 33RD STREET, 4TH FL.<br>NEW YORK, NY 10001 | 89,935.17 | 5,575.98 |
| | 5 MEDICARE WAGES | 6 MEDICARE TAX WITHHELD |
| | 89,935.17 | 1,304.06 |

| D) CONTROL NUMBER | 10 DEPENDENT CARE BENEFITS |
|---|---|

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 | |
|---|---|---|---|
| | | CODE | AMOUNT |
| VICKY WARE<br>80 PATTON AVENUE<br>WYANDANCH NY 11798 | | 12A DD | 7,685.50 |
| | | 12B | |
| | 13 [X] RETIREMENT PLAN | 12C | |
| | | 12D | |
| | | 12E | |
| | | 12F | |

**2014 TAX YEAR     COPY B     TO BE FILED WITH EMPLOYEE'S FEDERAL TAX RETURN**

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 86,738.16 | 4,896.46 | IRC 414H | 3,197.01 |
| 20A LOCALITY NAME | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 345.33 |
| NYC | | | FRINGE | 619.96 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

| W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO. [redacted] | DUPLICATE 02/20/2018 72 0001 |
|---|---|---|

| B) EMPLOYER IDENTIFICATION NUMBER | 1. WAGES & OTHER COMPENSATION | 2 FEDERAL INCOME TAX WITHHELD |
|---|---|---|
| 13-6400434 | 86,738.16 | 14,848.30 |

| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | 3. SOCIAL SECURITY WAGES | 4 SOCIAL SECURITY TAX WITHHELD |
|---|---|---|
| CITY OF NEW YORK<br>450 WEST 33RD STREET, 4TH FL.<br>NEW YORK, NY 10001 | 89,935.17 | 5,575.98 |
| | 5 MEDICARE WAGES | 6 MEDICARE TAX WITHHELD |
| | 89,935.17 | 1,304.06 |

| D) CONTROL NUMBER | 10 DEPENDENT CARE BENEFITS |
|---|---|

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 | |
|---|---|---|---|
| | | CODE | AMOUNT |
| VICKY WARE<br>80 PATTON AVENUE<br>WYANDANCH NY 11798 | | 12A DD | 7,685.50 |
| | | 12B | |
| | 13 [X] RETIREMENT PLAN | 12C | |
| | | 12D | |
| | | 12E | |
| | | 12F | |

**2014 TAX YEAR     COPY 2     TO BE FILED WITH EMPLOYEE'S STATE, CITY OR LOCAL TAX RETURN**

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 86,738.16 | 4,896.46 | IRC 414H | 3,197.01 |
| 20A LOCALITY NAME | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 345.33 |
| NYC | | | FRINGE | 619.96 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

INDEX NO. 518540/2019

NYSCEF DOC. NO. 262

FILED: KINGS COUNTY CLERK 10/08/2019 02:54 PM

RECEIVED NYSCEF: 10/08/2019

---

**DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008**

**W-2 WAGE & TAX STATEMENT**   DUPLICATE 02/20/2018  72  0001

THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE

| Box | Amount |
|---|---|
| 1 WAGES & OTHER COMPENSATION | 93,784.46 |
| 2 FEDERAL INCOME TAX WITHHELD | 16,664.87 |
| 3 SOCIAL SECURITY WAGES | 97,269.63 |
| 4 SOCIAL SECURITY TAX WITHHELD | 6,030.72 |
| 5 MEDICARE WAGES | 97,269.63 |
| 6 MEDICARE TAX WITHHELD | 1,410.41 |

B) EMPLOYER IDENTIFICATION NUMBER

C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE
CITY OF NEW YORK
450 WEST 33RD STREET, 4TH FL.
NEW YORK, NY 10001

D) CONTROL NUMBER

E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE
VICKY WARE
80 PATTON AVENUE
WYANDANCH NY 11798

12 SEE INSTRUCTIONS FOR BOX 12
12A DD   8,436.44

13 RETIREMENT PLAN [X]

14 OTHER   IRC 414H   3,485.17   IRC 125   372.56

**2015 TAX YEAR**

COPY C — EMPLOYEE'S COPY

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD |
|---|---|---|
| NEW YORK | 93,784.46 | 5,427.49 |
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD |

---

**DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008**

**W-2 WAGE & TAX STATEMENT**   DUPLICATE 02/20/2018  72  0001

THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE

| Box | Amount |
|---|---|
| 1 WAGES & OTHER COMPENSATION | 93,784.46 |
| 2 FEDERAL INCOME TAX WITHHELD | 16,664.87 |
| 3 SOCIAL SECURITY WAGES | 97,269.63 |
| 4 SOCIAL SECURITY TAX WITHHELD | 6,030.72 |
| 5 MEDICARE WAGES | 97,269.63 |
| 6 MEDICARE TAX WITHHELD | 1,410.41 |

C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE
CITY OF NEW YORK
450 WEST 33RD STREET, 4TH FL.
NEW YORK, NY 10001

E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE
VICKY WARE
80 PATTON AVENUE
WYANDANCH NY 11798

12A DD   8,436.44

14 OTHER   IRC 414H   3,485.17   IRC 125   372.56

**2015 TAX YEAR**

COPY 2 — STATE, CITY  OR LOCAL TAX RETURN

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD |
|---|---|---|
| NEW YORK | 93,784.46 | 5,427.49 |
| 20A LOCALITY NAME NYC | | |

---

**DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008**

**W-2 WAGE & TAX STATEMENT**   DUPLICATE 02/20/2018  72  0001

THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE

| Box | Amount |
|---|---|
| 1 WAGES & OTHER COMPENSATION | 93,784.46 |
| 2 FEDERAL INCOME TAX WITHHELD | 16,664.87 |
| 3 SOCIAL SECURITY WAGES | 97,269.63 |
| 4 SOCIAL SECURITY TAX WITHHELD | 6,030.72 |
| 5 MEDICARE WAGES | 97,269.63 |
| 6 MEDICARE TAX WITHHELD | 1,410.41 |

C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE
CITY OF NEW YORK
450 WEST 33RD STREET, 4TH FL.
NEW YORK, NY 10001

E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE
VICKY WARE
80 PATTON AVENUE
WYANDANCH NY 11798

12A DD   8,436.44

14 OTHER   IRC 414H   3,485.17   IRC 125   372.56

**2015 TAX YEAR**

COPY B — TO BE FILED WITH EMPLOYEE'S FEDERAL TAX RETURN

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD |
|---|---|---|
| NEW YORK | 93,784.46 | 5,427.49 |
| 20A LOCALITY NAME NYC | | |

## Instructions for Employee (Form 1040)

Do you have to file? Refer to the Form 1040 Instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

employer in 2016 and more that $7,347 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim the credit for the excess against your federal income tax. If you had more than one railroad employer and more than $4,321.80 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Earned income credit (EIC).** You may be able to take the EIC for 2016 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2016 or if income is earned for services provided while you were an inmate at a penal institution. For 2016 income limits and more information, visit www.irs.gov/eitc. Also see Pub. 596, Earned Income Credit. Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.

**Instructions for Employee**

**Box 1.** Enter this amount on the Wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Note.** If a year follows code D, E, G, AA, BB or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

D) Elective deferrals to a Section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

E) Elective deferrals under a section 403(b) salary reduction agreement.

G) Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 10.** This amount includes the total dependent care benefits your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 also is included in Box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $18,000 ($12,500 if you only have SIMPLE plans; $21,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $18,000.

AA) Designated Roth contributions under a section 401(k) plan.

BB) Designated Roth contributions under a section 403(b) plan.

DD) Cost of employer-sponsored health coverage. The amount reported with code DD is not taxable.

EE) Designated Roth contributions under a governmental section 457(b) plan. The amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Cost of employer-sponsored health coverage** (if such cost is provided by the employer). The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. The amount reported with code DD is not taxable.

**Box 13.** If the "Retirement Plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub.590-A, Contributions to Individual Retirement Arrangements (IRAs).

**Credit for excess taxes.** If you had more than one

However, if you were at least age 50 in 2016, your employer may have allowed an additional deferral of up to $6,000 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher.

**Note.** Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help protect your social security benefits, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE

W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO.

DUPLICATE 02/20/2018 72 0001

| B) EMPLOYER IDENTIFICATION NUMBER | 1 WAGES & OTHER COMPENSATION | 2 FEDERAL INCOME TAX WITHHELD |
|---|---|---|
|  | 96,343.21 | 17,114.54 |

| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | 3 SOCIAL SECURITY WAGES | 4 SOCIAL SECURITY TAX WITHHELD |
|---|---|---|
| CITY OF NEW YORK | 99,900.86 | 6,193.85 |
| 450 WEST 33RD STREET, 4TH FL. | 5 MEDICARE WAGES | 6 MEDICARE TAX WITHHELD |
| NEW YORK, NY 10001 | 99,900.86 | 1,448.56 |
| D) CONTROL NUMBER | | 10 DEPENDENT CARE BENEFITS |

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 |
|---|---|---|

CODE | AMOUNT

VICKY WARE
80 PATTON AVENUE
WYANDANCH NY 11798

| CODE | AMOUNT |
|---|---|
| 12A DD | 8,579.51 |
| 12B |  |
| 12C |  |

13 [X] RETIREMENT PLAN

12D

12E

12F

| 2016 TAX YEAR | COPY C | EMPLOYEE'S COPY |
|---|---|---|

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 96,343.21 | 5,622.12 | IRC 414H | 3,557.65 |
| 20A LOCALITY NAME | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 367.31 |
| NYC | | | FRINGE | 619.96 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE

W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO.

DUPLICATE 02/20/2018 72 0001

| B) EMPLOYER IDENTIFICATION NUMBER | 1 WAGES & OTHER COMPENSATION | 2 FEDERAL INCOME TAX WITHHELD |
|---|---|---|
|  | 96,343.21 | 17,114.54 |

| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | 3 SOCIAL SECURITY WAGES | 4 SOCIAL SECURITY TAX WITHHELD |
|---|---|---|
| CITY OF NEW YORK | 99,900.86 | 6,193.85 |
| 450 WEST 33RD STREET, 4TH FL. | 5 MEDICARE WAGES | 6 MEDICARE TAX WITHHELD |
| NEW YORK, NY 10001 | 99,900.86 | 1,448.56 |
| D) CONTROL NUMBER | | 10 DEPENDENT CARE BENEFITS |

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 |
|---|---|---|

VICKY WARE
80 PATTON AVENUE
WYANDANCH NY 11798

| CODE | AMOUNT |
|---|---|
| 12A DD | 8,579.51 |
| 12B |  |
| 12C |  |

13 [X] RETIREMENT PLAN

12D

12E

12F

| 2016 TAX YEAR | COPY B | TO BE FILED WITH EMPLOYEE'S FEDERAL TAX RETURN |
|---|---|---|

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 96,343.21 | 5,622.12 | IRC 414H | 3,557.65 |
| 20A LOCALITY NAME | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 367.31 |
| NYC | | | FRINGE | 619.96 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO.

DUPLICATE 02/20/2018 72 0001

| B) EMPLOYER IDENTIFICATION NUMBER | 1 WAGES & OTHER COMPENSATION | 2 FEDERAL INCOME TAX WITHHELD |
|---|---|---|
|  | 96,343.21 | 17,114.54 |

| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | 3 SOCIAL SECURITY WAGES | 4 SOCIAL SECURITY TAX WITHHELD |
|---|---|---|
| CITY OF NEW YORK | 99,900.86 | 6,193.85 |
| 450 WEST 33RD STREET, 4TH FL. | 5 MEDICARE WAGES | 6 MEDICARE TAX WITHHELD |
| NEW YORK, NY 10001 | 99,900.86 | 1,448.56 |
| D) CONTROL NUMBER | | 10 DEPENDENT CARE BENEFITS |

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 |
|---|---|---|

VICKY WARE
80 PATTON AVENUE
WYANDANCH NY 11798

| CODE | AMOUNT |
|---|---|
| 12A DD | 8,579.51 |
| 12B |  |
| 12C |  |

13 [X] RETIREMENT PLAN

12D

12E

12F

| 2016 TAX YEAR | COPY 2 | TO BE FILED WITH EMPLOYEE'S STATE, CITY OR LOCAL TAX RETURN |
|---|---|---|

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 96,343.21 | 5,622.12 | IRC 414H | 3,557.65 |
| 20A LOCALITY NAME | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 367.31 |
| NYC | | | FRINGE | 619.96 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

Case 1:20-cv-00914-DEH-SN Document 52 Filed 03/25/26 Page 255 of 353

Vicky Ware
c/o 80 Patton Avenue
Wyandanch Territory, New York Republic [11798]

August 27, 2018

Melanie Whinnery, Executive Director
NEW YORK CITY EMPLOYEE'S RETIREMENT SYSTEM
335 Adams Street, Suite 2300
Brooklyn Territory, New York Republic [11798]
Certified Mail Return Receipt Requested: 7017 2400 0000 9860 0198

RE:   Vicky Ware Pension #⬛⬛⬛⬛⬛,
      Reference / request numbers 1-1-1608671205, and 1-1-1609578038

Dear Ms. Melanie Whinnery, Executive Director:

I am writing to you regarding reference and service request number # 1-1-1608671205 (see attachment) dated August 24, 2018, pertaining to the error N.Y.C.E.R.S made with my pension number. Recently NYCERS made a mistake pertaining to my pension number and confused it with another number. My pension number is 511681, and has been confused with pension number 411346-0, which is not my pension number. Please correct this error as soon as possible.

I am also contacting you regarding my pension benefits under Disability Retirement. March 23, 2018, I received a letter from N.Y.C.E.R.S stating that this office is in receipt of an application for Disability Retirement pursuant to 507-a, and 507-c of Article 14 of the Retirement and Social Security Law (RSSL) filed on February 13, 2017. My claim for disability is based on incidents which occurred in May 2010, May 2013, and December 13, 2014. Please see attached letter from N.Y.C.E.R.S Medical Unit.

I was employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS July 1, 1998 and became a NYCERS member July 6, 1998, and I am a Tier 3 member who is covered under the provisions of Article 14 of the RSSL. I have also sent this inquiry directly to you via NYCERS Email system please locate reference/service request number 1-1-1609578038 (see attachment).

Thank you, for your consideration and attention in this matter, please feel free to contact me at 347-869-8529.

Sincerely,

All Rights Reserved

Vicky Ware
80 Patton Avenue
Wyandanch Territory, New York Republic [11798]

November 6, 2018

Melanie Whinnery, Executive Director
New York City Employee Retirement Systems
335 Adams Street, Suite 2300
Brooklyn Territory, New York Republic [11201]

RE: Disability Retirement, Pension #

Dear Melanie Whinnery:

I am contacting you again in good faith regarding my disability retirement. October 2018, I received a letter from NYCERS requesting an option package, I submitted an option package to NYCERS in person and then resubmitted a copy of the option package to NYCERS via email. I am contacting you again in good faith because I received a letter dated March 2018 from NYCERS Medical Board stating I am covered under Article 14 of the RSSL 507a and 507C . This letter also stated that New York City Department of Corrections claimed they did not have any other records pertaining to some of my other work and inmate related injuries. I have also filed applications for disability retirement prior to February 2017 while I was an active member with a sufficient amount of medical documentation, and I have more that 17 years of active service with New York City Department of Corrections.

February 2017, I filed an application for disability retirement, my employer New York City Department of Corrections did not allow me to return to work because of my physical work and inmate related injuries which resulted in my physical disability in addition to my employer claiming to perceive me as having a mental disability. New York City Department of Corrections never cleared me to return to work based upon my work and inmate related physical injuries that are the proximate cause of my physical disabilities, and the Departments claim of perceiving me as having a mental disability which is occupationally related.

November 2017, I submitted another application for disability retirement provided NYCERS with medical documentation and a medical separation / termination letter

from my employer again which has already  proven my eligibility for disability retirement under Article 14 RSSL 507c.

Recently, I received a letter from NYCERS requesting additional medical documentation, I have already submitted a sufficient amount of medical documentation to NYCERS pertaining to my applications for disability retirement, and as a result of being discriminated against by my employer NEW YORK CITY DEPARTMENT OF CORRECTIONS who constructively forced me out of employment based upon my work and inmate related injuries that caused my disabilities I am enduring an undue hardship because of their unlawful discriminatory actions towards me. I was already deprived of hazard pay while I was working for them and now, I don't have medical insurance because the Department refused to complete the medical change form I sent to them. They refuse to complete it because I didn't have a pension payability receipt. NYCERS sent a letter to me stating my pension payability date, I submitted this letter to the Department and they still refused to complete section J of the health insurance change form. This is causing an another hardship in addition to not receiving full disability retirement benefits I am eligible for.

The regular retirement pension benefits I received from July to the present time have been incorrect. The last three consecutive years I worked for Corrections I earned 99,900.86 ; 97,269.63 and 89,935.17, my average earnings are 95,701.88 per year, which means at this time I should at least be receiving 3,987.53 in regular pension benefits until my disability pension benefits become effective. So far I have been getting 2,868.00 which is 1,119.53 short.

As a Tier 3 Member who sustained work and inmate related physical injuries that resulted in my physical disabilities I am eligible for disability retirement pursuant to Article 14, RSSL 507c.

Sincerely,

Cc:    Thomas P. DiNapoli
OFFICE OF THE NEW YORK STATE COMPTROLLER
110 State Street,
Albany Territory, New York Republic [12236]

Thomas P. DiNapoli
OFFICE OF THE NEW YORK STATE COMPTROLLER
59 Maiden Lane
New York Territory, New York Republic [10038]

From: reply <reply@customerservice.nyc.gov>
    To: C21RES <C21RES@AOL.COM>
Subject: City of New York Auto Acknowledgment Correspondence # 1-1-1690201978
    Date: Mon, Mar 4, 2019 5:25 am

Dear VICKY WARE:

Thank you for contacting the City of New York. Your message has been forwarded to the appropriate agency for review and handling.

For future reference, your service request number is 1-1-1690201978.

Sincerely,

The City of New York

This is an auto-generated system message. Please do not reply to this message. Messages received through this address are not processed.

Thank you.

The information you have provided is as follows:
Form: Customer Comment
Topic: Other
Name: VICKY WARE
Street Address: 80 PATTON AVENUE
City, State Zip: WYANDANCH, NY 11798
Country: United States
Email: C21RES@AOL.COM
Company:
Work Phone:
Message:
Good Morning Ms. Whinnery:

I am contacting you regarding a letter I received dated February 25, 2019,  On or about January 21, 2019
I completed another option package and mailed it to NYCERS
at 30-30 47th Avenue, Long Island City Territory, New York Republic

From: Vicky <c21res@aol.com>
    To: MelanieWhinnery <MelanieWhinnery@nycers.gov>
Subject: Fwd: OPTION SELECTION FORM
    Date: Mon, Mar 4, 2019 5:24 am

-----Original Message-----
From: Vicky <c21res@aol.com>
To: melaniewhinnery <melaniewhinnery@nycers.gov>
Sent: Mon, Mar 4, 2019 5:15 am
Subject: OPTION SELECTION FORM

Good Morning Ms. Whinnery:

I am contacting you regarding a letter I received dated February 25, 2019, On or about January 21, 2019 I completed another option package and mailed it to NYCERS
at 30-30 47th Avenue, Long Island City Territory, New York Republic [11101] along with my beneficiaries birth certificate.

Please contact them to see what happened to it or confirm if they have it. The letter I received dated February 25, 2019 did not have the form I needed to resubmit to you.
If you still require these forms again with my beneficiaries birth certificate. Please email it to me and I will return it back to you as soon as possible.

Please feel free to contact me at 347-869-8529. If you would like I could email the copy of the letter that was sent to me (Pension # 511681)

Sincerely,
Vicky Ware Bey
All Rights Reserved, UCC 1-207, 1-308, 1-103

a115



NYCERS USE ONLY          F610

REC'D NYCERS
MEDICAL

2017 FEB 13  PM 12: 43

**Receipt For Disability Retirement Application**

Please retain this document for future reference.

Name
**Vicky Ware**

Member Number
███████

Title
**Correction Officer Dept of Correction**

This will acknowledge receipt of the Disability Retirement Application filed with the New York City Employees' Retirement System on

(MM/DD/YYYY)
**2/13/17**

**Processing of the Disability Retirement Application**

The NYCERS Medical Division will determine your eligibility. You will be notified in writing if you are not eligible. If eligible, in order for your application to be processed, you must provide sufficient medical evidence to support the claim for Disability Retirement.

Upon receipt of the required medical evidence, the Medical Division will schedule you to appear before the NYCERS Medical Board for an interview and/or examination.

If the Medical Board recommends approval of the application, you will be entitled to receive an advance disability payment until your case is finalized.

If the Medical Board recommends denial of the application, we will provide you with a copy of the Medical Board report which will state the reasons for the denial. You will also be notified of the appeal process if it is applicable in your case.

Issued by:     NYCERS Medical Division
340 Jay Street
Mezzanine Level
Brooklyn, NY 11201

R12/16    WALK-IN    340 Jay Street                     Talk 1 to 1 to NYCERS            MAIL ONLY    30-33 47th Avenue 10th Floor
CENTER    Brooklyn, NY 11201                                                            SCANDE-OFF    30-33 47th Avenue 10th Floor
(347) 643-3000                                                                          Long Island City, NY 11101
www.nycers.org                                                                          Page 1 of 1

**NYCERS** Mail completed form to:
30-30 47th Avenue, 10th Fl
Long Island City, NY 11101

*INR-ISSUED*

NYCERS USE ONLY    F603

RCC'D NYCERS
MEDICAL
2017 FEB 13 PM 12: 42

**Application for Disability Retirement**
**Tier 3 Uniformed Correction Force Only**

Member Number: [redacted]    Last 3 Digits of SSN: [redacted]    Home Phone Number: (347) [redacted]    Date of Birth [MM/DD/YYYY]: [redacted]

**Select a Benefit:**
Be sure to read the requirements on the Terms page to determine which you qualify under. All applicants will be processed as indicated. I am applying for (Mark all that apply):

[✓] 507-a  Disability Retirement    [ ] 1-507-c  Performance of Duty Disability Retirement

[ ] 207-a Heart Bill    [ ] 506 Ordinary Disability    [ ] 507 Accidental Disability

[ ] Disability Retirement under the World Trade Center Law (see WTC Fact Sheet for more information)

This application is for Tier 3 Correction members who wish to apply for Disability Retirement. In order for NYCERS to process this application, this form must be filled out in its entirety and notarized before submitting it for review. Please be sure you read and understand the requirements for filing for Disability Retirement found on the terms pages. In addition to this form, you must also submit (to NYCERS Medical Board):
- Applicant's Report of Personal Disability (form 605)    General Authorization (form 608)
- Physician's Report of Disability (form 606)    NYCERS Questionnaire (form 609)

**NOTE:** If the address you provide on this form is different from your address in our system, the new address will become your official address in our records. Should you have any questions, please contact our Medical Unit at 347-643-3000.

First Name: Vicky    M.I.    Last Name: Winge

Address: 80 Patton Avenue    Apt. Number:

City: Wyandanch    State: New York    Zip Code: 11798

Agency: NYC Department of Correction/[...] Officer    Title:

**Select a Temporary Option:**
This section allows you to select a temporary option, which determines what will happen to your benefit if you should die before the date of your first full payment. If you select either the Ten Year Certain or 100% Joint-And-Survivor option, you must select a beneficiary on the next page. If you should die before selecting an option, or if you fail to name a beneficiary, NO DEATH BENEFIT WILL BE PAYABLE FROM NYCERS. If you wish to select a different option, please contact NYCERS to get detailed information. Please choose only one of the following:

[ ] **Ten Year Certain** - Under this option, if you die within ten years of your retirement, the reduced monthly payment benefit will be paid to your surviving primary beneficiary for the unexpired balance of the ten-year period. If the designated primary beneficiary predeceases you, the balance of the payments amounts to your contingent beneficiary. If none exists, it is paid in a lump-sum to your estate. Should a primary beneficiary die after receiving payments, the balance will be paid in a lump-sum to your contingent beneficiary. If none exists, the lump-sum balance is paid to the estate of the primary beneficiary. You may nominate both a primary and a contingent beneficiary under this option.

[ ] **100% Joint-and-Survivor** - This option ensures you and your designated beneficiary a reduced benefit for lifetime. Should you die, your designated beneficiary will receive a percentage of your benefit. Because this option guarantees two specific people an income for life, the life expectancies of the retiree as well as the beneficiary are taken into consideration. Therefore, once you designate a beneficiary and the option is in force, you cannot change your beneficiary designation, even if he/she precedes you in death. You may only nominate a primary beneficiary under this option.

[✓] **The Maximum Retirement Allowance** - This option provides the greatest benefit payment to you while you are retired, for as long as you live. However, under the Maximum Retirement Allowance, no further payments will be made after your death.

*Sign this form and have it notarized. Page 2*

R12/16    WALK-IN    MAIL ONLY    Page 1 of 3
CENTER    NO DROP-OFF



**NYCERS**
Mail completed form to:
30-30 47th Avenue, (5th fl)
Long Island City, NY 11101

F603

NYCERS USE ONLY

REC'D NYCERS
MEDICAL
2017 FEB 13  PM 12:42

Member Number _____    Last 4 Digits of SSN _____

I, the undersigned, request to make application for disability retirement.

**Signature of Member** _____  **Date** 2/13/2017

This form must be acknowledged before a Notary Public or Commissioner of Deeds

State of _____ County of _____ On this _____ day of _____, 20___ personally appeared before me the above named _____ to me known, and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that he or she executed the same, and that the statements contained therein are true.

Signature of Notary Public or
Commissioner of Deeds _____

Official Title _____

Expiration Date of Commission _____

**Performance of Duty Disability Retirement §507-a** ...

There is no minimum service requirement if you apply for disability retirement from a line-of-duty injury that occurred while you are a member and will be if you were in City-service and as a natural and proximate result of an accidental injury, not caused by your own negligence.

**Performance of Duty Disability Retirement §507-c** ...

**Heart Bill (§207-k)** ...

**You may apply for Disability retirement under all of the above provisions.**

**Eligibility requirements for Disability under §507-a and §507-c of Article 14 and under §207-k of the General Municipal Law** ...

Sign this form and have it notarized. THIS PAGE

F12/16

a118

**NYCERS**  Mail completed form to:
30-30 47th Avenue, 10th Fl
Long Island City, NY 11101

NYCERS USE ONLY    F266

Member Number                    Last 4 Digits of SSN

[ ] **100% Joint-and-Survivor**

This option assures you and your designated beneficiary a lifetime benefit. Upon your death, your designated beneficiary will receive the same lifetime benefit. Because this option guarantees two specific people an income for life, the life expectancies of the retiree as well as the beneficiary are taken into consideration. Therefore, once you designate a beneficiary and the option is in force, you cannot change your beneficiary designation, even if he/she precedes you in death. You may nominate only a primary beneficiary under this option.

First Name _____ M.I. ___ Last Name _____

Full Social Security Number _____ Date of Birth (MM/DD/YY) _____ Relationship _____

Address _____ Apt. Number _____

City _____ State ___ Zip Code _____

[ ] If the beneficiary is a minor, check here and complete the guardian information on Form #137. If Form #137 is not submitted, NYCERS will require Letters of Guardianship for the Estate of the minor in order to pay a benefit to a minor.

**-OR-**

[ ] **Ten-Year Certain**

If you die within ten years from the date of your retirement, the reduced monthly retirement benefit will continue to be paid to your surviving primary beneficiary for the unexpired balance of the ten-year period. If the designated primary beneficiary predeceases you, the balance of the payments due for the remainder of the ten-year period will be paid in a lump sum to your contingent beneficiary or, if none exists, to your estate. Should a primary beneficiary die after receiving payments, the balance will be paid in a lump sum to your contingent beneficiary. If none exists, the lump sum balance is paid to the estate of the primary beneficiary. You may nominate both a primary and a contingent beneficiary under this option.

**Tier 3 and 22-Year Plan members:** You may nominate your Estate instead of a person. You may name a Trust or nonprofit organization as a Contingent Beneficiary only. NYCERS will not pay a continuing benefit to a Trust or nonprofit organization, only to a person.

**Tier 4, Tier 6 and Special Plan members:** You may not name your estate as either the Primary or Contingent Beneficiary. You may name a Trust or nonprofit organization as a Contingent Beneficiary only. NYCERS will not pay a continuing benefit to a Trust or nonprofit organization, only to a person.

First Name _____ M.I. ___ Last Name _____

Full Social Security Number _____ Date of Birth (MM/DD/YY) _____ Relationship _____

Address _____ Apt. Number _____

City _____ State ___ Zip Code _____

[ ] If this beneficiary is a minor, check here and complete the guardian information on Form #137. If Form #137 is not submitted, NYCERS will require Letters of Guardianship for the Estate of the minor in order to pay a benefit to the minor.

R12/16  **WALK-IN CENTER** 340 Jay Street Brooklyn, NY 11201 (347) 643-3000    **SITE** Visit us at NYCERS. Always use your secure MyNCERS account at www.nycers.org    **MAIL ONLY - NO PROP-OFF** 30-30 47th Avenue, 10th Floor Long Island City, NY 11101   Page 3 of 4

**NYCERS USE ONLY**    **F266**

**NYCERS**  Mail completed form to:
20-30 47th Avenue, 10th Fl
Long Island City, NY 11101

Member Number                Last 4 Digits of SSN

**Ten-Year Certain Contingent Beneficiary**

First Name                        M.I.    Last Name

Full Social Security Number    Date of Birth (MM/DD/YYYY)    Relationship

Address                                                    Apt. Number

City                                                State    Zip Code

**-OR-**

**Designation of Estate as Beneficiary — TIER 3 and 22-YEAR PLAN MEMBERS ONLY**

[ ] I understand that by checking this box, the benefit payable under the Ten-Year Certain option will be payable to my Estate.

**Federal Tax Withholding**

Federal tax law provides that all payers are required to withhold federal income tax on periodic payments (similar to wages), unless you elect to be excluded from such withholding. This election will remain in effect until revoked by you. If you do not complete this election, Federal income tax will be withheld at the rate of a married individual claiming three exemptions.

**Please indicate your withholding selection by marking the appropriate choice below:**

1. [ ] Do not withhold Federal income tax from my pension. (Do not complete 2 or 3 if you select this option)

2. [ ] Withhold based on _____ number of exemptions using the following status. (You may also enter a dollar amount in choice 3.)

   (Check one only)    [ ] Single    [ ] Married    [ ] Married, but withhold at higher "Single" rate

3. [ ] In addition to the amount withheld based on my exemptions and filing status in choice 2,

   I would like to withhold $ _____ per Month. (Must specify dollar amount only)

**Note:** You cannot enter an amount here without entering a number of exemptions in choice 2 (even if that number is zero).

I, the undersigned, hereby make application for payment of a vested Retirement Benefit under the applicable provision of the Retirement and Social Security Law (RSSL).

Signature of Member                                    Date

**This form must be acknowledged before a Notary Public or Commissioner of Deeds**

State of _____ County of _____    On this _____ day of _____, 20__, personally appeared before me the above-named, _____ to me to be the individual described in and who executed the foregoing instrument, and he or she acknowledged to me that he or she executed the same, and that the statements contained therein are true.

Signature of Notary Public or
Commissioner of Deeds

Official Title _____

Expiration Date of Commission _____

NYC
Health

CORRECTIONAL HEALTH SERVICES     NAME: [redacted]

Facility: DRCC     Shield#: [redacted]

**MEDICAL EVALUATION AND TREATMENT OF CORRECTION OFFICER / CIVILIAN**

Employee reported for medical attention at Time: ___ AM / PM

[handwritten clinical notes, largely illegible]

O: VITAL SIGNS:

[handwritten notes]

Assessment/ plan

A/P

[ ] Follow up with PVT physician / DOC health management division
[ ] Transfer to ER/ hospital
COMPLETED COPY OF THIS FORM MUST BE FAXED TO PHS Employee H# 718 546-3645

COMPLETED BY: _____     PRINT / STAMP: _____

Clearly document all treatment and times.
Use an additional blank progress note to document as needed.
Employee discharged from medical clinic at Time: ___ AM / PM

REMINDER: FULLY COMPLETE THE [illegible]

*0374*



November 23, 2011

Vicky Ware

M# ▓▓▓▓▓

Dear Ms. Ware:

As you were previously advised, the NYCERS' Medical Board recommended denial of the application filed on May 31, 2011 for disability retirement. In this regard, please find enclosed a copy of the Medical Board report based on the findings of the NYCERS' Medical Board.

Very truly yours,

*Oneta Killebrew*

Oneta Killebrew
Manager, Medical Unit
Operations Division

OK: dc

cc: M. Kalmus, Esq.

FW: Relinquishment of DOC Property re: Vicky Ware, Sh#10901,...    a134                https://mail.aol.com/webmail-std/en-us/PrintMessage

New York City Department of Correction
Health Management Division / C.A.R.E.
59-17 Junction Boulevard – Suite 1403
Rego Park, New York 11368

Office: 718 595-2554
Fax:   718 595-2573
Cell:  917 832-0059

From: Grant, Dahlia
Sent: Monday, January 30, 2017 9:30 AM
To: Smith, Helena <Helena.Smith@doc.nyc.gov>
Cc: Pinnock, Nadene M. <Nadene.Pinnock@doc.nyc.gov>; Wynter, Claudette <Claudette.Wynter@doc.nyc.gov>;
Villalona, Angel <Angel.Villalona@doc.nyc.gov>; Juarbe, David Jr. <david.juarbe@doc.nyc.gov>
Subject: FW: Employment Status re: Vicky Ware, Sh#10901, Ref#0448823, OBCC

Good morning,

Ms. Ware is Medically Separated from DOC. That action is correct. See PMS screen below.

When she reaches her 20 year anniversary, which, according to NYCERS, **is something in July 2018**, she will be
eligible to receive pension benefits through NYCERS. This information was explained to her by a NYCERS
representative when she submitted her Vesting application to them. Thereafter, David Juarbe spoke with Ms.
Ware and once again explained the Vesting process to her as well as her status with the agency. *According to
David, Ms. Ware does not seem to comprehend the Vesting process/status with agency.

Since she is Medically separated from the agency, she must relinquish her departmental properties.

*We are willing to send her something in writing regarding the above.

EMPLOYEE ID: ▮▮▮▮         EMP NAME:  WARE        VICKY
PAY NO:  072     JOB SEQ#:  1        CURR LV STAT: A
EFF DATE:  01/30/17
         RSN TYPE
CHG NO  EFF DATE  B T M L X  RSN CD ----------DESCRIPTION--------- LV STAT
 01  01/22/17    -    F37   DISMISSED MED DISABI SEC 71/73  A

Thanks.

Best Regards,

Dahlia R. Grant - Director, Employee Services - Human Resources|
Phone: 718-546-3172 | Mobile: 347-415-6024
75-20 Astoria Boulevard, Suite 320, E. Elmhurst, NY 11370

## CITY OF NEW YORK DEPARTMENT OF CORRECTION
### PERSONNEL DIVISION
### DEPARTMENTAL PROPERTY RECEIPT FORM

| FORM # 887 | REV. 12/87 | REFERENCE: GEN. ORDER #008/87 |
|---|---|---|

### SECTION #1 - TO BE COMPLETED BY MEMBER'S COMMAND

**RECEIVED FROM (EMPLOYEE'S NAME)** Wares, Vicky

| RANK/TITLE | C.O. | SHIELD # | 10901 | COMMAND | OBCC |
|---|---|---|---|---|---|

| REASON (CHECK ONE) | [X] RETIREMENT  [ ] TERMINATION | [ ] RESIGNATION  [ ] OTHER (SPECIFY) | [ ] SUSPENSION |
|---|---|---|---|

| FIREARMS INFORMATION  [ ] CHECK IF APPLICABLE | SERIAL NUMBER | N/A | PISTOL PERMIT (CHECK ONE) |
|---|---|---|---|
| | MAKE | | |
| | MODEL NUMBER | | [ ] YES    [ ] NO |

| RECEIVED BY (PRINT NAME) | | RANK/TITLE | | SHIELD# | |
|---|---|---|---|---|---|
| SIGNATURE | | | DATE | | |

### SECTION #2 - TO BE COMPLETED BY THE APPLICANT INVESTIGATION UNIT, OR HR

| ITEMS (CHECK) | | SHIELD # | 10901 |
|---|---|---|---|
| [1] SHIELD | M | HAT PIECE # | — |
| [2] HAT PIECE | [ ] | RULES & REGULATIONS # | yes |
| [3] RULES & REGULATIONS | N | ID CONTROL # | ████ |
| [4] IDENTIFICATION CARD | M | | |
| [5] STAB/SLASH VEST | [ ] | STAB/SLASH VEST # | — |
| [6] BALLISTIC VEST | [ ] | | |
| [7] PARKING PASS | [ ] | BALLISTIC VEST # | — |

| PROPERTY IN SECTION #2 RECEIVED BY | PRINT NAME | Cashan | DATE | 2/10/17 |
|---|---|---|---|---|
| | SIGNATURE | | | |
| | RANK/TITLE | C.O.I. | SHIELD # | 2096 |

| IDENTIFICATION CARD RETURNED TO MEMBER (CHECK ONE) | [ ] YES  [X] NO |
|---|---|

| SIGNATURE OF MEMBER CONCERNED | |
|---|---|

### SECTION #3 - DISTRIBUTION

| ORIGINAL TO BE FILED AT MEMBER'S COMMAND | COPY TO PERSONNEL DIVISON |
|---|---|
| | COPY TO MEMBER |



★FILED★
2011 SEP 21 PM 6:48
U.S. DISTRICT COURT

November 23, 2011

Vicky Ware

M# ████

Dear Ms. Ware:

As you were previously advised, the NYCERS' Medical Board recommended denial of the application filed on May 31, 2011 for disability retirement. In this regard, please find enclosed a copy of the Medical Board report based on the findings of the NYCERS' Medical Board.

Very truly yours,

Oneta Killebrew
Manager, Medical Unit
Operations Division

OK: dc

cc: M. Kalinus, Esq.

**NYC Health**

DIVISION OF HEALTH CARE ACCESS AND IMPROVEMENT
CORRECTIONAL HEALTH SERVICES    NAME: WARE

Facility: DRCC    Shield: 10501

**MEDICAL EVALUATION AND TREATMENT OF CORRECTION OFFICER / CIVILIAN**

Employee reported for medical attention at Time: 7    AM / (PM)

S: _using in a use of force with Inmate_ ___ _that my left knee + leg_ ___

O: VITAL SIGNS: T/U LOWER BACK

_[illegible handwritten notes]_

Assessment / plan

A/P:
1) R/L Knee pain ___
2) Low back pain ___
   — Analgesic ___

[X] Follow up with PVT physician / DOC health management division
[ ] Transfer to ER/ hospital

COMPLETED COPY OF THIS FORM MUST BE FAXED TO PHS Employee H# 718 546-3645

COMPLETED BY _____    PRINT / STAMP: _____

Clearly document all treatment and times.
Use an additional blank progress note to document as needed.
Employee discharged from medical clinic at Time: ___    AM / (PM)

REMINDER: FULLY COMPLETE THIS FORM    2011 SEP 21 PM 12:44    Page 1 of 1

#FILED#

# TED L. GUNDERSON & ASSOCIATES

6230-A Wilshire Blvd., Suite 6
Los Angeles, California 90048
Phone: (337) 344-8876

I, Ted L. Gunderson, hereby swear under the pains and penalties of jury that the following statements are true and correct:

1.  My name is Ted L. Gunderson. I am the owner and operator of Ted L. Gunderson & Associates, an international security and consulting firm based out of Santa Monica, California. I am currently a licensed private investigator in the state of California. I have performed private investigation and security work for numerous individuals, companies, and governments worldwide since founding my firm in 1979. I have worked for, amongst others, F. Lee Bailey, Esq., The California Narcotics Authority by appointment of Governor Jerry Brown, The 1984 Los Angeles Olympic Committee, and The 1979 Pan American Games in San Juan, Puerto Rico by appointment of then U.S. Attorney General Griffin Bell.

2.  Previous to my work as a private investigator I spent nearly three decades in the F.B.I. Between 1951 and 1960 I was an F.B.I. Special Agent. In 1960 I was promoted as a supervisor at F.B.I. Headquarters in Washington, D.C., where I was in charge of Organized Crime and Racketeering investigations covering 26 F.B.I. Field Offices nationwide. Following the assassination of President John F. Kennedy, I was re-assigned to Special Inquiry White House Matters at F.B.I. Headquarters. In 1965 I was promoted again to Assistant Special Agent-In-Charge of Internal Security and Anti-Terrorism of the F.B.I. New Haven, Connecticut Field Office. In 1970 I was promoted to Assistant Special Agent-In-Charge of the F.B.I. Philadelphia, Pennsylvania Field Office. On July 12, 1972 I successfully negotiated with two terrorist hijackers of National Airlines Flight 496 for the release of 119 passengers at Philadelphia International Airport. In 1973 I was promoted to Chief Inspector at F.B.I. Headquarters. I also served

as Special Agent-In-Charge of the F.B.I. Memphis and Dallas Field Offices. I retired from the F.B.I. as Senior Special Agent-In-Charge of the Los Angeles Field Office of the F.B.I. with over 700 employees and a budget of over 22 million dollars in 1979.

3. I have read the Complaint in the current action of Mr. Keith Labella against F.B.I. and D.O.J. It is my professional opinion, based on information, knowledge and belief that the information sought by Mr. Labella in this F.O.I.A. suit regarding "gang stalking", "gang stalking groups" and "gang stalking methods" reasonably describes an ongoing, active, covert nationwide program that is in effect today, and, based on my investigations and experience, has been operational since at least the early 1980's. Since the 1980's gang stalking has increased in scope, intensity and sophistication by adapting to new communications and surveillance technology. These programs are using the codenames Echelon Program, Carnivore System, and Tempest Systems. The Echelon Program is administered by the N.S.A. out of Fort Meade, Maryland, and monitors all email and phone calls in the world. Carnivore System is administered by the N.S.A. out of Fort Meade, Maryland, and can download any computer system without being traced or otherwise known to the owner. Tempest Systems can decipher what is on any computer screen up to a quarter of a mile away. These programs are negatively impacting thousands of Americans and severely abusing their civil rights on a daily basis.

4. Based on my investigative work, which includes intelligence from sources such as active and former members of the Intelligence Services (including the F.B.I., the C.I.A., the N.S.A. and Military Intelligence), information from informants active in criminal enterprises, and, victim testimonies, I have come to the conclusion that thousands of victims have been targeted by an illegal government rogue criminal enterprise that is active 24 hours a day within the U.S. This conspiracy is far too active to be controlled or operated by private enterprise whose goals are achieving financial gain. These operations require extensive financing with no return on the investment. This program's operations are financed by illegal black operations, i.e., narcotics, prostitution, child

2

kidnapping (children sell at covert auctions for up to $50,000 per child), human trafficking, gambling and other rackets.

5. I have documentation and know that throughout the U.S., operating 24 hours-a-day and 7 days-a-week, there is a Central Command, located within the U.S., with multiple satellite offices, whose administrators can instantly initiate surveillance, phone taps and harassment against any individual in the country. They have the technology, financing and manpower to dispense illegal surveillance and harassment against anyone at any time, day or night. I have files on numerous cases of active, programmatic, illegal government harassment currently being conducted against thousands of Americans. This makes the F.B.I.'s former COINTELPRO program, which I worked on, including in a supervisory capacity, look like a Sunday school program by comparison.

6. I firmly believe that most individuals working in the F.B.I., other intelligence agencies, and the government overall are honest, law-abiding public servants. However, a sophisticated network of rogue operatives has secretly infiltrated the F.B.I., other intelligence agencies including the C.I.A., and other key government positions. This rogue element seeks personal power and wealth and considers themselves above the law and the Constitution. They are carrying out the aforementioned surveillance and harassment activities in conjunction with organized crime, the cult movement in America including Satanic cults, other commercial and political interests, and even misguided civic organizations and neighborhood groups. This illegal surveillance and harassment program is being called gang stalking and organized stalking by the victims targeted by it. The victims are targeted for a variety of reasons including government and corporate whistleblowers, parties to financial and employment disputes, parties to marital disputes (usually divorced women), and even jilted paramours. Journalists covering controversial issues, and, even attorneys and private investigators representing unpopular clients or interests, have been targeted by this program.

7. Individuals targeted by this program have been subjected to illegal and unconstitutional phone taps, illegal re-routing of business and

3

private phone calls for purposes of harassment, illegal audio "bugging", surreptitious entry into home, office, and vehicle, visual surveillance in the home conducted by illegal placement of miniature remote, wireless cameras (often accessible via internet), illegal internet spyware, illegal GPS tracking (often through their own mobile phones), regular fixed and mobile surveillance, mail misdirection, mail theft and tampering, financial and employment sabotage, slander campaigns and community ostracizing , internet disinformation and smear campaigns,  poisoning, assaults and murder, illegal set-ups on drug charges and other felony charges, amongst many other civil rights abuses.

8. In addition to high-ranking members of the F.B.I., other intelligence services, and the government overall, wealthy, powerful members of criminal syndicates, multi-millionaires and the corporate elite are using the government gang stalking program to harass enemies. They can get a targeted individual harassed for the rest of that individual's life (individual cases of gang stalking lasting for over a decade are common). The higher status members of the gang stalking conspiracy initiate the gang stalking and coordinate logistics and funding. Lower echelon government rogue operatives, lower ranking members of the military (in violation of Posse Comitatus), petty criminals and street thugs perform the actual grunt work of daily monitoring and harassment of individuals targeted by the program.

9. Based on my professional experience, extensive intelligence information and belief, it is my professional opinion that the F.B.I. is involved in and has investigative files on the subject of gang stalking, related gang stalking methods, and gang stalking groups in the F.B.I.'s vast intelligence files, that are responsive to Mr. Labella's F.O.I.A. Complaint. Furthermore, I have personally referred numerous victims of gang stalking to the appropriate agents at the F.B.I. for investigation of their cases. I have also furnished the F.B.I. with documentation of an active, international child kidnapping ring probably operated by rogue C.I.A. agents. The F.B.I. has ignored my requests to investigate even though it is their responsibility to investigate kidnappings. I have a contact in Germany who advises me that the C.I.A. has set up secret operations on U.S. military bases for the kidnapping, sale and

4

trafficking of children worldwide. The F.B.I. may be using a unique codename and nomenclature for the gang stalking phenomenon in its records. However, this is a semantic difference, and, in no way changes my professional opinion that the F.B.I. has investigative files on the nationwide phenomenon of gang stalking described in reasonable and specific detail in Mr. Labella's F.O.I.A. Complaint. These F.B.I. files contain information responsive to Mr. Labella's F.O.I.A. Complaint regarding the subject of gang stalking. The F.B.I. and other intelligence agencies are administering and covering up the rogue, covert, government criminal enterprise of gang stalking. The gang stalking phenomenon appears in the records of both the F.B.I. and the N.S.A. in their records pertaining to the Echelon Program, Carnivore System, and Tempest Systems. In addition, the gang stalking phenomenon appears in the records of both the F.B.I. and the N.S.A. in their records pertaining to information collected by Narus systems. Narus is a wholly owned subsidiary of defense contractor Boeing that produces sophisticated, mass surveillance computer systems currently being used by both the F.B.I. and the N.S.A.

Dated this 26 day of April 2011.

Los Angeles, California

Ted L. Gunderson
Ted L. Gunderson

_____
NOTARY

5

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of **L○S /○a○ e L○c** }

On **4-25-2011** before me, **Robert R.S. Propp**
Date                              Here Insert Name and Title of the Officer

personally appeared **Ted L Gundelson**
Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

> ROBERT R.S. PROPP
> COMM. 1795936.
> NOTARY PUBLIC CALIFORNIA
> LOS ANGELES COUNTY
> My Comm. Expires April 20, 2012

Place Notary Seal Above

Signature _____
Signature of Notary Public

------- OPTIONAL -------

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: **Statement of Ted L. Gundelson & Associate**

Document Date: **4-26-2011**                    Number of Pages: **(5)**

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: **Ted L. Gundorson**
☒ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org  Item #5907  Reorder: Call Toll-Free 1-800-876-6827

# TED L. GUNDERSON

FBI Bureau Chief,
Senior Special Agent In Charge, (Ret.)
Head of the Los Angeles Office of the
Federal Bureau of Investigation
6230 A Wilshire Blvd.
Los Angeles, CA  90048
Direct Line:  (337)344-8876
California Investigation License Number:  12878

## PROFESSIONAL EXPERIENCE

**1979 – Present**

Ted L. Gunderson & Associates.
Founder, owner and operator of this international security consulting and investigation firm in 1979. Investigator for F. Lee Bailey Esq., Mr. Bailey describes Ted Gunderson as a person "whose investigative skills are unsurpassed by anyone I know or have known". At the time of retirement from the Federal Bureau of Investigations, Ted had 700 personnel under his command and he operated an annual budget of Twenty Two Million dollars (USD 22,000,000.00).

Ted is a renowned lecturer, published author and researcher. National Television and radio appearances include "The Geraldo Show", "48 Hours Mysteries", "Unsolved Mysteries" and "Larry King Live". He has been regularly featured on Discovery Channel and Lifetime.

**1984**   Los Angeles Olympics Committee Consultant.

**1981 – 1982**   California Narcotics Authority – Consultant appointed by Governor Jerry Brown.

**1979**   Pan American Games, San Juan, Puerto Rico – Security Coordinator
Special Appointee of United States Attorney General Griffin B. Bell.

**1951 – 1979**   Federal Bureau of Investigations

| | |
|---|---|
| 1977 – 79 | Senior Special Agent-In-Charge, Los Angeles, California |
| 1973 – 77 | Special Agent-In-Charge, Memphis, Tennessee and Dallas, Texas |
| 1973 | Chief Inspector |
| 1965 – 73 | Assistant Special Agent-In-Charge, New Haven, Connecticut and Philadelphia, Pennsylvania |
| 1960 – 65 | Special Agent Supervisors – Federal Bureau of Investigations Headquarters, Washington, D.C. |
| 1951 – 60 | Special Agent |

**PUBLICATIONS**   1989   "How To Locate Anyone Anywhere Without Leaving Home" – E.P. Dutton

**EDUCATION**   1950   Bachelor of Science – University of Nebraska

**AWARDS**   1979   Distinguished Alumnus Award in Recognition of Distinguished and Devoted Service to His Country – University of Nebraska

1977   Alumni Highest Effort Award in the Field of law Enforcement, Sigma Alpha Epsilon Social Fraternity

1977   Law enforcement Officer of the Year – AFL-CIO Metal Trades Counsel, Los Angeles, California

> "There exists a shadowy government with its own Air Force, its own Navy, its own fundraising mechanism, and the ability to pursue its own ideas of national interest, free from all checks and balances, and free from the law itself."
> — Senator Daniel K. Inouye (1987)

*Presentation submitted to the Senate Hearing on "The State of Civil and Human Rights in the United States"*

*Tuesday December 9, 2014.*

My name is Dr. Daniel Lebowitz.   I'm a medical doctor.   Over the past two years, I have worked with a Human Rights organization called Freedom From Covert Harassment and Surveillance, or FFCHS. People in this organization state that they are being targeted by an illegal and unethical government program that represents a modern version of COINTELPRO and MK-ULTRA combined. These victims call themselves **targeted individuals, or T.I.'s**.

I have worked with the leadership of FFCHS, and I have worked with the medical committee as well as with the Board of directors. As a result, **I have communicated with hundreds of self-described targeted individuals.** Additionally, I have worked with two other activist physicians on behalf of targeted individuals: Dr. John Hall and Dr. Terry Robertson. **I have also worked with Dr. Robert Duncan, a scientist turned whistleblower, who states that he has worked on some of the very weapons systems that are used in the remote electronic harassment that many targeted individuals say they experience.**
My presentation today is entitled:
**Targeted Individuals: Covert Repression in the 21st Century**

**OVERVIEW**
To understand the Targeted Individual phenomenon, you need to understand several things about it. You need to understand the societal and political and human rights trends which allow it to occur. You need to understand what the program is. You need to understand what the goals and the purpose of the program are. You need to understand who gets targeted. You need to understand where the program came from, in other words, compare it to counterintelligence programs and unethical human experimentation of the past. And you need to understand the implications of the program, and what it means for the future. Finally, we'll take a look about what must be done about it.

**STATE OF HUMAN AND CIVIL RIGHTS IN THE US: THE EMERGING POLICE AND SURVEILLANCE STATE**
In the United States, in short, we are seeing the emergence of a police and surveillance state. Former **President Jimmy Carter** recently wrote in the *New York Times*, "**The United States is abandoning its role as the global champion of human rights.**" In his article, Carter points out that top US officials are now **openly targeting US citizens for political assassination, "disappearance," unlimited surveillance, and other forms of gross human rights abuse. Are people prepared to call a former U.S. President a conspiracy theorist? Or has the U.S. strayed far from its roots as a democracy where rule of law and human rights are uniformly respected?**

**THE PROGRAM**

What is the Targeted Individual program that these people are complaining of? It is many things all at once. It is a discrediting and disruption campaign, similar to COINTELPRO. In some cases (not all) it is a torture/trauma-based brainwashing and mind-control program like MK-Ultra. It is a secret form of repression, persecution and psychological warfare, carried out in the community largely by regular people, along the lines of Stasi or Zersetzen torture. It is a political abuse of psychiatry, as has been carried out in many countries as a way to torture and discredit dissidents. Finally, it is unethical non-consensual human experimentation on unwitting subjects with advanced directed energy and psychotronic weapons systems.

**Overall, it represents a coming together of the most vicious and effective tools and weapons for covert harassment and political control of dissidents, activists, whistleblowers, agitators, and other so-called "undesirables" that the world has ever seen.**

What are the goals and purposes of the program? Again, they are many. **But, in a word, the neutralization of the target**. Let's start with understanding the mindset of the state. President Obama's information czar, former Harvard Law professor Cass Sunstein, co-authored a paper in 2008 which advocated that the government should "cognitively infiltrate" and "disable" those who have ideas the government finds threatening, for example, 9/11 truth activists. **Now, at a minimum, this suggests running illegal COINTELPRO-type disruption campaigns against people**. But, more interestingly, let's parse the words carefully: "cognitively infiltrate" and "disable". Cognition refers to the mind, or to thought. Infiltrate means to penetrate with hostile intent. **So, literally, this means to penetrate the minds or thought processes of so-called "troublesome" individuals, with the intent to disable them. Fascinating, in light of what targeted individuals say that they experience.** So, more specifically, what are the goals of the program?

1. Force the target to stop "unacceptable" activity (whistleblowing, activism, exposing corruption, etc.). Silence the target both about their original activism and about their targeting.
2. Subject target to noise campaigns, swarming, colors, or repetitive behaviors as a form of harassment.
3. Attack any psychological weaknesses. Cause target to blame themselves for their targeting and as such destroy the will to fight back.
4. Create a track record of so-called "mental illness", useful for both discrediting and plausible deniability.
5. Discredit the target.
6. Isolate the target from all forms of support using secret notifications, slander, and covert harassment carried out largely by regular people.
7. Encourage the target to lose hope and lash out in suicidal or homicidal rage secondary to covert harassment, and destruction of the target's life.
8. Set target up for possible institutionalization or arrest.
9. Damage or ruin the career and/or finances. In some cases, break up the family. In some cases, cause the target to lose their home.

10. After breaking the target's will to fight, in some cases, attempt to change the mindset, politics, ethics of the target. Create a mindset more useful to the state. Evaluate the potential for corruption or even recruitment.

11. **To summarize: the goal is the neutralization of the target. Exactly the goal pursued by the former COINTELPRO.**

**THE TARGETS**

Ok. So, who gets targeted by this program? There's a lot of overlap with COINTELPRO. COINTELPRO targeted "Perceived threats to the Established Political and Social Order". Which, in practice during COINTELPRO meant primarily those pursuing greater social and economic equality, peace activists, dissidents, so-called "unfriendly" politicians, and even non-conformists. In some cases, it can be proven that counter-intelligence operations have been undertaken against those aware of high-level criminality or wrong-doing. Like everyone else, many targets have weaknesses, foibles, flaws, problems, etc. Some have addictions. Any

perceived weaknesses (manufactured, real, or exaggerated) are used viciously to aid in the discrediting of the target. Let's learn from some actual examples of people who became targets for covert operations:

1. **Thomas Drake**, NSA Whistleblower: **Forced out of his job, blacklisted, financially ruined, forced to defend himself against criminal charges, placed under physical and electronic surveillance.**

1. **Jean Seberg**. Actress and civil rights activist. Supporter of the Black Panther Party. Experienced FBI **Surveillance, harassment, stalking, break-ins, intimidation, defamation and discrediting.** Victim of a false FBI story that she was pregnant by a Black Panther Party member, while married to a white husband. The stress of this caused premature delivery of her baby, which died at 2 days of age. The baby was white. Eventually committed suicide.

1. **Arnold Lockshin**. A Cancer researcher and supporter of socialism. **Experienced surveillance, harassment and threats by strangers, break-ins, psychological warfare, implied death threats through the 1970's and 1980's. Eventually sought asylum from Russia and was immediately fired, blacklisted, accused in retrospect of mental instability and deteriorating work performance. Notably, reported that even his children's classmates and his own father had been brought into a Stasi-like campaign against him and his family.** Wrote a book about the ordeal in 1988 called "Silent Terror: One family's history of political persecution in the US." The book was never published or distributed in the US. On the web: ArnoldLockshin.Wordpress.com. By the way, his work performance and mental stability in Russia are apparently just fine.

1. **Adrian Schoolcraft**. Blew the whistle on corruption, wrongful arrests, arrest quotas, and the stop and frisk program within the NYPD in 2009. **Received on the job harassment and was shunted to the NYPD psychologist. Within 3 weeks after reporting corruption he was involuntarily committed to a psychiatric ward, handcuffed to a bed and prevented from using a telephone. He was portrayed as paranoid during his hospital stay, which lasted 6 days. After discharge, he was suspended from the force without pay. Tapes he had made were eventually reported by the New York Times and others and he has been largely vindicated.**

1. **Dr. Lawrence Doerr**. Orthopedic surgeon. As reported in the NY Times, wrote an

open letter to fellow surgeons in 2008 warning about a flawed hip prosthesis. Subsequently **became the target of a whisper-campaign that questioned his skills and competence as a surgeon.**

1. **Russell Roderick**. Insulted a powerful, politically connected firm by refusing continued employment. Unclear if he was aware of high-level wrong-doing. Has been the target of a 25 year, **multi-national campaign (you will find that these programs are multi-national and follow targets wherever they go) including slander, character assassination, allegations of incompetence, paranoia, drug-addiction, sexual deviance, and being "a deranged, suicidal maniac." Has experienced blacklisting, financial devastation, isolation, stalking and overt surveillance, street theather, telephone/computer and mail tampering, Stasi-like manipulation of people into a campaign against him, death threats, intimidation, harassment, and a shut-down of all avenues of support.** He refers to this as Zersetzen torture. On the web: Zersetzen.wikispaces.com.

1. **Greenham Common Women's Peace Protestors**. In the 1980's, were protesting the presence of US cruise missiles at an English air force base. **Came under microwave weapon attack in 1984. Scientists from Electronics Today demonstrated the presence of electromagnetic waves.** Dr. Robert Becker, twice nominated for the Nobel prize, found their symptoms were consistent with exposure to a microwave weapon. Every time a cruise missile convoy was ready to drive by, these women were experiencing severe headaches and unbearable fatigue, etc.

1. **Andy Lewis and friends**. A group of former British soldiers. Became targets of full-on gang stalking in 1996 after attempts to draw attention to what they viewed as an unethical experimental vaccine program that had been given to Gulf War soldiers in 1991. These men have experienced **blacklisting, covert harassment, directed energy and psychotronic weapons attacks, overt and covert surveillance, stalking, secret notifications, etc.** They have made two excellent websites: targeted-individuals.com and gang-stalking.com.

1. **A long list of 9/11 truth activists** have reported being **targeted with electromagnetic weapons and death threats. Some have died under suspicious circumstances. US Army Major Doug Rokke, PhD physics from University of Illinois, former head of the US Army depleted uranium cleanup project after Gulf War I, says these weapons are very real, and commonly used in military circles. He has described how he personally used such weapons on a regular basis while training with Special Forces at US Army facilities: "We had them van-mounted, truck-mounted, plane-mounted, and hand-carried. We would go around zapping each other for fun. This was during exercises, or sometimes just as a practical joke." Rokke further stated that, based on his firsthand knowledge of US military mind-set and capabilities, 9/11 truth activists have undoubtedly been targeted by exotic non-lethal (and lethal) weapons.** Remember again Cass Sunstein, who openly advocated cognitive infiltration and disabling of 9/11 truth activists. Is he talking about psychotronic weapons attacks?

10. **Jill Hansen**. Professional surfer, model and entrepreneur. She received wide acclaim for her performance in a TED speech in 2010 about her spiritual values and altruistic beliefs, Entitled "Open Mind, Open Heart". In the talk she espouses values including compassion, honesty, integrity, generosity, belief in God, charity, hope, faith and love. She concludes by stating that the world would be a more beautiful place if we all thought this way. **Within weeks after this talk, which received a lot of publicity, she found herself the victim of stalking and electronic harassment.** Fast forward a few years. Unfortunately, In May 2014, she was charged with attempted homicide for allegedly running over a woman intentionally with her car. TI's report that attempting to get them to act out inappropriately with strangers is a common protocol. A couple interesting facts: **1) none of the news stories mention that she considered herself a TI and 2) Interestingly, The local Neighborhood Watch Group's 500 members had been alerted about Hansen—supposedly for reckless driving. A representative of the group was reported as saying, "We need everybody to be on the lookout for her, it's that scary." So here we have someone reporting being a victim of organized stalking, and it turns out that—HELLO— there was a group of at least 500 people deliberately on the lookout for her.**

11. **Ted Gunderson**. Worked for the FBI from 1950 – 1979. Former head of the Los Angeles FBI, where he was in charge of 700 personnel and had a budget of over 22 million dollars. **In 1979 he was one of a handful interviewed for the job of FBI director, which ultimately went to William H. Webster**. He retired and started a private investigation firm. He became a whistleblower and eventually filed an affidavit in support of attorney and targeted individual Keith Labella in his FOIA request from the FBI regarding gang stalking. Gunderson explained: "**It is my professional opinion based on information, knowledge and belief that the information sought by Mr. Labella in this FOIA suit regarding gang stalking…reasonably describes an ongoing, active, covert, nationwide program that is in effect today and…has been in effect since at least the 1980's…[and] has increased in scope, intensity and sophistication by adapting to new communications and surveillance technology.**" As a whistleblower, Gunderson was himself targeted. He experienced whisper campaigns, surveillance, phone tapping, computer hacking, poisonings, group stalking, aerial stalking and more. **Stated that based on his experience, victims are targeted for a variety of reasons including government and corporate whistleblowers, parties to financial and employment disputes, parties to marital disputes (usually divorced women), and even jilted paramours. Journalists covering controversial issues, and, even attorneys and private investigators representing unpopular clients or interests.** Gunderson's affidavit can be viewed on the internet, and in my opinion, is a fascinating read.

12. **William Binney**- An NSA whistleblower. **Has stated he is well-aware of mind control technologies.**

13. There has been a steady increase of **mass shootings** every year since 2000 from 5 per year until now, about 16 per year. Many of them were complaining of electronic harassment and/or organized stalking, stating that this led them to attack. This is being largely ignored and/or covered up by the media. **Does a faction of our government actually want gun violence in the US, perhaps as a pretext to reversing gun rights, or even individual rights in general?** Let's discuss 3 mass shooters.

14. **Jiverly Wong**- Chinese Immigrant. Reported being targeted with covert harassment for 18 years. Reported experiencing: stalking, harassment, chemical attacks, nausea, shortness of breath, job harassment and job loss, spreading of rumors, phantom touching at night while sleeping, home entry and theft of funds from his home, vehicular stalking and harassment, electronic body shocks. Became a mass shooter of 14 people including himself. Blamed his harassers for the killings. **Paranoid? Or victim of a high-tech covert operation that he could not even begin to understand? Let's not forget that some goals of COINTELPRO included trying to get people to commit suicide (e.g. MLK) or trying to get people to commit serious crimes (e.g. Black Panther Party members) in order to discredit and destroy them.**

15. **Aaron Alexis**- Ex-Navy veteran. Navy yard shooter. Contacted FFCHS stating he was under ELF weapons attack and was being stalked and surveilled, and he believed this was at the hands of the Navy. Interesting things about his case. **1) Although he corresponded with FFCHS, thus identifying himself as a TI, and stating his belief that the Navy was attacking him, the FBI after investigating and speaking with FFCHS Board members, insisted that he was a random shooter with no motive.**

1. **A heavily armed SWAT team was in the vicinity of the Navy Yard when Alexis started his shooting rampage and was on site within 5 minutes. Inexplicably, they were ordered to stand down and leave the area. The shooting rampage subsequently went on for 45 minutes.**

16. **Myron May**. A promising, young black attorney. Worked first for a well-known law firm and subsequently trying to help disadvantaged children. Cared about people and about God. Reported being recently targeted with directed-energy weapons and law enforcement harassment. Decided to draw attention to the abuse by mailing packages of information to 10 people, shooting people, and "suicide by cop". **He made his goal clear by ending his letter saying, "what targeted individuals need more than anything is media attention." These packages were confiscated by Federal agents.** His suicide note described, "financial, emotional, and psychological pain....a living hell" inflicted upon him as a targeted individual. He stated: "**Our government is able to capitalize on [the] lack of knowledge among the general population to curb sentiments toward questioning the mental health of targeted individuals rather than admitting the truth: that there is a system of covert torture of ordinary innocent citizens that is happening within our borders.**" He believed there was no hope for him and so he stated, "Consequently, I am making a sacrifice so that others in my same position might have a chance at a normal, harassment-free life." **He shot three people. None of them died. I wonder if, even when driven to extremes by secret government torture, whether he was still too moral to bring himself to kill…**

Ok, so we know who it happens to. We know this is the most sophisticated take-down program the world has ever seen. So, where do all these tactics and techniques come from? Well, as I mentioned before, a look at historical programs is highly instructive here.

**RELEVANT HISTORY: COINTELPRO, MK-ULTRA, STASI / ZERSETZEN TORTURE**

So- COINTELPRO. Known tactics included: Discrediting, smearing, character assassination. Covert campaigns to destroy interpersonal relationships, Harassment, Conspicuous surveillance (also known as stalking), anonymous letters and phone calls, IRS tax audits, legal harassment, Manipulation or strong-arming of parents, employers, landlords, school officials and others to create problems for targets. Threats, intimidation,

surreptitious home searches and "black bag" jobs, vandalism, Constant surveillance.
MK-ULTRA features and goals included: Create a subject who is easier to control and manipulate, create programmed assassins, develop more effective means of torture and interrogation, break down the personality of the subject and insert new belief systems, ethics, politics, personality traits; performed on unwitting and unwilling subjects; manipulate mental states and alter brain function; surreptitious drugging; isolation; verbal and sexual abuse; various forms of torture employed; promote illogical thinking and impulsiveness in the subject so that they will be discredited in public; attempt to produce amnesia for periods of time; surreptitious production of shock or confusion in subject over extended periods of time; attempt to alter the subject's personality to become dependent on the tormentors; attempt to lower the subject's ambition and work efficiency; attempt to impair eyesight and/or hearing; attempt to activate specific behavior by remote means.

Stasi tactics, also known as Zersetzen torture, included such features as: secret persecution, secret methods of control and manipulation, involved even the personal relationships of the target, extensive use of unofficial collaborators--also known as regular people; used the State's influence to turn public and private institutions against the target, psychological attack intended to deprive the target of the ability to mount hostile political action, often causes irreversible damage to the target, attempt to gain influence over the target in in such a way that undesirable attitudes and beliefs would be slowly changed to more preferable traits over time, Attempt to cause fragmentation, paralysis, disorganization and isolation of target, Attempt political and ideological "re-education", used in situations when judicial procedures are not convenient for political reasons, a.k.a. extrajudicial punishment, attempts to frame or entrap targets, slander/character assassination involving some true and some false, but always degrading information, orchestrating a series of social and professional failures in order to damage self-confidence, creation of doubts about future, stimulation of mistrust or paranoia, exploitation of target's personality weaknesses, addictions etc., shaming due to the spreading of rumors to those around the target, overt and covert surveillance, intercepting mail, calls, etc., tampering with property and vehicles, poisoning the food and tampering with medications, entering the residence and leaving traces of evidence in order to threaten or intimidate the target by adding removing or modifying objects.

The items on these lists will sound very familiar to targeted individuals. Nearly all of them apply to the current program. And nearly all of them are reported by Targeted Individuals. I have no reason to not believe them. Now, add in the use of advanced directed energy and neuro-weapons, and you have a very potent takedown program.


**THE WEAPONS**
Ok so at this point we have a pretty good understanding of the program. But there's one more thing that needs to be understood about this program. The advanced weaponry that is being used.


Evidences/Examples:

1. **The Moscow Signal**: low-power microwave beams were directed into the US embassy for more than two decades, from 1953 until 1976. Discovered in 1962, US scientists studied the signal until the 1970's before finally telling the diplomats it was there, and offering them hazard pay. Many got sick, some died. Was not exposed to the public until 1976 when unearthed by an investigative reporter. This led to DoD's ARPA Project Pandora

    2. From 1965 through to 1970, Defense Advanced Projects Research Agency (DARPA), with up to 70-80% funding provided by the military, set in motion operation **PANDORA** to study the health and psychological effects of low intensity microwaves with regard to the so called "Moscow signal**". This project was quite extensive and included (under US Navy funding) studies demonstrating the ability to: induce heart stoppage, create leaks in**

the blood brain barrier, and production of auditory hallucinations. **Nervous system function could easily be degraded with properly pulsed signals. Memoranda of Richard Cesaro, Director, DARPA, confirmed that the program's initial goal was to "discover whether a carefully controlled microwave signal could control the mind." Cesaro urged that further studies be made "for potential weapons applications." This was 1970, and very specific neurological and physiological weapons capabilities of microwaves had already been recognized.**

1. **Jose Delgado**—the scientist who stopped the charging bull by remote control. Dr. Jose Delgado's secret work in Project Pandora was directed towards the creation of a "psycho-civilized" society. In his paper "Intracerebral Radio Stimulation and recording in Completely Free Patients", using radio waves, Delgado observed that: "Radio Stimulation on different points in the amygdala and hippocampus in the four patients produced a variety of effects, including **pleasant sensations, elation, deep thoughtful concentration, odd feelings, super relaxation, colored visions (hallucinations), and other responses.**" Speaking in **1966**, Delgado asserted that his research "supported the distasteful **conclusion that motion, emotion and behaviour can be directed by electrical forces and that humans can be controlled like robots by push buttons. Delgado stated that EM weapons were "more dangerous than atomic destruction." "With knowledge of the brain, we may transform, we may shape, direct, roboticize man. I think the great danger of the future is that we will have roboticized human beings who are not aware that they have been roboticized." He created a brain transponder that was IN FACT used to roboticize human subjects.**

1. **Dr Ross Adey**, formerly of the Brain Research Center at the University of Southern California, worked on the CIA's infamous Pandora project. His research involved inducing of specific behavior modifications by electromagnetic means. In his pioneering work, **Dr. Ross**

**Adey determined that emotional states and behavior can be remotely influenced merely by placing a subject in an electromagnetic field. He also demonstrated that EM radiation, properly modulated and pulsed, can induce calcium efflux events to interfere with brain's function---the so-called "confusion weaponry". Again, this is by 1970.**

1. **Lawrence Pinneo**, a neurophysiologist and electronic engineer working for Stanford Research Institute (which is a leading military contractor), "**developed [in 1974] a computer system capable of reading a person's mind. It correlated brain waves on an electroencephalograph (EEG) with specific commands.**

1. **Dr. Eldon Byrd, a Navy medical engineer with a graduate degree from George Washington University,** worked on the Polaris weapon system as an engineer, worked for Naval Surface Weapons Office, **was tasked in 1980- 1981 by the US Marine Corps as**

**Project manager to develop non-lethal electromagnetic weapons for purposes including "riot control", clandestine operations and hostage removal. Worked on ELF, non-linear magnetics**. He worked with Ross Adey, Dr. Elizabeth Roscher, Michael Persinger **on the ability to entrain human brainwaves at a distance. And he said, "We accomplished it." 1980. His project went dark after that. It was taken away from him. He had it confirmed from a senator—Senator Pell—confirmed for him that his project went dark. Byrd was quoted in a lecture around 2001 as saying, "Is Mind Control Possible? Absolutely. There is a**

mountain of evidence." He went on to say that, "Today we know there are technologies that can induce sound into the brain at a
distance, can monitor and alter brainwaves at a distance, can alter behavior at a distance, can induce images into the brain at a distance, can target individual organs at a distance. Can disrupt the calcium ions binding on individual cell surfaces at a distance, creating pain and other effects anywhere in the body. Mind control technology exists, without a question." Less than a year later, Dr. Byrd was dead. Maybe it was a coincidence.

1. A 1980 NASA document [*NASA abstract Report Number: AD-A090426*, June 1, **1980]** described that one can **remotely create the perception of noise in the heads of personnel by exposing them to low power, pulsed microwave…. By proper choice of pulse characteristics, intelligible speech may be created** . 1980. Yes, **1980.**

1. For further documentation, I recommend the following webpage: **http://educate-yourself.org/mc/listofmcsymptoms05jun03.shtml**. **This webpage documents that there is truly a mountain of evidence about these terrifying weapons**. Some highlight include the PROVEN capabilities **to induce false memories** in the brain, **Subliminal command implantation into the brain to modify behavior (including suppressing dissidents).**

1. Finally, In July 1996, the Spotlight, a widely circulated right-wing U.S. newspaper, reported that well-placed DoD sources have confirmed a classified Pentagon contract for the development of "high-power electromagnetic generators that interfere with human brain waves."

Dr. Emery Horvath, a professor of physics at Harvard University, has stated in connection to these generators,"**These electronic 'skull-zappers' are designed to invade the mind and short circuit its synapses... in the hands of government technicians, it may be used to disorient entire crowds, or to manipulate individuals into self-destructive acts. It's a terrifying weapon**."

To quote José Delgado in his book Physical Control of the Mind: Toward A Psychocivilized Society, p. 116:

Individuals whose brain centers are electrically stimulated believe their evoked actions are their own ideas; their conscious mind rationalizes the evoked actions away. People experiencing this electrical stimulation aren't consciously aware of an external influence.

**In summary, these weapons have the ability to mentally and physically torture people, and to influence human psychological behavior. With, or even WITHOUT the target's knowledge or awareness.**

**SUMMARY OF THE PROGRAM AND ITS IMPLICATIONS**

In summary, we have a program which includes the earmarks of past programs including COINTELPRO and MK-Ultra. It also uses collaboration of regular people to carry out much of the harassment, similar to Stasi or

Zersetzen torture of the prior East Germany. Furthermore, it uses advanced neuro-weapons to mentally and physically torture victims from a distance-- whether in their homes, workplaces, or wherever they may go. The goals of the program are many, but ultimately boil down to torture, control, discrediting, and neutralization-- exactly the same goals as the prior COINTELPRO, MK-ULTRA, and Stasi or Zersetzen torture. While some victims may be chosen at random, many cases, upon examination, are shown to be perpetrated against activists, whistleblowers, and those who have spoken out against corruption. The consequences are severe. Most targets lose their jobs, homes, and/or their families. Many end up on dangerous medications or institutionalized. Some end up committing suicide or homicide.

Of course, the implications for humanity are frightening. Is it possible we are heading toward a synthetic reality, where people's thoughts, conversations, hopes, dreams, illnesses, major life events are controlled by supercomputers and handlers, all without their knowledge?  Is our society becoming one in which no-one can be trusted, with everyone spying on everyone else? With a large percentage of the population becoming government informants and spying collaborators?

Are we developing a class of people with "less" rights, who can be harassed at will, even as we all slowly have our rights eroded? If so, doesn't that sound like a totalitarian regime such as Nazi Germany?

**WHAT NEEDS TO BE DONE ABOUT THE PROGRAM**

Several things. First of all, **targets must speak out. Especially those who have their wits about them. This program is highly disruptive, and is specifically designed to make even the most solid citizen look as if they have become delusional**. Compounding the problem, many targets are either forced to, or willingly take powerful psychiatric medications in hopes of decreasing the severe attacks they are suffering, or to appease skeptical friends and family members. In the case of real mental illness, this should resolve the symptoms. In the case of TI's, it does not stop the torture and harassment and manipulation of their lives.

So, that leads to the next point. **If you know someone who this is happening to—don't count them as crazy. They may be a victim of this program**. Recognize that the issues they were speaking about before they got into their current situation are still just as valid now as they were before **. In fact, it was probably the very legitimacy of their issues that led powerful forces to want to discredit them so thoroughly. Remember that.**

**Whistleblowers must come forward** who are aware of this program.

**Fearless journalists must pursue the story**. It was investigative journalists who brought widespread attention to MK-ULTRA, COINTELPRO, and much of the unethical experimentation that has occurred in the USA. **Targets must come together.** There is strength in numbers. Targets should never give up the fight.

**Finally, Congress MUST thoroughly investigate the intelligence agencies, DOD research programs, and black operations. The targeted individual program is happening. It's not science fiction. It needs to be EXPOSED AND SHUT DOWN FOREVER.** Thank you for your attention.

**NON-CONSENSUAL EXPERIMENTATION WITH ELECTROMAGNETIC WEAPONS**


TO WHOM IT MAY CONCERN:

I am writing you on the behalf of victims both in the United States and abroad. As you are aware, many revelations surrounding the National Security Agency's extensive electronic dragnet have recently come to light through released records by the intelligence insider Mr. Edward Snowden. During the course of the LIBE Committee hearings even more first-hand testimony was heard from other former NSA insiders regarding the extent of NSA privacy invasion and lack of oversight regarding their methods of data collection. Their statements begin to come very close to an issue that those of us in the medical community in the United States and abroad have been keenly watching for several years now.

Over the last decade we have seen a sharp rise in the number of people coming forward with complaints of non-consensual experimentation with electromagnetic weapons designed to target both electronic hardware and the human central nervous system. While this was typically disregarded as mental illness in the past, the total global population voicing these identical complaints has exponentially grown to numbers that can no longer be attributed to delusional disorder, schizophrenia or any other described mental illness. You may be unaware that the safeguards against experimenting on the public without their consent in the United States are very lax and are included in legislation referred to as The Common Rule which is the Federal Policy regarding human subjects protection. It is written with several loopholes for the allowance of non-consensual experimentation, mostly by intelligence agencies. Hence, we have seen the necessity for the Bioethics Commission hearings in the United States after it was brought to light that Guatemalan prisoners were experimented on with contagions by the National Institutes of Health. During the course of the Bioethics Hearings, their directive was to determine if any other non-consensual experimentation was ongoing in the United States or abroad. At each of the four meetings there was included a public forum for the committee to address concerns by the public at large. Over one hundred individuals were in attendance at each of the four meetings voicing complaints of exposure and experimentation with electromagnetic weapons technologies. The effects of these technologies on the human body can only be described as torture.

Several years ago another National Security Agency insider, John St. Clair Akwei, described in detail the frequencies used by the NSA and other intelligence agencies to access and influence the human body and nervous system in his civil action against the NSA. His descriptions of technologies used to track, monitor and alter a subject's perceptions, moods and motor control are similar to the complaints we are hearing today from victims alleging non-consensual experimentation and torture. Moreover, Vladimir Putin, in a speech in 2012, admitted that Russia is following suit in funding development of weapons that will attack the human central nervous system. His defense minister, Anatoly Serdyukov, described the weapons as directed energy weapons, wave energy weapons, genetic weapons and psychotronic weapons based upon new physics principles. Obviously, Russia intends to go down the same path of directed energy weapons research that the United States has long been on. The unfortunate truth regarding this type of technology is the ease with which it can be used remotely and non-consensually on the public without the recommended safeguards of an Institutional Review Board or any appreciable ethical oversight. In the United States this research is typically done clandestinely under the guise of

national security concerns just as the NSA electronic data mining was done which is currently being covered in the LIBE Committee.

Over the last decade I have consulted with thousands of people in the United States complaining of exposure and experimentation with electromagnetic weapons technologies which include, but are not limited to, complaints of mood alteration, heart palpitations, involuntary body movements, severe headaches, blurred vision, burns to the skin, non-consensual micro-chipping and neurocognitive perturbation. It is my belief, based upon former and current publically released government research documents as well as victims complaints of torture, that this technology is being used in a non-consensual manner on the global public.

I would like to express my deepest gratitude to you for meeting with our representative from the International Center Against Abuse of Covert Technologies and taking the time out of your busy schedule to hear these complaints and read my letter. On behalf of the whole of humanity, I sincerely hope that these technologies will eventually be addressed in the Subcommittee on Human Rights of the European Parliament, as the use of these currently can only be described as torture and dehumanizing.

Thank You,

Dr. John R. Hall, D.O.
5282 Medical Drive # 200, San Antonio, Texas 78229, USA
tel: 210-614-6432

www.satweapons.com
www.drjohnrhall.com


(Note:  Dr Hall retired in 2019)

NEWS • Remarks

# Written Testimony for NYC Board of Correction's Special Hearing on Sexual Abuse and Sexual Harassment in New York City Correctional Facilities

April 23, 2019

### Written Testimony by Supervising Attorney for the Sex Crimes Unit Vanessa Puzio

### New York City Board of Correction Special Hearing on Sexual Abuse and Sexual Harassment in New York City Correctional Facilities

Good Morning Chairman Cephas and Members of the Board. My name is Vanessa Puzio. I am a Supervising Attorney in the Sex Crimes Unit and Attorney-in-Charge of Work-Related Sexual Violence Initiatives. Thank you for the opportunity to speak today about DA Vance's strategies to combat sexual violence in the workplace, specifically within New York City Correctional Facilities.

Recently, our office received a letter from an anonymous group of female corrections officers. The letter detailed sexual harassment and sexual abuse within the Department of Corrections. Specifically, the letter detailed sexual misconduct committed by supervisors against the female staff. It was anonymous, but the writer made it clear that she and other female officers needed help.

After reading the letter, I reached out to the Corrections Officer Benevolent Association Union and was subsequently invited to Manhattan Detention Complex to give a training on sex crimes in the workplace. The overwhelming majority of officers I spoke to that day stated that inmates routinely groped and touched both male and female officers. The sentiment amongst the corrections officers I spoke to at Manhattan Detention Complex was that being touched in a sexual way had become "part of the job" and reporting it was "not worth it." I urged the officers to report to law enforcement and spoke to them about potential sex offender registration.

Clearly there are significant challenges for corrections officers that are not necessarily reflected in the number of sexual assault cases that are reported by or against corrections officer at the Manhattan Detention Complex. For example, in 2018, there were 597 post-arrest sex crimes cases handled by our office and, out of those, 0 were from Manhattan Detention Complex. In 2017, we again had 0 sex crimes cases originating out of MDC. Not one was a sexual assault committed against a corrections officer. There is also a dearth of complaints that come to our office concerning sexual assaults where inmates are the victim and the perpetrator is also an inmate. As stated in your audit, these case are occurring and being reported to in-house investigators, but they are not making their way to our office. Why is that?

Under the current system, when an individual reports a sexual assault, the case is investigated by your trained in-house investigators. As seen in the NYC Department of Corrections Audit Report, these investigations are not being done in a thorough manner. The cases are then forwarded to DOI, but if the initial investigation was not done properly, the victim in that case is never given an opportunity to have law enforcement appropriately investigate his or her case.

The current system at Correction is reminiscent of the now reformed systems at colleges and universities where victims' complaints were dealt with in-house and where victims of sexual assault were not given options on reporting directly to law enforcement. Victims of a sex crime should not only be given access to medical care as mandated in your rules, but information and swift access to law enforcement, and not simply an in-house investigator.

Sexual violence is a devastating crime that leaves a lasting impact on the survivor. This impact can be acutely felt when the sexual abuse is suffered at the workplace. The Manhattan District Attorney's Office is committed to investigating and prosecuting these crimes and to achieve justice.

In the wake of #MeToo our office saw not only a spike in reporting but countless media reports detailing sexual abuse at the workplace. In an effort to encourage further reporting and engage survivors, the Manhattan DA created the first-of-its-kind Work-Related Sexual Violence Unit. The Unit recognizes the inherent power imbalance and fear of reprisal that survivors face in reporting. But when an act of work-related sexual misconduct constitutes a crime, it is not enough that the abuser loses his or her job. Justice demands and survivors deserve that criminal abusers be held accountable in court.

DA Vance asked me to lead the work-related sexual violence initiatives with our main goal being to encourage further reporting of crimes. As a prosecutor, I continue to work directly with victims of workplace violence but I also go out into the community to speak about our office and encourage reporting. We contact businesses and organizations directly and ask them to circulate our materials to their members and employees. We also offer trainings to employees to let them know who we are and what our office can do to help in terms of referrals to the NYC Commission on Human Rights or in-house counseling. We consider this to be a more holistic approach when dealing with work-related sexual violence.

Our hotline number is 212- 335-9373. When I spoke at the Manhattan Detention Complex, I stressed that we are not just a faceless telephone number at a government agency. We are there to answer questions and provide support for victims of sexual violence.

I would suggest that, going forward, our office further collaborate to assist officers at Manhattan Detention Complex with training and information so that they can make informed decisions about reporting acts of sexual misconduct to law enforcement and to follow through with their complaints to see real change. Furthermore, anyone reporting a crime within a correctional facility should be given the information and resources to have their case investigated directly by law enforcement and not be left to the discretion of in-house investigators.

 **Manhattan District Attorney's Office**

MAIN OFFICE

One Hogan Place

New York, NY 10013

212.335.9000

HARLEM OFFICE

163 West 125th Street

New York, NY 10027

212.864.7884

WASHINGTON HEIGHTS OFFICE

530 West 166th Street, Suite 600A

New York, NY 10032

212.335.3320

ABOUT THE OFFICE

OUR WORK

EVENTS

NEWS

VICTIM RESOURCESESPANOL 繁體中文

CONTACT US

CAREERS & TRAINING

Keep up with us! Sign up for our newsletter.

SIGN UP

# Keep up with us.

SIGN UP TO RECEIVE OUR NEWSLETTER

First NameLast NameEmail Address

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 293 of 353

# EXHIBIT 8

# PROOF OF NEW YORK CITY DEPARTMENT OF CORRECTIONS MALADMINISTRATION AND NEGLIGENT HIRING AND RETENTION PRACTICES

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 293 of 353

FILED: KINGS COUNTY CLERK 02/08/2020 00:00:00 PM

NYSCEF DOC. NO. 102

INDEX NO. 518948/2019

RECEIVED NYSCEF: 02/08/2020

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 294 of 353

Rikers Tumult Rises: Prison Official Accused of Spying on Investigator - The New York ...    Page 1 of 5

E001

# The New York Times

# Rikers Tumult Rises: Prison Official Accused of Spying on Investigator

By William K. Rashbaum and Michael Schwirtz

May 8, 2017

New York City's Department of Investigation has picked apart practically every facet of the troubled Rikers Island jail complex in recent years, including abuses committed by guards and inmates and the misuse of official cars by the commissioner and his staff.

Now it is taking aim at the very person who is supposed to prevent wrongdoing at the jail from within — the head of the Correction Department's Investigation Division.

The Department of Investigation believes the jail official, Gregory Kuczinski, has orchestrated a spying campaign against it and has called for his removal. On Monday morning, Mr. Kuczinski was removed from his position and placed on modified duty.

In a long letter to Mayor Bill de Blasio, the Department of Investigation said Mr. Kuczinski and his subordinates violated city rules and regulations by repeatedly listening in on telephone calls between an investigator with the agency and inmates who were serving as informants, several people with knowledge of the letter said.

In an interview late on Sunday, the Correction Department commissioner, Joseph Ponte, insisted that "there was no improper eavesdropping." As soon as Correction Department investigators determined that they had been listening in on a conversation involving a Department of Investigation staff member, he said, they stopped the surveillance.

"Clearly there was no intent to interfere with D.O.I. and anything they were doing," he said.

Mr. Kuczinski, in a separate phone interview on Sunday, denied wrongdoing and called the reaction of officials at the investigation agency "ridiculous," saying: "Are they trying to cover something up? I don't know."

The letter from the head of the department, Mark G. Peters, was sent to Mayor de Blasio on Wednesday, according to the people. They spoke on the condition of anonymity because the contents of the letter were confidential.

FILED: KINGS COUNTY CLERK 02/08/2020 00:00:00 PM
NYSCEF DOC. NO. 162

INDEX NO. 518948/2019

RECEIVED NYSCEF: 02/08/2020

Case 1:26-cv-00914-DEH-SN     Document 52     Filed 03/25/26     Page 295 of 353

Rikers Tumult Rises: Prison Official Accused of Spying on Investigator - The New York ...     Page 2 of 5

The letter said that Mr. Ponte had learned of the surveillance in February, after another official had shut it down, the people said. But Mr. Ponte did not report the surveillance to the investigation agency, nor did he take any action against Mr. Kuczinski, whom he had promoted into his current job.

The accusation came just a week after the Department of Investigation issued a report sharply rebuking Mr. Ponte, Mr. Kuczinski and two other top correction officials for misusing their city cars. It was the latest in a series of embarrassing revelations of deep systemic problems in the city jails uncovered by the agency.

Paired with the rebuke over the cars, the accusations in the letter underscore how Rikers continues to be plagued with problems, including brutality on the cell blocks, corruption in the correction officer ranks and a disturbing level of mismanagement from the commissioner's suite on down.

But the accusations against the city jails' chief investigator, by another department's investigators, represent a low point for the jails system. They suggest that the very person responsible for ferreting out wrongdoing at Rikers may have been focused instead on protecting the jail, and those who work there, from further scrutiny.

The mayor, in a statement issued by his press secretary, Eric F. Phillips, acknowledged the gravity of the accusations and suggested that they would lead to change.

"These are serious and troubling allegations," the statement said. "We will work with the Department of Correction and the Department of Investigation to determine what happened and what changes must occur to ensure that it doesn't happen again."

Two city officials said the mayor was expected to order that Mr. Kuczinski be removed from his post as early as Monday and that he be placed on modified duty.

Mr. Kuczinski, in the interview on Sunday, defended his actions and disputed some aspects of the Department of Investigation's account. He said he learned of the recordings only in early February, soon after he took over the unit that monitors phone calls, when Mr. Ponte asked him to investigate the suspicions of a senior Correction Department official. That official, Mr. Kuczinski said, believed that four of the calls suggested that someone from the investigations agency was trying to frame Correction Department officials.

Mr. Kuczinski said he never listened to the recorded calls himself. Instead, he said, he assigned two members of his staff to investigate, but because of the demands of his new role, it took him two weeks to do so. It took the staff members several weeks to review the recordings and conclude that the calls did not indicate an attempt to frame anyone, he said. He said he did not initially notify the Department of Investigation about the matter in February because he believed it would have posed a conflict for the agency.



Gregory Kuczinski
City of New York Department of Corrections

Mr. Ponte defended Mr. Kuczinski, affirming Mr. Kuczinski's assertion that he was not initially involved with the call monitoring unit that had picked up the conversation between the Department of Investigation employee and an inmate informant. Mr. Ponte acknowledged that better communication with the Department of Investigation could have prevented the monitoring of the investigator's calls, but he placed some of the blame on the investigation agency.

"There are ways that D.O.I. could have told us that, these numbers, don't listen to them," he said.

The hiring of Mr. Kuczinski at the Correction Department remains something of a mystery.

As the deputy commissioner in charge of the agency's Investigation Division, he is responsible for uncovering administrative misconduct in the ranks of the department's 10,000 officers and investigating crimes committed by inmates.

But when he joined the jail agency in March 2015 as the division's No. 2 official, Mr. Kuczinski, a retired New York Police Department sergeant and a lawyer, had little investigative and no internal affairs experience from his police tenure. Nonetheless, Mr. Ponte promoted him to the division's top position about a year later, just days after he was rebuked and fined $1,500 for assigning an on-duty subordinate to drive him and his family to the airport for a summer vacation.

Case 1:26-cv-00914-DEH-SN     Document 52     Filed 03/25/26     Page 297 of 353

Officials at City Hall, the Department of Investigation and the Correction Department[b004] could not explain how Mr. Ponte came to hire and then promote Mr. Kuczinski despite his limited relevant experience. Mr. Kuczinski said he was hired after responding to a newspaper advertisement.

The investigation agency did not conclude that the spying was undertaken because of the report on vehicle misuse, the people with knowledge of the letter said. But the letter "did note concerns of the timing of certain actions regarding monitoring of D.O.I. investigator phone calls, especially at the direction of Kuczinski, that immediately followed D.O.C. being notified about the vehicle investigation," one of the people said.

Mr. Kuczinski's investigators at the Department of Correction are permitted to listen to inmate calls, but not when they know they are with lawyers, clergy, doctors or investigators with the Department of Investigation. If Mr. Kuczinski believed he had uncovered a corrupt investigator, the person said, he should have notified the agency or some other city or law enforcement official. There is no indication, the person said, that he did so.

In recent years, the Department of Investigation has prioritized inquiries into corruption and brutality at Rikers Island. Its investigations have identified officers who have smuggled drugs and weapons into the jails and determined that the Correction Department had hired gang members and people with criminal backgrounds as officers. Since 2014, 38 jail staff members have been arrested as a result of Department of Investigation inquiries.

The Department of Investigation report on the misuse of city vehicles by Mr. Ponte, Mr. Kuczinski and other senior officials said they had been referred to the city's ethics watchdog, the Conflicts of Interest Board, for possible discipline.

Mayor de Blasio is facing increasing criticism for his vocal support of Mr. Ponte — and by implication, other correction officials. The mayor has said he accepts Mr. Ponte's defense that he inadvertently violated city rules by repeatedly driving his government vehicle to Maine, where he spent a total of 90 days last year, because he had been advised by unnamed staff members that he was allowed to do so.

The mayor's support of the commissioner and other correction officials has prompted comparisons by department critics with the fate of low-level city employees who in recent years have been docked as much as 10 vacation days for using a city car for personal reasons for one day.

Mr. Ponte has made a number of questionable appointments and promotions since becoming commissioner in April 2014. Months into his tenure, Mr. Ponte promoted William Clemons to chief of department, the top uniformed position, despite an objection

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 298 of 353

Rikers Tumult Rises: Prison Official Accused of Spying on Investigator - The New York ...    Page 5 of 5

from the Department of Investigation. Several years earlier, an internal Correction[b005]
Department audit had recommended Mr. Clemons be fired for presenting distorted data
that made it appear as if violence was decreasing when in fact it was going up. Mr.
Ponte's predecessor ignored the recommendation and also promoted Mr. Clemons.

Mr. Clemons was forced to resign after a New York Times investigation into the
distorted data.

The Correction Department's Investigation Division has been in disarray for a long time.
In August 2014, Preet Bharara, then the United States attorney for the Southern District
of New York, published a report documenting astounding brutality at city jails and
singled out the division for aiding what was described as a "deep-seated culture of
violence" by failing to properly discipline guards.

Shortly after, Mr. Ponte appointed Michael Blake, a former senior official with the Police
Department, to lead the division. Mr. Blake was another unusual appointment. Previous
division heads had spent many years as prosecutors. Mr. Blake had never been a
prosecutor, and his only experience investigating officer misconduct came during a stint
that lasted less than two years in the Patrol Services Bureau two decades ago.

Mr. Blake lasted a little more than a year in the position. He left in December 2015,
replaced by Mr. Kuczinski, who served as acting head of the division until April 2016.

Although the unit has expanded in recent years and closes cases more rapidly than in
the past, under Mr. Kuczinski it has still suffered from many of the same deficiencies
outlined in Mr. Bharara's report three years ago.

In a report last month, a federal monitoring team responsible for overseeing the reform
effort at Rikers harshly criticized the division, accusing it of failing "to pursue
disciplinary action in cases where there was objective evidence of wrongdoing."

A version of this article appears in print on May 7, 2017, on Page A1 of the New York edition with the headline: Rikers Tumult Rises:
Monitor Accused of Spying

READ 64 COMMENTS

Case 1:26-cv-00914-DEH-SN   Document 52   Filed 03/25/26   Page 299 of 353



b006

The City of New York
Department of Investigation

MARK G. PETERS
COMMISSIONER

90 MAIDEN LANE                                          Release #22-2018
NEW YORK, NY 10038                                     nyc.gov/doi
212-825-5900

FOR IMMEDIATE RELEASE                      CONTACT: DIANE STRUZZI
THURSDAY, MAY 3, 2018                               NICOLE TURSO
                                                   (212) 825-5931

**DOI INVESTIGATION REVEALS CONTINUING FAILURES BY THE DEPARTMENT OF CORRECTION (DOC)
TO PROPERLY SCREEN RECRUITS FOR RED FLAGS**
*Failures identified by DOI in 2015 remain and recommended changes were never adopted by DOC*

Mark G. Peters, Commissioner of the New York City Department of Investigation ("DOI") today issued a Report detailing the findings of a year-long probe of the City Department of Correction's ("DOC") hiring practices for Correction Officers ("COs"), exposing persistent problems at the agency's Applicant Investigation Unit ("AIU"). DOI's investigation found a significant number of the COs hired in the January, June, and December 2016 classes continued to have red flags signaling corruption and safety hazards that should have precluded their hiring or required them to undergo monitoring once they were hired, including previous arrest records, employment termination, and contact with inmates. This investigation is a follow up to DOI's 2015 Report, which is linked here (2015 report) and uncovered vulnerabilities and breakdowns in the AIU's screening processes, including antiquated and haphazardly filed personnel documents and a failure to perform basic background and credit checks on individuals applying to become COs, that allowed recruits with significant background issues to be hired. As a result of its 2015 investigation, DOI made several recommendations to improve and strengthen DOC's hiring processes. DOI began looking at whether DOC had strengthened its protocols around hiring after a December 2016 arrest of a CO charged with bringing in contraband. When DOI reviewed that CO's file, it found significant red flags that should have precluded his hiring.

The Report released today demonstrates that DOC did not implement some recommendations and only partially implemented others, leading to the continued hiring of underqualified candidates. A copy of DOI's Report is attached to this release and can be found at the following link: DOI's 2018 Report.

DOI Commissioner Mark G. Peters said, "DOI continues to arrest correction officers who have red flags in their backgrounds that should have precluded their hiring. Until the City Department of Correction (DOC) creates and implements a proper screening system, we will not solve the problems that plague Rikers and DOI arrests of DOC staff will likely only increase. This was a systemic problem in 2015 when we released our first Report and DOC's failure to act on DOI's findings continues to be a problem."

As part of DOI's investigation, a random sample of 291 candidate files from the January, June and December 2016 classes were examined using factors set out in the Notice of Examination for COs and DOC's own automatic disqualifiers. The review found that more than a quarter — and almost a third — of the candidates (88 of the 291 candidates) should not have been hired or should have been monitored after their hiring because of red flags. Specifically in its review, DOI found:

- 42 files, or 40% of files reviewed from the January 2016 Class, indicated friends and relatives who were or had been previously incarcerated.
- 33 files, or 33% of files reviewed from the June 2016 Class, indicated a past employment termination.
- 28 files, or 30% of the files reviewed from the December 2016 Class, indicated candidates had at least one prior arrest. Seven of these files indicated that the candidate had been arrested more than once.

Nonetheless, these candidates were hired by DOC.

*more*

E094

b007

DOI's review identified a number of troubling examples of underqualified individuals with red flags being hired by DOC in these sensitive positions, including:

- A candidate that DOC knew was previously employed by the New York State Department of Correction and Community Supervision ("DOCCS") and had left his employment after he had an inappropriate relationship with an inmate.

- A candidate that DOC knew had been previously arrested for criminal possession of a weapon and harassing a fellow worker at a prior job.

- A candidate who, prior to applying to be a CO, had multiple visits to inmates with gang affiliations and failed to list those inmate visits as required in the application submitted to DOC.

The review also exposed continued vulnerabilities in DOC's screening process first brought to light in DOI's 2015 Report, including the failure of AIU investigators to conduct thorough applicant background checks, relying instead on self-reported information from candidates to meet time constraints; a lack of field visits to assess a candidate's suitability; and a failure to wait for third-party employment verifications when candidates reported being terminated or resigning from a past employer. DOI found that AIU still does not verify personal information through public record databases and infrequently obtains paperwork on police contacts or inmate phone calls when a candidate notes an association with a past or present inmate. The investigation also revealed that despite DOI's 2015 recommendation to computerize AIU record-keeping, AIU's files are still paper-based and, as a result, many were incomplete.

DOI's investigation demonstrates that its original recommendations have not been fully realized or implemented, and underscores the critical need for DOC to make significant improvements to its screening process for those applicants seeking to become COs in City jails. DOC should now implement the following recommendations from the 2015 Report:

- DOC should have a more thorough and standardized applicant review process; the application and review process should be computerized;

- DOC should implement in-house training for investigators in investigative and interview techniques that is relevant to recruiting and evaluation COs, and have a written AIU investigator manual;

- AIU investigators should use law enforcement and public databases as investigative tools and as collateral checks on applicants;

- DOC should staff AIU properly to enable investigators to thoroughly investigate and vet candidates;

- DOC should engage in a more rigorous review of the psychological testing presently employed and decisions by supervisors should be more thoroughly explained in writing; and

- DOC should have a system in place to proactively monitor applicants who are hired despite red flags.

DOI Commissioner Mark G. Peters thanked DOC Commissioner Cynthia Brann, and her staff, including General Counsel Heidi Grossman, for their cooperation in this investigation.

This investigation was conducted by DOI's Inspector General for DOC, specifically Special Investigators Lawrence Bond, Robert Ellis, LaShana M. Taylor, Cindy Tsui, Vincent Valerio, Lauren Kerstein, Rhonda Young, and Ferdinand Torres, Chief Investigator Anthony DeLeo, Confidential Investigators Matthew London, Kelly Melendez, and Zoe Swenson, Assistant Inspector General Michael Garcin, and Deputy Inspector General Richard Askin, under the supervision of Inspector General Dana A. Roth, Associate Commissioner Paul Cronin, Deputy Commissioner/Chief of Investigations Susan Lambiase, and First Deputy Commissioner Lesley Brovner.

*DOI is one of the oldest law-enforcement agencies in the country and New York City's corruption watchdog. Investigations may involve any agency, officer, elected official or employee of the City, as well as those who do business with or receive benefits from the City. DOI's strategy attacks corruption comprehensively through systemic investigations that lead to high-impact arrests, preventive internal controls and operational reforms that improve the way the City runs.*

DOI's press releases can also be found at twitter.com/NYC_DOI
Bribery and Corruption are a Trap. Don't Get Caught Up. Report it at 212-3-NYC-DOI.

b008



# New York City Department of Investigation
# Report on the Recruiting and Hiring Process for
# New York City Correction Officers

**MARK G. PETERS**
**COMMISSIONER**

**January 2015**

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 302 of 353

b009

Over the past year, the Department of Investigation (DOI) has conducted an extensive investigation into systemic illegal conduct at the Department of Correction (DOC) Rikers Island facility. As a result, DOI has already arrested or referred for discipline 23 Rikers staff and more than 30 inmates for crimes related to violence, contraband smuggling and falsification of documents and evidence. DOI has also issued a detailed report on the problem of contraband smuggling that resulted in unprecedented changes in security and screening, including the agreement to use drug-detecting canines.

Related to these problems is a failure to recruit and hire consistently excellent staff at the Correction Officer (CO) level. Most COs perform a difficult and dangerous job in a professional and competent manner. However, DOI's investigation reveals that DOC's hiring process has failed to recruit sufficient talented COs and has failed, in some instances, to weed out those who would abuse their position.

As an integral part of DOI's investigation of DOC's recruitment and applicant screening procedures, DOI has now reviewed over 150 applications of recently hired COs. Of these, 54 had significant red flags that should have either precluded their hiring altogether or at least required significant follow up or monitoring.[1] For example, among the more than 150 files DOI reviewed, we observed the following:

- Ten of the CO files indicated that the applicant had been arrested more than once. One CO had pleaded guilty to harassment in a domestic violence case. Another had several arrests and had previously been fired as a security guard after being caught stealing from the store he was hired to guard.

- 65 of the CO files indicated that the applicant's psychological exam raised some form of concern about his/her ability to perform his/her duties. More troubling, several raised significant red flags. In one case, the applicant's psychological exam indicated "low personality development" and the applicant was rejected by the Director of the Applicant Investigation Unit (AIU). However, despite this finding, a DOC Deputy Commissioner reversed that decision and hired the CO anyway. A detailed explanation for the reversal is missing and the file includes notation that the applicant was a "family friend of [Correction Officers Benevolent Association President] Norman Seabrook."

- 79 of the CO files indicated that the applicant had friends or relatives who were or had been incarcerated. More troubling, a number of these included current inmates and situations in which significant contact could not be explained. Such relationships between inmates and COs present a considerable security threat, especially as inmates often use these relationships to extort, coerce and control COs. One applicant had nine relatives who had been incarcerated.

---

[1] We note that during our review, DOI identified many more files that had at least some cause for concern. However, these 54 files are representative of those that DOI identified as having multiple and/or significant red flags.

1

b010

Another received calls from inmates on her personal telephone and could provide no viable explanation to AIU for the calls.

- In 54 of the CO files, the applicants clearly failed to demonstrate the "good character and satisfactory background" required of every CO. The failures ranged from significant personal debt of over $400,000, to a candidate with multiple arrests and previous employment at a strip club that was the target of prior criminal investigations.

All of the above applicants were hired.

Beyond the specific problems noted above, DOI conducted over 200 hours of interviews with DOC staff and site visits and review of more than 75,000 documents related to the hiring process. This review demonstrated significant systemic problems that clearly contributed to a process in which many applicants with significant red flags could be hired. For example:

- DOC did not properly train the staff assigned to handle candidate screening: Many red flags in files were simply missed or the staff had no ability to evaluate or follow up on the problems. Indeed, while staff evaluated all candidates on a scale of 1 to 5, interviews indicated confusion even on the basic fact of whether a "1" or a "5" was the best score. In any event 90 percent of applicants received a "3" rating, thus making the rating system effectively useless.

- DOC did not make use of basic background screening tools: DOC did not check credit reports nor did it effectively verify personal information for candidates. Most troubling, DOC did not require screening staff to check DOC's Visitor Express database to find out whether applicants have visited inmates in jail – a sign that applicants may have connections to the very people they are to guard.

- Until recently, DOC had no significant process to screen applicants for gang affiliation. Even where DOC was aware of gang affiliation in newly hired recruits, it previously failed to coordinate with its own gang intelligence unit to take appropriate precautions. While DOC has now corrected this problem in its screening process, DOC's Correction Intelligence Bureau (CIB) still estimates that there are dozens of staff with gang affiliations.

- DOC did not have a meaningful recruitment strategy: DOC disbanded its Recruitment Unit in 2009 and since then has had no real recruitment outreach efforts. As a result, DOC is not able to recruit sufficient, qualified applicants such that even after a rigorous screening process there will be the requisite number of candidates to fill the ranks of new COs.

2

E098

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 304 of 353

b011

The failure of DOC to properly screen CO applicants has had real world consequences. Of the 23 staff that DOI arrested or recommended for discipline in the past year, DOC was able to readily produce 13 of their applicant files. Of these, six had red flags of the type described in this Report. In other words, proper recruitment and screening should have eliminated at least 25% percent of the arrests and disciplinary referrals that DOI was forced to make last year alone. Moreover, of the 54 newly hired staff with red flags noted above, already three no longer work for DOC after being implicated in incidents of misconduct and two have since resigned for unknown reasons.

This report describes all of these problems in further detail and makes recommendations for improvements going forward. We hasten to note that these problems are the result of a decade or more of institutional neglect. They cannot be quickly or easily solved. This is especially so now, given the numerous, and immediate issues that DOC management must confront. However, these problems must be tackled as part of any long lasting reform.

Since DOI's review of the AIU, DOC has already made some improvements. Notably, both the Director and Deputy Commissioner who were responsible for the hiring of the applicants DOI reviewed have been replaced. DOC has also allocated additional staff to the unit, including COs. Finally, DOC has now agreed to implement the additional recommendations contained in this report. At a recent meeting, DOC outlined a series of further aggressive steps to solve this problem that are addressed in the recommendation section below. We are encouraged by these changes.

## I.    Background: DOC's CO Application Process

The DOC CO application process begins when the Department of Citywide Administrative Services (DCAS) publishes a Notice of Examination (NOE) on its website. The NOE provides the public with basic information about the job of CO and the application process, as well as the basic qualifications required for the position.[2] Anyone who wants to become a CO first must take a Civil Service examination, administered by DCAS. After the applicants have completed the examination, it is rated. Once the exam is rated and scores are finalized, the civil service list resulting from the exam is made public and eligibles receive a Notification of Results (NOR) card with their score and civil service list number. The civil service list, which is issued by DCAS, ranks the applicants by their score.[3] DOC's AIU List Management Unit

---

[2] These published standards include the requirement that applicants successfully complete the requirements established by the State of New York for Peace Officers and that they maintain their status as Peace Officers for the duration of their employment.

[3] DOI learned that there is a delay of over three years between the test date and the date that AIU receives a certified copy of the list from DCAS. In October 2014, DCAS certified CO Exam 1318, which was held in June 2011. AIU Executive Director Larry Johnson told DOI that this delay costs DOC the opportunity to hire high-quality applicants who will find employment elsewhere. DCAS confirmed that lists must be published and then established in exam date order. This does not prevent hiring opportunities as lists are established based on DOC's hiring needs and the timeframe for DOC to exhaust older lists. This particular list was made public in

3

b012

(LMU) then contacts every applicant on this civil service list to begin the investigation process to ensure that they meet certain criteria, including possessing a valid driver's license, being a United States citizen, and meeting educational and work experience requirements. The list is established, as needed, and certified to the agency to make appointments.

As part of the recruitment process, LMU invites eligible applicants to an orientation program. During this program, AIU, among other things, informs the applicants about the duties of a CO and initiates a criminal history check.

Following this orientation, the candidates undergo medical and psychological screenings – by DOC's Medical and Psychology Units, respectively – and a background investigation. For the background investigation, an AIU "case coordinator" interviews the applicant to review his or her background questionnaire, which includes questions about the applicant's current and prior residences, family, education, employment record, criminal background, family's criminal background, driver's license, financial debts, and drug and alcohol use. The case coordinator then contacts the applicant's former employers, reviews his or her social media pages, examines some inmate visitation and telephone call history, and confirms information that the applicant has provided on the background questionnaire.

Once both the Medical and Psychology Units have found the applicant qualified, and the background investigation is complete, the case coordinator prepares an analysis of the candidate on a Case Review Sheet, which is sent to AIU's Executive Director.[4] In turn, the AIU Executive Director examines the file and Case Review Sheet, makes a hiring recommendation, and forwards the applicant's Case Review Sheet and medical reports to the Deputy Commissioner of Operations.[5] The Deputy Commissioner has final say over whether to hire the applicant, pending an agility test, and may reject the AIU Executive Director's recommendation.[6]

AIU can determine that a list eligible is Not Qualified for medical, psychological, or character reasons. If DOC determines that an eligible is not qualified, he or she may appeal to the Civil Service Commission. Absent a successful appeal, however, eligible is removed from the Civil Service list. After unqualified

---

March of 2012. The list remains public until the agency requests that it be established. DOC requested that the list be established in May of 2014 and DOC requested that the list be certified to them for hiring in October 2014.

[4] Since August 18, 2014, Larry Johnson, Ed.D., has been AIU's Executive Director. Before Director Johnson's appointment, the position was held by AIU Director David A. Safran, Ph.D., who resigned on August 1, 2014.

[5] Deputy Commissioner of Operations Errol Toulon, Jr. currently is in charge of hiring. At the time that AIU completed its review of the files that DOI examined, the Deputy Commissioner for Human Resources and Training Alan Vengersky was in charge of hiring. Vengersky retired effective August 9, 2014. At the time that these files were processed by AIU, the first round of review was done by a civilian investigator, the second by then AIU Director Safran, and the third by then Deputy Commissioner Vengersky.

[6] The agility test, also known as the physical ability test, measures, among other things, an applicant's strength and endurance. Components of the test include running, lifting the weight of an inmate, and ascending stairs.

4

b013

candidates are removed from the list, DOC must choose who to hire from the remaining candidates using the "1 in 3" rule. This rule requires DOC to hire one of the top three candidates on the list for the first available CO position, and fill each remaining CO position by choosing one of the next three eligible candidates. The remaining two candidates who are not selected will be considered as part of the next group of three. If a candidate is considered but not selected three times, that person is removed from the list without the opportunity to appeal DOC's decision.

Once hired, the CO commences employment subject to a two-year probationary period where the CO can be terminated without many of the civil service protections afforded to officers who have completed their probationary period.

## II.    DOI Reviewed Over 150 Random Applicant Files For Recently Hired COs. In Many Cases the Applicants Were Not Fit for Service and Should Not Have Been Hired.

As noted above, DOI reviewed a random sample of 153 applicant files for recently hired COs.[7] 54 files, 35%, presented significant red flags that should have either precluded their hiring outright or required further follow-up or monitoring. None of these necessary safety measures occurred. Moreover, in just the past year, at least three of the applicants with red flags have already had some sort of disciplinary issue.

Below, we discuss some of the significant red flags that went unaddressed in the DOC hiring process.

### A.    The Applicant File Review Revealed that AIU Hired 54 COs Despite the Fact Their Files Showed Potentially Disqualifying Criteria

According to DCAS's NOE, "proof of good character and satisfactory background" is an "absolute" prerequisite to appointment. The most recent NOE lists the following specific factors as possible causes for disqualification: "(a) conviction of a felony; (b) conviction of any offense, the nature of which indicates lack of good moral character or disposition towards violence or disorder; (c) repeated convictions of an offense, where such convictions indicate a disrespect for the law; (d) discharge from employment, where such discharge indicates poor behavior or inability to adjust to discipline; (e) dishonorable discharge from the Armed Forces; (f) conviction for petit larceny and (g) conviction of domestic violence." The NOE also states that DOC may reject an applicant for intentional misrepresentations on his or her application forms.[8]

---

[7] The majority of the files were chosen at random from one recently hired class of new COs. DOI also reviewed files from recent subjects of DOI investigations who were hired in 2012 or later. In total, over 160 files were reviewed. These additional files should not significantly influence the overall numbers in our findings.
[8] DCAS issues a new NOE for each examination, but the factors listed here were used at the time that all the COs, whose files were reviewed by DOI, took the CO examination, and they were listed on the most recent NOE posted by DCAS.

5

b014

DOI found that, using these criteria, 25 of the hired COs lacked the "good character" that DOC requires for its COs and therefore should have been rejected as "not qualified." For example, one application indicated that the applicant had several prior arrests, was fired from his former employment as a security guard, and was arrested after he was caught stealing from the store he was hired to guard. A second CO's application indicated that he had pleaded guilty to disorderly conduct in a domestic violence case, had been fired from a job for poor behavior, and failed the NYPD's background check. Both officers were hired without any monitoring put in place.

DOC also hired COs whose files had evidence of generalized poor character, although not any of the specific attributes found on the NOE's list. Although these CO's did not have any of the specifically prohibited factors, their applications cast serious doubt about whether the COs had the "good character and satisfactory background" required of every CO. Moreover, even if such problems would not eliminate the candidates for character reasons, AIU had the option of not selecting them from the civil service list – an option it failed to exercise.

For example, ten of the hired COs whose files DOI reviewed had been arrested more than once, and some of the COs had significant signs of financial instability. In one instance, DOC hired one CO with $400,000 in debt, despite the Director's acknowledgement in his recommendation that this put him at risk for corruption.

Moreover, DOC hired 79 COs with friends and relatives who were or had been incarcerated, including one CO who listed nine relatives who had been incarcerated. More troubling, a number of these included current inmates and situations in which significant contact could not be explained. Other hired COs had received calls from inmates on their personal telephones, and the assigned case coordinator failed to offer any reasonable explanation for why they received those calls. Such relationships between inmates and COs present a considerable security threat, especially as inmates often use these relationships to extort, coerce, and control the COs. Through its investigations, DOI has found that inappropriate contact with inmates is associated frequently with criminal conduct, including taking bribes for contraband smuggling and committing sexual offenses.[9]

DOI found that twelve of the hired COs had previously been rejected for employment by the NYPD. While it is not surprising that someone would apply to both agencies, DOI found that DOC used significantly lower hiring standards than the NYPD. (As discussed below, DOC's failure to maintain a robust recruitment process may partly contribute to its lower hiring standards.) Of the twelve applicants subsequently hired by DOC, the NYPD rejected six for psychological reasons, one for failing a drug test, one for excessive Vehicle and Traffic Law (VTL) violations, one for

---

[9] DOC prohibits uniformed staff members from having "unduly familiar" relationships with inmates, and requires them to notify DOC whenever a relative, friend, or someone else with whom they have a relationship is incarcerated and housed in the same facility. Failure to make such a notification can result in disciplinary charges. See DOC Rules & Regulations §§ 3.25.040, 3.25.041, 3.25.050, 3.25.060.

6

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 308 of 353

b015

problems uncovered during the background review process, and one because she "failed to appear for appointment or [was] uncooperative," according to a letter from the NYPD Applicant Processing Division (APD).[16] In addition to the twelve applicants rejected by the NYPD, the NYPD had fired one hired CO from a position as Police Cadet for her failure to disclose an arrest for petit larceny. Thus, it appears that most of these candidates were simply unfit for law enforcement – whether working on the streets of New York City as police officers or in its jails.

DOC's hiring of six applicants previously disqualified by the NYPD based on psychological exam results suggests that the NYPD's psychological examination process is more stringent. DOI's visits to both DOC and NYPD psychological testing facilities revealed that the NYPD obtains more information from applicants by giving a lengthier psychological exam and administering a drawing test aimed at revealing personality traits. Thus, while the exams are subjective, the NYPD obtains more information from its applicants to enhance the examination process.

**B.** **DOC Failed to Document Its Determinations Properly: The Director of AIU Excused Bad Conduct for Inadequate Reasons and the Deputy Commissioner at Times Hired CO's after the Director Rejected Them, But Provided No Viable Explanation. At Times, Political Rather than Merits Based Reasoning Applied.**

In any hiring system, it is important that decisions be documented, especially where senior staff overrule the initial determination of line investigators. Not only does this provide an important record of the agency's overall thinking and process, but it forces supervisors to explain their decisions and thus increases the chances that they will be made thoughtfully. Such documentation was woefully absent in 25 of the files reviewed by DOI.

DOI found that, at each stage of the process, AIU officials lacked a clear system of recommendation for CO hires. Case coordinators often did not give recommendations. The Director, who is responsible for recommending hires, until recently, used a number system that offered little guidance. And the former Deputy Commissioner, who had final authority over hires, wrote only brief notes by hand in the reviewed files that offered little to no reasoning behind his hiring decisions.

DOI further found that AIU case coordinators summarized their findings for an application, but, in many cases, did not clearly recommend or exclude candidates. Further, former AIU Director Safran evaluated candidates on an apparent scale of 1 to 5, but this system offered little guidance as to whether a candidate should be hired. DOI was unable to determine the meaning of this rating system, even after speaking with former Deputy Commissioner Vengersky, who stated on nearly all applications reviewed by DOI that he "agreed" with Safran's candidate assessments. This, despite

---

[16] Another CO failed the Police Officer civil service exam and a CO was rejected from a position as a police cadet for a reason unclear from the AIU file.

7

FILED: KINGS COUNTY CLERK 11/08/2020 00:00 PM
NYSCEF DOC. NO. 162

INDEX NO. 518948/2019
RECEIVED NYSCEF: 08/08/2029

Case 1:26-cv-00914-DEH-SN     Document 52     Filed 03/25/26     Page 309 of 353

b016

the fact that Vengersky told DOI that he was unsure of whether 1 or 5 is the highest rating. DOI did not speak to former Director Safran, who left DOC in early August 2014.

In any event, the 5-point scale was meaningless because almost all of the applicants received the same score regardless of their merit. Of the 153 reviewed files, the AIU Director rated approximately ninety percent of the applicants a "3" and rated approximately eight percent of the applicants a "4." Two percent received no rating.[11] No applicants from the reviewed group received a rating of 1, 2, or 5.

Further, the quality of applicants whom the Director rated a "3" varied drastically. For example, Candidate A was working in a federal government security position at the time of her application and had no inmate associations, no prior arrests, no prior terminations, slight debt from credit cards and school loans, and no psychological issues. Candidate B was terminated from his prior employment as a security guard after he was caught stealing from the store he was assigned to guard, and he was arrested four times. Yet both applicants received a rating of "3." Nor were the Deputy Commissioner's handwritten comments of any use. Typically, he gave only limited, generalized comments, such as "Agree. Some risk. Hire pending agility test." This level of "analysis," or a slight variation of it, appears in nearly every file examined by DOI.

When the process got to the AIU Director it was further flawed. DOI found that, in 18 files, approximately 12% of those reviewed, the AIU Director excused serious red flags without adequate explanation. Indeed, in several applications, the AIU Director excused prior arrests and other bad conduct as isolated incidents or youthful indiscretions.

In one case, the CO's application file contained signs of potential corruption, including serious financial instability, that were dismissed as mere "immaturity." This CO was arrested earlier this year after meeting with a DOI undercover investigator, accepting money and placebos that he believed to be real drugs, and delivering them to an inmate who was a DOI confidential informant. The fee he charged and accepted for this delivery was $500. DOI's investigation determined that the CO had engaged in similar conduct, and accepted similar fees, on multiple occasions. In this CO's AIU Case Review Sheet, then Director Safran commented, "He has shown no major issues in the vocational sphere, albeit he has quite a few jobs and appears to be unable to focus on career choices. Given his age, much of this behavior may be due to immaturity." He further stated, "His traffic violations and lack of due diligences with regard to paying his student loan may indicate some issues with impulse control, but again this may also be attributed to immaturity. As such, he will be qualified and rated a 3." While these traits might not be an absolute bar to hiring, the Director offered a notably weak excuse for the serious problems identified and

---

[11] Seven applicants received no rating number – all of them because they were not recommended by the Director who gave the ratings, a decision which was later overturned.

8

b017

failed to provide sufficient justification for recommending this applicant for hire.

DOI further observed flawed and arbitrary hiring decisions by the former Deputy Commissioner in charge of the applicant review process, including seven cases where the Deputy Commissioner hired an applicant whom the Director had rejected. In all cases, as demonstrated below, the Deputy Commissioner – despite the unusual nature of his action – gave only a brief, and barely legible, handwritten justification for his decision.

In one file, the Director rejected the applicant, whom the file notes was a "family friend of Norman Seabrook," president of the Correction Officers Benevolent Association, because he was concerned, based upon the nature of her past employment, that she could not handle the stress of working as a CO. In addition, the Director noted that, due to the low personality development score of three on a scale of seven that she received in her psychiatric exam, she was a poor candidate for law enforcement and that she would be too deferential to other people, including inmates. Initially, the Deputy Commissioner, in his note, asked whether DOC had hired COs with a personality development score of only three. But, later, without explanation, he overruled the Director and recommended her hire.

In a second case, the Director found that the CO's application had several problems – including questionable receipt of public assistance and a potentially false statement about her termination from a prior job. In hiring this CO, the Deputy Commissioner offered no explanation except for sparse, illegible notes, and a reference to the candidate's internship on Rikers Island.

In a third case, the Director, in his summary, found that the candidate "present[ed] as a sycophantic individual who ha[d] some questionable moral undertakings in his life." In addition, the applicant had over one million dollars in the bank, and the Director questioned why the candidate "would desire [the CO position] unless there was some secondary gain that he had in mind." In overruling the Director, however, the Deputy Commissioner merely wrote, "Reviewed; hire pending agility test results."

In the fourth case, among other cited issues, the Director stated that the candidate's "psychological exam was indicative of being inattentive and defensive, characteristics which are not ideal in a prospective CO." The Deputy Commissioner, however, approved the hire, writing a brief, illegible comment before recommending, "Some issues, but hire pending agility test results."

In the fifth case, the Director noted that the candidate had failed the NYPD psychological exam three times and the DOC psychological exam one time -- all for poor stress tolerance – but the results of the DOC exam were overturned on appeal. The Director recommended not hiring her "based on poor stress tolerance and poor adjust [sic] to the demands of adulthood." The Deputy Commissioner then approved her hire with a brief illegible note.

9

b018

In the sixth case, the Director stated that it was unclear that the candidate could accede to the demands of correctional work, as he had no work experience until he was 30 years old and seemed to have substantial "off time" for travel at his prior job. He also questioned his ability to adjust to the demands of adulthood. He did not recommend the candidate for hire. The Deputy Commissioner overruled the Director, with a brief, illegible note.

In the seventh case, the candidate had previously been shot by a gang member in a street altercation. He had a prior employment termination and an arrest record. The Director disapproved the candidate, but the Deputy Commissioner overruled the Director noting only: "Disagree. Some risk, but hire pending agility test results."

With all of these applications, the Deputy Commissioner had the duty and responsibility to overrule the Director if he disagreed with his decision. However, in each instance he failed to explain why the Director's judgment was incorrect or address the serious issues raised by the Director.

### C.    AIU's Files Lacked Any Indication that the Applicants Had Been Screened for Gang Affiliation.

Significantly, prior to recent changes to the applicant screening process, AIU did not screen the reviewed applications for gang affiliation. Indeed, DOI found no notations in the files that AIU screened for gang affiliation or consulted with the DOC's Correction Intelligence Bureau (CIB).[12] As DOI has learned through interviews with CIB personnel, CO gang membership is potentially the greatest threat to DOC's security because gang members generally place their gang allegiance above their CO duties. CIB estimates that dozens of DOC employees are members of gangs and states that inmates frequently report that COs are involved in gang activity.

More concerning, DOI discovered one file during review where the applicant admitted to prior associations with known gang members during his psychological exam. Also concerning was that he initially denied these associations in the screening sheet he completed for AIU, apparently only admitting to such after it was discovered in the psychological exam. Although the candidate denied gang membership, he submitted a detailed statement to supplement his admission explaining that a close family friend was an identified gang member, and the applicant regularly socialized with him and his fellow gang members during his teenage years. He also admitted to still having limited contact with some of these individuals during the time of his AIU background investigation.

What is not clear from the file is whether the association was discovered through AIU's background screening or was merely self-reported by the applicant. Notwithstanding having the applicant resubmit his screening sheet to indicate he had

---

[12] CIB is responsible for policing the City's jails. Among other things, it monitors gang activity in the facilities, investigates crimes committed by inmates, including slashings and stabbings, and processes arrests.

10

b019

prior associations, the file lacks any further follow up or targeted investigation on the matter once the information was reported. Instead, AIU staff made a notation of the risk this association presented, noting in the applicant's file that "if he is approved for hire his past gang associations should be made known to [DOC's] gang intelligence." The candidate was hired. However, DOI has confirmed that no such notification was made to DOC's gang intelligence unit.

DOI investigators, however, have learned that CIB is now assisting AIU in screening applicants for gang membership. The AIU medical unit photographs applicants' tattoos and sends the photos to CIB, which then analyzes the tattoo alone, without any other identifying information on the candidate, to determine gang affiliation in an objective manner. According to Director Johnson and Medical Unit Supervisor Pamela Eanes, DOC has rejected six applicants after CIB found that their tattoos suggested gang membership.

**III.    DOI's Review of the Hiring Process Showed Various Systemic Flaws that Led to the Hiring Problems Found in the DOI Case Review Discussed Above.**

In addition to the extensive review of CO applicant files detailed above, DOI also interviewed eleven AIU staff and made multiple visits to AIU's offices to understand their hiring process. To assist in our evaluation of DOC, DOI also consulted with DCAS staff responsible for developing the NOE and tracking DOC's CO hiring decisions and consulted with the NYPD APD to learn their hiring process. As a result, we found various systemic failures that directly contributed to the problems identified in the case review. The most important of these problems are discussed below.

**A.    DOC Does Not Properly Train its AIU Staff. As a Result, the Staff Does Not Conduct Thorough Investigations and Does Not Make Use of Modern Investigative Tools.**

Through its discussions with AIU staff, DOI investigators discovered that AIU lacks a regimented training program. AIU does not train its case coordinators in interviewing techniques, case management, or basic investigative practices. Indeed, AIU lacks a written manual describing its investigative strategies and procedures.

By contrast, supervisors at the NYPD informed DOI that the APD provides a two-week training course for new investigators, offers refresher training courses, and has written guidelines for the unit. The two-week course includes training in investigator responsibilities, use of computer databases, processing candidates, interview techniques, preparing reports, and using APD forms. Further, investigators within APD's Computer Investigations Unit have special training in identifying signs of gang membership.

11

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 313 of 353

b020

The contrast in the DOC and NYPD process is striking. As a result, DOC screening is not sufficiently thorough, does not follow up on obvious issues and does not make use of modern investigative technology. We discuss these specific concerns below.

### i. AIU fails to thoroughly investigate applicants' backgrounds.

DOI found that AIU case coordinators do not thoroughly investigate applicants' backgrounds. DOI investigators discovered, through their interviews with AIU personnel, as well as their examination of applicant files discussed above, that case coordinators rarely made field visits and failed sufficiently to investigate applicants with past problems that may be a basis for disqualification.

AIU case coordinators reported to DOI that they visit applicants' personal references and homes infrequently. Director Johnson told DOI, and case coordinators confirmed, that case coordinators make these field visits in their discretion, and only if a problem is uncovered during the applicant's background investigation. For instance, a case coordinator reported that he once visited an applicant's former employer with his supervisor's permission. AIU ultimately rejected the applicant after the visit uncovered negative information in the applicant's work history.

By contrast, the NYPD APD has a "Residency Unit" that conducts field investigations and completes personal reference reports for every viable candidate eligible for the position of Police Officer. This unit ensures that the applicants comply with residency requirements, and it interviews the applicants' friends, coworkers, and/or neighbors.

Further, DOI, in reviewing the files discussed below, found that AIU hired several applicants without ever obtaining key background information required in their applications. For example, DOI found eleven questionnaires where the hired applicants did not answer whether they had ever been disqualified or barred from employment by any City, State, or Federal agency, and the case coordinators never addressed the omission.

These types of omissions are not possible in an NYPD application because its APD uses computerized application forms that require the applicant to answer every question.

Moreover, in its file review, DOI found more than one file in which a CO applicant denied knowing inmates who called his or her phone number and the CO was still hired without further inquiry. For example, one CO reported that she did not have any current or former incarcerated associates, but her cell phone was called once by an inmate in 2010 and she received over 20 calls to her home phone, one lasting 15 minutes, from five inmates between 2002 and 2007. She gave AIU a statement saying that she did not know any of the people who called her home phone, but provided no further information, including who was living with her at the time

12

and might have received the calls. Nor did she give a statement about the call to her cell phone. The AIU Director did not address these phone contacts in his comments, and the CO was hired without any further follow-up or explanation of the phone calls.

In addition, DOI found files where AIU failed to address applicants' suspicious explanations of inmate contact adequately. For example, one hired CO initially told AIU, in her application, that she had no incarcerated associates. After her case coordinator found that an inmate had called the CO's cell phone twenty times, she claimed that she had not spoken to anyone and that she could think only of one possible caller. In a notarized statement the CO said that she met the caller in her neighborhood, had a few brief conversations with him when he was on Rikers Island, tried to "disassociate herself" from him, and knew only his nickname. In the Case Review Sheet, the case coordinator appeared skeptical, but the AIU Director, in his summary statement on the case review sheet, completely ignored the issue, approving the CO for hire. The Deputy Commissioner gave final approval, commenting only: "Agreed, some risk, hire pending agility test results."

### ii. AIU fails to make use of modern investigative technology.

DOI investigators discovered that AIU has failed to provide its case coordinators with the necessary tools to conduct thorough background investigations. AIU does not check credit scores or personal information in a LexisNexis database, use "Virtual Identity Reports" to find all applicant social media sites,[13] or listen to recorded conversations between applicants and inmates at DOC facilities when they are detected by DOC's call monitoring system.

DOI found that AIU does not check the credit histories of its applicants, despite the known risk for corruption associated with personal debt. Nor does it use a database, like LexisNexis, to verify personal information of all candidates, including their addresses, telephone numbers, and household members, and to determine whether they have associations with inmates. Indeed, DOI discovered that AIU case coordinators currently lack access to LexisNexis or similar databases, in part, because AIU's current director mistakenly believed that a case coordinator had access to LexisNexis, when the coordinator did not.

By contrast, the NYPD APD checks the credit history and personal information of every Police Officer applicant to verify the information provided by the candidates.

In addition, DOI found that, until recently, case coordinators lacked access to social media sites, including Facebook, YouTube, Instagram, and Twitter. Instead, case coordinators had applicants display their social media accounts on their own

---

[13] Virtual Identity Reports are generated by the LexisNexis Accurint service and can tell whether a person's email address is linked to certain social networking sites, including Facebook and LinkedIn, and can provide links to the person's profiles on those sites.

13

b022

phones during interviews. Even now, AIU has not provided its case coordinators with access to "Virtual Identity Reports," which can identify applicants' unreported social media websites. As a result, case coordinators must rely upon the applicants to disclose their social media websites.

By contrast, DOI learned that the NYPD APD has a "Computer Inquiry Unit" that completes a comprehensive computer background check. Among other things, this unit is trained in identifying signs of gang activity among the applicants, which are often apparent from an applicant's social media presence.

Further, AIU does not require its case coordinators to check DOC's Visitor Express database to find out whether applicants have visited inmates in jail. Although case coordinators regularly check DOC's Inmate Information System (IIS) to see if applicants have visited inmates, Visitor Express is newer, is updated more regularly, and allows users to view photos of the visitors to confirm identity. Not utilizing Visitor Express could result in AIU failing to uncover applicant relationships with inmates that present significant integrity concerns.

Also, DOI found that AIU fails to listen to DOC recorded telephone calls between applicants and inmates, even though inappropriate personal relationships between inmates and COs are a serious corruption risk that have surfaced in previous DOI investigations. The Inmate Financial Commissary Management System (IFCOM) is a telephone monitoring system that tracks inmate telephone calls, and AIU has the ability to use it to investigate whether applicants have had telephone conversations with inmates. DOI's file review, however, found at least two files where the case coordinator had failed to run an applicant's telephone number in IFCOM.

Moreover, DOI found that case coordinators, upon identifying a telephone call between an applicant and a DOC inmate, do not listen to the recording of that telephone call. Indeed, of the approximately 150 files discussed above, seven files had IFCOM printouts showing calls from inmates to the hired CO's telephone that lasted over a minute and that were recent enough for AIU to obtain a recording.[14] When DOI investigators asked about the general failure to obtain recordings, case coordinators responded that they believed that DOC policy prohibited them from listening to inmate calls in the context of a background investigation. Director Johnson informed DOI that he did not know whether anything prohibited coordinators from listening to these recordings and said that he would review this matter.[15]

---

[14] DOC records inmate telephone calls and maintains those calls for eighteen months. Inmates are warned by posted signs and recordings before the call that the contents of their conversations are being recorded.

[15] One case coordinator told DOI that he was denied permission to listen to an applicant's telephone calls after submitting a formal request. During DOI's conversations with former Deputy Commissioner Vengersky, he said that uniformed executive staff resisted giving AIU this authority because they thought that a unit outside of AIU should listen to the calls. But AIU never pursued the matter, and nobody at DOC, in AIU or any other unit, listens to inmate calls for AIU background investigations.

14

b023

## B.    DOC Does Not Have A Meaningful Recruitment Strategy.

In order to have sufficient qualified candidates to put through a rigorous screening, DOC must first have a proper recruitment plan. However, as discussed below, no such plan exists or has existed since at least 2009.

During conversations with AIU Director Johnson, DOI investigators, learned that DOC does not have a meaningful CO recruitment strategy. DOC does not have an advertising campaign, recruitment pamphlets to distribute to the public, or a functioning recruitment website. Furthermore, DOC does not have any program to reach out to college students with an interest in careers as COs. According to Director Johnson, DOC's only recent recruitment event took place at Briarcliffe College, and only because that institution reached out to DOC.

DOI investigators learned that DOC previously had a Recruitment Unit under the DOC Office of the Chief of Administration, which was located at the Correction Academy and was run by at least one Captain and eight to ten COs. The Recruitment Unit was established in 2004 but was disbanded in 2009 because of budget cuts and because DOC executives were satisfied that the program had recruited approximately 8,000 candidates to take the CO exam. When the Unit was active, the recruitment officers would attend job affairs in New York City, Long Island, and at military bases. The Unit also had a website which no longer functions, and an automated telephone hotline. That number – 877-NY1-BOLD – is still in service, providing inaccurate information about the availability of walk-in CO examinations and referring people to the defunct website.

In addition, DOI learned from a former member of the Recruitment Unit that, until about 2008, DOC had participated in the New York City Law Enforcement Exploring Program, a law enforcement education, outreach, and training program aimed at young people aged fourteen to twenty years old.[16] This is a popular recruitment tool with a range of law enforcement agencies, including the FBI and NYPD, and, at the end of 2013, it had 4,271 youth participants. DOI asked the citywide coordinator[17] for Law Enforcement Exploring why DOC withdrew from the program, and he responded that the woman who had run the program retired from DOC. The citywide coordinator also said that the Boy Scouts of America, a partner in the program, has tried to renew DOC's participation, but their attempts have been unsuccessful.

By contrast, the NYPD maintains a recruitment website at www.nypdrecruit.com. This website contains a variety of useful information about benefits and salary, the hiring process, the police exam, and job requirements. It even has special features, including an interactive overview of the hiring process, a "Day in

---

[16] www.nyexploring.org

[17] The citywide coordinator is a detective with the NYPD who oversees the Law Enforcement Exploring Program for the NYPD and is the liaison to all other NYC Law Enforcement agencies with Law Enforcement Exploring programs.

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 317 of 353

b024

the Life" video of a police officer, an interactive video precinct tour, and the opportunity to chat online with a recruiter.

DOC has informed DOI that it has discussed the recruitment issue internally and currently is developing ideas for recruiting, but nothing has been finalized and there is no set date for implementation.

### C. DOC does not continue to investigate COs after they are hired, even if problems were uncovered during their background investigation.

When a questionable CO is hired, DOC does not continue to investigate issues that arose during the application process. The former AIU Director wrote in two Case Review Sheets that DOC should continue to monitor the applicants for concerns raised during their background investigation, but DOC lacks procedures to monitor these applicants once they are hired. Indeed, the current AIU director has told DOI that he is unaware of any such procedure.

One of these two hired COs, whom the former AIU director suggested for monitoring because of concern that she might be too conciliatory toward inmates, was subsequently fired for having an "unduly familiar" relationship with an inmate, in violation of DOC rules, following an investigation by DOI. Even more concerning, the CO was linked to the inmate's criminal activities after he was released from DOC custody, and she was present when the inmate met with an undercover officer posing as a "hitman." The inmate was subsequently arrested for his involvement in a murder-for-hire conspiracy.

The CO had listed this same inmate as an incarcerated friend during her AIU background investigation. IFCOM detected many telephone calls between the two, and, in response to the IFCOM information, the CO submitted supplementary forms for her application, admitting that she spoke to the inmate and visited him, but advised she would cease contact with this inmate.

In the applicant's case review sheet, based in part upon her prior associations with inmates, the Director wrote, "It is possible that she may relate to inmates she is charged to watch in a more conciliatory fashion than would be desired. Thus, if she is approved for hire, it is recommended that she be monitored while on the job." The Director, giving her a rating of "3," then approved her for hire. As discussed above, however, DOC lacked any procedure to monitor this applicant, and, as DOI learned, her relationship with the inmate continued in violation of DOC rules. During an interview with DOI after the inmate's arrest, the officer denied involvement in any criminal activity, but admitted that she failed to notify DOC of her continued contact with the inmate as she was required to do. She was subsequently terminated, less than a year after her start date.

16

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 318 of 353

b025

### D.    AIU uses pen and paper applications and its computer system cannot process basic statistical information about applicants.

DOI investigators found that AIU uses a highly inefficient pen and paper application system, keeping each application and its supporting documents in a paper folder instead of storing that information in a computer. Moreover, AIU's computerized tracking system tracks only the status of files and is unable to generate useful statistical information, including how many applicants it rejects and the reasons for those rejections.

In addition, DOI found that applicant files are deficient beyond AIU's failure to use available technology. The files lack uniform components and have no checklists to document what the files contain. The application questionnaire itself appears unprofessional and apparently was copied from NYPD's form. Indeed, page 17 of the AIU background questionnaire mistakenly tells CO applicants that they must adhere to the NYPD's Patrol Guide procedure 203-10 "Public Contact/Prohibited Conduct" if appointed to the "New York City Police Department."

By contrast, as DOI found, the NYPD APD uses both a computerized application form, which is completed by applicants online, and a computerized investigator case review sheet that tracks the status of each case and whether or not specific materials have been collected. The computer case review sheet allows investigators to comment on each form or piece of information they gather and record when the form was obtained or the candidate provided the information. The computer system is also accessible by supervisors, allowing them to monitor the status of pending applications.

### E.    DOC does not allow investigators to eliminate candidates efficiently.

During their conversations with DOI's investigators, AIU case coordinators complained most about the time that they wasted investigating a large number of severely deficient candidates. According to the case coordinators, even if they find a candidate unqualified early in the background investigation, they still must complete the entire background process before officially eliminating the applicant. One case coordinator told DOI that she had investigated an applicant with a felony conviction for statutory rape. She ultimately convinced the applicant to withdraw, but did not reject him automatically because she thought that rules prohibited her from doing so.

The current Director initially confirmed to DOI that investigations must continue even after case coordinators discover that applicants are clearly unqualified. During ongoing conversations with Director Johnson, however, the Director said that AIU recently eliminated an applicant for the first time in his tenure without reviewing the entire file, based upon gang affiliation and an arrest history.

17

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 319 of 353

b026

Increasing the difficulty of eliminating bad candidates, AIU has no background and character factors that it uses to disqualify candidates automatically. The NOE tells exam takers: "Proof of good character and satisfactory background will be absolute prerequisites to appointment." But the NOE's listed character and background factors, discussed in detail in Section II A above, are mere guidelines to determine whether candidates are qualified. Even the felon, who had a statutory rape conviction discussed above, could have been hired as a CO because DOC still could have found him "qualified" despite his criminal background.

By contrast, the NYPD Police Officer NOE specifically states what will automatically disqualify a candidate. For example, the NYPD NOE states that convictions of a felony or a domestic violence misdemeanor automatically disqualify a person from becoming a police officer. In addition, NYPD APD stops its investigation immediately if it uncovers a felony conviction, a domestic violence misdemeanor conviction, or a dishonorable discharge from the military, and then begins procedures to eliminate the candidate from the applicant pool.

## IV.    Based upon its findings, DOI recommends a series of changes to the hiring process.

DOC must improve its procedures for recruiting, screening, and hiring to ensure it hires the most qualified COs. To do this, DOC must invest resources in AIU to ensure that it has the best trained personnel and most effective technology. Hiring COs of the highest talent and character is necessary both to handle the difficult tasks facing the City jails today and to nurture the future supervisors and leaders of DOC. Therefore, DOI makes the following recommendations for DOC to increase its applicant pool, improve its screening process, and, if needed, to monitor new hires.

### A.    DOC needs an aggressive recruitment strategy and clear disqualification standards to improve the applicant pool.

DOC currently has no viable plan to recruit COs. It lacks a recruitment unit, does not participate in job fairs, and fails to recruit at local universities. Nor does it have a recruitment website, brochure, or any other reasonable means to inform the public about DOC job opportunities.

Having failed to develop a recruitment strategy, DOC can consider only a limited number of quality applicants for hire. Often, DOC applicants already have been rejected for hire by other city agencies, including the NYPD.[18] As discussed above, DOC has hired many candidates with suspect backgrounds, relationships with inmates, and other corruption risks. The lack of a more robust pool of candidates clearly contributes to this problem.

---

[18] DOC also has hired COs rejected by the Bridge & Tunnel police, the Port Authority police, the New York State Department of Correction, the Human Resources Administration, and the Department of Probation.

18

Case 1:26-cv-00914-DEH-SN     Document 52     Filed 03/25/26     Page 320 of 353

b027

Additionally, as DOI has found, AIU wastes considerable resources investigating applicants who are clearly at risk for corruption instead of eliminating them early in the process. As DOI has determined, DOC's lack of clear standards for disqualifying certain candidates automatically contributes to this waste.

In order to remedy these failings, DOI makes the following recommendations:

1. DOC should reestablish its Recruitment Unit. This Unit should advertise and recruit aggressively, especially at law enforcement oriented schools, and should ensure that its recruitment materials and website are accessible and professional. In addition, DOC should resume participation in the Law Enforcement Exploring program, which, as discussed in Section III B above, has the potential to recruit many young people with a genuine interest in law enforcement. DOC is slated to meet with DCAS to discuss the scheduling of future exams after the current exam schedule ends on June 30, 2015. DOC should have a recruitment plan to attract candidates for those exams.

2. DOC should adopt automatic disqualifying factors, including the conviction of certain crimes, with a goal to eliminate unqualified applicants as quickly and efficiently as possible. Once it becomes clear that a candidate lacks the "good character" required of a CO, such as felony convictions or dishonorable discharge from the armed forces, case coordinators should have the discretion to reject the applicant as "not qualified" without going through the entire process. AIU has eliminated at least one candidate in this manner, and DOI hopes that this represents a change in its practice.

3. DOC should expand its list of potential disqualifying factors to include corruption risks unique to DOC. For instance, DOC should list financial instability because it makes a CO vulnerable to accepting bribes in exchange for contraband smuggling. It should also list current and prior associations with inmates because these associations potentially increase the risk that a CO will have inappropriately familiar relationships with inmates. Finally, it should list present affiliation with gang members as this too presents a considerable risk.

4. In an attempt to curb the number of unqualified applicants, DOC should meet with DCAS to update the language in the Correction Officer NOE. These updates should include any new automatically disqualifying criteria developed by DOC, and be tailored, as necessary, to specific corruption vulnerabilities

19

b028

unique to the agency. Implementing this list and using strict criteria to eliminate certain candidates immediately would allow AIU to devote resources to the background investigations of truly qualified candidates.

B.    DOC must make AIU's candidate screening uniform, thorough, and tailored to the unique corruption vulnerabilities at DOC. Decisions must be properly documented.

Throughout DOI's investigation, investigators received conflicting information about the screening process from AIU staff, and at times staff was not even able to articulate a clear policy in response to investigators' questions. Equally as concerning, AIU investigators reported that they were not trained in conducting background investigations, and that they failed to use all available investigative resources. Finally, decisions by supervisors were at times not properly documented.

In general, DOC's applicant screening process sharply contrasts that of the NYPD APD. The NYPD investigators receive formal training that includes interview techniques and the use of law enforcement databases. Moreover, the APD tracks applicant files in an efficient electronic database, has strict standards to disqualify certain candidates automatically, and employs multiple layers of supervisory review before selecting an applicant. DOI also found evidence that the NYPD's process is more stringent. For example, several of the reviewed AIU files included a notation that the candidate was previously rejected by the NYPD.

To improve DOC's application process, DOI makes the following recommendations:

1. DOC should have a more thorough applicant review process. DOC should adopt a system, comparable to the NYPD APD, in which each applicant must pass through multiple levels of review, by both civilian and uniformed staff, before being approved by a panel of executives. On August 6, 2014, DOC announced vacancies for COs and a Captain in AIU. Since that time, DOC has assigned seven COs and one Captain to AIU.

2. AIU should create a standard detailed checklist identifying all documents that it requires applicants to submit and all AIU investigative steps necessary to complete the background investigation. This, along with a new computer system, should help ensure that all required information is obtained for every applicant.

3. DOC should ensure that all case coordinators are using IFCOM as an investigative tool. Specifically, not only should DOC check

20

FILED: KINGS COUNTY CLERK 02/09/2020 00:09:00 AM PM
NYSCEF DOC. NO. 102

INDEX NO. 518940/2019
RECEIVED NYSCEF: 02/09/2020

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 322 of 353

6029

IFCOM databases for telephone contact with inmates, but it should listen to the recorded telephone calls between the inmate and the applicant. The identification of an applicant's phone number in the inmate database is concerning, and only a review of the content of these calls will allow DOC to determine the extent of the relationship and whether it should disqualify the candidate.

4. DOC should implement standardized training for case coordinators in investigative and interview techniques, to explain the application process, to teach them to use computer databases and other law enforcement tools, and to provide guidance on appropriate hiring recommendations. In particular, gang identification and disqualifying factors related to gang activity must be part of the training course as this type of affiliation by a CO presents a serious threat to the safety and security of DOC facilities. The NYPD APD's two-week training course for investigators with follow-up refresher courses provides one effective model.

5. DOC, using the NYPD APD system as a model, should computerize its applicant file review system. At present, all AIU files are paper based, and many that DOI reviewed were incomplete. Computerization would enhance DOC's ability to store and access information, and ensure that a standard process is followed for every applicant. Additionally, an electronic application questionnaire similar to that used by NYPD would prevent applicants from advancing in the process without filling out required information and allow AIU to develop useful statistical information to help guide its hiring practices.

6. DOC must engage in a more rigorous review of the psychological testing presently employed.

7. Decisions by supervisors, especially the Director and Deputy Commissioner that overrule the judgment of subordinates, must be explained in writing.

C.    **DOC must have a system in place to proactively monitor applicants who are hired but are considered vulnerable to corruption.**

Once a CO is hired, DOC fails to investigate issues that arose during the application process and has no procedure to monitor problematic applicants after

21

b030

they become COs. DOI, however, found more than one instance where the AIU Director recommended that DOC continue to monitor the applicants for questions raised during their background investigation. As discussed above, a hired CO continued her unduly familiar relationship with an inmate after she was working inside DOC facilities and after telling AIU that the relationship would stop after she was hired. No monitoring was done, and this officer was ultimately fired less than a year after her start date for continuing to this unduly familiar relationship.

It is particularly important for DOC to monitor newly hired COs, because they are on probation for two years, and, therefore, can be fired summarily without a lengthy disciplinary process. Terminating the COs at this stage is far easier than eliminating corrupt COs who have tenure and all the procedural rights that it carries.

Therefore, DOI recommends that DOC continue the investigation after hiring the candidate if any issues implicating integrity concerns arose during the application process. At the very least, DOC should monitor these identified candidates on a regular basis to ensure they are not engaging in prohibited conduct. The monitoring should include regular checks of IFCOM, more frequent evaluations by supervisors and enhanced training for the officer.

**V.     DOC is in agreement with the above recommendations, and has already outlined a series of further aggressive steps to address the problems DOI uncovered.**

In a recent meeting with DOC, DOI discussed the findings contained in this report in further detail. We were encouraged to learn that DOC has started outlining a plan to implement DOI's recommendations, has already scheduled a meeting with the NYPD APD to discuss their process, and that they have outlined further aggressive steps to address these problems. Of particular importance:

- DOC will seek to modify their NOE so that it is in line with the standards in place for the NYPD. This will result in stricter disqualifiers for prior convictions, prior summonses and traffic violations, and prior job terminations. DOC is also prepared to adopt an automatic disqualifier for individuals who have previously been terminated from government employment.

- DOC is prepared to adopt an additional disqualifier for individuals who have had prior contact with two or more inmates. Additionally, DOC will use the CIB to listen to recorded phone calls uncovered between applicants and inmates. Candidates will be disqualified based on the nature of these calls.

- DOC will begin using additional investigative tools, including running full credit report checks for applicants. DOC will also use databases to check for

22

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 324 of 353

b031

additional phone numbers, social media sites, and other things that candidates may have not reported in their application.

- DOC will implement a formal training program for staff assigned to the AIU and responsible for screening candidates. This training program will cover not only interview techniques and database training, but staff will also be trained by DOC's CIB to learn about gang affiliation.

- DOC will enhance the oversight of hiring decisions. Specifically, a "disapproval" decision by anyone in the hiring process can no longer be unilaterally overturned. Additionally, DOC will enhance the review process for probationary officers, before they become tenured.

We are encouraged by DOC's prompt response to these findings and will continue to monitor the implementation of these and all of the recommendations contained in this report.

## VI. Conclusion

DOI's investigation has demonstrated that significant flaws in AIU's hiring system have contributed to the hiring of corrupt COs. DOI discovered that poor recruitment efforts, inadequate training of AIU investigators, and a deficient applicant evaluation process have all contributed to serious problems within AIU, and ensured that DOC is not meeting its goal of hiring "the most qualified" individuals to become COs. Although DOC has taken some initial steps to remedy this problem, the findings of this investigation conclusively demonstrate that DOC must continue to reform its hiring process. The people entrusted with the care and custody of the City's inmates are essential to any plan to reform its jails. Finding quality candidates to fill this role, and ultimately ensuring that quality candidates are available for promotion to higher ranks, begins with AIU.

In order to achieve the desired goal of a safe and corruption free jail system, DOC must hire applicants with the strength of character to handle the stress of the demanding job of a CO and the integrity required to reject the temptations of corruption. COs must consistently ensure the safety of inmates without resorting to excessive force, refuse to accept bribes for smuggling contraband, and enforce DOC regulations without favor to any particular group of inmates. Therefore, AIU must improve its vetting process to screen for corruption vulnerabilities unique to DOC. Particularly, screening for prior associations with inmates, gang affiliation, and prior arrests or misconduct indicative of poor moral character is of paramount importance. DOC must also consistently monitor any CO that, while ultimately hired, showed signs of corruption vulnerabilities during the screening process. Quick implementation of these recommendations will improve the quality of the men and women who will be tasked with the immense challenge of reforming the City's jails.

23

Case 1:26-cv-00914-DEH-SN     Document 52     Filed 03/25/26     Page 325 of 353

Joseph Ponte's Biography - The Voter's Self Defense System - Vote Smart

Page 3 of 5

b032

- Appointed, Commissioner of Corrections, State of Maine, January 24, 2011

## Caucuses/Non-Legislative Committees (#)

- *No caucus information on file.*

## Professional Experience (#)

- Warden, Pahrump County, Nevada Southern Detention Center, Corrections Corporation of America, 2006
- Administrator, Shelby County Jail, Memphis, Tennessee, 2001
- Administrator, Union County, New Jersey State Prison, 1996
- Head, East Coast Operations, Cornell Corrections Corporation, 1992
- Assistant Warden, Walpole, Massachusetts State Prison, 1960
- Correctional Officer, Massachusetts Department of Corrections, 1969

## Religious, Civic, and other Memberships (##)

- *No organizational membership information on file.*

Site Search Form

| Search site... | SUBMIT |

## About Vote Smart

- Background (/about)
- Board (/about/board)
- Staff (/about/staff)
- Advisors (/about/advisors)
- Finances (/about/finances)
- Jobs (/jobs)
- News Room (/media)
- Contact Us (/about/contact)

## WAYS TO HELP

- Donate (/donate?utm_source=votesmart&utm_medium=bottomnav&utm_campaign=donate)
- Volunteer (/volunteer?utm_source=votesmart&utm_medium=bottomnav&utm_campaign=donate)
- Ambassador (/ambassadors)
  (/ambassadors)
- (/ambassadors)Leave a Legacy (/legacy)
  (/legacy)
- (/legacy)Internships (/internships)

## EDUCATION

- Government 101 (/education/government)
- For Teachers (/education)

b033



# New York City Department of Investigation

# Persistent Problems in the Hiring of City Correction Officers

**MARK G. PETERS**
**COMMISSIONER**

Dana A. Roth
Inspector General for the Department of Correction

May 2018

b034

## I.   Executive Summary

The New York City Department of Investigation (DOI) has conducted a year-long probe of the City Department of Correction's hiring procedures for Correction Officers (COs), finding that serious problems continue to plague the Applicant Investigation Unit (AIU) within the Department of Correction (DOC). These findings are especially troublesome in light of DOI's 2015 Report that examined the same issue and uncovered similar hiring vulnerabilities that allowed underqualified individuals and individuals with serious arrest records and gang affiliations to become COs. Most significantly, this investigation, a follow up to the 2015 Report, found that while DOC stated it would implement DOI's 2015 recommendations to improve and strengthen DOC's hiring process, in fact, DOC did not implement some recommendations and only partially implemented others.

In this investigation, DOI examined AIU files for recently hired COs from the January, June and December 2016 classes and found that many of the same vulnerabilities found in DOI's 2015 investigation continue to exist. DOI's investigation found that for the files reviewed of COs hired in 2016, after DOC claimed it had implemented the recommendations DOI called for in 2015, over one-quarter of these COs continued to have red flags that should have precluded their hiring. For example, DOC hired:

- A candidate that DOC knew was previously employed by the New York State Department of Correction and Community Supervision (DOCCS) and had left his employment after he had an inappropriate relationship with an inmate (the candidate's file contained a report from DOCCS).

- A candidate that DOC knew had previously been arrested on charges related to domestic violence (the candidate's file contained the candidate's rap sheet, and the Court's Certificate of Disposition).

- A candidate that DOC knew had previously been arrested for criminal possession of a weapon and harassing a fellow worker at a prior job (the candidate's file contained the Court's Certificate of Disposition).

- A candidate who, prior to applying to be a CO, had made multiple visits to inmates with gang affiliations and failed to list those inmate visits as required in the application submitted to DOC. DOC visitor records clearly demonstrated the visits.

1

E122

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 328 of 353

One of the candidates hired with red flags has since been arrested by DOI as part of its ongoing investigation into prison contraband smuggling. Other candidates remain employed by DOC.[1]

This investigation underscored the critical need for DOC not only to accept, but also to actually implement the recommendations DOI has issued that would strengthen DOC's hiring process and help to close multiple vulnerabilities that are allowing individuals with serious integrity issues to be hired in the City's jails. Specifically, DOC should now implement the following recommendations from DOI's 2015 Hiring Report:

- DOC should have a more thorough and standardized applicant review process; the application and review processes should be computerized;

- DOC should implement in-house training for investigators in investigative and interview techniques that is relevant to recruiting and evaluating COs, and have a written AIU investigator manual;

- AIU investigators should use Securus[2] and other law enforcement and public databases as investigative tools and as collateral checks on applicants;

- DOC should engage in a more rigorous review of the psychological testing presently employed; decisions by supervisors, especially the Director and Deputy Commissioner of AIU, should be more thoroughly explained in writing; and finally

- If DOC is going to continue to hire applicants who are considered vulnerable to corruption, DOC should have a system in place to proactively monitor those applicants.

Furthermore, this investigation also found that while the above recommendations are crucial to improving hiring protocols, AIU has yet to determine ideal staffing for its workload. DOI recommends that DOC review its AIU staffing, including staffing sufficient personnel and supervisors to thoroughly investigate and vet candidates, and report its results back to DOI.

DOC must immediately implement these policy and procedure recommendations.

---

[1] The names of those who remain employed have been withheld to protect the integrity of DOC's disciplinary process.

[2] DOC inmate calls were previously recorded and maintained on DOC's Inmate Financial Commissary Management System (IFCOM). Beginning around March 2015, DOC began recording and maintaining recorded inmate calls on a secure call platform through Securus Technologies (Securus).

2

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 329 of 353

b035

## II.   Summary of DOI's 2015 Hiring Report

### i.   DOI's 2015 Findings and Recommendations

DOI's 2015 Hiring Report highlighted the need for reform in DOC's hiring practices. DOI discovered that out of the over 150 files of then-recently hired COs reviewed: 10 COs had more than one arrest; 65 COs' psychological exams raised concerns about their ability to perform the job duties; 79 COs had friends or relatives who had been incarcerated (a number of whom had significant contact with inmates over DOC phone calls that AIU failed to follow up on); 54 COs files failed to show the "good character and satisfactory background" of a correction officer; and 25 COs lacked the "good character" listed on the New York City Department of Citywide Administrative Services' (DCAS) Notice of Examination (NOE), which is also required by DOC.[3]

Furthermore, through review of the 2014 files, interviews with DOC staff, and site visits, DOI identified systemic problems that fostered an environment in which many applicants with significant red flags were nonetheless hired. For example, DOI found that DOC's AIU did not properly train its staff to handle candidate screenings, and did not have a written manual describing its investigative strategies and procedures. AIU staff failed to evaluate the severity of red flags when they were discovered, and simply missed other red flags altogether. AIU did not use basic investigative tools, including running credit checks and verifying personal information through public record database checks such as LexisNexis or CLEAR (a law enforcement database). AIU utilized an inefficient pen and paper application questionnaire and submission system.

Additionally, AIU rated all candidates on a scale of 1 to 5, but DOI found AIU staff demonstrated confusion on whether "1" or "5" was the best score and that 90 percent of candidates were rated at a "3," making the system effectively useless. In 12% of the files reviewed by DOI, the AIU Director excused serious red flags without adequate explanation, as isolated incidents, or as youthful indiscretions. AIU had no system in place to detect gang affiliations among applicants, nor did AIU staff cross-reference applicants with DOC's Visitor Express database to uncover connections between applicants and their incarcerated friends or family. AIU staff further failed to run applicants' phones numbers in the inmate telephone system. When an applicant's number was found to have been contacted by an inmate, AIU staff often failed to review recorded phone calls, despite their availability. DOI found DOC did not continue to proactively monitor applicants who were hired but considered vulnerable to corruption. Finally, DOI found DOC did not have a meaningful CO recruitment strategy, an advertising campaign, recruitment pamphlets, a functioning

---

[3] DCAS puts out Notices of Examination to fill civil service job vacancies. The NOE for COs does not define the term "good character." DOC should request that in the NOE for COs, DCAS include a definition, which likely would provide significant guidance as to the traits that a candidate needs to become an exemplary CO.

3

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 330 of 353

b037

recruitment website, or any programs to reach out to college students interested in careers as COs.

As a result of the foregoing findings in DOI's 2015 Hiring Report, DOI made a number of policy and procedure recommendations to DOC, including expanding recruitment outreach, adopting automatic disqualifying factors, increasing use of the inmate phone system to cross-check applicants' phone numbers, and implementing a system to monitor applicants who were hired but considered vulnerable to corruption.

ii.    DOC's 2015 Response to DOI

In response to DOI's 2015 Hiring Report, DOC agreed to adopt most of DOI's recommendations and reported that they began implementing the requested policy changes in stages. DOC stated that they revamped their external marketing to attract qualified applicants. To that end, they showcased DOC's specialized units to help market DOC to potential candidates, and participated in recruiting events.

DOC also reported they adopted in-house automatic disqualifiers related to the following areas: employment, felony and domestic violence misdemeanor convictions, and total numbers of criminal court summonses and driving record violations.[4] DOC also reported that they provided the AIU investigators with access to various web-based investigative tools, including IFCOM, upon their appointment to the unit. DOC partially accepted DOI's recommendation that it computerize the process; it reported AIU would use an electronic system to track applicants' appointments and documents submitted through the hiring process, but AIU's candidate files would remain paper-based. DOC reported AIU's Psychological Unit would establish a tiered system of review, whereby investigators' findings would be initially reviewed by a member of AIU's Psychological Unit, and finally by AIU's Executive Director or Deputy Commissioner. According to Dr. Christopher Sbaratta, Assistant Director of AIU's Psychological Unit, he and two colleagues established this system in August 2015, in time for the 2016 classes of incoming COs. DOC further reported that AIU's Executive Director or Deputy Commissioner would provide a written summary on an applicant's file, whether for approval or disqualification. DOC stated that AIU proposed a monitoring system for probationary COs who were hired but identified as "questionable" during their background investigation. DOC reported AIU investigators would be required to take an in-house training course. AIU also implemented a dedicated Field Team Unit to conduct site visits to candidates' homes and neighborhoods.

---

[4] These disqualifiers are enumerated in DOC's Response to DOI's 2015 Report, attached in the Appendix.

4

### III.   DOI's 2018 AIU Follow-Up Investigation

#### i.   DOI's Arrest of CO Brown Revealed DOC's Misrepresentation that it Had Implemented DOI Recommendations

In December 2016, less than a year after he was hired, DOI arrested probationary CO James Brown at the Otis Bantum Correctional Center (OBCC) front gate after a DOI K-9 alerted to the presence of contraband on his person. Probationary CO Brown was transporting alcohol camouflaged in an iced tea bottle, and eight Ziploc bags containing tobacco and marijuana concealed in his underwear. He was one of the 665 recruits in DOC's January 2016 academy class. After his arrest, DOI reviewed probationary CO Brown's applicant file and found significant red flags that should have precluded his hiring.

First, probationary CO Brown had a spotty employment history. In 2001, the City Parks and Recreation Department terminated him for excessive lateness, and in 2004, he resigned from the United States Park Police, having failed a probationary evaluation.

Second, during his psychological examination, probationary CO Brown falsely stated he was not delinquent on child support payments. DOI interviewed CO Brown post-arrest and he indicated he had significant debt and defaults. Indeed, when DOI investigators questioned him following his December 2016 arrest, probationary CO Brown stated his reason for attempting to smuggle the contraband into OBCC for inmates was because he had been having great financial difficulty, due in large part to owing approximately $8,000 in child support. The information collectively detailed above should have prevented CO Brown's hiring, especially in light of the hiring reforms DOC said it had implemented. DOC's reforms should have flagged CO Brown but failed to do so, illustrating the same flaws DOI identified.

CO Brown's arrest, coupled with other DOI investigations into probationary COs, raised suspicions that DOC had not adopted all of DOI's recommendations, and was not adhering to the NOE's specific factors as causes for disqualification which would have covered several of the red flags in CO Brown's file.[5]

---

[5] The full list of factors includes: (a) arrest record or conviction of an offense, the nature of which indicates lack of good moral character or disposition towards violence or disorder; (b) repeated arrests or convictions of an offense, where such convictions or arrests indicate a disrespect for the law; (c) discharge from employment, where such discharge indicates poor behavior or an inability to adjust to discipline; (d) dishonorable discharge from the Armed Forces; (e) conviction of petit larceny; and (f) conviction of a felony or domestic violence misdemeanor. Under the "Penalty for Misrepresentation" section of the NOE, any intentional misrepresentation on the application or examination, even after appointment, may result in disqualification. Probationary CO Brown had been discharged from employment, and included several intentional misrepresentations on his application, either of which should have disqualified him from being hired as a CO.

5

Case 1:26-cv-00914-DEH-SN   Document 52   Filed 03/25/26   Page 332 of 353

b039

### ii.    DOI Review of 2016 DOC Probationary CO Applicant Files

DOI reviewed a random sample of 291 candidate files for the January, June, and December 2016 classes.[6] For each class, DOI used the factors set out in the NOE, along with DOC's in-house automatic disqualifiers. DOI's review concluded that 88 of the 291 candidates, equaling more than a quarter and almost a third of the files DOI reviewed, should not have been hired or should have been monitored after hire.

DOI reviewed 102 files of the 665 total number of files for candidates appointed to the January 2016 CO class. Twenty-seven presented significant red flags that either should have precluded their hiring outright or required follow-up or monitoring. Twenty-seven of the 103 candidates indicated a past employment termination. Forty-two had friends and relatives who were or had been incarcerated. Twenty-seven candidates had at least one prior arrest; six had been arrested more than once. One of the candidates who reported multiple arrests prior to his appointment, including one for harassment, was subsequently arrested again for assault and harassment after starting with DOC. That CO is still an active employee with DOC (although his probationary period was extended).[7]

In one case, AIU did conduct a follow-up investigation after hiring a probationary CO. During his background investigation, the candidate disclosed he was previously employed with DOCCS and resigned because his long commute led to child care issues. However, a re-review of his file during the follow-up showed DOCCS' documented response was in the file, and contained information contrary to information the candidate provided. That response reported the candidate had an inappropriate relationship with an inmate after he was found in a female parolee's home, and made false statements to the New York State Office of the Inspector General (NYSIG). It appears the AIU investigator did not address the DOCCS response in the CO candidate's case review sheet (CRS)[8] -- whether by oversight or design is not clear -- and cleared the candidate to be hired by DOC. DOC terminated the probationary CO for his intentional misrepresentation, once it was discovered during the follow up investigation.

DOI reviewed 98 files of the 756 total number of files for candidates appointed to the June 2016 CO class. Thirty-two files presented significant red flags that either should have precluded their hiring outright or required follow-up or monitoring. Thirty-three of the 98 candidates indicated a past employment termination. Thirty-three had friends and relatives who were or had been incarcerated. Another 28 candidates had at least one prior arrest; six had been arrested more than once.

---

[6] In addition to the files selected at random from the three DOC CO classes, DOI also reviewed seven files from recent subjects of DOI investigations.

[7] This candidate's history is discussed in further detail commencing on page 11, Example C.

[8] The CRS is a summary of the AIU investigator's findings regarding the candidate's background investigation.

6

DOI reviewed 91 files of the 950 total number of files for candidates appointed to the December 2016 CO class. Twenty-nine files presented significant red flags that either should have precluded their hiring outright or required follow-up or monitoring. Eighteen of the 91 candidates indicated a past employment termination. Forty-two had friends and relatives who were or had been incarcerated. Twenty-eight candidates had at least one prior arrest, seven had been arrested more than once.

**Summary Table of DOI Review of 2016 CO Candidate Files[9]**

| | | Correction Officer Class | | |
|---|---|---|---|---|
| | | January 2016 Class Size: 619 (102 files reviewed) | June 2016 Class Size: 156 (98 files reviewed) | December 2016 Class Size: 950 (91 files reviewed) |
| **DOI Findings** | **Significant Red Flags[10]** | 27 files or 26% | 32 files or 33% | 29 files or 30% |
| | **Past Employment Termination** | 27 files or 26% | 39 files or 30% | 18 files or 19% |
| | **Incarcerated Associates** | 42 files or 40% | 25 files or 73% | 42 files or 46% |
| | **Prior Arrests** | 27 files or 26% | 28 files or 29% | 28 files or 30% |

iii.    **DOC's Ongoing Vulnerabilities Regarding AIU Hiring Procedures**

DOI's 2017 review revealed that AIU's hiring procedures and policies remain vulnerable. As demonstrated above, DOI found AIU investigators often do not thoroughly investigate applicants' backgrounds. AIU staff often approved candidate files based on self-reported information, and did not do independent, collateral checks to corroborate that information, simply to meet DOC's time constraints, based on interviews with staff. AIU's lack of field visits and failure to obtain third party

[9] The percentages are greater than 100% for each of the January, June, and December 2016 classes because there were multiple findings for some of the candidate files reviewed.

[10] DOI defines a significant red flag to be an explicit, objective violation of NOE's or DOC's automatic disqualifying factors (detailed in Appendix), or, more subjectively, a candidate having multiple or a combination of factors, including prior criminal arrests, past employment termination, incarcerated associates, poor driving record, and insufficient college credits (a single deficiency in any of those criteria may not be sufficient to preclude hiring).

7

employment verifications were referenced in the *Nunez* Independent Monitor's[11] Reports as potential problems.

Through interviews with several AIU personnel, including AIU then-Executive Director – now Assistant Commissioner - Dr. Larry Johnson, DOI determined AIU was significantly backlogged on conducting field visits for CO candidates. Dr. Johnson acknowledged there were only four investigators assigned to the Field Team Unit and the unit wasn't large enough to handle the amount of work allotted. DOI's arrest of a probationary CO in December 2016 for contraband smuggling, referenced in Section III, above, shows just how important field visits are to assessing a candidate's suitability. Assessing appropriate levels of staffing, including supervisory personnel, to thoroughly investigate candidates is of paramount necessity.

The Fourth Report of the *Nunez* Independent Monitor[12] found it was reasonable, and DOI agrees, for AIU to continue with a candidate's appointment without third party employment verifications if the rest of the candidate's background appears spotless. However, DOI found AIU frequently failed to wait for third-party employment verifications when the candidate reported being terminated or resigning in lieu of termination from a past employer, circumstances that blemish a candidate's record and can be disqualifying per NOE's specific factors. If a candidate reported being terminated from a past employer, especially if it was fairly recent and close to DOC's background investigation, AIU should make every effort to contact that candidate's employer for a collateral check.

DOI found AIU still does not verify personal information through public record databases, such as LexisNexis or CLEAR. These public record databases provide investigators with a detailed listing of a person's past and present addresses and telephone numbers, and are useful in ascertaining objective and truthful information. DOI also found AIU infrequently obtains New York City Police Department (NYPD) paperwork to corroborate a candidate's description of police contacts and AIU rarely contacts outside correctional institutions, including DOCCS, to obtain documentation

---

[11] As part of a November 1, 2015, consent judgment in the federal class action lawsuit *Nunez v. City of New York et al.*, Case 1:11-cv-05845-LTS (SDNY), entered in the Southern District of New York, the court appointed Independent Monitor Steven J. Martin to oversee and report on DOC reforms intended to prevent use of unnecessary and excessive force, protect inmates from inmate-on-inmate violence, and prevent inappropriate placement of 16- to 18-year-old male inmates in punitive segregation for excessive periods of time. The *Nunez* Independent Monitor found AIU's background checks were largely adequate. However, the Independent Monitor's focus was on whether or not AIU reported it had conducted checks, rather than whether those checks occurred or resulted in proper hiring decisions.

[12] This report covered the monitoring period from January 1, 2017 through June 30, 2017, and can be found at
https://www1.nyc.gov/assets/doc/downloads/pdf/Fourth_Report_Nunez_Independent_Monitor_10.10.17.pdf.

8

b042

and inmate phone calls, if applicable, when a candidate notes a past or present incarcerated associate at that institution.

At present, and as noted in the *Nunez* Independent Monitor's Third and Fourth Reports, AIU still lacks a written AIU investigator manual, another tool to establish standardized, thorough and objective hiring investigations. By contrast, the NYPD has written policy and procedures that provide its investigators with guidance relating to the standards to be used while conducting an investigation, what information should be collected, and how the information should be documented in candidate files. Without a comprehensive investigator manual and standardized background investigation specific training, AIU investigations are inconsistent and hiring decisions are subjective.

DOI's review found that AIU files are still paper-based and, as a result, many are incomplete. For example, if the file was computerized, it could be designed so that an applicant could not finalize an application without finishing every question. DOI found that candidates oftentimes failed to completely fill out the screening sheet and application questionnaire booklet and that AIU investigators failed to address the omissions. As previously addressed in DOI's 2015 Hiring Report, errors in the application questionnaire booklet still appear uncorrected, with page 17 of the booklet telling CO applicants that they must adhere to the NYPD's Patrol Guide if appointed to the "New York City Police Department."

Although DOI found that DOC implemented a "New Investigator Training Plan" for AIU investigators, its curriculum devoted several weeks to subjects such as conducting a compelled statement pursuant to Mayoral Executive Order, and medical reports and Medical Examiner consults, training not applicable to conducting background investigations.

While DOC implemented a monitoring system for probationary COs who were hired but identified as "questionable" during their background investigation, DOI determined that this system entailed a mere cursory review of all candidates approximately three months prior to expiration of probation (probation is generally 24 months). This undercuts the effectiveness of consistent and ongoing monitoring of truly problematic candidates.

DOI's recent review of CO candidate files also found that, although Dr. Larry Johnson and then-Deputy Commissioner Errol Toulon did complete summaries in the CRS, they were generic and were not indicative that the author had reviewed the full files.

9

## IV. Specific Hiring Failures as a Result of DOC's Flawed Hiring Practices

In January 2017, former Deputy Commissioner Toulon informed DOI that under Commissioner Joseph Ponte, the DOC Administration had been pressuring AIU to process larger academy classes in a shorter amount of time than had previously been done. Although AIU increased the staff size and number of investigators from 2014, in 2016, the average number of background investigations per investigator also increased. Since that time, in 2017 and 2018, the average number of files per investigator has decreased. However, DOI still sees the same issues in 2017 and 2018 (DOC hiring candidates who are deficient and cannot make it through their probationary period without being reprimanded, modified, administratively punished, or terminated), showing that there is a problem in practice and supervision that still needs to be rectified.

DOI has not conducted an intensive review of DOC's hiring practices for the 2017 and 2018 classes, but when probationary COs of those classes have been administratively or legally charged, and DOI has reviewed their applicant files, some files contain red flags that should have been addressed. DOI recommends DOC to conduct the same or similar type of review for their 2017 and 2018 classes that DOI conducted for the 2016 classes, and to report their findings back to DOI.

Former Deputy Commissioner Toulon reported concern that DOC pressure to hire increasingly large classes was leading AIU to hire candidates who otherwise would not have cleared the screening process. DOI spoke with several AIU investigators who corroborated Toulon's information. DOI's review found that in order to meet the new time constraints, investigators were relying on candidates' self-reported information without obtaining corroboration through objective sources, checking boxes on the checklist AIU developed without completing the required tasks, and submitting files for closure without obtaining essential information.

Additionally, the individual investigations DOI has conducted indicate that from the end of 2016 to present, there has been an increase in the number of allegations against probationary COs, some of which have resulted in arrests and terminations. While increased allegations against probationary COs may be partially explained by the fact there are simply more probationary COs being hired, DOI investigations have found these allegations also reflect the continued hiring of problematic probationary COs, who are susceptible to corruption hazards due to deficiencies that were overlooked during the hiring process, and otherwise should have excluded them from the applicant pool.

10

E131

b044

## V.   Examples from Recent DOI Investigations[18]

a)    Probationary CO ▮▮▮▮▮▮▮▮▮▮▮ (January 2016 class) was arrested on August 3, 2017 for Strangulation in the Second Degree, a class D felony. In her background file, probationary CO ▮▮▮▮ listed two prior arrests, one in 2010 for driving with a suspended license, the other in 2012 for shoplifting. She reported being employed by a police department in Georgia at the time of both arrests, but AIU did not make contact with this previous employer prior to hiring her. Probationary CO ▮▮▮▮'s background file also showed she had four accounts in collection, and her license was suspended in 2014. According to NOE's and DOC's criteria, she should not have been hired. A review of her background file showed on the two occasions (in the screening sheet and in the application questionnaire booklet) probationary CO ▮▮▮▮ was asked to list her social media accounts; she left those sections blank. AIU never addressed the omissions, and should have. Nevertheless, AIU reported an investigator reviewed probationary CO ▮▮▮▮'s Instagram and Facebook accounts, and found no derogatory information (the background file does not set forth the name of the social media accounts the investigator checked, if indeed the check was done, nor were there any printouts of the accounts to reference for comparison). However, the NYPD complaint report associated with probationary CO ▮▮▮▮'s arrest did list her Instagram account name, which DOI investigators reviewed and observed the notation "Loc Nation" and two pitchforks, references to possible Crip gang affiliation. DOI could not determine whether the gang-related red flags found after her 2017 arrest were present in her social media accounts during her DOC background investigation due to the lack of specificity in the AIU file. Because of the 2017 arrest, DOC terminated probationary CO ▮▮▮▮ on November 11, 2017.

b)    Probationary CO ▮▮▮▮▮▮▮ (January 2016 class) was previously employed by DOCCS. He claimed that he resigned from DOCCS because his long commute led to child care issues. DOC conducted a follow-up review of probationary CO ▮▮▮▮'s file and found DOCCS' documented response in it, which refuted probationary CO ▮▮▮▮ claims. DOCCS' response stated probationary CO ▮▮▮▮ had been found in a parolee's home, had had an inappropriate relationship with an inmate, and made false statements to the NYSIG. There is no indication the AIU investigator addressed DOCCS' response in candidate ▮▮▮▮ a case review sheet and cleared the candidate to be hired by DOC. DOC terminated probationary CO ▮▮▮▮ for his intentional misrepresentation October 19, 2017.

c)    Probationary CO ▮▮▮▮▮▮ (January 2016 class) had two arrests prior to being hired; one for driving under the influence, and one for aggravated harassment related to a domestic dispute with his wife. On March 8, 2017, after he was hired, he was arrested (off duty) for assault and harassment related to another

---

[18] All names have been redacted except in the one case where DOI arrested the CO.

11

b045

domestic dispute with his wife.[14] A review of his background file indicates that in addition to the two reported arrests, the candidate's credit check showed that several of his accounts were in collection. Probationary CO ▓▓▓▓ also reported two incarcerated associates, his brother and a friend. He had visits with and calls from his brother from 2012 - 2015, and stated that his brother was transferred to state prison. AIU investigators made no attempt to obtain visitor logs, documents, or recorded calls from DOCCS. Visitor Express also showed two visits to his friend in 2011. Thus, with all of these issues considered together, according to NOE's and DOC's criteria (mainly "proof of good character and satisfactory background"), this candidate should not have been hired. Probationary CO ▓▓▓▓ remains employed.[15]

d)     Probationary CO ▓▓▓▓▓▓▓ (January 2016 class) was hired despite his failure to have the 39 college credits required by the NOE. However, his background file contains a notation that an AIU investigator verified official educational transcripts showing that probationary CO ▓▓▓▓ met NOE's college credit requirement. Additionally, there was a discrepancy by the AIU investigator about how many credits the candidate actually earned. In one section of the CRS, the AIU investigator reported probationary CO ▓▓▓▓ had 52 credits, and in another section, the AIU investigator reported probationary CO ▓▓▓▓ had 61 college credits. The Executive Director and Deputy Commissioner both approved the candidate for hire. In his decision section, the Executive Director noted "[t]here is evidence of good vocational and educational skills with no difficulties in either area."[16] In reality, the only college transcript in the file indicated probationary CO ▓▓▓▓ earned only 14 credits. Thus, according to NOE's and DOC's criteria, this candidate should not have been hired. Probationary CO ▓▓▓▓ remains employed.

e)     Probationary CO ▓▓▓▓▓▓▓ (January 2016 class) was the subject of an administrative investigation conducted by DOC's ID in regards to excessive use of force. ID concluded probationary CO ▓▓▓▓ utilized unnecessary force against an inmate, and did not provide an accurate account of the incident. As a result, ID recommended CO ▓▓▓▓'s probation be extended six months. A review of her background file indicates that in 2006, she was arrested for menacing, criminal possession of a weapon, and harassment after a fight in the bathroom with a co-worker. The case was ultimately dismissed, but she was terminated from her employment following the incident. Probationary CO ▓▓▓▓'s background file further showed her salary was garnished to repay defaulted student loans, and in 2015, she was issued a summons for boarding a bus without a ticket. According to NOE's and DOC's criteria (mainly "proof of good character and satisfactory

---

[14] When a member of service is arrested off-duty, the investigation goes to DOC's Investigation Division (ID), which then may refer the member for disciplinary proceedings.

[15] ID originally sought to terminate probationary CO ▓▓▓▓. However, on January 9, 2018, ID/Correction Intelligence Bureau Acting Deputy Commissioner Antonio J. Cruz reviewed probationary CO ▓▓▓▓'s case and recommended no action. First Deputy Angel Villalona recommended that CO ▓▓▓▓'s probation be extended six months, to September 13, 2018. Neither Cruz nor Villalona explained their decisions.

[16] ▓▓▓▓ CRS, page five, dated January 2, 2016.

b046

background" NOE designation), this candidate should not have been hired. Probationary CO ███████ resigned on January 9, 2017.

f)      Probationary CO ████████████ (June 2016 class) also failed to meet the college credit threshold. In his background file, the AIU investigator noted probationary CO ██████ met the NOE requirements. However, the only college transcript in the file indicated he had 49 attempted credits, but earned only 13. The Executive Director and Deputy Commissioner both approved the candidate for hire. In his decision section, Executive Director Dr. Johnson noted "[t]here is evidence of good vocational and educational skills with no difficulties in either area."[17]   In addition, probationary CO ██████'s Department of Motor Vehicles abstract indicated he had eight suspensions from 2012 to 2015. As per DOC's response to DOI's 2015 Hiring Report, one of the added in-house automatic disqualifier was "[m]ore than five (5) suspensions on different dates" and "[m]ore than two (2) suspensions on different dates" within less than five years.[18]   Thus, according to NOE's and DOC's criteria, this candidate should not have been hired. Probationary CO ██████ remains employed.

g)      Probationary CO ████████ (June 2016 class) initially was not recommended for hire by the AIU investigator. One of the reasons was she was not truthful on her application; she disclosed only one incarcerated associate until IFCOM results revealed calls to her telephone number by other inmates (including her child's father). In addition, on her CRS, probationary CO ████ denied having ever been disciplined. However, a DOI check with the New York City Department of Homeless Services (DHS) (her employer at the time of her background investigation) indicated she currently had an open matter in the disciplinary unit. A review of the background file showed AIU never followed up with DHS about that pending disciplinary matter. The CRS also noted she failed to appear for her initial appointment with the AIU investigator. DOI investigators found Securus logged attempted calls to a telephone number listed in the probationary CO ████'s AIU application questionnaire booklet, and both attempted and completed Securus calls (from incarcerated inmates) to her listed cellphone number. A review of probationary CO ████'s background file revealed AIU conducted an IFCOM search but failed to conduct a Securus check, and therefore did not ask her about these inmate calls and possible additional incarcerated associates. Thus, according to NOE's and DOC's criteria, this candidate should not have been hired. Probationary CO ████ remains employed.

h)      Probationary CO ██████████████ (December 2016 class) was found to be having an unduly familiar relationship with an inmate in her facility, and received 39 calls to her home telephone number from the inmate after she was hired. A review of her background file indicated the AIU investigator found IFCOM hits to that same telephone number in 2013 and 2014. Probationary CO ██████ reported she did not

---

[17] ██████ CRS, page five, dated April 28, 2016.
[18] See Appendix, at page three.

13

E134

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 340 of 353

b047

know the inmate placing the calls and the home telephone number wasn't issued to her until 2014. The AIU investigator accepted this response at face value. Probationary CO [REDACTED] also had calls to her cellphone number from 2012 to 2014 from an inmate listed in her Declaration of Incarcerated Associates form and reported visiting him as well. Probationary CO [REDACTED] listed two additional incarcerated associates -- her brother in Alexandria City Jail, and a friend in Augusta Correctional Center, who she reported visiting and from whom she received calls. The AIU investigator made no attempts to contact those jurisdictions to get phone calls or visitor information during the background investigation. Although this doesn't necessarily mean that probationary CO [REDACTED] should not have been hired based on the NGE's and DOC's criteria, her extensive communication with incarcerated associates is a good example of a potential corruption hazard. She should have been proactively monitored after being hired. Probationary CO [REDACTED] was terminated from employment on August 1, 2017.

i)    Probationary CO Torray Riles (December 2016 class) was arrested on January 21, 2018, and charged with Promoting Prison Contraband in the Second Degree, a class A misdemeanor. On that date, DOI's K-9 Unit alerted on probationary CO Riles as he entered the front gate of OBCC. When searched, he produced two medium-sized clear bags containing approximately 26 grams of marijuana he had concealed in his underwear. He also carried a clear backpack with four packs of Newport cigarettes (DOC rules prohibit COs from bringing in more than one pack at a time). A review of his background file showed probationary CO Riles was arrested in April 2016 for assault, menacing, and harassment. He had two driver's license suspensions in 2013 and 2014. Although probationary CO Riles listed no incarcerated associates, in April 2015 he received two calls to his previous cellphone number from an inmate. He reported lending his phone to a friend, and denied having any association with the inmate who made the calls. A discrepancy was noted in his CRS – the two phone calls had no duration, but they were forwarded to Correction Intelligence Bureau for further investigation. A review of the calls by DOI investigators revealed there was, in fact, duration to the calls and the conversations suggested that probationary CO Riles was the recipient of the calls, indicating he provided an intentional misstatement to AIU during his background investigation process. Thus, according to NGE's and DOC's criteria, this candidate should not have been hired. On January 22, 2018, probationary CO Riles was suspended, pending termination.

j)    Probationary CO [REDACTED] (December 2016 class) listed contact with her brother in her Declaration of Incarcerated Associates form. However, a review of Visitor Express showed visits as recently as 2015 by probationary CO [REDACTED] to additional inmates, who were not listed in her Declaration of Incarcerated Associates form. Several were gang-affiliated. AIU investigators did not address probationary CO [REDACTED]'s omissions. Probationary CO [REDACTED] reported visits to her brother in upstate prisons, but the AIU investigator never reached out to DOCCS for documentation or phone calls. AIU conducted a search in Securus for the telephone

14

E135

b048

number probationary CO [redacted] reported belonging to her with negative findings. However, DOI conducted a CLEAR check that revealed that probationary CO [redacted] had an additional number that received multiple Securus calls from 2015 to 2016, predominantly by one gang-affiliated inmate who probationary CO [redacted] did not list on her Declaration of Incarcerated Associates form. The nature of the calls corroborate probationary CO [redacted] was the recipient of the calls. Additionally, some conversations contradicted information probationary CO [redacted] provided during her background investigation. For instance, during her background investigation, probationary CO [redacted] denied ever using or abusing controlled substances. However, during one call with an inmate, her statements asserted otherwise, which should have prompted AIU to conduct further checks. If AIU had collateral checks for a candidate's telephone numbers, they might have caught her deception and not hired her. Probationary CO [redacted] intentionally omitted reporting the additional telephone number during her background investigation and, according to NOE's and DOC's criteria, this candidate should not have been hired. Probationary CO [redacted] remains employed.

## VI.   Conclusion and Recommendations

AIU's applicant hiring process remains flawed and deficient despite DOC's statements that it would reform its hiring practices. While DOC accepted DOI's recommendations in 2015, DOC's implementation has fallen short of what is necessary to adequately reform the hiring process. The following 2015 policy and procedure recommendations remain unimplemented or incompletely implemented:

1.   DOC should have a more thorough applicant review process. DOC should adopt a system, comparable to the NYPD's Candidate Assessment Section (CAS), in which each applicant must pass through multiple levels of review, by both civilian and uniformed staff, before being approved by a panel of executives. Failure to adequately review a candidate's application should subject an AIU investigator to disciplinary review.

2.   DOC should create a written manual for AIU, describing its investigative strategies and procedures, and containing the standards to be used while conducting an investigation, the information to be collected, and how to properly document information in candidate files. The investigative manual must clearly set out the factors that constitute automatic disqualifiers, detail how to gather third-party employment verifications, and describe circumstances necessitating field visits. The manual should also have clear guidelines related to reviewing Securus calls (running inmates' calls with candidates' telephone numbers, and clearly delineating responsibility for this task). This, along with a new computerized application processing system, should help ensure that all required information is obtained for every applicant.

15

b049

3. DOC should implement standardized in-house training for AIU investigators tailored to conducting background investigations, including interviewing techniques, understanding the application process, and using social media, computer databases, and other law enforcement tools. In particular, gang identification and disqualifying factors related to gang activity must be part of the training course as this type of affiliation by a CO presents a serious threat to the safety and security of DOC facilities. The NYPD's CAS two-week training course for investigators with follow-up refresher courses provides one effective model.

4. DOC, using the NYPD's CAS system as a model, should computerize its applicant file review system. At present, all AIU files are paper based, and many DOI reviewed were incomplete. DOC should require the screening sheet and application questionnaire booklet be filled out electronically by the applicant, and the CRS be filled out electronically by the AIU investigator. Computerizing the process would force applicants to answer every question in the screening sheet and application questionnaire booklet before they could successfully submit documents to AIU for review, enhance DOC's ability to store and access information, ensure a standard process is followed for every applicant, and require AIU investigators to fill out every section prior to submitting the applicant's file for a supervisor's review. Computerization would enhance DOC's ability to store and access information. Additionally, an electronic application questionnaire similar to that used by NYPD would allow AIU to develop useful statistical information to help guide its hiring practices.

5. DOC should engage in a more rigorous review of the psychological testing presently employed. There must be more communication between AIU background investigators and AIU's psych unit when it comes to possibly conflicting or omitted information provided by the candidate at different stages of the hiring process. It should be mandated that DOC's PsyQ Personal History Report be completed by the applicant prior to the commencement of the background investigation. That way, AIU investigators and AIU psychologists will be in a better position to question applicants on any conflicting information (and possible misstatements or omissions) they might provide.

6. Decisions by supervisors, especially the Director and Deputy Commissioner that overrule the judgment of subordinates, should be explained in writing.

16

b050

7. DOC should have a system in place to proactively monitor applicants who are hired but are considered vulnerable to corruption.

8. AIU should focus on conducting more collateral checks. AIU too often relies on the information provided solely by the candidate.

9. AIU investigators should have access to public record database checks, such as LexisNexis or CLEAR. This will provide the investigators with a way to conduct collateral checks related to information the candidate provides about their current and former residences and telephone numbers. These public record database checks can also provide collateral checks for information related to a candidate's criminal history outside of New York State and their social media accounts (via use of the LexisNexis "Virtual Identity Report").

10. AIU should liaise with the NYPD to obtain paperwork related to arrest and complaint history, police contact, Domestic Incident Report history, etc. A review of the files showed AIU investigators relied on the candidate's description of certain incidents without obtaining paperwork for corroboration.

11. When a candidate discloses associations with incarcerated inmates in other correctional institutions and jurisdictions, including NYS DOCCS, AIU investigators should contact that jail or prison to obtain relevant documentation and phone calls, if applicable.

Implicit in these recommendations is the requirement that where adverse information on a candidate is developed, DOC will act on that information, including not hiring candidates with significant red flags. To the extent this implicit requirement should be made explicit, DOI now does so.

In addition, DOI is issuing a new policy and procedure recommendation:

12. DOC should staff AIU properly to enable investigators to thoroughly investigate and vet candidates. DOC should review and determine what the suitable workload for their AIU investigative staff should be. This review should include allocating supervisory personnel for auditing and spot monitoring, to ensure that background investigations and decisions are appropriate.

DOC reviewed a draft of this report. DOC agreed that AIU will audit and spot monitor background investigations and hiring recommendations.

17

b051

## New York City Department of Correction's Response to the January 2015 Department of Investigation's Report on Hiring Practices

In its report, DOI recommended a series of changes to the hiring process. Specifically, DOI strongly advised the DOC to improve procedures for recruiting, screening, and hiring to ensure it hires the most qualified COs and to invest resources in AIU to ensure that it has the best trained personnel and most effective technology.

A. **DOC needs an aggressive recruitment strategy and clear disqualification standards to improve the applicant pool. DOI made the following recommendations:**

1. **DOC should re-establish its Recruitment Unit and execute a recruitment plan to attract candidates for upcoming civil service exams. In addition, DOC should resume participation in the Law Enforcement Exploring program.**

   In June 2015, the DOC began executing a Recruitment Plan designed to ensure that we have sufficient quantity and quality of Officers.

   Recruitment Plan
   - Revamped DOC external marketing to enhance recruitment efforts:
     - Rolled out a new DOC recruitment website for uniform and non-uniform positions.
     - Created a full scale social media platform (Facebook, Instagram and Twitter) to bolster recruitment efforts.
     - Used external HR tools including DOC LinkedIn, Glassdoor to market the DOC as a quality employer.
     - Launched a full scale print media campaign with Metro Newspaper, NY Times, NY Daily News, NY Post, Newsday, Queens Courier, and other ethnic media outlets.
     - Collaborated with i-Heart Radio to increase the awareness of our November 2015 exam.
     - As a result of the Recruitment team's efforts, approximately 2,761 applicants sat for the November 2015 examination; a rate higher than the past several exams. The next exam periods are January 2016, March 2016, and May 2016. We are currently in negotiations with DCAS regarding scheduling 4 additional correction officer exams for the second half of the 2016.
     - Designed a Human Resources Journal entitled Correction Quarterly which gives potential recruits an overall snapshot of the current state of the agency. Fall issue: http://issuu.com/jointheboldest/docs/oct_cq_mag_1 Winter issue: http://issuu.com/jointheboldest/docs/cqwinter

   - Hired staff to execute this initiative.

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 345 of 353

b062

- o New recruitment team consists of: 12 Uniformed staff and 5 Civilians.

- Improved Processes:
  - o Designed a candidate attrition journey to make the process clear to potential candidates.
  - o Created an exit interview process for candidates that resign from the CO title within 90 days.
  - o Identified the gaps in our current and future workforce and developed a strategic recruitment plan to address these gaps.
  - o Defined and outlined DOC's specialized units to help market DOC to potential candidates.

- Held and participated in multiple events in order to recruit potential candidates.

- The next step in the Recruitment Plan seeks to refine its process while continuing to be progressive and meeting the following objectives that aim to transform the way the agency recruits, selects, and hires staff:
  - o Establish a DOC branded Career Fair tour throughout the 5 boroughs of New York City and on Long Island in 2016.
  - o Create stronger community relations with faith-based institutions and community based organizations across the city.
  - o Launch a DOC Youth Explorers program in partner with selected Department of Education schools.
  - o Meet with DCAS to discuss post exams results.
  - o Develop a survey to monitor the status of probationary officers for retention purposes.

2. DOC should adopt automatic disqualifying factors, including the conviction of certain crimes, with a goal to eliminate unqualified applicants as quickly and efficiently as possible.

   DOC's Applicant Investigation Unit has adopted the following automatic disqualifiers, effective January 2015:

   1. Current Civil Service Law has only five (5) automatic disqualifiers for appointment. Therefore, the DOC established objective criteria for determining the character fitness of candidates by creating a group of "in-house" disqualifiers, similar to the NYPD.
   2. DOC decided to empower the in-house automatic disqualifiers by utilizing the Department of Correction Commissioner's discretion to not hire under the 1 in 3 rule as stated in New York City Civil Service Law Section 61 and in Section 4.7.1 of the Rules and Regulations of the City Personnel Director. The in-house

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 346 of 353

b053

Automatic Disqualifiers are as follows (they are in three (3) important character areas)*[1]:

A. **EMPLOYMENT***
  - Dismissal from employment while a tenured member of a governmental or other public employer.

B. **FELONY AND DOMESTIC VIOLENCE MISDEMEANOR CONVICTION.***
  - Any felony conviction
  - Domestic violence misdemeanor conviction

C. **CRIMINAL COURT SUMMONSES TOTAL***
  - More than FIVE (5) "C" Summonses
  - Less than five (5) years
    - More than three (3) "C" Summonses
  - Less than two (2) "C" Summonses

D. **DRIVING RECORD TOTAL***
  - More than seven (7) moving violations on separate occasions, other than related to employment
  - More than five (5) hazardous moving violations
  - More than five (5) suspensions on different dates
  - More than one (1) license revocation
  - Less than five (5) years:
    - More than four (4) moving violations on separate occasions, other than related to employment
    - More than three (3) hazardous moving violations
    - More than two (2) suspensions on different dates
    - Any license revocation
  - Less than two (2) years:
    - More than three (3) moving violations on separate occasions, other than related to employment
    - More than two (2) hazardous moving violations

---

[1] Symbol represents disqualifiers documented in New York City Police Department's In-House disqualifiers to All Applicant Division Personnel, July 19, 1995, A.P.D. Memo # 143.

E141

b054

    o   More than one (1) license suspension

3. **DOC should expand its list of potential disqualifying factors to include corruption risks unique to DOC including financial instability, inappropriately familiar relationships with inmates, and present affiliation with gang members.**

Effective August 2014, the Applicant Investigation Unit's utilizes the following criminal background-check applications:
- ✓ E-Justice
- ✓ WebCrims
- ✓ Family Watch Dog

A brief description of each application and its use, are as follows:

- **E-Justice:** Investigators utilize this application for integrity check of a Candidate's driver's license, any outstanding Order of Protection or status of Order of Protection. This application is also used to print out the results of fingerprints from the nationwide federal data base. **Benefit:** This application has proven beneficial for preliminary investigation purpose and is vital to the vetting process to cultivate Candidates who fulfill the conditions of employment and are void of criminal records.

- **WebCrims:** This application is utilized by the investigators to determine the status of a Court Case the Candidate may have reported during the Candidate-to-Investigator interview process. WebCrims is also used to check the Court case status of a spouse or family member that reside with the Candidate.
  **Benefit:** This is important to know, especially if the Candidate failed to report this information or the individual in question has felony charges.

- **Family Watch Dog:** This application is utilized to check if the Candidate is a registered sex offender on any level.
  **Benefit:** Ensuring that the Department cultivate the best Candidate and supplying the Department with facts; to make a viable decision regarding the hiring of a Candidate.

Additionally, Investigators are provisioned with the below accounts the day of appointment.
- Email Account
- Full Internet Access
- IFCOM
- IIS w/ VINQ, VINQH, QHIN, VIST

Lastly, DOC is currently procuring a system to run credit checks on applicants.

b055

4. DOC should meet with DCAS to update the language in the Correction Officer NOE. These updates should include any new automatically disqualifying criteria developed by DOC, and be tailored, as necessary, to specific corruption vulnerabilities unique to the agency.

In July 2015, the Recruitment Unit worked with DCAS to revise the job description portion of the notice of exam. Specifically, sections regarding "What The Job Involves", "Special Working Conditions", and a more detailed description of the physical work activities performed and environmental conditions were updated. The changes appeared on the November 2015 and January 2016 exams.

B. DOC must make AIU's candidate screening uniform, thorough, and tailored to the unique corruption vulnerabilities at DOC. DOI makes the following recommendations:

1. DOC should have a more thorough applicant review process. DOC should adopt a system, comparable to the NYPD APD, in which each applicant must pass through multiple levels of review, by both civilian and uniformed staff, before being approved by a panel of executives.

Since DOI has issued its recommendations on DOC's applicant review process, AIU has implemented more stringent standards regarding automatic disqualifications, additional levels of review by the psychological unit, more intensive background investigations through use of additional tools such as IFCOM and credit checks, and a system of tracking the flow of applicant files. Please see responses to questions 2-7 for further explanation.

The changes to AIU have been phased-in during the review period of the last four recruit classes.

- October 2014 Class- 155
- March 2015 Class- 398
- August 2015 Class- 626
- January 2016 Class-631

2. AIU should create a standard detailed checklist identifying all documents that it requires applicants to submit and all AIU investigative steps necessary to complete the background investigation.

Please see attached Checklist created in January 2015.

3. DOC should ensure that all case coordinators are using IFCOM as an investigative tool.

E143

b066

As previously mentioned, every AIU Investigator is provided access to and training on IFCOM upon their appointment to the Unit. It has become a consistently used investigative tool by AUI in conducting background investigations.

4. DOC should implement standardized training for case coordinators in investigative and interview techniques. In particular, gang identification and disqualifying factors related to gang activity must be part of the training course as this type of affiliation by a CO presents a serious threat to the safety and security of DOC facilities.

Effective January 2015, the following DOC in-house Investigative training courses have been implemented.

### New Investigator Training Plan

I. Week 1: Three (3) Full day sessions divided between immediately relevant topics and database familiarization
   a. Day 1: Familiarization with Investigation Division
   b. Day 2: Phases and Documents of an Investigation
   c. Day 3: Documentation

II. Week 2: Case Management and Organization (4 hrs.)
   a. View video in advance of session: 003 *Case Management and File Organization*
   b. Why do we need standardized file organization?
   c. How should a folder be organized?
   d. Vouchering and associated processes
   e. Tracking your work

III. Week 3: Conducting an MEO / formal interviews (4 hrs.)
   a. View video in advance of session: 004 *ID Investigator Training Course on Interviewing*
   b. What is an MEO?
   c. Use immunity
   d. Scheduling an MEO
   e. Preparing for an MEO
   f. Conducting an MEO

IV. Week 4: Confidential Allegations: PREA and Special Considerations for Victims of Sexual Assault (4 hrs.)
   a. View video in advance of session: 010 *Investigating Sexual Misconduct and Abuse*
   b. What is PREA?

b057

    c. What makes the callout and case different?

    d. Impact on interviews

**V.   Week 5: Medical Reports and ME Consults (4 hrs.)**

    a. View video in advance of session: 007 Office of the Chief Medical Examiner (elective video 006 Obtaining and Analyzing Medical Evidence)

    b. Requesting medical records

    c. What to look for

    d. Codes and acronyms

    e. ME consults

**VI.   Week 6: Closing a Case (4 hrs.)**

    a. View video in advance of session: 002 Overview of the Disciplinary Process

    b. Organize all materials and ensure everything is accounted for in final report

    c. Reexamine charges – is everything still relevant?

    d. Agree on charges

    e. Draft MOC, PDR, Facility Referrals and Trials

**VII.   Week 7: Potpourri (4 hrs.)**

    a. SRG

    b. Internet and Social networking

    c. Evidence Analysis

    d. Photographic identification procedures

    e. Securpass

    f. Databases

**VIII.   Week 8: Final Considerations (4 hrs.)**

    a. Current challenges

    b. Case work workshop

    c. Mentoring matchup?

Note: Some weekly sessions for _civilian_ investigators may be extended to 6 hours due to the need for more extensive familiarization with DOC policy, practice, and procedure.

During the four "off" days each week, new investigators are expected to review ID policy and procedure videos and manual (in preparation for upcoming sessions), attend MEO interviews and transcribe related audio, complete facility video reviews, and shadow

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 351 of 353

b058

experienced investigators in their daily operations. Each new investigator will paired with an experienced investigator for the duration of the 7 weeks of follow up training.

5. **DOC, using the NYPD APD system as a model, should computerize its applicant file review system. At present, all AIU files are paper based, and many that DOI reviewed were incomplete.**

AIU's files remain paper-based in conjunction with an electronic tracking system which follows an applicant during the process. It tracks the documents that the applicant has submitted, when the applicant's physical and psychological appointments are scheduled, and what remains outstanding. DOC will continue to assess the use of a computerized system.

6. **DOC must engage in a more rigorous review of the psychological testing presently employed.**

AIU's Psychological Unit uses the same vendor as the NYPD's APD to purchase materials for the psychological testing of correction officer applicants. The testing not only mirrors the same types of exams administered by the NYPD APD, but are the national standard for law enforcement. In effort to enhance the applicant review process, in August 2015, the AIU Psychological Unit established a Tiered System of review. After the collecting the results of both the background investigation and written psychological exam, the results are filtered by Psychology Leadership to a reviewer with the appropriate level of skill and education. Candidates are then sorted by Tier; Tier #1 cases are completed by Examiners and/or Psychologists under supervision of Psychology Leadership. Tier #2 and Tier #3 cases are completed by Psychologists under supervision of Psychology Leadership. This method promotes ongoing training and clinical supervision while expediting candidate evaluation and capitalizing on experience-based distribution of responsibilities.

7. **Decisions by supervisors, especially the Director and Deputy Commissioner that overrule the judgment of subordinates, must be explained in writing.**

Every determination, whether an approval or disqualification made on an applicant's file is now accompanied by a written summary by either the AUI's Executive Director or Deputy Commissioner.

C. **DOC must have a system in place to proactively monitor applicants who are hired but are considered vulnerable to corruption.**

AIU proposed a monitoring system for probationary correction officers identified as 'questionable' due to information learned during the background investigation.

Case 1:26-cv-00914-DEH-SN    Document 52    Filed 03/25/26    Page 352 of 353

- o The monitoring system is triggered approximately 3 months before "questionable" correction officers' probation ends. AIU would contact DOC Human Resource Unit for a master list of probationary officers by class.
- o This Master List would be divided amongst Squad A & B of investigators based on who conducted the initial background check.
  - Some programs/background checks can be ran again to ensure candidate compliance.
- o For candidates whom declared knowing and associating with inmates (family and friends):
  - IIS (Inmate Information system)
  - Visitor Express
  - Inmate Lookup Services (ILS)
  - IFCOM (phone dump – request updated annual Personnel sheet from facility – which would show any new numbers and/or addresses)
- o Additionally, general inquiries should be conducted:
  - Unified Court system (any undisclosed new arrests)
  - Order of Protection
  - Drivers license check (suspension, unpaid tickets and etc.
- o For candidates who had a questionable background (possible gang affiliation):
  - Social media lookup (Facebook, Instagram, Snapchat and etc.)

E147

b060



The City of New York
Department of Investigation
MARK G. PETERS
COMMISSIONER

80 MAIDEN LANE
NEW YORK, NY 10038
212-825-5900

Release 01-2015
nyc.gov/html/doi

**FOR IMMEDIATE RELEASE**
**THURSDAY, JANUARY 15, 2015**

**CONTACT: NICOLE TURSO**
**(212) 806-5225**

**BETSY PISIK**
**(212) 825-5931**

### DOI REPORT REVEALS BROKEN RECRUITMENT SYSTEM AT RIKERS ISLAND AND DEEPLY FLAWED APPLICATION PROCESS FOR NEWLY HIRED CORRECTION OFFICERS

*More than a third of new officers hired despite significant red flags*
*DOC commits to aggressive changes*

Department of Investigation (DOI) Commissioner Mark G. Peters today issued a comprehensive review of the Department of Correction's (DOC) hiring process for correction officers at Rikers Island, uncovering a deeply flawed system in which more than a third of officers were hired despite numerous corruption and safety hazards, including multiple prior arrests and convictions, prior associations with gang members, or relationships with inmates. Equally troubling, the Applicant Investigation Unit (AIU), responsible for screening potential recruits, relied on antiquated and haphazardly filed paper personnel documents and had little to no access to software necessary to perform basic background and credit checks. As a result, DOC has already replaced both its Director and Deputy Commissioner responsible for oversight of the AIU and responsible for the hiring of the applicants DOI reviewed, assigned additional staff to the screening process and committed to an aggressive set of reforms in this area.

DOI Commissioner Mark G. Peters said, "DOI's latest investigation on Rikers Island exposes a shockingly inadequate screening system, which has led to the hiring of many officers that are underqualified and unfit for duty. Applicants with a history of violence or gang affiliations should not be patrolling our jails. Positions as law enforcement officers demand better. We are pleased DOC has listened to our recommendations and is taking the necessary steps, after a decade of neglect, to strengthen its recruitment to attract candidates with only the highest talent and character."

DOC Commissioner Joseph Ponte said, "Improving staff recruitment, training and retention is a key part of my agenda of meaningful reform. My earliest actions as commissioner included providing new leadership for our staff recruiting and training operations. We have subsequently made significant changes to the Applicant Investigation Unit, including many based on recommendations from the DOI. Because at the end of the day, our performance is only as strong as the men and women who fill the posts that keep our facilities operating 24/7."

This report is another piece of DOI's ongoing investigation into criminal activity and civil disorder at Rikers Island. As part of the probe, which began in early 2014, investigators spent over 200 hours interviewing staff, conducting site visits, and reviewing over 75,000 documents related to the hiring process. For this report, DOI

E148